**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:20-CV-230**

CAMERON CAIN-BAARBÉ, *individually and* )
*as the representative of the* ESTATE OF )
ALEXANDER PINCZOWSKI; JAMES )
PALMER CAIN; and HELEN REVELLE CAIN; )
)
RON GREENFIELD; PNINA GREENFIELD; )
LIRON SHALOM GREENFIELD; SHERE )
GREENFIELD; GILI GREENFIELD; and SHYE )
GREENFIELD; )
)
CARYN OR TSADOK ORBACH and URI )
ORBACH, *individually and as the* )
*representatives of the* ESTATE OF EREZ )
ORBACH *and on behalf of their minor children* )
A.O., E.O., and O.O.; EITAN ORBACH; and )
ALON ORBACH; )
)
EYTAN YAIR RUND and TAMAR BRACHA )
RUND, *individually and on behalf of their minor* )
*children* S.A.R., H.H.R., and Y.M.R.; )
)               **COMPLAINT**
NITZACHYA GOLDMAN, *individually and as* )   **(JURY TRIAL DEMANDED)**
*the representative of the* ESTATE OF )
AVRAHAM GOLDMAN; GILA )
NISSENBAUM; NATAN GOLDMAN; MAYA )
GOLDMAN COHEN; SHARON GOLDMAN )
NAJMAN; YOSEF GOLDMAN; ISRAEL )
GORENZKY; and TAMAR CHORESH; )
)
BEATRIZ GONZALEZ, *individually and as the* )
*representative of the* ESTATE OF NOHEMI )
GONZALEZ; JOSE HERNANDEZ; REY )
GONZALEZ; and PAUL GONZALEZ, )
)
Plaintiffs, )
)
v. )
)
THE SYRIAN ARAB REPUBLIC, )
)
Defendant. )

NOW COME Plaintiffs Cameron Cain-Baarbé, individually and as the representative of the Estate Of Alexander Pinczowski; James Palmer Cain; Helen Revelle Cain; Ron Greenfield; Pnina Greenfield; Liron Shalom Greenfield; Shere Greenfield; Gili Greenfield; Shye Greenfield; Caryn Or Tsadok Orbach and Uri Orbach, individually and as the representatives of the Estate of Erez Orbach and on behalf of their minor children A.O., E.O., and O.O.; Eitan Orbach; Alon Orbach; Eytan Yair Rund and Tamar Bracha Rund, individually and on behalf of their minor children S.A.R., H.H.R., and Y.M.R.; Nitzhia Goldman, individually and as the representative of the Estate of Abraham Goldman; Gila Nissenbaum; Natan Goldman; Maya Goldman Cohen; Sharon Goldman Najman; Yoseff Goldman; Israel Gorenzky; Tamar Choresh; Beatriz Gonzalez, individually and as the representative of the Estate Of Nohemi Gonzalez; Jose Hernandez; Rey Gonzalez; and Paul Gonzalez (collectively "Plaintiffs"), by and through undersigned counsel, and, pursuant to Fed. R. Civ. P. 7, hereby brings this Complaint against Defendant the Syrian Arab Republic ("Syria" or "Defendant"), alleging and stating as follows: Plaintiffs, by their counsel, complain of the Defendant, and hereby allege for their Complaint as follows:

## NATURE OF ACTION

1.      This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*., arising from a March 22, 2016 ISIS terror attack in Brussels, Belgium in which 32 people were murdered, including Alexander Pinczowski ("Alexander") and his sister Sascha Pinczowski ("Sascha") ("Brussels Terrorist Attack"), a March 19, 2016 ISIS terror attack in Istanbul, Turkey in which Ron and Pnina Greenfield and Nitzhia Goldman were seriously injured and Abraham Goldman was murdered ("Istanbul Terrorist Attack"), a January 8, 2017 ISIS terror attack in Jerusalem, Israel in which

Erez Orbach was murdered ("Jerusalem Terrorist Attack") and Eytan Yair Rund was injured, and from a November 13, 2015 ISIS terror attack in Paris, France in which Nohemi Gonzalez was murdered ("Paris Terrorist Attack").

2.　　For many years, ISIS was part of al-Qaeda. Al-Qaeda later separated from ISIS because it found ISIS too brutal and extreme.

3.　　Known at various times as the "al-Zarqawi Network," "al-Qaida in Iraq," "Islamic State," "Islamic State in Iraq," "Islamic State in Iraq and the Levant," "Islamic State in Iraq and Syria," "Daesh,"[1] "IS," "ISIL," and other official and unofficial names, ISIS has been a designated Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, § 8 U.S.C. § 1189, since 2004.

4.　　By the time of the Brussels, Istanbul, Jerusalem, and Paris Terrorist Attacks, ISIS had become one of the largest and most widely recognized and feared terrorist organizations in the world.

5.　　At the time of the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks, ISIS was operating with the material support of the Syrian Arab Republic ("Syria").

6.　　Syrian President Bashar al-Assad (hereinafter "Assad") and his security apparatus helped create and thereafter greatly assisted ISIS, which it propped up as a sham opponent in the Syrian civil war to bolster Syria's negotiating power vis-à-vis world powers that had been seeking an end to the Assad regime.

---

[1] Daesh is an Anglicization of the Arabic acronym for ad-Dawlah al-Islamiyah fil-'Iraq wash-Sham. Its literal meaning is Islamic State in Iraq and the Levant, but it is also a homophone with the Arabic words *daes* ("one who crushes something underfoot") and *dahes* ("one who sows discord"). It is seen as a pejorative description of ISIS.

7. Assad's plan was to cooperate with ISIS to destroy the moderate opposition to Assad, leaving ISIS as his only opponent in the Syrian civil war. Forced to choose between Assad and ISIS, Assad reasoned that the world powers would choose Assad.

8. At all times relevant to this Complaint, Syria provided material support to ISIS, such as financial support, provision of materiel, and military air support.

9. Over this same period, Syria also provided direct instructions to ISIS through embedded intelligence officers

10. ISIS's Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks in which it murdered Alexander, Sascha, Nohemi, Abraham Goldman and Erez Orbach and seriously wounded Ron and Pnina Greenfield, Nitzhia Goldman and Eytan Yair Rund benefited Syria in that it shifted the focus of the world powers opposing the Assad Regime from Syria and on to its closest ally, ISIS.

## THE PARTIES

11. Plaintiff Cameron Cain-Baarbé ("Cameron") at all times relevant thereto, is a citizen of the United States who was raised in Raleigh, North Carolina. She currently resides in Canada. She brings claims both individually and as the representative of the estate of her husband, Alexander, who was a resident of the United States at the time of his death.

12. Plaintiff James Palmer Cain ("James") at all times relevant thereto, is a citizen of the United States and is domiciled in Raleigh, North Carolina. He brings claims individually as the father of Cameron and the father-in-law of Alexander at the time of his death.

13. Plaintiff Helen Revelle Cain ("Helen") at all times relevant thereto, is a citizen of the United States and is domiciled in Raleigh, North Carolina. She brings claims individually as the mother of Cameron and mother-in-law of Alexander at the time of his death.

14. Plaintiff Ron Greenfield ("Ron"), who was severely wounded in the Istanbul Terrorist Attack, at all times relevant hereto, is a citizen of the United States and is domiciled in Israel.

15. Plaintiff Pnina Greenfield ("Pnina"), who was seriously wounded in the Istanbul Terrorist Attack, at all times relevant hereto, is an Israeli citizen domiciled in Israel and the wife of Ron Greenfield.

16. Ron and Pnina Greenfield have four children, Liron Shalom Greenfield, Shere Greenfield, Gili Greenfield and Shye Greenfield, that at all times relevant hereto, are citizens of the United States domiciled in Israel.

17. Plaintiff Caryn Or Orbach a/k/a Caryn Tzadok ("Caryn") at all times relevant hereto, is a citizen of the United States and is domiciled in Israel. She brings claims both individually and as the representative of the estate of her son, Erez Orbach, who was a citizen of the United States residing in Israel at the time of his death. She also brings a claim on behalf of her minor children, A.O., E.O. and O.O., who are all United States citizens domiciled in Israel.

18. Plaintiff Uri Orbach ("Uri") at all times relevant hereto, is a citizen of and domiciled in Israel. He brings claims both individually and as the representative of the estate of his son, Erez Orbach. He also brings a claim on behalf of his minor children, A.O., E.O. and O.O.

19. Plaintiff Eitan Orbach ("Eitan"), the brother of Erez Orbach, at all times relevant hereto, is a citizen of the United States and is domiciled in Israel.

20. Plaintiff Alon Orbach ("Alon"), the brother of Erez Orbach, at all times relevant hereto, is a citizen of the United States and is domiciled in Israel.

21. Plaintiff Eytan Yair Rund ("Eytan"), who was wounded in the Jerusalem Terrorist Attack, at all times relevant hereto, is a citizen of the United States domiciled in Israel. He also

brings a claim on behalf of his minor children, S.A.R., H.H.R., who are U.S. citizens domiciled in Israel and on behalf of his other minor child, Y.M.R., who is a citizen of and domiciled in Israel and is eligible to become a U.S. citizen and intends to do so in the near future.

22.     Plaintiff Tamar Bracha Rund, the wife of Eytan Yair Rund, at all times relevant hereto, is a U.S. citizen domiciled in Israel. She also brings a claim on behalf of her minor children, S.A.R., H.H.R. and Y.M.R.

23.     Plaintiff Nitzhia Goldman ("Nitzhia") at all times relevant thereto, is a citizen of the United States and domiciled in Israel. She brings claims individually and as the representative of the estate of her husband, Abraham Goldman, who was a citizen of the United States domiciled in Israel at the time of his death.

24.     Plaintiffs Gila Nissenbaum ("Gila") and Natan Goldman ("Natan"), siblings of Abraham Goldman, at all times relevant thereto, are citizens of and domiciled in the United States.

25.     Plaintiffs Maya Goldman Cohen ("Maya") and Sharon Goldman Najman ("Sharon"), the children of Nitzhia and Abraham Goldman, at all times relevant thereto, are citizens of and domiciled in the United States.

26.     Plaintiff Yoseff Goldman ("Yoseff"), a child of Nitzhia and Abraham Goldman, at all times relevant thereto, is a citizen of and domiciled in Israel.

27.     Plaintiff Israel Gorenzky, the brother of Nitzhia, at all times relevant thereto, is a citizen of and domiciled in Israel.

28.     Plaintiff Tamar Choresh, the sister of Nitzhia, at all times relevant therefore, is a citizen of and domiciled in Israel.

29.     Plaintiff Beatriz Gonzalez at all times relevant thereto, is a citizen of the United States and is domiciled in the United States. She brings claims individually and as the representative of the estate of her daughter, Nohemi Gonzalez.

30.     Plaintiff Jose Hernandez is the stepfather of Nohemi Gonzalez and at all times relevant thereto, is a legal resident of and domiciled in the United States.

31.     Plaintiffs Rey Gonzalez and Paul Gonzalez are the brothers of Nohemi Gonzalez.

32.     Rey Gonzalez is a United States legal resident.

33.     Paul Gonzalez is a United States citizen.

34.     Defendant Syria is and was, at all times relevant hereto, a foreign state within the meaning of 28 U.S.C. § 1603, designated continuously since 1979 as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

35.     Syria, through its political subdivisions, agencies, instrumentalities, officials, employees and agents knowingly provided ISIS with material support and resources, for acts of extrajudicial killing within the meaning of 28 U.S.C. §§ 1605(a)(7), 1605A(a)(1), including these Terrorist Attacks, and performed other actions that enabled, facilitated and caused these Terrorist Attacks and harm to the plaintiffs herein.

36.     According to the State Department's 2014 Country Reports on Terrorism,

Syrian government awareness and encouragement for many years of violent extremists' transit through Syria to enter Iraq, for the purpose of fighting Coalition Troops, is well documented. Syria was a key hub for foreign fighters en route to Iraq. Those very networks were the seedbed for the violent extremist elements, including ISIS, which terrorized the Syrian and Iraqi population in 2014 and—in addition to other terrorist organizations within Syria—continued to attract thousands of foreign terrorist fighters to Syria in 2014….

As part of a broader strategy during the year, the regime still attempted to portray Syria itself as a victim of terrorism, characterizing all of its armed opponents as "terrorists."

U.S. DEP'T STATE, BUREAU OF COUNTERTERRORISM, COUNTRY REPORT ON TERRORISM 2014, 288 (2015), http://www.state.gov/documents/organization/239631.pdf.

37.     The U.S. Department of State has stated that Assad is "actively seeking to bolster [ISIS] for his own cynical reasons," namely to make his administration the more palatable alternative to ISIS—both for the global powers that oppose him and for his own citizens.[2]

## JURISDICTION AND VENUE

38.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330-1332, 1367, 1605A(a) and 18 U.S.C. §§ 2333(a) and 2334(a).

39.     Personal jurisdiction over the defendant will be established once the defendant is properly served pursuant to 28 U.S.C.§§ 1608(a) and 1330(b).

40.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(14) and 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

### A.     Islamic State in Syria

41.     In the late 1980's, Abu Musab al-Zarqawi ("al-Zarqawi") left his native Jordan and traveled briefly to Afghanistan to join radical Islamists then fighting Soviet forces.

---

[2] Ruth Sherlock & Raf Sanchez, *US Accuses Assad Regime of Helping Islamic State by Targeting Rival Rebels in Strike*, TELEGRAPH, June 2, 2015, http://www.telegraph.co.uk/news/ worldnews/islamic-state/11645434/US-accuses-Assad-regime-of-helping-Islamic-State-by-targeting-rival-rebels-in-strikes.html.

42.     When he returned to Jordan, al-Zarqawi adopted a goal of overthrowing the Jordanian monarchy to establish an Islamic state in Jordan, and he formed a local radical Islamist group called *Jund al-Sham*.

43.     In 1992, when a cache of guns and explosives was discovered in his home, al-Zarqawi was arrested and imprisoned in Jordan.

44.     After his release from prison in 1999, al-Zarqawi returned to Afghanistan, where he met with *al-Qaeda* leader Osama Bin-Laden ("Bin-Laden") and reportedly received $200,000 in "seed money" from Bin-Laden to establish a *jihadi* training camp near the border of Iran.

45.     Al-Zarqawi attracted his own followers and formed a new radical Islamist terrorist group called "*Jam'at al Tawhid wa'al-Jihad*" ("The Monotheism and *Jihad* Group"), popularly known as "*al-Tawhid*" or "The Zarqawi Network."

46.     Al-Zarqawi's *al-Tawhid* was based upon a radical Sunni Islamist belief that violent attacks on non-believers, heretics, and apostates are not only justified, but religiously mandated. Al-Zarqawi taught that these attacks would lead to the establishment of an Islamic state and accelerate a global apocalyptic battle in which Islam would ultimately triumph and govern the world.

47.     In January 2004, al-Zarqawi reportedly sought to be recognized by Bin-Laden as an official part of *al-Qaeda's* global *jihadi* movement, but without success.

48.     Among the purported reasons for Bin-Laden's reticence about al-Zarqawi was the latter's open brutality, as well as al-Zarqawi's uncompromising hostility toward Shi'a Muslims.

49.     In late 2004, al-Zarqawi received the official recognition he sought: on October 17, 2004, al-Zarqawi declared allegiance to Bin-Laden in an official online statement, and *al-Qaeda*

accepted and publicized al-Zarqawi's oath to Bin-Laden in its online magazine *Mu'askar al-Battar* on October 25, 2004.

50.     Al-Zarqawi changed his group's name to "*Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn*" ("Organization of *Jihad's* Base in the Land of Two Rivers [Iraq]"), and it became commonly known as "*al-Qaeda* in Iraq."

51.     *Al-Qaeda* in Iraq distinguished itself through its military effectiveness, brutality against rival Sunni factions, and gruesome murders of Shiite civilians.

52.     Its methods caused a backlash within Sunni enclaves, which formed militia groups that often cooperated with U.S. forces against *al-Qaeda* in Iraq.

53.     *Al-Qaeda* in Iraq eventually lost the support of al-Qaeda "central" and became stigmatized within the Iraqi insurgency and the Sunni community.

54.     Following its loss of influence in Iraq, in January 2006, *al-Qaeda* in Iraq merged with several terrorist groups to create the Mujahadeen Shura Council.

55.     In June 2006, Zarqawi was killed by U.S. forces in Hibhib, Iraq.

56.     In October 2006, the Mujahadeen Shura Council proclaimed the formation of the "*ad-Dawlah al-'Iraq al-Islamiyah*", the Islamic State of Iraq ("ISI"), under the leadership of Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi.

57.     In April 2010, Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi were killed in a joint U.S.-Iraqi operation, and Abu Bakr al-Baghdadi ("al-Baghdadi") took over leadership of ISI.

58.     In April 2013, having merged with the al-Nusra Front and expanded into Syria, ISI adopted the name Islamic State of Iraq and the Levant.

59.     In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), a US federal court found Syria liable for the al-Qaeda in Iraq beheadings of two U.S. civilian contractors in Iraq.

60.     The *Gates* court found that beginning no later than 2003, Syria provided material support to al-Qaeda in Iraq and Zarqawi including training at facilities in Syria, free passage through Syria accompanied by Syrian intelligence officers, transportation across the Syria-Iraq border, false documents, safe haven in Syria, weapons, and funding.

61.     On October 15, 2004, ISIS's predecessor was designated by the United States Government as a "specially designated global terrorist" ("SGDT"), pursuant to Executive Order 13224, and as a designated "foreign terrorist organization" ("FTO"), pursuant to 8 U.S.C. § 1189.

62.     Its successor organizations, including ISIS, have been continuously designated as SGDTs and FTOs since October 15, 2004. Those designations have been updated from time to time to include ISIS's various names and aliases.

63.     Syria provided and has continued to provide material support to ISIS through each iteration of the group and each generation of leadership, from Zarkawi to al-Masri to al-Baghdadi, facilitating horrific terroristic attacks in Iraq and Syria.

64.     When the Arab Spring came to Syria in January 2011, the Assad Regime came to rely on ISIS for its very existence, as described *infra*.

**B.      Syria's Provision of Material Support and Resources to ISIS**

65.     The Assad Regime deliberately facilitated the creation of ISIS from its precursor groups of ISI and the al-Nusra Front.

66.     The Assad Regime provided ISIS with critical material support at crucial times during its metastasis from an isolated group of terrorists into a terrorist quasi-"state" that

subsequently murdered Alexander. The Assad Regime remains one of ISIS's primary material supporters.

67.     In January 2011, Syrian citizens began peaceful protests as a response to the region's "Arab Spring."

68.     By March 2011, these protests had evolved into massive anti-governmental opposition rallies and civil disobedience.

69.     By April 2011, Assad's attempts to pacify the protestors had failed and the Syrian government deployed military forces to suppress the opposition movement but failed to do so.

70.     As the situation continued to spiral out of control, the Syrian General Security Directorate released hundreds of Islamist extremists from prison from June to October 2011.

71.     The Islamist extremists released from Syria's prisons by Syria in 2011 constitute the majority of ISIS's current leadership.[3]

72.     According to a former member of the Syrian Military Intelligence Directorate, the Assad Regime did not merely open the door to the prisons and let these extremists out; it facilitated them in their work by helping to create armed brigades.

73.     According to this former Military Intelligence Directorate official, since at least the summer of 2011, Syria has had officers embedded within ISIS and its precursors, as well as within other Islamist groups, operating in Syria. Through these officers, Assad directs attacks against other Islamist groups or even against other branches of the Syrian security services.

---

[3] Simon Cordall, *How Syria's Assad Helped Forge ISIS*, Newsweek, June 21, 2014, https://www.newsweek.com/how-syrias-assad-helped-forge-isis-255631.

74.     This former intelligence officer reported that the Assad Regime wanted to tell the world it was fighting an armed Islamic revolt. It had to create one. There were strong Islamic tendencies to the uprising, so it just had to encourage them.

75.     Another former regime official reported that Syria supplied weapons to these freed prisoners, stating, "this is not something I heard rumors about, I actually heard the orders, I have seen it happening. These orders came down from [Military Intelligence] headquarters in Damascus."[4]

76.     As Affaq Ahmad, the former right hand to Syrian Air Force Intelligence Chief, General Jamil Hasad, explained, this precursor to ISIS justified Assad's use of military force against the civilian uprising. ISIS thus granted Syria some measure of international legitimacy and simultaneously encouraged Syria's non-Sunni minorities to rally around the Assad Regime.

77.     After Assad's creation of ISIS's precursor groups as a political foil in 2011, Syria became one of ISIS's largest trading partners. ISIS fighters eventually captured the oil fields of eastern Syria.

78.     By January 2013, Syria was purchasing oil from ISIS and its affiliates.[5]

79.     Amos Hochstein, a U.S. State Department official, told the Wall Street Journal on January 19, 2017 that "Daesh's revenue and energy generation is being supported by the Syrian regime," referring to Islamic State by its Arabic acronym.[6]

---

[4] Michael Weiss & Hassan, ISIS: Inside the Army of Terror (2015).

[5] CBS News, *U.S.: Syria Buying Millions Dollars of Oil from ISIS*, December 11, 2015, https://www.cbsnews.com/video/us-syria-buying-millions-of-dollars-in-oil-from-isis/

[6] See https://www.wsj.com/articles/islamic-state-steps-up-oil-and-gas-sales-to-assad-regime-1484835563.

80.     In a recorded interview on July 2, 2018 for OilPrice.com Razeek Radeek Maksimo, an Azerbaijani national and former senior ISIS commander, told Kurdistan 24 from a prison in Rojava where he is held by Syrian Kurdish authorities that "Oil and gas obtained by the Islamic State was sold to Turkey and the Syrian regime."[7]

81.     Syria became a mass consumer for the oil that ISIS plunders. That oil would have been worthless to ISIS if it did not have in Syria a willing buyer on a large scale.[8]

82.     Considering the array of forces aligned against ISIS and the geographical constraints on its trade, it is likely that Syria was the *only* buyer of large volumes of ISIS's oil.

83.     The Assad Regime also provides ISIS with the critical technical expertise required to run some of the oil and gas installations controlled by ISIS.

84.     Syria thus enabled ISIS to possess the oil fields, operate them to produce a marketable product, and sell that product (by serving as ISIS's sole large-scale buyer).

85.     Commenting on Syria's commercial and logistical support for ISIS, UK Foreign Secretary stated that "Assad's 'war' on ISI[S] is a sham and that he supports them financially."[9]

---

[7] See https://oilprice.com/Geopolitics/Middle-East/Confirmed-ISIS-Sold-Oil-To-Assad-Turkey.html#. Video of his interview can be seen at https://www.kurdistan24.net/en/news/78f3aed3-9dff-4fd4-9d5d-49e0c3a42cd2.

[8] See for example, NPR, *Why Syria's Oil Matters*, October 31, 2019, https://www.npr.org/2019/10/31/775142854/opinion-syria-s-oil-production-is-low-but-here-s-why-it-matters ("ISIS was able to turn the barrels under its control into money, smuggling them into Turkey, selling in local markets — and selling to the Assad regime.")

[9] Natasha Bertrand, *Revealed: The oil middleman between the Syrian regime and ISIS*, BUSINESS INSIDER, Mar. 7, 2015, https://www.businessinsider.com/revealed-the-oil-middleman-between-the-syrian-regime-and-isis-2015-3.

86.     According to Danny Glaser, Assistant Secretary for Terrorist Financing at the U.S. Treasury Department, "the Assad regime needs the oil, ISIS needs the cash, and they're willing to do business even as they're fighting each other."[10]

87.     In October 2014, the Undersecretary of the Treasury Department, David Cohen, said that oil commerce is a key source of ISIS's operating revenue, earning "at least" $1 million per day from its oil.[11]

88.     In March 2015, the European Union imposed sanctions against George Haswani, a Syrian businessman, for providing material support to the Assad Regime through his role as a middleman in deals for the purchase of oil from ISIS by the Syrian Regime.

89.     On November 25, 2015, the United State Treasury designated several Syrian individuals, including George Haswani and several entities for providing support to the Syrian government, including acting as middlemen for oil purchases by Damascus from ISIS.[12]

90.     According to news reports, sales of oil by ISIS to the Assad regime amounted to $40 million monthly.[13]

---

[10] BBC Two, *This World*, *World's Richest Terror Army*, https://www.bbc.co.uk/programmes/b05s4ytp (television broadcast on Apr. 22, 2015).

[11] NBC News, *Syrian Regime, Iraqi Kurds Among Those Buying ISIS Oil: Official*, Oct. 23, 2014, https://www.nbcnews.com/news/world/syrian-regime-iraqi-kurds-among-those-buying-isis-oil-official-n232381.

[12] Press Release, U.S. Department of the Treasury, Treasury Sanctions Network Providing Support to the Government of Syria for Facilitating Syrian Government Oil Purchases from ISIL, November 25, 2015 https://www.treasury.gov/press-center/press-releases/Pages/jl0287.aspx#.XeFUrByRYA4.twitter.

[13] Jack Moore, *ISIS's Multimillion-Dollar Oil Deals With Assad Regime Uncovered in U.S. Special Forces Raid*, April 26, 2016 https://www.newsweek.com/isis-oil-deals-assad-regime-revealed-us-special-forces-raid-452426.

91.     Syria's support for ISIS is not merely commercial. Syria provides ISIS military support as well.

92.     Assad's occasional military strikes on ISIS are a sham. He does not seek to root out ISIS. To the contrary, the purpose of those strikes is to bolster ISIS's position.

93.     ISIS defectors have confirmed that Assad's war on ISIS is a sham, reporting that they slept soundly knowing that Syrian airstrikes would be used to target their opponents, not them.

94.     In June 2015, the United States Department of State found that Syria was launching airstrikes on behalf of ISIS during its advance on Aleppo.[14] These airstrikes were part of a joint effort by the Assad Regime and ISIS to retake Aleppo from a coalition of Islamist and moderate rebel groups.

95.     At all times relevant to this Complaint, the Assad Regime and Syria knew ISIS and its precursors were FTOs.

96.     At all times relevant to this Complaint, the Assad Regime and Syria were aware that ISIS's mission is to create a global Islamic state by any means necessary, including using violence against innocent civilians.

97.     Prior to the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks, the Assad Regime and Syria were aware that monies and non-monetary support given by Syria to ISIS would be and was used by ISIS to carry out terror attacks, including the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks.

---

[14] Erica Wenig, *US Embassy Accuses Syrian Regime of Supporting ISIS Advance*, THE DAILY CALLER, June 2, 2015, http://dailycaller.com/2015/06/02/us-embassy-accuses-syrian-regime-of-supporting-isis-advance/.

98.     The Assad Regime and Syria were aware before the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks, that the financial and other support provided by the Assad Regime and Syria to ISIS would be and was used by ISIS to facilitate and carry out terror attacks.

99.     The Assad Regime and Syria were aware before the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks, that the financial and other support provided by the Assad Regime and Syria to ISIS was used by ISIS to purchase components necessary to make suicide bombs, to provide food and shelter to ISIS members, to provide for the families of suicide bombers, to pay for the funerals of suicide bombers, to promote and recruit members for ISIS for the purpose of carrying out terror attacks and to train ISIS members so they could carry out terror attacks.

**C.     The Brussels Terrorist Attack**

100.    On March 22, 2016, ISIS carried out a horrendous terrorist attack in Brussels, Belgium, murdering 32 people (in addition to the three terrorists) and injuring more than 300 others.

101.    This Terrorist Attack was intended: a) to intimidate and coerce the civilian population of Belgium, the United States, and other countries engaged in activities against ISIS; b) to influence the policies of these governments by intimidation and coercion; and c) to affect the conduct of these governments by mass destruction, assassination, and kidnapping.

102.    Indeed, a major component of these attacks was the messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attacks against these countries' civilians.

103.    These attacks involved extensive planning, recruiting, organization, training, preparation, coordination, and funding.

104. They also involved private communications between ISIS members as well as public communications to intensify the fear and intimidation that ISIS intended to inflict by these mass casualty attacks.

105. Shortly before 8:00 a.m. on Tuesday, March 22, 2016, three ISIS terrorists, Najim Laachraoui, Ibrahim el Bakraoui, and Mohamed Abrini, exited a taxi at the Zaventem Airport in Brussels, Belgium.

106. The three ISIS terrorists entered the airport pushing luggage carts with large luggage bags packed with explosives, nails and screws, on their carts.

107. At approximately 7:58 a.m., Bakraoui detonated his bomb near check-in row 11 in the Departures Hall of the airport, which had counters for Delta Airlines.

108. About ten seconds later, Laachraoui detonated his bomb near check-in row 2, which had counters for Air Canada, among other airlines.

109. The third terrorist at the airport, Abrini, abandoned his bomb and fled the airport; he was later identified wearing a light-colored jacket and a hat in a surveillance video that recorded the three terrorists entering the airport pushing the luggage carts.

110. At about 9:10 a.m., during the height of the morning rush, another ISIS terrorist, Khalid el Bakraoui ("Khalid") (Bakraoui's brother), carried out another suicide bombing in the second car of a train at the Maelbeek subway station in downtown Brussels; the subway station is near many European Union buildings, including the European Parliament, the European Commission headquarters, and the Council of the European Union.

111. Among those killed in the suicide bombings at the Brussels airport was decedent Alexander and his sister Sascha.

112.    Abrini was subsequently arrested on April 8, 2016, and he admitted to being the terrorist seen wearing a hat in the airport surveillance video from the morning of the attack.

113.    The Terrorist Attack would not have occurred without Syrian sponsorship. Indeed, it is doubtful that ISIS could have existed without Syrian sponsorship.

114.    ISIS carried out the Brussels Terrorist Attack utilizing funds, weapons, terrorist training and other material support, resources, aid and assistance provided by Syria for the specific purpose of carrying out the Brussels Terrorist Attack and other such acts of extrajudicial killing and international terrorism.

**D.    The Istanbul Terrorist Attack**

115.    On March 19, 2016, ISIS carried out a horrific terrorist attack in Istanbul, Turkey.

116.    This Terrorist Attack was intended: a) to intimidate and coerce the civilian population of Turkey, the United States, and other countries engaged in activities against ISIS; b) to influence the policies of these governments by intimidation and coercion; and c) to affect the conduct of these governments by mass destruction, assassination, and kidnapping.

117.    Indeed, a major component of these attacks was the messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attacks against these countries' civilians.

118.    These attacks involved extensive planning, recruiting, organization, training, preparation, coordination, and funding.

119.    They also involved private communications between ISIS members as well as public communications to intensify the fear and intimidation that ISIS intended to inflict by these mass casualty attacks.

120.    On the morning of March 19, 2016, Turkish citizen Mehmet Öztürk, 24, strapped explosives to his body and traveled to Istanbul's Beyoglu district in the area near the local governor's office.

121.    At approximately 10:55 a.m., Öztürk walked down Istiklal Avenue, a crowded pedestrian boulevard that is a popular shopping venue for tourists in Turkey. The wide avenue is one of the most famous streets in Istanbul, lined with boutiques, art galleries, cafes and foreign consulates, and it leads into Galatasaray Square.

122.    As the bomber passed the Balo Street intersection, he spotted a group of tourists and detonated his explosives.

123.    The powerful bomb, packed with nails, screws and bolts was designed to inflict massive physical damage on anyone in the vicinity of its detonation. The explosion rocked the surrounding area and sprayed its deadly shrapnel in all directions.

124.    The bombing killed five people, including Abraham Goldman, and injured 36 others, including Öztürk, Ron and Pnina Greenfield, and Nitzhia Goldman.

125.    In the wake of the explosion, hundreds of people panicked and ran away from the shopping district. On the ground, in the midst of the smoke and smell of charred flesh, dead bodies, limbs, pools of blood, along with nails and pieces of metal scattered were everywhere. Police and ambulances made their way slowly to the bomb site through the crowds of terrorized and fleeing people.

126.    Ron and Pnina Greenfield had arrived in Istanbul for a vacation a few days earlier. On the morning of March 19, 2016, they were standing on Istiklal Avenue when the suicide bomber detonated his explosives. The massive explosion knocked both husband and wife to the ground.

127.     Nitzhia and Abraham Goldman had also arrived in Istanbul for a vacation a few days earlier on the same tour as Ron and Pnina Greenfield. On the morning of March 19, 2016, they were standing on Istiklal Avenue when the suicide bomber detonated his explosives.

128.     Shrapnel from the bomb entered the legs of Ron and Pnina Greenfield severely injuring them and Nitzhia Goldman's right ankle and foot were severely injured due to the shrapnel from the bomb. Abraham Goldman died at the scene of the terrorist attack.

129.     Ron, Pnina and Nitzhia were severely shocked by the explosion as they lay wounded on the ground.

130.     Turkish authorities identified the bomber through his DNA. They announced that the attack had been planned and perpetrated by the ISIS terrorist organization.

131.     The Istanbul Terrorist Attack would not have occurred without Syrian sponsorship.

132.     Indeed, it is doubtful that ISIS could have existed without Syrian sponsorship.

133.     ISIS carried out the Istanbul Terrorist Attack utilizing funds, weapons, terrorist training and other material support, resources, aid and assistance provided by Syria for the specific purpose of carrying out the Istanbul Terrorist Attack and other such acts of extrajudicial killing and international terrorism.


**E.     The Jerusalem Terrorist Attack**

134.     On January 8, 2017, terrorist, Fadi Ahmad Hamdan al-Qanbar, who was a supporter of ISIS, ran over a group of soldiers that had just stepped off a bus at the Armon Hanatziv Promenade.

135.     This Terrorist Attack was intended: a) to intimidate and coerce the civilian population of Israel, the United States, and other countries engaged in activities against ISIS; b) to

influence the policies of these governments by intimidation and coercion; and c) to affect the conduct of these governments by mass destruction, assassination, and kidnapping.

136.     Indeed, a major component of these attacks was the messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attacks against these countries' civilians.

137.     These attacks involved extensive planning, recruiting, organization, training, preparation, coordination, and funding.

138.     They also involved private communications between ISIS members as well as public communications to intensify the fear and intimidation that ISIS intended to inflict by these mass casualty attacks.

139.     Fadi al-Qanbar drove his truck from the east, from the village of his residence, westward in the direction of Jerusalem, spotted the group of soldiers, veered from his route, accelerated and ran over the soldiers.

140.     Immediately after he ran over the soldiers, al-Qanbar switched into reverse and drove his truck backwards, right back over the soldiers, trampling them an additional time.

141.     Al-Qanbar intended to strike as many people as possible, to kill and injure them, and his attack ended only after the terrorist was shot and killed. A number of soldiers and civilians, who were in the area at the time, opened fire on the terrorist as soon as they realized a vehicular terror attack was underway. This did not stop the terrorist, who was determined to carry out his scheme and even die as a Martyr during the course of the terror attack.

142.     As a result of the terror attack, four soldiers were killed, including Erez Orbach, and at least 13 others were injured, including Eytan Yair Rund.

143. The terrorist identified with the ideology of the Islamic State, disseminated its propaganda and ideology among those close to and around him, and believed in the establishment of an independent Islamic caliphate.

144. The date that the terrorist chose for the terror attack, January 8, 2017, was the anniversary of the death of another terrorist, who had also perpetrated an attack under the inspiration of the Islamic State. The choice of this date indicates both the organizational affiliation of the terror attack and the fact that it was pre-planned.

145. The modus operandi of the terrorist, meaning, a multiple-victim, vehicular terror attack by means of a heavy vehicle, such as a truck, in an attempt to maim and kill as many people as possible, is consistent with that of two similar terror attacks, that were perpetrated by the Islamic State in Europe.

146. News agencies in Gaza, which are identified with the Islamic State, published statements in support of the terror attack, describing it as an Islamic State terror attack, and identifying the terrorist as an Islamic State operative.

147. The Jerusalem Terrorist Attack would not have occurred without Syrian sponsorship.

148. Indeed, it is doubtful that ISIS could have existed without Syrian sponsorship.

149. ISIS carried out the Jerusalem Terrorist Attack utilizing funds, weapons, terrorist training and other material support, resources, aid and assistance provided by Syria for the specific purpose of carrying out the Jerusalem Terrorist Attack and other such acts of extrajudicial killing and international terrorism.

**F.     The Paris Terrorist Attack**

150.    On November 13, 2015, ISIS carried out a gruesome terrorist attack in Paris, France, murdering 130 people, including Nohemi Gonzalez, and injuring hundreds more.

151.    This Terrorist Attack was intended: a) to intimidate and coerce the civilian population of France, the United States, and other countries engaged in activities against ISIS; b) to influence the policies of these governments by intimidation and coercion; and c) to affect the conduct of these governments by mass destruction, assassination, and kidnapping.

152.    Indeed, a major component of these attacks was the messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attacks against these countries' civilians.

153.    These attacks involved extensive planning, recruiting, organization, training, preparation, coordination, and funding.

154.    They also involved private communications between ISIS members as well as public communications to intensify the fear and intimidation that ISIS intended to inflict by these mass casualty attacks.

155.    Nohemi Gonzalez was a student at California State University, Long Beach studying industrial design. At the time of her death, Nohemi was spending a semester in Paris, France at the Strade School of Design.

156.    On Friday, November 13, 2015, Nohemi and some friends were enjoying a night in Paris and were dining at a bistro La Belle Epoque located on Rue de Charrone. Shortly after arriving, a group of militants sprayed bullets into the bistro. Nohemi was struck and killed.

157.    Shortly after the coordinated Paris Terrorist Attack, ISIS claimed responsibility for the attacks.

158.     The Paris Terrorist Attack involved three coordinated teams of ISIS terrorists that carried out terrorist attacks in Paris in the evening of November 13, 2015.

159.     To date, the following twelve ISIS terrorists have been identified as being directly involved in the Paris Attacks:

        a.      Abdelhamid Abaaoud (a Belgian national);

        b.      Brahim Abdeslam (a Belgian national);

        c.      Chakib Akrouh (a Belgian national);

        d.      Bilal Hafdi (a French citizen who lived in Belgium);

        e.      Ahmed al-Mohamed (believed to be an Iraqi);

        f.      M. al-Mahmod (believed to be an Iraqi);

        g.      Omar Ismail Mostefai (a French national);

        h.      Sami Amimour (a French citizen);

        i.      Foued Mohammed Aggad (a French national);

        j.      Salah Abdeslam (a Belgian-born French national);

        k.      Mohamed Belkaid (believe to be Algerian); and

        l.      Najim Laachraoui (a Moroccan-born resident of Belgium).

160.     By the time of the Paris Terrorist Attack, Belgium was the country with the highest number per capita of recruits to travel to Syria and Iraq to join ISIS among all Western countries.

## G.     The Plaintiffs' Injuries

161.     Alexander and Cameron met in the summer of 2010 when they were both taking summer classes in Durham, North Carolina. The two fell in love with each other and were married in 2013.

162.     Alexander had become very connected to Cameron's family, joining the family on vacations and family holidays. Cameron's father, James, described Alexander as "a brilliant young man."

163.     Cameron and Alexander were "so . . . in love," "inseparable," and had "a passion for life." Alexander was a "family man" who "would do anything" for Cameron.

164.     In the spring of 2016, Alexander and Cameron were living in New York.

165.     Alexander and Cameron developed a business plan to open a craft-related business, and Alexander travelled to Europe to work on his business plan and to visit his parents and sister Sascha, who lived in Belgium.

166.     Sascha, who had graduated in 2015 with a business degree from Marymount Manhattan College in New York, was living in Europe and planned to move back to New York.

167.     On March 22, 2016, Alexander was scheduled to fly back home to New York, and his sister Sascha decided to fly with him. Alexander and Sascha arrived at the Brussels airport in the early morning of March 22, 2016 and went to check in for their flight.

168.     While Alexander and Sascha were in the check-in area, one of the ISIS terrorists detonated his bomb, and Alexander and Sascha were both killed.

169.     After the explosion, the family did not hear from Alexander and Sascha, and the brother and sister could not be found.

170.     Family and friends in Europe searched for Alexander and Sascha, checking all the nearby hospitals to no avail. Alexander and Sascha's family was devastated by news of the terrorist explosions at the airport and not knowing the fate of their loved ones.

171. Cameron also knew that Alexander and Sascha were at the airport at the time of the explosion, and she was uncertain of their fate; she was panic-stricken, not being able to reach Alexander or determine what had happened to him and his sister for days.

172. Cameron and her parents, James and Helen, traveled from New York to Brussels on Wednesday, March 23, 2016 to join the search for Alexander and Sascha. They frantically searched the hospitals of Brussels, spread photos around the city, and sent out pleas for assistance, while Cameron continued contacting people and posting notices to gain any information she could.

173. On Thursday night, March 24, 2016, authorities in Brussels released a list of survivors from the Brussels Terrorist Attack, and Alexander and Sascha's names were not on the list.

174. Finally, on Friday, March 25, 2016, authorities confirmed that Alexander and Sascha's bodies had been identified and that they were killed in the Brussels Terrorist Attack.

175. Alexander was 29 years old and Sascha was 26 years old at the time of their deaths.

176. Cameron was devastated by the loss of her husband Alexander and his sister Sascha. She suffered, and will continue to suffer, severe psychological and emotional harm, as well as loss of solatium as a result of the Brussels Terrorist Attack that killed Alexander and Sascha.

177. Likewise, James and Helen have suffered, and will continue to suffer, severe psychological and emotional harm, due to the loss of their son-in-law Alexander and the severe trauma experienced by their daughter Cameron as a result of the Brussels Terrorist Attack.

178. Ron suffered serious physical injuries, including shrapnel in his legs requiring significant debridement, in the Istanbul Terrorist Attack.

179.    Pnina sustained severe physical injuries, including extensive debridement to remove shrapnel from her legs, in the Istanbul Terrorist Attack.

180.    Ron and Pnina spent a week in hospitals after the Istanbul Terrorist Attack and then were in wheelchairs for 2 months. After wheelchairs, Ron and Pnina were compelled to use walkers and then special boots due to their physical injuries.

181.    Ron and Pnina have suffered, and will continue to suffer, severe psychological and emotional harm, as well as loss of solatium as a result of the Istanbul Terrorist Attack.

182.    Plaintiffs Liron Shalom Greenfield, Shere Greenfield, Gili Greenfield and Shye Greenfield, who are the children of Ron and Pnina, all suffered severe psychological and emotional injuries as a result of the Istanbul Terrorist Attack.

183.    Erez Orbach was an Israeli soldier stepping off a bus in Jerusalem when he was brutally murdered by a terrorist running him over multiple times. The pain and suffering Erez Orbach felt when the terrorist used a vehicle as a weapon to run him over is unimaginable. Erez was only 20 years old when his life was suddenly cut short.

184.    Plaintiffs Caryn, Uri, A.O., E.O., O.O., Eitan and Alon, who are family members of Erez Orbach, all suffered severe psychological and emotional injuries as a result of the Jerusalem Terrorist Attack.

185.    Eytan, as a result of the Jerusalem Terrorist Attack, sustained physical and psychological injuries. To this day, Eytan has issues with his balance due to the injuries he suffered in the Jerusalem Terrorist Attack.

186.    Plaintiffs Tamar Bracha Rund, S.A.R., H.H.R. and Y.M.R., who are family members of Eytan, all suffered severe psychological and emotional injuries as a result of the Jerusalem Terrorist Attack.

187.     Abraham Goldman was murdered in the Istanbul Terrorist Attack and Nitzhia suffered serious physical injuries in the Istanbul Terrorist Attack. Due to her injuries, Nitzhia spent a month in hospitals and had to undergo multiple surgeries. To this day, Nitzhia's daily living activities are impeded by her physical injuries sustained in the Istanbul Terrorist Attack.

188.     Nitzhia, the wife of Abraham Goldman, Abraham Goldman's siblings, Gila and Natan, the children of Nitzhia and Abraham Goldman, Maya, Sharon and Yoseff, and Nitzhia's siblings, Israel Gorenzky and Tamar Choresh, all suffered severe psychological and emotional injuries as a result of the Istanbul Terrorist Attack.

189.     Nohemi Gonzalez was the first person in her family to attend college. While studying abroad, Nohemi Gonzalez was the victim of the Paris Terrorist Attack.

190.     Plaintiffs Beatriz Gonzalez, Jose Hernandez, Rey Gonzalez and Paul Gonzalez, who are family members of Nohemi Gonzalez, all suffered severe psychological and emotional injuries as a result of the Paris Terrorist Attack.

## FIRST CLAIM FOR RELIEF
## FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

191.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

192.     Syria is a foreign state that since 1979 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

193.     Syria provided material support and resources to ISIS, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Brussels, Jerusalem, Istanbul and Paris Terrorist Attacks.

194.    The Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks were an act of extrajudicial killing within the meaning of 28 USC § 1605A.

195.    The Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks did not occur within Syrian territory.

196.    Alexander, a United States resident, was murdered during the Brussels Terrorist Attack.

197.    The murder of Alexander causes Cameron, a U.S. citizen, severe injury including pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.

198.    The murder of Alexander causes James, a U.S. citizen, severe injury including emotional distress and mental anguish due to the loss of his son-in-law and because Cameron has suffered, and continues to suffer, due to the murder of Alexander.

199.    The murder of Alexander causes Helen, a U.S. citizen, severe injury including emotional distress and mental anguish due to the loss of her son-in-law and because Cameron has suffered, and continues to suffer, due to the murder of Alexander.

200.    Ron, a citizen of the United States, sustained serious physical injuries during the Istanbul Terrorist Attack.

201.    The Istanbul Terrorist Attack that caused serious injuries to Ron and Pnina Greenfield, causes Ron severe injury including loss of guidance, loss of consortium, loss of companionship and society, loss of solatium, severe emotional distress and mental anguish because Ron has and continues to suffer due to the injuries he sustained in the Istanbul Terrorist Attack.

202.    The Istanbul Terrorist Attack that caused serious injuries to Ron and Pnina Greenfield, causes Liron Shalom Greenfield, Shere Greenfield, Gili Greenfield and Shye

Greenfield, who are all U.S. citizens, severe injury including loss of guidance, loss of companionship and society, loss of solatium, severe emotional distress and mental anguish because Ron has and continues to suffer due to the injuries he sustained in the Istanbul Terrorist Attack.

203.    Erez Orbach, a citizen of the United States, was murdered during the Jerusalem Terrorist Attack.

204.    The murder of Erez causes Caryn, Eitan, Alon, A.O., E.O. and O.O., all U.S. citizens, severe injury including pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.

205.    Eytan, a citizen of the United States, sustained serious physical injuries during the Jerusalem Terrorist Attack.

206.    The Jerusalem Terrorist Attack that caused serious injuries to Eytan, causes Eytan severe injury including loss of guidance, loss of consortium, loss of companionship and society, loss of solatium, severe emotional distress and mental anguish because Eytan has and continues to suffer due to the injuries he sustained in the Jerusalem Terrorist Attack.

207.    The Jerusalem Terrorist Attack that caused serious injuries to Eytan, causes Tamar Bracha Rund, S.A.R. and H.H.R., who are all U.S. citizens, severe injury including loss of guidance, loss of companionship and society, loss of solatium, severe emotional distress and mental anguish because Eytan has and continues to suffer due to the injuries they sustained in the Jerusalem Terrorist Attack.

208.    Abraham Goldman, a United States citizen, was murdered during the Istanbul Terrorist Attack.

209.     Nitzhia, a United States citizen, was seriously injured during the Istanbul Terrorist Attack.

210.     The murder of Abraham causes Nitzhia, Gila, Natan, Maya and Sharon, all U.S. citizens, severe injury including pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.

211.     The Istanbul Terrorist Attack that caused serious injuries to Nitzhia, causes Nitzhia severe injury including loss of guidance, loss of consortium, loss of companionship and society, loss of solatium, severe emotional distress and mental anguish because Nitzhia has and continues to suffer due to the injuries she sustained in the Istanbul Terrorist Attack.

212.     Nohemi Gonzalez, a U.S. citizen, was murdered during the Paris Terrorist Attack.

213.     The murder of Nohemi causes Beatriz Gonzalez and Paul Gonzalez, U.S. citizens, along with Rey and Jose Gonzalez, U.S. legal residents, severe injury including pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.

214.     As a direct and proximate result of the conduct of Syria, Plaintiffs suffered the injuries and harm described herein.

215.     Alternatively, Syria conspired with and aided and abetted ISIS within the meaning of 28 U.S.C. § 1605A, 1606, to enable ISIS's acts of extrajudicial killing complained of here.

216.     Syria is therefore liable under 28 USC § 1605A(c) for the full amount of Plaintiffs' damages.

217. The conduct of the defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF FOR WRONGFUL DEATH AND BATTERY
### (Under 28 U.S.C. §1605A(a) and Common Law)

218. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

219. Defendant, personally and/or through its agents and/or employees and/or co-conspirators willfully and deliberately authorized, organized, planned, aided, abetted, induced, conspired to commit and provided material support for the Brussels, Jerusalem, Istanbul and Paris Terrorist Attacks.

220. Defendant's behavior constituted a breach of legal duty to desist from committing, or aiding, abetting, authorizing, encouraging or conspiring to commit acts of extrajudicial killing, and to refrain from intentionally, wantonly, and/or negligently authorizing or causing the infliction of death, physical injuries and harm to persons such as the Plaintiffs herein and the decedents.

221. ISIS violently and forcefully committed illegal acts resulting in Alexander's severe injury and death.

222. ISIS violently and forcefully committed illegal acts resulting in Ron and Pnina's severe injuries.

223. ISIS violently and forcefully committed illegal acts resulting in Erez's severe injury and death.

224. ISIS violently and forcefully committed illegal acts resulting in Eytan's severe injuries.

225.    ISIS violently and forcefully committed illegal acts resulting in Abraham's severe injury and death.

226.    ISIS violently and forcefully committed illegal acts resulting in Nohemi's severe injury and death.

227.    ISIS violently and forcefully committed illegal acts resulting in Nitzhia's severe injuries.

228.    These willful, wrongful, and intentional acts constitute battery upon Alexander Pinczowski, causing injury to him.

229.    These willful, wrongful, and intentional acts constitute battery upon Abraham Goldman, causing injury to him.

230.    These willful, wrongful, and intentional acts constitute battery upon Nohemi Gonzalez, causing injury to her.

231.    These willful, wrongful, and intentional acts constitute battery upon Ron Greenfield, causing injury to him.

232.    These willful, wrongful, and intentional acts constitute battery upon Pnina Greenfield, causing injury to her.

233.    These willful, wrongful, and intentional acts constitute battery upon Nitzhia Goldman, causing injury to her.

234.    These willful, wrongful, and intentional acts constitute battery upon Erez Orbach, causing injury to him.

235.    These willful, wrongful, and intentional acts constitute battery upon Eytan, causing injury to him.

236.    Defendant's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Brussels Terrorist Attack that killed Alexander and Sascha.

237.    At the time of his death, Alexander was 29 years old, in good health and furthering his and his wife Cameron's business plan.

238.    The murder of Alexander caused Alexander, Alexander's estate and Plaintiffs Cameron, James and Helen to suffer severe injury, including, but not limited to pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress, mental anguish and loss of solatium.

239.    Defendant's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Jerusalem Terrorist Attack that killed Erez Orbach.

240.    At the time of his death, Erez Orbach was 20 years old, in good health.

241.    The murder of Erez Orbach caused Erez, Erez's estate and Plaintiffs Caryn and Uri Orbach and their minor children, A.O., E.O. and O.O., and Eitan and Alon Orbach to suffer severe injury, including, but not limited to pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress, mental anguish and loss of solatium.

242.    Defendant's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Istanbul Terrorist Attack that killed Abraham Goldman.

243.    At the time of his death, Abraham Goldman was 69 years old and in good health.

244. The murder of Abraham Goldman caused Abraham, Abraham's estate and Plaintiffs Nitzhia, Gila, Natan, Maya, Sharon, Yoseff, Israel Gorenzky and Tamar Choresh to suffer severe injury, including, but not limited to pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress, mental anguish and loss of solatium.

245. Defendant's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Paris Terrorist Attack that killed Nohemi Gonzalez.

246. At the time of her death, Nohemi Gonzalez was 23 years old, in good health and pursuing a college degree.

247. The murder of Nohemi Gonzalez caused Nohemi, Nohemi's estate and Plaintiffs Beatriz Gonzalez, Jose Hernandez, Rey Gonzalez and Paul Gonzalez to suffer severe injury, including, but not limited to pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress, mental anguish and loss of solatium.

248. Syria provided material support and resources to ISIS, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks.

249. As a direct and proximate result of the conduct of Syria, Plaintiffs suffered the injuries and harm described herein.

250. The conduct of the Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

251. Defendant is therefore liable for the full amount of Plaintiffs' damages.

## THIRD CLAIM FOR RELIEF ON BEHALF OF THE ESTATE OF ALEXANDER PINCZOWSKI FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. §1605A(a) and Common Law)

252.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

253.    The Brussels Terrorist Attack caused by Defendant's actions herein caused decedent Alexander Pinczowski and his estate severe injury, including pain and suffering, pecuniary loss and loss of income.

254.    From the time of the Brussels Terrorist Attack until the time of his death, decedent Alexander Pinczowski suffered conscious pain, shock and physical and mental anguish.

255.    Defendant is therefore jointly and severally liable to the Estate of Alexander Pinczowski for the full amount of decedent's damages, in such sums as may hereinafter be determined.

256.    The conduct of the Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## FOURTH CLAIM FOR RELIEF ON BEHALF OF THE ESTATE OF EREZ ORBACH FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. §1605A(a) and Common Law)

257.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

258.    The Jerusalem Terrorist Attack caused by Defendant's actions herein caused decedent Erez Orbach and his estate severe injury, including pain and suffering, pecuniary loss and loss of income.

259.     From the time of the Jerusalem Terrorist Attack until the time of his death, decedent Erez Orbach suffered conscious pain, shock and physical and mental anguish.

260.     Defendant is therefore jointly and severally liable to the Estate of Erez Orbach for the full amount of decedent's damages, in such sums as may hereinafter be determined.

261.     The conduct of the Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## FIFTH CLAIM FOR RELIEF ON BEHALF OF THE ESTATE OF ABRAHAM GOLDMAN FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. §1605A(a) and Common Law)

262.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

263.     The Istanbul Terrorist Attack caused by Defendant's actions herein caused decedent Abraham Goldman and his estate severe injury, including pain and suffering, pecuniary loss and loss of income.

264.     From the time of the Istanbul Terrorist Attack until the time of his death, decedent Abraham Goldman suffered conscious pain, shock and physical and mental anguish.

265.     Defendant is therefore jointly and severally liable to the Estate of Abraham Goldman for the full amount of decedent's damages, in such sums as may hereinafter be determined.

266.     The conduct of the Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SIXTH CLAIM FOR RELIEF ON BEHALF OF THE ESTATE OF NOHEMI GONZALEZ FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. §1605A(a) and Common Law)

267.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

268.    The Paris Terrorist Attack caused by Defendant's actions herein caused decedent Nohemi Gonzalez and her estate severe injury, including pain and suffering, pecuniary loss and loss of income.

269.    From the time of the Paris Terrorist Attack until the time of her death, decedent Nohemi Gonzalez suffered conscious pain, shock and physical and mental anguish.

270.    Defendant is therefore jointly and severally liable to the Estate of Nohemi Gonzalez for the full amount of decedent's damages, in such sums as may hereinafter be determined.

271.    The conduct of the Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SEVENTH CLAIM FOR RELIEF FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Under 28 U.S.C. § 1605A(a) and Common Law)

272.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

273.    Defendant's conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

274.    Defendant intended to, and did in fact, terrorize the Plaintiffs, and cause them egregious emotional distress.

275.     As a result of and by reason of the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks, which were caused by the actions of Defendant described herein, all the Plaintiffs have suffered, and will continue to suffer, terror, severe mental anguish, bereavement and grief, and injury to their feelings.

276.     The Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks constitute extreme and outrageous conduct with the intent to inflict emotional distress upon the victims and their families.

277.     ISIS subjected Ron, Pnina, Eytan and Nitzhia to severe physical injury and risk of death.

278.     When Cameron learned of the Brussels Terrorist Attack, she knew that Alexander was in the Brussels airport at the time of the attack and could have been injured or killed in the attack. Her heart filled with dread.

279.     On March 23, 2016, Cameron and her parents James and Helen flew to Brussels to search for Alexander and Sascha.

280.     On March 25, 2016, authorities told Cameron, James and Helen that Alexander and Sascha were murdered in the Brussels Terrorist Attack.

281.     Alexander was the love of Cameron's life and they had a bright future together, including their much-anticipated business they were in the process of creating when Alexander's life was taken so suddenly and in such a cruel manner.

282.     Due to Alexander's murder, Plaintiff Cameron has suffered a severe psychological injury that continues to this day.

283. Due to Alexander's murder, Plaintiff James, as Cameron's father and Alexander's father in-law has sustained emotional distress due to his own mental anguish and the mental anguish Alexander's murder has caused Cameron.

284. Due to Alexander's murder, Plaintiff Helen, as Cameron's mother and Alexander's mother-in-law has sustained emotional distress due to her own mental anguish and the mental anguish Alexander's murder has caused Cameron.

285. ISIS's conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

286. Upon learning of the Brussels Terrorist Attack, Plaintiffs Cameron, James and Helen suffered severe emotional distress in worrying about Alexander's safety and ultimately in grieving his untimely, sudden and gruesome death.

287. Upon learning of the Istanbul Terrorist Attack, Plaintiffs Liron Shalom Greenfield, Shere Greenfield, Gili Greenfield and Shye Greenfield suffered severe emotional distress in worrying about Ron and Pnina's safety and wellbeing.

288. Due to Ron and Pnina being in the Istanbul Terrorist Attack, Liron Shalom Greenfield, Shere Greenfield, Gili Greenfield and Shye Greenfield have suffered severe psychological injury that continues to this day.

289. Upon learning of the Jerusalem Terrorist Attack, Plaintiffs Caryn, Uri, A.O., E.O., O.O., Eitan and Alon Orbach suffered severe emotional distress in worrying about Erez Orbach's safety and ultimately in grieving his untimely, sudden and gruesome death.

290. Due to Erez's murder, Caryn, Uri, A.O., E.O., O.O., Eitan and Alon Orbach have suffered severe psychological injury that continues to this day.

291. Upon learning of the Jerusalem Terrorist Attack, Plaintiffs Tamar Bracha Rund, S.A.R., H.H.R. and Y.M.R. suffered severe emotional distress in worrying about Eytan's safety and wellbeing.

292. Due to Eytan being in the Jerusalem Terrorist Attack, Tamar Bracha Rund, S.A.R., H.H.R. and Y.M.R. have suffered severe psychological injury that continues to this day.

293. Upon learning of the Istanbul Terrorist Attack, Plaintiffs Gila, Natan, Maya, Sharon, Yoseff, Israel Gorenzky and Tamar Choresh suffered severe emotional distress in worrying about Nitzhia's safety and wellbeing and in worrying about Abraham's safety and ultimately in grieving his untimely, sudden and gruesome death.

294. Due to Nitzhia being in the Istanbul Terrorist Attack and due to Abraham's murder in the Istanbul Terrorist Attack, Plaintiffs Nitzhia, Gila, Natan, Maya, Sharon, Yoseff, Israel Gorenzky and Tamar Choresh have suffered severe psychological injury that continues to this day.

295. Upon learning of the Paris Terrorist Attack, Plaintiffs Beatriz Gonzalez, Jose Hernandez, Rey Gonzalez and Paul Gonzalez suffered severe emotional distress in worrying about Nohemi Gonzalez's safety and ultimately in grieving her untimely, sudden and gruesome death.

296. Due to Nohemi's murder, Plaintiffs Beatriz Gonzalez, Jose Hernandez, Rey Gonzalez and Paul Gonzalez have suffered severe psychological injury that continues to this day.

297. ISIS intended to, and did in fact, terrorize the Plaintiffs, and cause them egregious emotional distress.

298. As a result of and by reason of the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks, which were caused by the actions of the Defendant described herein, Plaintiffs have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief.

299. Syria provided material support and resources to ISIS, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Brussels, Istanbul, Jerusalem and Paris Terrorist Attacks.

300. As a direct and proximate result of the conduct of Syria, Plaintiffs suffered the injuries and harm described herein.

301. Syria is therefore liable for the full amount of Plaintiffs' damages.

302. The conduct of the Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## EIGHTH CLAIM FOR RELIEF ON BEHALF
## OF ALL PLAINTIFFS FOR NEGLIGENCE
### (Under the Law of the State of Israel)

303. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

304. Pursuant to Fed. R. Civ. P. 44.1 Plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

305. Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) – 1968, (hereinafter "CWO").

306. The CWO provides that any person injured or harmed by the civil wrongs (i.e. torts) enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

307. CWO § 35 creates a tort of Negligence.

308. Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

309. CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same

circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damages to another person toward whom, under those circumstances he is obligated not to act as he did.

310.    CWO § 36 provides that the obligation states in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

311.    By providing material support to ISIS, the Defendant performed acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

312.    By providing material support to ISIS, Defendant performed acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

313.    Defendant did not, in the performance of their occupations, use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, within the meaning of the CWO, in that, inter alia, Defendant provided material support to ISIS.

314.    Defendant acted negligently in connection with the decedent and the Plaintiffs, toward whom, in the circumstances described herein, Defendant had an obligation not to act as it did. Defendant was obligated not to act as it did because a reasonable person would, under the

same circumstances, have foreseen that, in the ordinary course of events, persons such as the decedent and the Plaintiffs were liable to be harmed by the acts of the Defendant described herein.

315.    The behavior of the Defendant constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the harm to all Plaintiffs including Pnina Greenfield, Uri Orbach, Y.M.R., Yoseff Goldman, Israel Gorenzky and Tamar Choresh, which includes physical injury; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship, and loss of solatium.

316.    Defendant is therefore liable for the full amount of the compensatory damages due to each of the Plaintiffs herein.

317.    Under Israeli case law a Plaintiff harmed by an act of Negligence caused by intentional conduct is entitled to punitive damages.

318.    The conduct of the Defendant was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

## JURY DEMAND

319.    Plaintiffs demand a trial by jury of all issues legally triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)    Judgment against the Defendant for compensatory damages in an amount to be determined at trial;

(b)    Judgment against the Defendant for punitive damages in an amount to be determined at trial;

(c)    Plaintiffs' costs and expenses;

(d)     Plaintiffs' attorneys' fees; and

(e)     Such other and further relief as are just and proper under the circumstances.


Respectfully submitted, this the 2nd day of June, 2020.

**SHANAHAN LAW GROUP, PLLC**

By:     */s/  Kieran J. Shanahan*
Kieran J. Shanahan, NCSB # 13329
Christopher S. Battles, NCSB # 42682
128 E. Hargett Street, Suite 300
Raleigh, North Carolina 27601
Telephone: (919) 856-9494
Facsimile: (919) 856-9499
kieran@shanahanlawgroup.com
cbattles@shanahanlawgroup.com
*Attorneys for Plaintiffs*
