**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:20-CV-230-BO**

-------------------------------------------------------------------- X

CAMERON CAIN BAARBÉ, *et al.*,

                              Plaintiffs,

                -against-

THE SYRIAN ARAB REPUBLIC,

                             Defendant.

--------------------------------------------------------------------- X

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

        Plaintiffs respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of their Motion for Default Judgment against the Syrian Arab Republic ("Syria") pursuant to 28 U.S.C. § 1608(e); and their request to refer the assessment of damages to a special master pursuant to 28 U.S.C. § 1605A(e).

## I.
## PROCEDURAL POSTURE

        This is a civil action for damages pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq.* Plaintiffs are the estate and family of U.S. national Nohemi Gonzalez murdered in a terror attack on November 13, 2015, the family and estate of U.S. national Abvraham[1] Goldman murdered in a terror attack on March 19, 2016, the estate and family of Alexander Pinczowski murdered in a terror attack on March 22, 2016, and the estate and family of

---

[1] This unusual spelling is, nevertheless, the spelling of decedent's name that appears on his legal documents.

U.S. national Erez Orbach murdered in a terror attack on January 8, 2017. Plaintiffs are also the survivors of the terror attacks on March 19, 2016 and January 8, 2017 and their families. Plaintiffs filed this action on June 2, 2020 against Syria. (Dkt. 1). Plaintiffs amended the complaint on October 13, 2020. (Dkt. 44). Plaintiffs assert a cause of action under the FSIA, 28 U.S.C. § 1605A(c), as well as causes of action for wrongful death, battery, survival damages, intentional infliction of emotional distress and negligence under Israeli law. *Id*. at ¶¶ 191-318 (Dkt. 44). Syria did not answer or otherwise appear. Plaintiffs moved for entry of default by the Court against Syria and the Clerk noted the default of Syria on February 25, 2022. (Dkt. 53, 55).

Plaintiffs have presented evidence in the form of an expert declaration by Dr. Daveed Gartenstein-Ross ("Gartenstein-Ross Decl.") regarding Syria's material support to ISIS, as well as ISIS's responsibility for the terror attacks in Istanbul, Paris and Brussels and an expert declaration by Arieh Dan Spitzen, Israel Defense Forces Colonel (ret.) ("Spitzen Decl.") regarding the responsibility of ISIS for the terror attack in Jerusalem. (Dkt. 75, 78). Plaintiffs also rely upon the testimony and reports of Dr. Gartenstein-Ross and Dr. Matthew Levitt in *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121 (D.D.C. 2021) (Dkt. 34-1, 34-2, 41, 42), the expert reports by Dr. Gartenstein-Ross in *Doe v. Syrian Arab Republic*, 2020 WL 5422844 (D.D.C. Sept. 10, 2020) (Dkt. 31-6) and in *Fields v. Syrian Arab Republic*, 2021 WL 9244135 (D.D.C. Sept. 29, 2021) (Dkt. 16-2, as well as Dr. Levitt's expert report in *Winternitz v. Syrian Arab Republic*, 2022 WL 971328 (D.D.C. March 31, 2022). (Dkt. 14-2) (Dkt. 98, Ex. 2, 5-8, 10-11). From *Sotloff*, 525 F. Supp. 3d 121, Plaintiffs further rely upon Ex. 1-11, Ex. 15-25, Ex. 27 from Docket 38 and Docket 37-1, which include government reports, records, and statements about Syria's material support of

ISIS.[2] (Dkt. 98, Ex. 9, 9A-9S). Plaintiffs further rely upon the declarations of Dr. Boaz Shnoor in

*Force v. Islamic Republic of Iran, et al.*, 464 F. Supp. 3d 323 (D.D.C. 2020) (Dkt. 34) and

*Borochov v. Islamic Republic of Iran, et al.*, 2022 WL 656168 (D.D.C. March 4, 2022) (Dkt. 60-

1) and the declaration of Dr. Israel Gilead in *Henkin v. Islamic Republic of Iran*, 2021 WL 291403

(D.D.C. July 12, 2021) (Dkt. 56-2) regarding the application of Israeli law to the claims of a non-

U.S. family member of a U.S. national victim, the declaration of Dr. Jean Sébastien Borghetti

regarding the application of French law to the claims of José Hernandez, the declaration of Dr. N.

Can Isiktac regarding the application of Turkish law to the claims of Pnina Greenfield, Yoseff

Goldman, Tamar Choresh's estate and Israel Gorenzsky and the declaration of Dr. Rafaël Jafferali

regarding the application of Belgian law to the claims of Alexander Pinczowski's estate. (Dkt. 77,

80, 81, 98, Ex. 15-17, 98, Ex. 15-17). Moreover, Plaintiffs have submitted declarations from each

adult Plaintiff regarding the attack as well as their damages and sworn reports from Dr. Rael Strous,

a psychiatric expert, regarding Plaintiffs' psychological and emotional damages, and sworn reports

by Dr. Alan Friedman regarding Ron Greenfield's, Pnina Greenfield's, Nitzachya Goldman's and

Eytan Rund's physical injuries, as well as Nohemi's and Alexander's conscious pain and suffering

---

[2] The contents of U.S. government records, reports and statements are admissible to prove facts in dispute under F.R.E. 803(8) which has a hearsay rule exception for public documents containing factual finding 'unless the sources of information or other circumstances indicate lack of trustworthiness.'" *Owens v. Republic of Sudan*, 864 F.3d 751, 792-93 (D.C. Cir. 2017). "[P]ublic records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial." *U.S. v. Am. Tel. & Tel. Co.*, 498 F. Supp. 3d 353, 360 (D.D.C. 1980) (citing *Melville v. American Home Assurance Co.*, 443 F. Supp. 1064 (E.D. Pa. 1977) (rev'd on other grounds, 584 F.2d 1306 (3d Cir. 1978). Rule 803(8) also includes public statements issued by government agencies to be admissible. *See, e.g.*, *Washington-El v. Bear*, 2013 WL 1314528, at * 10 (W.D. Pa. Feb. 26, 2013). The Ex. being relied upon are admissible under the public records exception to the hearsay rule. *See, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 48, 59 n.3 (D.D.C. 2018); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 16 (D.D.C. 2019).

before death. (Dkt. 79, 82, Ex. N, Q, R, W, 83-85, 88, 89-95, 100-116). Finally, Plaintiffs rely upon an economist to project the economic losses due to the terror attacks that murdered Nohemi and Erez and injured Ron Greenfield. (Dkt. 76). From the entire record, this Court makes the following findings of fact and conclusions of law.

## II.
## FINDINGS OF FACT

### A.      The Evolution of ISIS

#### *The Islamic State - Background*

The "Islamic State" (IS) organization also known as ISIS/ISIL (Islamic State of Iraq and Syria/Levant), and DAESH[3] is an Al-Qa'ida splinter group with a militant Sunni Islamist ideology.[4] (Spitzen Decl. ¶ 19) (Dkt. 78).

ISIS is a radical Sunni organization that seeks to restore what they imagine was the era of Prophet Muhammad through holy war (Jihad) against its enemies. (Spitzen Decl. ¶ 21) (Dkt. 78). ISIS maintains that a supranational Islamic Caliphate, modeled after the regimes of the first Caliphs who ruled following the death of Muhammad, should be established. (Spitzen Decl. ¶ 21) (Dkt. 78). It would be ruled by Islamic religious law (the *Sharia*), according to its strictest

---

[3] https://fas.org/sgp/crs/mideast/R43612.pdf. P. 1 (last accessed May 25, 2023).

[4] Al-Qa'ida was established in Afghanistan in 1989 by Osama Bin Laden. Bin Laden was killed in May of 2011, in Afghanistan by the U.S. military. Read more here:
https://www.files.ethz.ch/isn/131483/Geneva%20Paper%203%20-%20Research%20Series.pdf (last accessed May 25, 2023); https://www.pbs.org/wgbh/\frontline/article/timeline-al-qaedas-global-context/ (last accessed May 25, 2023); https://www.cfr.org/timeline/us-war-afghanistan (last accessed May 25, 2023).

interpretation. (Spitzen Decl. ¶ 21) (Dkt. 78). The Caliphate would arise on the ruins of the nation states established in the Middle East after World War I.[5] (Spitzen Decl. ¶ 21) (Dkt. 78).

For ISIS, the establishment of the Caliphate and the change of the organization's name to the "Islamic State," created the sole legitimate religious and political framework for Muslims in the 21st century.[6] (Spitzen Decl. ¶ 22) (Dkt 78). IS deems anyone who is not devoted to its ideology as a "Murtad," meaning, an apostate, someone who had believed in Islam but abandoned it, or as a "Kafir," meaning, an infidel. (Spitzen Decl. ¶ 24) (Dkt. 78). IS views those organizations that do not accept its ideology and way of life as illegitimate organizations, against whom a war of annihilation must be waged. (Spitzen Decl. ¶ 24) (Dkt. 78). Categorizing someone who does not accept the ways of IS as an apostate or as an infidel, in effect, is a call for murder. (Spitzen Decl. ¶ 25) (Dkt. 78).

### *Groups Designated as Foreign Terrorist Organizations*

Over the years, the U.S. State Department has designated ISIS-affiliated individuals and entities as terrorists and terror organizations.[7] (Spitzen Decl. ¶ 27) (Dkt. 78). In August 2017, the U.S. State Department designated over 30 ISIS leaders and operatives in an effort to curtail the

---

[5] https://www.terrorism-info.org.il/Data/articles/Art_20733/101_14_Ef_1329270214.pdf, P. 3 (last visited May 30, 2023).

[6] www.meisai.org.il/cwsd.php?Z3AuPTQ0MA/NDM/amBkUGFkdXFRNjBNYG1gaH12UnVqfGVsfXorYmp2.pdf. p. 142 (last visited May 23, 2023).

[7] https://www.state.gov/j/ct/rls/other/des/143210.htm (last accessed May 25, 2023). October 2004: Al-Qa'ida in Iraq; September 2015: Islamic State of Iraq and the Levant—Caucasus Province (ISIL-CP); September 2015: Islamic State of Iraq and the Levant Khorasan (ISIL-K); February 2018: ISIS affiliates in Bangladesh, the Philippines, West Africa, Somalia, and Egypt. In addition, in May 2016, the American State Department designated the following ISIL branches: Saudi Arabia, Yemen and Libya.

terror activity of ISIS.[8] (Spitzen Decl. ¶ 27) (Dkt. 78). For years, the U.S. Treasury worked to strike at ISIS's sources of funding.[9] (Spitzen Decl. ¶ 27) (Dkt. 78).

### *Background: Abu Musab al-Zarqawi*

Abu Musab al-Zarqawi is considered ISIS's founder. (Gartenstein-Ross Decl. ¶ 29) (Dkt. 75). ISIS is the most recent iteration of the "Zarqawi organization," a militant group that has undergone name changes since its founding in 1993. (Gartenstein-Ross Decl. ¶ 28) (Dkt. 75). Zarqawi and his network were responsible for some of the worst atrocities committed in Iraq's civil war. (Gartenstein-Ross Decl. ¶ 29) (Dkt. 75).

In 1989, Zarqawi traveled to Afghanistan after undergoing a religious awakening.[10] (Gartenstein-Ross Decl. ¶ 30) (Dkt. 75). Zarqawi went to Afghanistan hoping to fight the Soviet Union but was too late. (Gartenstein-Ross Decl. ¶ 31) (Dkt. 75). While in Afghanistan Zarqawi joined the jihadist movement. (Gartenstein-Ross ¶ 31) (Dkt. 75). Al-Qaeda leader Osama bin Laden was in Afghanistan during Zarqawi's time there, and Zarqawi trained for combat in al-Qaeda' Sada camp, which bin Laden ran.[11] (Gartenstein-Ross Decl. ¶ 32) (Dkt. 75). Zarqawi also met fellow Jordanian Abu Muhammad al-Maqdisi in Afghanistan. (Gartenstein-Ross Decl. ¶ 32) (Dkt. 75). Maqdisi is a renowned Salafist cleric who became Zarqawi's ideological mentor. (Gartenstein-Ross Decl. ¶ 32) (Dkt. 75). Zarqawi also built relationships with other jihadists in

---

[8] https://www.state.gov/r/pa/prs/ps/2017/08/273500.htm (last accessed May 25, 2023).

[9] www.treasury.gov/resource-center/sanctions/Programs/Documents/tar2017.pdf.  P.  10 (last accessed May 25, 2023).

[10] Mary Anne Weaver, "The Short, Violent Life of Abu Musab Al-Zarqawi," *The Atlantic*, July/August 2006.

[11] Weaver, "The Short, Violent Life of Abu Musab Al-Zarqawi."

Afghanistan that allowed him to form the "Zarqawi organization," which became known as ISIS after his death. (Gartenstein-Ross Decl. ¶ 32) (Dkt. 75).

### *Bayat al-Imam / Tawhid wa-l-Jihad*

While in Afghanistan, Zarqawi and Maqdisi established their own militant Islamist group, known as Bayat al-Imam. (Gartenstein-Ross Decl. ¶ 33) (Dkt. 75). But members of the group reportedly referred to it instead as Tawhid wa-l-Jihad (Monotheism and Jihad, or TwJ). (Gartenstein-Ross Decl. ¶ 33) (Dkt. 75). The group wanted to overthrow Jordan's monarchy and replace it with an Islamic government. (Gartenstein-Ross Decl. ¶ 33) (Dkt. 75).

Zarqawi and Maqdisi returned to Jordan in 1993 and authorities arrested them in 1994. (Gartenstein-Ross Decl. ¶ 34) (Dkt. 75). Both men were convicted on terrorism charges and sentenced to 15 years in prison.[12] (Gartenstein-Ross Decl. ¶ 34) (Dkt. 75). The Zarqawi organization was very influential in prison.[13] (Gartenstein-Ross Decl. ¶ 35) (Dkt. 75). In 1999, King Abdullah II declared a general amnesty for Jordanian prisoners, and Zarqawi and Maqdisi were released. (Gartenstein-Ross ¶ 37) (Dkt. 75).

Two weeks after his arrival in Kandahar, Zarqawi met with Saif al-Adl, who was al-Qaeda's security chief.[14] (Gartenstein-Ross Decl. ¶ 38) (Dkt. 75). Adl played an important role in al-Qaeda's partnership with Zarqawi.[15] (Gartenstein-Ross Decl. ¶ 38) (Dkt. 75). According to Adl, bin Laden and Ayman al-Zawahiri were reluctant to associate with Zarqawi. (Gartenstein-Ross

---

[12] George Michael, "The Legend and Legacy of Abu Musab Al-Zarqawi," *Defence Studies* 7:3 (2007), p. 340.

[13] *Al-Sharq al-Awsat*, March 8, 2004.

[14] Hussein, *Al-Zarqawi*.

[15] Bin Laden disputed this account and pointed to at least one factual error in Adl's telling. *See* discussion in Fishman, *The Master Plan*, locs. 459-63 of 8220.

Decl. ¶ 38) (Dkt. 75). But Adl counseled al-Qaeda's leadership to work with Zarqawi to enable al-Qaeda to gain a foothold in Palestine and Jordan.[16] (Gartenstein-Ross Decl. ¶ 38) (Dkt. 75).

With bin Laden's consent, Adl met with Zarqawi and discussed plans to establish a military camp in western Afghanistan.[17] (Gartenstein-Ross Decl. ¶ 39) (Dkt. 75). Bin Laden indirectly provided funding and equipment for the camp.[18] (Gartenstein-Ross Decl. ¶ 39) (Dkt. 750. Al-Qaeda and Zarqawi also worked together to plot terror attacks before the 9/11 attacks.[19] (Gartenstein-Ross Decl. ¶ 39) (Dkt. 75).

### *Jund al-Sham*

The Zarqawi organization's network in Herat became known as Jund al-Sham, though the banner above the entrance to the Herat camp still read *Tawhid wa-l-Jihad*—which is the name that insiders called the group during this period.[20] (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). Graduates of the Herat camp took part in terror plots.[21] (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75).

After the establishment of the Herat camp, Zarqawi tasked Abu Abdel Rahman al-Shami,a fellow Jordanian militant, with expanding his network into northern Iraq.[22] (Gartenstein-Ross Decl. ¶ 41) (Dkt. 75). On September 1, 2001, Shami helped form the group Jund al-Islam with

---

[16] *Id.*

[17] *Id;* see also Hazim al-Amin, "Al-Zarqa Produces al-Khalayleh and al-Maqdisi, and the Returnees from Kuwait Rallied Around Them," *Al-Hayah* (London; original in Arabic), December 15, 2004.

[18] Hussein, *Al-Zarqawi*.

[19] *See* U.S. Department of the Treasury, "Fact Sheet: Abu Musa'ab al-Zarqawi," September 23, 2003.

[20] Hussein, *Al-Zarqawi*; Michael Weiss & Hassan Hassan, *ISIS: Inside the Army of Terror* (New York: Regan Arts, 2015), p. 13.

[21] Weiss & Hassan, *ISIS*, p. 13.

[22] *Id.*, p. 14.

Kurdish jihadist leader Abu Abdullah al-Shafi'i and Iraqi militant Abu Wa'il. (Gartenstein-Ross Decl. ¶ 41) (Dkt. 75). Following the 9/11 attacks, Jund al-Islam merged with a Kurdish jihadist organization operating in northern Iraq known as Ansar al-Islam.[23] (Gartenstein-Ross Decl. ¶ 41) (Dkt. 75). The U.S. invasion of Afghanistan in late 2001 forced Zarqawi and Jund al-Sham members to relocate from Herat to Iran and then to Iraq.[24] (Gartenstein-Ross Decl. ¶ 42) (Dkt. 75). Zarqawi expanded his organization into other countries in the region, but his main focus was in Iraq. (Gartenstein-Ross Decl. ¶ 42) (Dkt. 75).

### Al-Qaeda in Iraq

In October 2004, Zarqawi pledged *bayah* (an oath of allegiance) to bin Laden, thus making his organization al-Qaeda's first official affiliate group. (Gartenstein-Ross Decl. ¶ 44) (Dkt. 75). Zarqawi intended to become a key player for al-Qaeda in Iraq, and his declaration served "as a recruiting statement for the Iraqi insurgency."[25] (Gartenstein-Ross Decl. ¶ 44) (Dkt. 75).With Zarqawi's public declaration of *bayah*, his organization became known as al-Qaeda in Iraq (AQI), but the Zarqawi organization's leadership structure and membership ranks remained intact. (Gartenstein-Ross Decl. ¶ 45) (Dkt. 75).

### Mujahedin Shura Council (MSC)

On January 15, 2006, AQI's deputy emir, Abu Maysarah al-Iraqi, announced the establishment of MSC, an umbrella group composed of six Iraqi Sunni militant factions. (Gartenstein-Ross Decl. ¶ 46) (Dkt. 75). These factions were AQI, the Victorious Sect Army, the

---

[23] Hussein, *Al-Zarqawi*.

[24] Mary Anne Weaver, "The Short, Violent Life"; Hussein, *Al-Zarqawi*.

[25] Jeffrey Pool, "Zarqawi's Pledge of Allegiance to al-Qaeda: From Mu'asker Al-Battar, Issue 21," *Terrorism Monitor* 2:24 (Jamestown Foundation), December 16, 2004.

Monotheism Supporters Brigades (Saraya Ansar al-Tawhid), the Islamic Jihad Brigades (Saraya al-Jihad al-Islami), the Al-Gurib (Foreigners) Brigades, and the Al-Ahwal (Fear) Brigades.[26] (Gartenstein-Ross Decl. ¶ 46) (Dkt. 75). ISIS's eventual "caliph" Abu Bakr al-Baghdadi formally came into AQI's orbit weeks later, when the group Jaysh Ahl al-Sunnah wa-l-Jama'a, in which Abu Bakr served as the emir of the Sharia Committee, joined MSC.[27] (Gartenstein-Ross Decl. ¶ 46) (Dkt. 75). The MSC's establishment came about due to the formalization of prior relationships. (Gartenstein-Ross Decl. ¶ 46) (Dkt. 75).

Though MSC purported to function as a coalition, the group was AQI's brainchild. (Gartenstein-Ross Decl. ¶ 47) (Dkt. 75). At the time, AQI faced criticism from Iraqis for representing a foreign agenda and attacking civilians. (Gartenstein-Ross Decl. ¶ 47) (Dkt. 75). AQI envisioned MSC as a way to rebrand, highlighting its local origins and connections in an effort to regain the support of other Iraqi factions and the population. (Gartenstein-Ross Decl. ¶ 47) (Dkt. 75). Attacks in Iraq claimed by MSC during its brief existence did not invoke AQI's name, in order to downplay AQI's involvement in the insurgency and to draw attention instead to Iraqi militants. (Gartenstein-Ross Decl. ¶ 47) (Dkt. 75). Though the MSC was designed to provide cover to AQI and showcase the "Iraqi-led" insurgency, AQI quietly remained the dominant player. (Gartenstein-Ross Decl. ¶ 48) (Dkt. 75).

### Islamic State of Iraq (ISI)

On October 15, 2006, MSC announced its establishment of the ISI.[28] (Gartenstein-Ross

---

[26] *See, e.g.*, Muhammad al-'Ubaydi *et al.*, The Group That Calls Itself a State: Understanding the Evolution and Challengers of the Islamic State (West Point: Combating Terrorism Center, 2014).

[27] Fishman, *The Master Plan*, p. 151.

[28] MSC statement on the establishment of the Islamic State of Iraq, October 15, 2006.

Decl. ¶ 50) (Dkt. 75). Zarqawi died prior to ISI's creation, but its establishment advanced AQI's objectives in keyways. (Gartenstein-Ross Decl. ¶ 50) (Dkt. 75). According to Saif al-Adl, establishing an Islamic state was one of Zarqawi's core goals when he relocated to Iraq.[29] (Gartenstein-Ross Decl. ¶ 50) (Dkt. 75).

Brian Fishman notes ISI "immediately set out to build a scalable bureaucratic framework that would eventually define the IS during the Syrian civil war."[30] (Gartenstein-Ross Decl. ¶ 52) (Dkt. 75). Fishman outlines a number of steps that ISI took during this period that would later define ISIS's bureaucracy, including: (1) naming a cabinet; (2) implementing small public works projects; and (3) implementing health and safety regulations.[31] (Gartenstein-Ross Decl. ¶ 52) (Dkt. 75). By late 2006, the Zarqawi organization-controlled territory in Iraq that was larger in size than New England.[32] (Gartenstein-Ross Decl. ¶ 53) (Dkt. 75).

ISI encountered a challenge that produced the group's defeat but it reemerged in the post-Arab Spring environment as ISIS. (Gartenstein-Ross Decl. ¶ 54) (Dkt. 75). Though the Zarqawi organization had tried to mask its activities in Iraq under the pretense of an Iraqi-led insurgent coalition, many Sunni tribal leaders saw the jihadist organization as brutal, foreign in its conception, and forcibly imposing an oppressive form of the Islamic faith that was alien to Iraq. (Gartenstein-Ross Decl. ¶ 54) (Dkt. 75). In September 2006, around 30 of these leaders held a meeting to voice their opposition to the Zarqawi organization, and formed a coalition called *Majlis*

---

[29] Quoted in Cole Bunzel, *From Paper State to Caliphate: The Ideology of the Islamic State* (Washington, D.C.: Center for Middle East Policy at the Brookings Institution, 2015), p. 15; https://www.brookings.edu/wp-content/uploads/2016/06/the-ideology-of-the-islamic-state.pdf (last accessed May 25, 2023).

[30] Fishman, *The Master Plan*, loc. 1794 of 8220.

[31] *Id.*, locs. 1801-08 of 8220.

[32] Peter L. Bergen, The Longest War: The Enduring Conflict between America and al Qaeda (New York: Free Press, 2011), p. 271.

*Inqadh al-Anbar*, or the Anbar Salvation Council, to combat al-Qaeda elements in their midst.[33] (Gartenstein-Ross Decl. ¶ 54) (Dkt. 75). This became known as the Awakening movement, which was key in the Zarqawi organization's defeat during this period. (Gartenstein-Ross Decl. ¶ 54) (Dkt. 75).

The U.S. also made two major changes in its military strategy that contributed to the Zarqawi organization's setbacks: increasing the number of soldiers on the ground and shifting the way the troops were used. (Gartenstein-Ross Decl. ¶ 55) (Dkt. 75). America's focus shifted toward protecting Iraqi civilians from insurgents and other dangers, and American forces were better integrated with the Iraqis through the use of outposts in the districts they patrolled.[34] (Gartenstein-Ross Decl. ¶ 55) (Dkt. 75). These changes, coupled with the turning of tribes, as well as former insurgents, to cooperate with coalition forces made a difference on the ground. (Gartenstein-Ross Decl. ¶ 56) (Dkt. 75).

In April 2010, U.S. and Iraqi forces raided a safe house north of Baghdad and killed ISI's emir and its minister of war. (Gartenstein-Ross Decl. ¶ 58) (Dkt. 75). On May 16, 2010, ISI announced the selection of a new emir, Abu Bakr al-Baghdadi al-Husayni al-Qurashi, who would become ISIS's first caliph.[35] (Gartenstein-Ross Decl. ¶ 58) (Dkt. 75).

---

[33] *Al-Bayyinah al-Jadidah* (Arabic), September 20, 2006.

[34] *See* the reporting on the new "joint security stations" in Jonathan Karl, "Troop Surge Already Under Way," *ABC News*, January 10, 2007.

[35] For the announcement of Baghdadi's ascension within ISI, see "God Is Great, A Statement of the Islamic State of Iraq's Shura Council [trans. from Arabic]," posted to Al-Fallujah Islamic Forums, May 16, 2010.

*Abu Bakr al-Baghdadi and the Rise of ISIS*

Abu Bakr al-Baghdadi came from Iraq. (Gartenstein-Ross Decl. ¶ 60) (Dkt. 75). After high school, he enrolled in a doctorate program at Saddam University for Islamic Studies and became a member of the Muslim Brotherhood.[36] (Gartenstein-Ross Decl. ¶ 60) (Dkt. 75). In 2004, U.S. forces arrested Abu Bakr in Fallujah, and sent him to the notorious Camp Bucca prison. (Gartenstein-Ross Decl. ¶ 61) (Dkt. 75). By the time of his release at the end of that year, Abu Bakr had built a network of jihadists from among his fellow prisoners. (Gartenstein-Ross Decl. ¶ 61) (Dkt. 75). Abu Bakr then worked with several militant groups, including AQI. (Gartenstein-Ross Decl. ¶ 61) (Dkt. 75).

Abu Bakr was a member of Jaysh al-Mujahideen in Iraq in 2005 before becoming the emir of the Sharia Committee of the Jaysh Ahl al-Sunnah wa-l-Jama'a, which is a jihadist outfit that aligned ideologically with Zarqawi and bin Laden and joined the MSC on January 26, 2006. (Gartenstein-Ross Decl. ¶ 62) (Dkt. 75).

As unrest in Syria mounted in 2011, Abu Bakr began laying the groundwork for ISI's western expansion. (Gartenstein-Ross Decl. ¶ 64) (Dkt. 75). In August 2011, Abu Bakr dispatched Abu Muhammad al-Julani and a small group of ISI members into Syria to establish a new branch of ISI.[37] (Gartenstein-Ross Decl. ¶ 64) (Dkt. 75). In January 2012, Julani's group announced the establishment of Jabhat al-Nusra. (Gartenstein-Ross Decl. ¶ 65) (Dkt. 75). Seeking to gain more moderate Syrian rebels, Jabhat al-Nusra obscured its ties to ISI and al-Qaeda. (Gartenstein-Ross Decl. ¶ 65) (Dkt. 75). In December 2012, the U.S. Treasury designated the group as a foreign terrorist organization (FTO) connected to AQI. (Gartenstein-Ross Decl. ¶ 65) (Dkt. 75).

---

[36] Fishman, *The Master Plan*, pp. 149-50.
[37] Rania Abouzeid, "The Jihad Next Door," *Politico,* June 23, 2014.

The dynamics between Abu Bakr and Julani were troubled, as Julani was not an obedient and deferential deputy. (Gartenstein-Ross Decl. ¶ 66) (Dkt. 75). The two leaders had different strategic and tactical outlooks, and Julani disobeyed some of Abu Bakr's orders.[38] (Gartenstein-Ross Decl. ¶ 66) (Dkt. 75). In late 2012, Haji Bakr traveled to Syria to restore the relationship between Jabhat al-Nusra and ISI.[39] (Gartenstein-Ross Decl. ¶ 66) (Dkt. 75).

Abu Bakr began publicizing the link between ISI and Jabhat al-Nusra, emphasizing ISI's control over the Syria-based group.[40] (Gartenstein-Ross Decl. ¶ 67) (Dkt. 75). On April 9, 2013, Abu Bakr announced the dissolution of Jabhat al-Nusra. (Gartenstein-Ross Decl. ¶ 68) (Dkt. 75). In its place, he said the IS of Iraq and al-Sham (ISIS) would be the name of a new entity under his leadership. (Gartenstein-Ross Decl. ¶ 68) (Dkt 75). Abu Bakr's move to unite the two groups ruined his group's relationship with Jabhat al-Nusra and al-Qaeda's senior leadership. (Gartenstein-Ross Decl. ¶ 69) (Dkt. 75). When Julani rejected Abu Bakr's merger, Zawahiri tried to resolve their dispute through mediation, but al-Qaeda decided to disown ISIS. (Gartenstein-Ross Decl. ¶ 69) (Dkt. 75).

By the time of this dissociation, ISIS had already begun its expansion throughout Iraq and Syria. (Gartenstein-Ross Decl. ¶ 70) (Dkt. 75). On January 4, 2014, ISIS seized control of Fallujah. (Gartenstein-Ross Decl. ¶ 70) (Dkt. 75). Less than two weeks later, ISIS gained control of the

---

[38] Aron Lund, "As Rifts Open Up in Syria's al-Qaeda Franchise, Secrets Spill Out," Carnegie Middle East Center, August 10, 2015, http://carnegie-mec.org/diwan/60973 (last accessed May 25, 2023).

[39] Christoph Reuter, "Secret Files Reveal The Structure of Islamic State," *Spiegel*, April 18, 2015, http://www.spiegel.de/international/world/islamic-state-files-show-structure-of-islamist-terror-group-a-1029274.html (last accessed May 25, 2023).

[40] *See*, for example, Islamic State of Iraq, "Pounding the Fortresses," video posted to the Hanin Network Forums, March 7, 2013.

Syrian city of Raqqa.[41] (Gartenstein-Ross Decl. ¶ 70) (Dkt. 75). ISIS opened June 2014 with a shocking offensive from Syria into Iraq, seizing control of the major cities of Mosul and Tikrit in two days. (Gartenstein-Ross Decl. ¶ 70) (Dkt. 75). By the end of June 2014, the group's spokesman, Abu Muhammad al-Adnani, claimed that ISIS had re-established the caliphate, thus becoming—in the group's eyes—the legitimate political and spiritual leader of the world's Muslims.[42] (Gartenstein-Ross Decl. ¶ 70) (Dkt. 75).

ISIS then managed to establish branches or persuade other militant groups to declare their allegiance to it, in various places. (Gartenstein-Ross Decl. ¶ 71) (Dkt. 75). After the conquest of territories in Syria and Iraq, the IS adopted an efficient governmental pyramid structure; it established ad hoc state-like institutions; and it expanded the range of its non-violent activities. (Gartenstein-Ross Decl. ¶ 39) (Dkt. 75).

Data published in December 2015 disclosed the Islamic State's sources of funding in 2014: independent profits of two billion dollars. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). Its "soldiers" earned $400 to $1,200 a month, plus a $50 stipend for their wives and $25 for each child. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). Engineers and technicians earned $1,500 a month. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). Over $360 million was collected annually in taxes from citizens under its control. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). The takeover of oil wells and refineries within the area of the organization's control brought in over $500 million dollars in revenue. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). ISIS sold a portion of the oil and its products to its enemies. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). ISIS stole between $500 million and $1

---

[41] "ISIL Recaptures Raqqa from Syria's Rebels," *Al Jazeera*, January 14, 2014, https://www.aljazeera.com/news/2014/1/14/isil-recaptures-raqqa-from-syrias-rebels (last accessed May 25, 2023).

[42] Abu Muhammad al-Adnani, "This is the Promise of Allah," June 29, 2014.

billion from banks. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75). Kidnappings brought in $20-45 million. (Gartenstein-Ross Decl. ¶ 40) (Dkt. 75).

One factor in ISIS's growth was its powerful propaganda machine. (Gartenstein-Ross Decl. ¶ 72) (Dkt. 75). With the power of social media and significant advances in DIY video production, ISIS spread horrific imagery throughout the globe. (Gartenstein-Ross Decl. ¶ 72) (Dkt. 75).

## B.    Syrian Support for the Zarqawi Organization

Syria's relationship with ISIS during the time period most relevant to this case—the post-Arab Spring period—is best understood in the context of support that Bashar al-Assad's regime provided to previous iterations of the Zarqawi organization before the Arab Spring. (Gartenstein-Ross Decl. ¶ 73) (Dkt. 75). Syria's considerable support for AQI was intended to undermine coalition efforts in Iraq. (Gartenstein-Ross Decl. ¶ 73) (Dkt. 75). Addressing the Syrian parliament in March 2003—the month of the U.S. invasion—Syrian foreign minister Farouq al-Sharra said that "Syria has a national interest in the expulsion of the invaders from Iraq."[43] (Gartenstein-Ross Decl. ¶ 73) (Dkt. 75). Though Syria's involvement with the Zarqawi organization went between tacit approval and blatant support, evidence of such support from 2002 to around 2010 is well documented and has been established by analysts and court opinions.[44] (Gartenstein-Ross Decl. ¶¶ 73-75) (Dkt. 75).

---

[43] Neil MacFarquhar, "Syria Wants U.S. to Lose War, Its Foreign Minister Declares," *New York Times*, March 31, 2003.

[44] Some evidence discussed herein has been outlined in prior testimonies in *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 2d 22 (D.D.C. 2016) and *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008).

***Transit Point for Militants***

Syria's role as the primary transit point for militants heading to Iraq, as well as a permissive operating environment for Zarqawi network operatives stationed there, is well documented. (Gartenstein-Ross Decl. ¶ 74) (Dkt. 75). America invaded Iraq in March 2003, and before the end of that month, U.S. Secretary of Defense Donald Rumsfeld had "accused Syria of allowing military supplies to be transported across its border to Iraq."[45] (Gartenstein-Ross Decl. ¶ 76) (Dkt. 75). A month later, on *Face the Nation*, Secretary Rumsfeld described "busloads of people coming out of Syria into [Iraq]."[46] (Gartenstein-Ross Decl. ¶ 77) (Dkt. 75). The U.S. tried to pressure the Syrian regime, but the regime's response was designed to maintain its support for the insurgency, as it shifted its posture from a policy of blatant facilitation of insurgents to one of tacit acceptance masked by disingenuous crackdowns. (Gartenstein-Ross Decl. ¶¶ 76-79) (Dkt. 75).

A March 2007 Department of Defense report found that Syria's tacit support, including safe haven, border transit and logistical support, for the Iraqi insurgency had continued well into that year. (Gartenstein-Ross Decl. ¶ 80) (Dkt 75). In October 2007, U.S. forces killed AQI's emir of the Iraq and Syria border area and obtained documents that further revealed AQI's cross-border operations. (Gartenstein-Ross Decl. ¶ 81) (Dkt. 75). The documents obtained in the raid, which became known as the "Sinjar records," were studied in a 2008 report by the Combating Terrorism Center at West Point (CTC)[47] and it concluded that "all of the fighters listed in the Sinjar Records

---

[45] Neil MacFarquhar, "Syria Wants U.S. to Lose War, Its Foreign Minister Declares," *New York Times*, March 31, 2003.

[46] *Face the Nation*, April 13, 2003, https://www.cbsnews.com/news/ftn-4-13-03/ (last accessed May 25, 2023).

[47] Though Dr. Gartenstein-Ross cites CTC's conclusions several times, he examined the relevant documents independently, and only cites CTC's report where his analysis of the available evidence aligns with that of the CTC.

crossed into Iraq from Syria."[48] (Gartenstein-Ross Decl. ¶ 82) (Dkt. 75). CTC released a follow-up report in 2008 that concluded "hundreds of fighters passed through Abu Kamel and Hasake just before the US invasion" and that "the Syrian authorities monitored the flow but made no move to stop it."[49] (Gartenstein-Ross Decl. ¶ 82) (Dkt. 75). The U.S. State Department's annual *Country Reports on Terrorism* in 2008, 2009, and 2010 identified Syria as the main conduit for foreign fighters entering Iraq. (Gartenstein-Ross Decl. ¶ 83) (Dkt. 75). A former senior ISIS official, Abu Ahmed, confirmed to *The Guardian* newspaper in 2014 that "the *mujahideen* all came through Syria."[50] (Gartenstein-Ross Decl. ¶ 85) (Dkt. 75). Concerned about possible military action against the Syrian regime, Syria opted to support insurgents and terrorists wreaking havoc in Iraq."[51] (Gartenstein-Ross Decl. ¶ 82) (Dkt. 75). The logistics and facilitation networks established during this time would have later consequences for ISIS. (Gartenstein-Ross Decl. ¶ 82) (Dkt. 75). Indeed, a major 2014 report from the U.S. Department of State, its annual *Country Reports on Terrorism*, discussed how Syria served as a "key hub" for foreign fighters traveling to Iraq and noted that

---

[48] Combating Terrorism Center at West Point, *Al-Qaeda's Foreign Fighters in Iraq: A First Look at the Sinjar Fighters* (2007), https://ctc.westpoint.edu/wp-content/uploads/2010/06/aqs-foreign-fighters-in-iraq.pdf. (last accessed May 25, 2023).

[49] Peter Bergen, Joseph Felter, Vahid Brown & Jacob Shapiro, *Bombers, Bank Accounts, & Bleedout: Al-Qa'ida's Road In and Out of Iraq* (West Point, NY: Combating Terrorism Center at West Point, 2008), p. 90, https://ctc.westpoint.edu/wp-content/uploads/2011/12/Sinjar_2_FINAL.pdf (last accessed May 25, 2023).

[50] Martin Chulov, "Isis: The Inside Story," *Guardian*, December 11, 2014, https://www.theguardian.com/world/2014/dec/11/-sp-isis-the-inside-story (last accessed May 25, 2023). Abu Ahmed engaged in two years' worth of discussions with *The Guardian* before agreeing to speak on the record. *The Guardian* learned of Abu Ahmed's long history of involvement with Baghdadi and the Zarqawi network. Abu Ahmed was reportedly incarcerated with Abu Bakr al-Baghdadi at Camp Bucca and became an "essential member" of the Zarqawi network after his release. Indeed, described by *The Guardian* as "one of Iraq's most formidable and connected militants," Abu Ahmed's account is widely considered to be credible by experts in the field.

[51] *Id.*, p. 62.

"those very networks were the seedbed for the violent extremist elements that terrorized the Syrian population in 2013."[52] (Gartenstein-Ross Decl. ¶ 82) (Dkt. 75).

### Safe Haven for Militants

Syria served as a safe haven for key AQI operatives and ex-Baathist insurgents. (Gartenstein-Ross Decl. ¶ 86) (Dkt. 75). For example, one of AQI's leaders, Abu al-Ghadiyah (born Sulayman Khalid Darwish) was based in Syria. (Gartenstein-Ross Decl. ¶ 86) (Dkt. 75). The U.S. Treasury Department designated Abu al-Ghadiyah in 2005 for his role in the Zarqawi network, which included fundraising and recruiting. (Gartenstein-Ross Decl. 86) (Dkt. 75).

Following Darwish's death in 2005, his *kunya* (Abu al-Ghadiya) reappeared with Badran Turki Hishan al-Mazidih.[53] (Gartenstein-Ross Decl. ¶ 87) (Dkt. 75). Mazidih had his own distinguished jihadist career until his death in 2008, reportedly serving as AQI's Syrian commander for logistics as early as 2004. (Gartenstein-Ross Decl. ¶ 87) (Dkt. 75). He "obtained false passports for foreign terrorists, provided weapons, guides, safe houses, and allowances to foreign terrorists in Syria and those preparing to cross the border into Iraq.[54] (Gartenstein-Ross Decl. ¶ 87) (Dkt. 75). To assist his recruitment and fundraising, Mazidih cultivated a small familial network of AQI operatives in Syria. (Gartenstein-Ross Decl. ¶ 88) (Dkt. 75). For example, one of

---

[52] U.S. Department of State, *Country Reports on Terrorism 2013* (2014), https://2009-2017.state.gov/documents/organization/225886.pdf (last accessed May 25, 2023).

[53] Despite a shared pseudonym, it is clear that Darwish and Mazidih were separate incarnations of "Abu al-Ghadiya." Not only did Mazidih work for AQI *after* Darwish's death, but he was also the ringleader of a familial network composed of men with the shared Mazidih name. *See* article in *Al-Ghadd* (Arabic), June 25, 2005.

[54] U.S. Department of the Treasury, press release, "Treasury Designates Members of Abu Ghadiyah's Network Facilitates Flow of Terrorists, Weapons, and Money from Syria to al Qaida in Iraq," February 28, 2008, https://home.treasury.gov/news/press-releases/sm474 (last accessed May 25, 2023).

Mazidih's cousins was integral to the transfer of funds, fighters, and suicide bombers from Syria into Iraq. (Gartenstein-Ross Decl. ¶ 88) (Dkt. 75). Mazidih's familial network of operatives demonstrates the freedom of movement and operation allowed to key AQI members in Syria. (Gartenstein-Ross Decl. ¶ 88) (Dkt. 75).

Syria at times provided more active support to the insurgency in Iraq. (Gartenstein-Ross Decl. ¶ 89) (Dkt 75). Regime defector Nawaf Fares claimed that during his time working for the Syrian government, he was part of "an operation to smuggle jihadist volunteers into Iraq from Syria after the 2003 invasion."[55] (Gartenstein-Ross Decl. ¶¶ 89-90) (Dkt. 75). The regime felt threatened and believed that its policies of supporting insurgent groups could help prevent a military intervention to topple it. (Gartenstein-Ross Decl. ¶ 91) (Dkt. 75). The Syrian government's apparent hopes in pursuing these policies included: 1) to tie down the U.S. in Iraq; 2) to allow the Iraq conflict to serve as an outlet for domestic jihadists, thus preventing them from causing trouble at home; and 3) to gain "street cred" by being one of the few Arab governments to sanction armed opposition to the American presence in Iraq. (Gartenstein-Ross Decl. ¶ 91) (Dkt. 75).

Former Levant country director for the Office of the Secretary of Defense David Schenker testified in *Gates v. Syrian Arab Republic* that "in the months prior to the [U.S.] invasion, the Assad regime allowed the establishment of an office across the street from the U.S. Embassy in Damascus where would-be insurgents could sign up and board a bus to travel to Baghdad."[56] (Gartenstein-Ross Decl. ¶ 93) (Dkt. 75). Then-U.S. Ambassador to Syria Ted Kattouf complained to the Syrian government about these activities but after months of complaints Damascus only

---

[55] Ivan Watson and Samya Ayish, "Ex-Syrian Ambassador Calls for Foreign Military Intervention," *CNN*, July 15, 2012, https://www.cnn.com/2012/07/15/world/meast/syria-defector-interview/index.html (last accessed May 25, 2023).

[56] David Schenker testimony, *Gates v. Syrian Arab Republic*, trial transcript (D.D.C. 2008), pp. 87-88.

moved the sign-up to Damascus Fairgrounds—a government-owned property—where it continued its work for several more months."[57] (Gartenstein-Ross Decl. ¶ 93) (Dkt. 75).

Further, a senior official in the Obama administration said that Fares's account of Syrian policy toward militant groups, including AQI, was "broadly consistent" with the Obama administration's understanding. (Gartenstein-Ross Decl. ¶ 94) (Dkt. 75). The official said that "since 2003, al-Assad allowed al Qaeda and associates to facilitate weapons, money and fighters to al Qaeda's Iraq-based affiliate."[58] (Gartenstein-Ross Decl. ¶ 94) (Dkt. 75). The Bush administration also fingered active Syrian support for AQI. (Gartenstein-Ross Decl. ¶ 94) (Dkt. 75). In 2005, the U.S.'s ambassador to Iraq, Zalmay Khalilzad, said publicly that state-run Syrian newspapers "glorify the terrorists as resistance fighters," and that Syrian authorities "allow youngsters misguided by Al Qaeda" to fly into Damascus International Airport, "to attend training camps and then cross into Iraq."[59] (Gartenstein-Ross Decl. ¶ 94) (Dkt. 75).

### Syria's Relationships with Key Zarqawi Organization Members

Syria supported AQI recruiter Abu Qaqaa. (Gartenstein-Ross Decl. ¶ 95) (Dkt. 75). By the time of his assassination in 2007, Abu Qaqaa was considered to be an agent of the Syrian state. (Gartenstein-Ross Decl. ¶ 95) (Dkt. 75). Abu Qaqaa gave "regular sermons at Aleppo's al-Tawabbin mosque, something normally done only with the permission of Syria's Al-Awqaf Ministry."[60] (Gartenstein-Ross Decl. ¶ 95) (Dkt. 75). The BBC reported that Abu Qaqaa had been

---

[57] Schenker testimony, p. 4.

[58] Watson & Ayish, "Ex-Syrian Ambassador Calls for Foreign Military Intervention."

[59] Joel Brinkley, "American Envoy Says Syria Assists Training of Terrorists," *New York Times*, September 13, 2005.

[60] Andrew McGregor, "Controversial Syrian Preacher Abu al-Qaqa Gunned Down in Aleppo," *Terrorism Focus* 4:33 (2007), https://jamestown.org/program/controversial-syrian-preacher-abu-al-qaqa-gunned-down-in-aleppo/ (last accessed May 25, 2023).

"appointed head of a religious school by the Syrian government" in the year prior to his death.[61] (Gartenstein-Ross Decl. ¶ 95) (Dkt. 75). Scholar Charles Lister described in his book *The Syrian Jihad* Abu Qaqaa's "relationship with Syrian intelligence" as "almost certain" and noted that Syrian officials attended Abu Qaqaa's funeral—which Lister notes was described as having "all the trappings of a state occasion"—as indicative of this relationship.[62] (Gartenstein-Ross Decl. ¶ 95).

Abu Qaqaa's ties to the Syrian regime were further validated in 2009, when Iraq aired the confession of Mohammed Hassan al-Shemari, the head of AQI in Diyala province. (Gartenstein-Ross Decl. ¶ 96) (Dkt. 75). Shemari said that he had received training from "a Syrian intelligence agent called Abu al-Qaqaa." (Gartenstein-Ross Decl. ¶ 96) (Dkt. 75). According to his confession, Shemari travelled from Saudi Arabia to "an al Qaeda training camp in Syria." (Gartenstein-Ross Decl. ¶ 96) (Dkt. 75). Shemari said that Abu al-Qaqaa ran the training camp, which was "well known to Syrian intelligence."[63] (Gartenstein-Ross Decl. ¶ 96) (Dkt. 75). In an interview with the *Daily Beast* in 2016, regime defector and former intelligence official Mahmud al-Naser confirmed that Abu Qaqaa was "one of dozens" of imams who were "commissioned" by Syrian intelligence.[64] (Gartenstein-Ross Decl. ¶ 96) (Dkt. 75).

Fawzi Mutlaq al-Rawi, appointed by President Assad as "leader of the Iraqi wing of the Syrian Ba'ath party" in 2003, was designated by the U.S. Department of the Treasury in 2007 "for

---

[61] "Radical Syrian Cleric 'Shot Dead,'" BBC (U.K.), September 29, 2007.

[62] Charles Lister, *The Syrian Jihad* (Oxford: Oxford University Press, 2015), pp. 42-43.

[63] Muhanad Mohammed, "Iraq al Qaeda Militant Says Syria Trained Him," Reuters, August 30, 2009; Al-Iraqiyah television (Arabic), August 30, 2009.

[64] Roy Gutman, "Assad Henchman: Here's How We Built ISIS," *Daily Beast*, December 1, 2016, https://www.thedailybeast.com/assad-henchman-heres-how-we-built-isis (last accessed May 25, 2023).

providing financial and material support to AQI."[65] (Gartenstein-Ross Decl. ¶ 97) (Dkt. 75).

Fawzi's activities, along with his relationship to the Syrian state, are proof that Assad sided with

the Iraqi insurgency. (Gartenstein-Ross Decl. ¶ 97) (Dkt. 75). According to Nawaf Fares, Assad's

brother-in-law, Assaf Shawkat, ran an al-Qaeda training camp struck by U.S. forces in October

2008. (Gartenstein-Ross Decl. ¶¶ 98-99) (Dkt. 75). In 2006, the U.S. Treasury named Shawkat,

the director of Syrian military intelligence, a Specially Designated National "for directly furthering

the Government of Syria's support for terrorism and interference in the sovereignty of Lebanon."

(Gartenstein-Ross Decl. ¶ 100) (Dkt. 75). The designation outlines how Shawkat's career in

government progressed even as he collaborated with numerous designated FTOs from 1997

onward.[66] (Gartenstein-Ross Decl. ¶ 100) (Dkt. 75).

Following the August 2009 bombings in Baghdad, Iraqi officials aired their conclusions

about the Syrian regime's ties to the Zarqawi organization.[67] (Gartenstein-Ross Decl. ¶ 101) (Dkt.

75). Iraqi Prime Minister Nouri al-Maliki detailed Syria's reluctance to respond to Iraqi

intelligence reports about jihadists operating in Syria. (Gartenstein-Ross Decl. ¶ 101) (Dkt. 75). In

December 2009, the Iraqi minister of defense Abd al-Qadir al-Ubaydi stated that "most of the

---

[65] U.S. Department of the Treasury, press release, "Treasury Designates Individuals with Ties to Al Qaida, Former Regime," December 7, 2007, https://home.treasury.gov/news/press-releases/hp720. (last accessed May 25, 2023).

[66] U.S. Department of the Treasury, press release, "Treasury Designates Director of Syrian Military Intelligence," January 18, 2006, https://home.treasury.gov/news/press-releases/js3080 (last accessed May 25, 2023).

[67] On August 19, 2009, Iraqi government targets in Baghdad were hit by coordinated bombings. These were the first major attacks in the city after American forces had given control of Baghdad's security back to the Iraqis in June. In response to these attacks, Iraq's government recalled its Syrian ambassador and publicly criticized Syria for harboring insurgent forces.

weapons seized by his ministry's forces" were arriving from Syria, and the regime was "financing armed groups in Iraq."[68] (Gartenstein-Ross Decl. ¶ 102) (Dkt. 75).

## C.      Syrian Regime Support for ISIS Post-Arab Spring

Following the onset of the Arab Spring, Bashar al-Assad's government provided tacit and explicit support for ISIS, even though ISIS was fighting the regime. (Gartenstein-Ross Decl.¶ 104) (Dkt.75). The main reason the regime supported ISIS was the regime's desire to make anti-Assad elements appear extreme, and hence unpalatable, to the outside world. (Gartenstein-Ross Decl. ¶ 104) (Dkt. 75). Assad feared foreign military intervention—a fear that drove his support for AQI during the Iraq war, and one that grew after the NATO intervention that brought down Muammar al-Qaddafi's regime in Libya. (Gartenstein-Ross Decl. ¶ 104) (Dkt. 75). The mechanisms for maintaining a relationship with ISIS were well established due to the Assad regime's prior support for the Zarqawi organization. (Gartenstein-Ross Decl. ¶ 104) (Dkt. 75).

The 2018 U.S. State Department's *Country Reports on Terrorism* outlines how the relationship between Assad and ISIS's predecessor organizations continues to have consequences today: "Over the past decade, the Assad regime's permissive attitude towards al-Qa'ida and other terrorist groups' foreign terrorist fighter facilitation efforts during the Iraq conflict in turn fed the growth of al-Qa'ida, ISIS, and affiliated terrorist networks inside Syria. The Syrian government's awareness and encouragement for years of terrorists' transit through Syria to enter Iraq for the purpose of fighting Coalition Forces is well documented. Those very networks were among the terrorist elements that brutalized the Syrian and Iraqi populations in 2017. Additionally, the Syrian

---

[68] Al-Sharqiyah television (Arabic), December 12, 2009.

regime has purchased oil from ISIS through various intermediaries, adding to the terrorist group's revenue."[69] (Gartenstein-Ross Decl. ¶ 105) (Dkt. 75).

### *Jihadist Prisoner Releases*

In 2011, Assad began releasing inmates from Sednaya prison. (Gartenstein-Ross Decl. ¶ 107) (Dkt. 75). Sednaya prison has been home to many of the "battle-hardened Syrian jihadis" who returned to Syria from the war in Iraq in the early 2000s and was regarded as an "incubator for jihadism."[70] (Gartenstein-Ross Decl. ¶ 107) (Dkt. 75). Following Assad's May 2011 general pardon, hundreds of Sednaya's extremist prisoners were released unconditionally despite no signs of rehabilitation. (Gartenstein-Ross Decl. ¶ 108) (Dkt. 75). They were free to join the fight against the regime, an outcome that Mohammed Habash, a former member of Syria's parliament, is "certain" the regime knew would happen.[71] (Gartenstein-Ross Decl.¶ 108) (Dkt. 75).

Speaking anonymously to the U.A.E.-based newspaper *The National*, one former regime official described the releases as part of "a policy on the part of Mr. Al Assad's forces to create violence and terrorism to legitimize a crackdown on the opposition." (Gartenstein-Ross Decl. ¶ 109) (Dkt. 75). The former official claimed that "weapons were made available to radical elements of the opposition in key hotspots." (Gartenstein-Ross Decl. ¶ 109) (Dkt. 75). He further

---

[69] U.S. Department of State, *Country Reports on Terrorism 2017, Chapter 2: State Sponsors of Terrorism* (2018), https://www.state.gov/wp-content/uploads/2019/04/crt_2017.pdf. (last accessed May 25, 2023).

[70] Quotes from Rania Abouzeid, "The Jihad Next Door: The Syrian Roots of Iraq's Newest Civil War," *Politico*, June 23, 2014 ("battle-hardened Syrian jihadis"); Roy Gutman, "Assad Henchman: Here's How We Built ISIS," *The Daily Beast*, December 1, 2016, https://www.thedailybeast.com/assad-henchman-heres-how-we-built-isis. ("incubator for jihadism") (last accessed May 25, 2023).

[71] *Id.*

told *The National* that he heard the orders come down from [Military Intelligence] headquarters in Damascus.[72] (Gartenstein-Ross Decl. ¶ 109) (Dkt 75).

In 2015, U.S. Secretary of State John Kerry described ISIS as, at least in part, "created by Assad releasing 1,500 prisoners from jail." (Gartenstein-Ross Decl. ¶ 110) (Dkt. 75). Kerry attributed the move to a calculation on Assad's part that he could create a choice between Assad and the terrorists.[73] (Gartenstein-Ross Decl. ¶ 110) (Dkt. 75). Many of the prisoners released were known jihadists and extremists, who have since become leaders in militant groups, including ISIS.[74] (Gartenstein-Ross Decl. ¶ 111). Some of the notable ISIS leaders whom the Syrian government released from Sednaya prison during this period, include Ali al-Shawaq (a/k/a Abu Luqman), Fiwaz Muhammad al-Kurdi al-Hiju, and Amr al Absi. (Gartenstein-Ross Decl. ¶ 111). Dr. Gartenstein-Ross details in his declaration the rise of each of these men in the ranks of ISIS after their release from Sednaya prison and their importance in the leadership of ISIS, including but not limited to recruitment, oil trade, detention of foreign hostages, executions, and media propaganda. (Gartenstein-Ross Decl. ¶¶112-125) (Dkt. 75).

The U.S. Department of State's 2014 *Country Reports on Terrorism* highlights how Syria's actions with respect to the insurgency in Iraq years prior aided ISIS's rise in Syria from 2013-14: "The Syrian government had an important role in the growth of terrorist networks in Syria through

---

[72] Phil Sand *et al.*, "Assad Regime Abetted Extremists to Subvert Peaceful Uprising, Says Former Intelligence Official," *The National* (UAE), January 21, 2014, https://www.thenationalnews.com/world/assad-regime-abetted-extremists-to-subvert-peaceful-uprising-says-former-intelligence-official-1.319620 (last accessed May 25, 2023).

[73] U.S. Department of State, "John Kerry Interview with Gregory Palkot of Fox News," November 17, 2015, https://2009-2017.state.gov/secretary/remarks/2015/11/249588.htm (last accessed May 25, 2023).

[74] This fact is widely documented. For one source, see Ruth Sherlock and Richard Spencer, "Syria's Assad Accused of Boosting al-Qaeda with Secret Oil Deals," *The Telegraph* (U.K.), January 20, 2014.

the permissive attitude the Asad regime took towards al-Qa'ida's foreign fighter facilitation efforts during the Iraq conflict.… Those very networks were the seedbed for the violent extremist elements, including ISIL, which terrorized the Syrian and Iraqi population in 2014 and—in addition to other terrorist organizations within Syria—continued to attract thousands of foreign terrorist fighters to Syria in 2014."[75] (Gartenstein-Ross Decl. ¶ 127) (Dkt. 75).

As early as 2012, regime defector Fares indicated to the *Telegraph* that he was familiar with "several Syrian government 'liaison officers' who still dealt with al-Qaeda."[76] (Gartenstein-Ross Decl. ¶ 128) (Dkt. 75). At the time, ISIS had not yet been expelled from al-Qaeda. (Gartenstein-Ross Decl. ¶ 128) (Dkt. 75). According to regime defector and former intelligence officer Mahmud Naser, after the outbreak of civil war in Syria, the regime circulated two sets of instructions for dealing with insurgents. (Gartenstein-Ross Decl. ¶ 129) (Dkt. 75). The first instructed officials in writing to "arrest and kill" jihadists listed on the communique, but there was a second message ordering officials to do the opposite.[77] (Gartenstein-Ross Decl.¶ 129).

In August 2014, French President Francois Hollande declared Assad to be a "de facto ally of jihadists."[78] (Gartenstein-Ross Decl. ¶ 130) (Dkt. 75). While testifying before the House Foreign Affairs Committee in September 2014, U.S. Secretary of State Kerry described the Assad regime as having "played footsie" with ISIS, saying that Assad "has used them as a tool of weakening the opposition. (Gartenstein-Ross Decl. ¶ 130). He never took on their headquarters, which were open

---

[75] U.S. Department of State, *Country Reports on Terrorism 2013* (2014), https://2009-2017.state.gov/documents/organization/225886.pdf.  (Last accessed May 25, 2023).

[76] Ruth Sherlock, "Exclusive Interview: Why I Defected from Bashar Al-Assad's Regime, by Former Diplomat Nawaf Fares," *Telegraph* (U.K.), July 14, 2012.

[77] Roy Gutman, "How ISIS Returned to Syria," *The Daily Beast*, December 5, 2016.

[78] "Hollande: Assad Cannot Be a Partner in War Against Terror," *Middle East Monitor* (U.K.), August 28, 2014, https://www.middleeastmonitor.com/20140828-hollande-assad-cannot-be-a-partner-in-war-against-terror/ (last accessed May 25, 2023).

and obvious, and other assets that they have. (Gartenstein-Ross Decl. ¶ 130) (Dkt. 75). So we have no confidence that Assad is either capable of or willing to take on ISIL."[79] (Gartenstein-Ross Decl. ¶ 130) (Dkt. 75).

### Assad-ISIS Oil Sales

As for Syria's second major kind of support for ISIS, oil sales were an important source of revenue for ISIS. (Gartenstein-Ross Decl. ¶ 131) (Dkt. 75). Al-Qaeda in Iraq and the IS in Iraq used the sale of stolen oil to finance themselves as early as 2005, though these previous iterations of the group did not draw as much revenue as ISIS later would, as they did not control as much oil production.[80] (Gartenstein-Ross Decl. ¶ 131) (Dkt. 75). By late 2008, financial records from the Zarqawi organization's show that 39 percent of its revenue, or roughly $1.87 million, was derived from oil-related activities.[81] (Gartenstein-Ross Decl. ¶ 131) (Dkt. 75). After this, the Zarqawi organization experienced significant battlefield losses so the group's oil sales declined. (Gartenstein-Ross Decl. ¶ 132) (Dkt. 75). The group's involvement in oil sales returned with the rise of ISIS. (Gartenstein-Ross Decl. ¶ 132) (Dkt. 75). In 2014, ISIS made between $150 million

---

[79] "Kerry: There Is Evidence That Assad Has Played 'Footsie' With ISIL," *RealClearPolitics*, September 18, 2014, https://www.realclearpolitics.com/video/2014/09/18/kerry_there_is_evidence_that_assad_has_played_footsie_with_isil.html. (last accessed May 25, 2023).

[80] Patrick B. Johnson *et al.*, *Foundations of the Islamic State: Management, Money and Terror in Iraq, 2005-2010* (Washington, D.C.: RAND Corporation, 2016), p. 256.

[81] The internal ISI document can be found at https://ctc.westpoint.edu/harmony-program/a-list-of-isi-revenue-items-for-a-specific-period-of-time-in-the-year-2008-original-language/ (last accessed May 25, 2023).

to $450 million from oil, with its "peak earnings estimates ranging from $1-3 [million] a day."[82] (Gartenstein-Ross Decl. ¶ 132) (Dkt. 75).

In October 2014, the U.S. Treasury Department's Under Secretary for Terrorism and Financial Intelligence David S. Cohen stated:

> Our best understanding is that ISIL has tapped into a long-standing and deeply rooted black market connecting traders in and around the area…. So who, ultimately, is buying this oil? According to our information, as of last month, ISIL was selling oil at substantially discounted prices to a variety of middlemen, including some from Turkey, who then transported the oil to be resold. It also appears that some of the oil emanating from territory where ISIL operates has been sold to Kurds in Iraq, and then resold into Turkey. And in a further indication of the Assad regime's depravity, it seems the Syrian government has made an arrangement to purchase oil from ISIL.[83]

(Gartenstein-Ross ¶ 133) (Dkt. 75). The U.S. government noted the regime's oil trading relationship with ISIS in the State Department's 2017 *Country Reports on Terrorism*, which states "the Syrian regime has purchased oil from ISIS through various intermediaries, adding to the terrorist group's revenue."[84] (Gartenstein-Ross Decl. ¶ 133) (Dkt. 75).

In January 2014, London's *Telegraph* published an investigative report revealing that Jabhat al-Nusra and ISIS had "both been financed by selling oil and gas from wells under their

---

[82] Stefan Heißner, *et al*., "Caliphate in Decline: An Estimate of Islamic State's Financial Fortunes," International Centre for the Study of Radicalisation and Ernst & Young, February 2017, p. 11, https://icsr.info/wp-content/uploads/2017/02/ICSR-Report-Caliphate-in-Decline-An-Estimate-of-Islamic-States-Financial-Fortunes.pdf (last accessed May 25, 2023).

[83] David S. Cohen, "Attacking ISIL's Financial Foundation," Public Remarks, Carnegie Endowment for International Peace, Washington, D.C., October 23, 2014, https://home.treasury.gov/news/press-releases/jl2672. (last accessed May 25, 2023).

[84] United States Department of State, Bureau of Counterterrorism and Countering Violent Extremism, *Country Reports on Terrorism 2017* (2018), https://www.state.gov/wp-content/uploads/2019/04/crt_2017.pdf. (last accessed May 25, 2023).

control to and through the regime."[85] (Gartenstein-Ross Decl. ¶¶ 134-135) (Dkt. 75). According to a Syrian businessman who spoke on condition of anonymity to *Time* in 2015: "Even from the early days the regime purchased fuel from ISIS-controlled oil facilities, and it has maintained that relationship throughout the conflict."[86] (Gartenstein-Ross Decl. ¶ 136) (Dkt. 75). The source, who had close ties to the Syrian government, described the regime's oil trade and provision of other goods and services—such as food and the preservation of mobile phone service providers—as consistent with the Syrian government's "pragmatic approach" to dealing with ISIS. (Gartenstein-Ross Decl. ¶ 136) (Dkt. 75).

A significant portion of the Assad regime's purchase of ISIS's oil was distinct from its other purchases from ISIS. (Gartenstein-Ross Decl. ¶ 137) (Dkt. 75). In an on-the-record interview, Gen. (ret.) Terry Wolff, who served as the U.S.'s Deputy Special Presidential Envoy for the Global Coalition to Defeat ISIS, explained this unique dynamic to Dr. Gartenstein-Ross. (Gartenstein-Ross Decl. ¶ 137) (Dkt. 75). He explained that while there was a free flow of commerce via the black market in Syria, he assessed that ISIS's oil pipelines continued to facilitate the flow of oil to Damascus during this period. (Gartenstein-Ross Decl. ¶ 137) (Dkt. 75). Per Gen. Wolff, the fact that Damascus purchased oil from ISIS through its pipelines rather than the black market means that the Assad regime had a *direct* financial relationship with ISIS. (Gartenstein-Ross Decl. ¶ 138) (Dkt. 75). The use of oil pipelines also cemented the Assad regime as ISIS's key oil customer,

---

[85] Ruth Sherlock, "Syria's Assad Accused of Boosting al-Qaeda with Secret Oil Deals," *Telegraph* (London), January 20, 2014, https://www.telegraph.co.uk/news/worldnews/middleeast/syria/10585391/Syrias-Assad-accused-of-boosting-al-Qaeda-with-secret-oil-deals.html#:~:text=The%20Syrian%20regime%20of%20President,rebels%20and%20al%2DQaeda%20defectors (last accessed May 25, 2023).

[86] Aryn Baker, "Why Assad Won't Fight ISIS," *Time*, February 26, 2015, https://time.com/3719129/assad-isis-asset/ (last accessed May 25, 2023).

given the far larger volumes of oil that can be moved more efficiently and at lower cost through pipelines as opposed to black-market tankers. (Gartenstein-Ross Decl. ¶ 138) (Dkt. 75)

ISIS had an elaborate bureaucratic structure. (Gartenstein-Ross Decl. ¶ 139) (Dkt. 750. According to an October 2015 *Financial Times* report, at the ISIS-controlled Tuweinan gas plant, the group appointed emirs to "monitor operations and negotiate with the regime through mediators."[87] (Gartenstein-Ross Decl. ¶ 139) (Dkt. 75). For example, ISIS carved out a deal wherein the group would reap 70 megawatts of electricity from Tuweinan each day, while providing 50 megawatts to the regime.[88] (Gartenstein-Ross Decl. ¶ 139) (Dkt. 75). That ISIS organized these deals while employing regime and private employees further speaks to the group's relationship with the regime. (Gartenstein-Ross Decl. ¶ 139) (Dkt. 75). Since the jihadists lacked the technical expertise to operate the machinery, they typically served as managers, while employees—still paid by the regime, or by their former companies—continued their jobs under new management.[89] (Gartenstein-Ross Decl. ¶ 139) (Dkt 75).

In 2016, U.S. Special Forces gave the *Wall Street Journal* exclusive access to a portion of documents recovered during a May 2015 raid on ISIS "oil tycoon" Abu Sayyaf.[90] (Gartenstein-Ross Decl. ¶ 140) (Dkt. 75). According to the *Wall Street Journal*, the documents revealed the magnitude of ISIS's "multinational oil operation," and described how ISIS "deals with the Syrian regime," including trade agreements between ISIS and the Syrian regime suggesting the regime

---

[87] Erika Solomon & Ahmed Mhidi, "ISIS Inc: Syria's 'Mafia-Style Gas Deals with Jihadis," *Financial Times*, October 15, 2015, https://www.ft.com/content/92f4e036-6b69-11e5-aca9-d87542bf8673 (last accessed May 25, 2023).

[88] *Id.*

[89] *Id.*

[90] *See* Benoit Faucon & Margaret Coker, "The Rise and Deadly Fall of Islamic State's Oil Tycoon," *Wall Street Journal,* April 24, 2016, https://www.wsj.com/articles/the-rise-and-deadly-fall-of-islamic-states-oil-tycoon-1461522313 (last accessed May 25, 2023).

was a significant trade partner. (Gartenstein-Ross Decl. ¶¶ 140-142) (Dkt. 75). Dr. Gartenstein-Ross in his declaration details a key Assad-ISIS intermediary, Hussam al-Katerji, for trade between ISIS and Syria. (Dkt. 75 ¶¶ 143-146).

Since 2015, the U.S. has designated several individuals and entities for trading with ISIS on behalf of the regime. (Gartenstein-Ross Decl. ¶ 148) (Dkt. 75). For example, in November 2015, the U.S. Treasury designated Russian-Syrian businessman George Haswani and his company HESCO for "materially assisting and acting for or on behalf of the Government of Syria."[91] (Gartenstein-Ross Decl. ¶ 148) (Dkt. 75). According to the designation, Haswani served "as a middleman for oil purchases by the Syrian regime from ISIL."[92] (Gartenstein-Ross Decl. ¶ 148) (Dkt. 75). Another of Haswani's companies, International Pipeline Construction, was designated in September 2018.[93] (Gartenstein-Ross Decl. ¶ 148).

In September 2018, the U.S. Treasury designated Muhammad al-Qatirji and Qatirji Company. (Gartenstein-Ross Decl. ¶ 149) (Dkt. 75). According to the designation, "Qatirji maintains strong ties to the Syrian regime and facilitates fuel trade between the regime and ISIS, including providing oil products to ISIS-controlled territory. Qatirji is responsible for import and export activities in Syria and assists with transporting weapons and ammunition under the pretext of importing and exporting food items. These shipments were overseen by the U.S. designated Syrian General Intelligence Directorate. The Syria-based Qatirji Company is a trucking company

---

[91] U.S. Department of the Treasury, press release, "Treasury Sanctions Networks Providing Support to the Government of Syria, Including for Facilitating Syrian Government Oil Purchases from ISIL," November 25, 2015, https://home.treasury.gov/news/press-releases/jl0287 (last accessed May 25, 2023).

[92] *Id.*

[93] U.S. Department of the Treasury, press release, "U.S. Treasury Imposes Sanctions on Assad Regime's Key ISIS Intermediary and a Petroleum Procurement Network," September 6, 2018, https://home.treasury.gov/news/press-releases/sm474 (last accessed May 25, 2023).

that has also shipped weapons from Iraq to Syria. Additionally, in a 2016 trade deal between the Government of Syria and ISIS, the Qatirji Company was identified as the exclusive agent for providing supplies to ISIS-controlled areas, including oil and other commodities."[94] (Gartenstein-Ross Decl. ¶ 149) (Dkt. 75).

### D. ISIS's Responsibility for the Paris Terror Attacks

On November 13, 2015, a cell of ISIS operatives working in three teams carried out a coordinated wave of terror attacks in Paris. (Gartenstein-Ross Decl. ¶ 151) (Dkt. 75). The first team of three attackers wore suicide vests, which they detonated at entrances to the Stade de France, where people were watching a soccer match. (Gartenstein-Ross ¶ 151) (Dkt. 75). The suicide bombs killed one person and wounded another 50. (Gartenstein-Ross Decl. ¶ 150) (Dkt. 75). At 9:25 p.m., minutes after the first attack, a second team of attackers opened fire on the Le Carillon bar and Le Petit Cambodge restaurant, killing 15. (Gartenstein-Ross ¶ 152) (Dkt. 75). The team of gunmen then moved on to attack À La Bonne Bière cafe and Casa Nostra pizzeria, killing 5. (Gartenstein-Ross Decl. ¶ 152) (Dkt. 75). They ended their attacks by opening fire on diners at La Belle Équipe restaurant, killing 19, including Nohemi Gonzalez. (Gartenstein-Ross Decl. ¶ 152) (Dkt. 75). While fleeing the scene, one of the gunmen, Ibrahim Abdeslam, detonated a suicide bomb at Le Comptoir Voltaire. (Gartenstein-Ross Dec. ¶ 152) (Dkt. 75). A third team of gunmen wearing suicide belts opened fire on concertgoers at Bataclan concert hall, which killed 90 people. (Gartenstein-Ross ¶ 152) (Dkt. 75).

ISIS claimed responsibility for the attacks the next day in a communiqué posted on Telegram, which was then circulated by pro-ISIS Telegram channels and Twitter accounts.

---

[94] *Id.*

(Gartenstein-Ross Decl. ¶ 154) (Dkt 75). ISIS subsequently laid claim to the attacks on multiple other occasions and featured it repeatedly in the group's propaganda. (Gartenstein-Ross Decl. ¶ 154) (Dkt. 75). Dr. Gartenstein-Ross in his declaration details the authenticity of these posts by ISIS. (Dkt. 75 ¶¶ 170-178).

### Official French Statement Regarding ISIS's Culpability

The French government's investigation concluded ISIS was culpable. (Gartenstein-Ross ¶ 174) (Dkt. 75).

### The Amniyat al-Kharji's Role in the Paris Attacks

A third substantiation of ISIS's claim of responsibility for the Paris attacks is the involvement of ISIS's external operations division, the Amniyat al-Kharji. (Gartenstein-Ross Decl. ¶ 175) (Dkt. 75). The Amniyat al-Kharji (*External Security*) is a component of ISIS's broader Amniyat (Security Services).[95] (Gartenstein-Ross ¶ 176) (Dkt. 75). The Amniyat al-Kharji is responsible for training external operatives and planning terror attacks in areas outside of ISIS's core territory.[96] (Gartenstein-Ross Decl. ¶ 176) (Dkt. 75). The Amniyat al-Kharji relied on a multi-layered command structure, which includes what can be regarded as "theater commanders," or individuals responsible for planning operations in various regions that ISIS is targeting.

---

[95] In addition to the Amniyat al-Kharji, ISIS has Amniyat al-Dawla (State Security), Amniyat al-Dakhili, which is akin to an interior ministry; and Amniyat al-Askari which functions as ISIS's military intelligence wing. *See, e.g.*, Michael Weiss, "How ISIS Picks Its Suicide Bombers," *Daily Beast*, July 12, 2017.

[96] *Id;* see also Rukmini Callimachi, "How a Secretive Branch of ISIS Built a Global Network of Killers," *New York Times*, August 3, 2016.

(Gartenstein-Ross Decl. ¶ 177) (Dkt. 75). They tend to originate from the regions they command.[97] (Gartenstein-Ross Decl. ¶ 177). After receiving training in ISIS territory, some Amniyat al-Kharji commanders travel back to their regions to coordinate attacks. (Gartenstein-Ross Decl. ¶ 177) (Dkt. 75). Abdelhamid Abaaoud, a Belgian of Moroccan descent, was one such commander. (Gartenstein-Ross Decl. ¶ 178) (Dkt. 75).

Abaaoud is sometimes described as the attack's ringleader and was an ISIS member involved in the Amniyat al-Kharji. (Gartenstein-Ross Decl. ¶ 189) (Dkt. 75). After receiving training in Syria, Abaaoud was able to go between Syria and Europe. (Gartenstein-Ross Decl. ¶ 178) (Dkt. 75). Once in Europe, Belgian police say that Abaaoud "identified, recruited, and trained other individuals to carry out the attacks in Paris."[98] (Gartenstein-Ross Decl. ¶ 178) (Dkt 75). Dr. Gartenstein-Ross produced a social network analysis in April 2016 about the militants associated with the Paris attackers and their accomplices. (Gartenstein-Ross Decl.¶ 178) (Dkt. 75). The analysis in graphic form shows Abaaoud's central role in coordinating the attack as the primary connection between individuals and other ISIS cells in Europe, including the perpetrators of the March 22, 2016, Brussels attack. (Gartenstein-Ross Decl. ¶ 178) (Dkt. 75).

Other members of ISIS's Amniyat al-Kharji who were involved in the Paris attacks have also been named publicly. (Gartenstein-Ross Decl. ¶ 178) (Dkt. 75). For example, on November 22, 2016, the U.S. Department of State designated Abdelilah Himich a Specially Designated

---

[97] *See* Daveed Gartenstein-Ross & Nathaniel Barr, "Recent Attacks Illuminate the Islamic State's Europe Attack Network," Jamestown Foundation, April 27, 2016, https://jamestown.org/program/hot-issue-recent-attacks-illuminate-the-islamic-states-europe-attack-network/ (last accessed May 25, 2023).

[98] Quoted in State of New Jersey Office of Homeland Security and Preparedness, "ISIS: European Operations Increase in Scale and Complexity," May 11, 2016, https://www.njohsp.gov/analysis/brussels (last accessed May 25, 2023).

Global Terrorist. (Gartenstein-Ross Decl. ¶ 180) (Dkt. 75). The designation described Himich's membership in ISIS's external operations division and noted that he was involved in planning the Paris and Brussels attacks.[99] (Gartenstein-Ross Decl. ¶ 175) (Dkt. 75). A number of individuals were convicted of the Paris terror attacks and some of those individuals are on trial for the 2016 Brussels terror attacks, including Salah Abdeslam, Mohamed Abrini, Osama Krayem, Sofien Ayari, Mohamed Bakkali and Oussama Atar. (Dkt. 98, Ex. 1).[100]

### *Conclusions About ISIS and the Paris Attacks*

The importance of ISIS's Syria-Iraq safe haven for the success of the Paris plot is established by a number of factors: (1) Training in a physical safe haven increased the chances of a plot's success. (Gartenstein-Ross Decl. ¶ 182) (Dkt. 75). Cell members, including ringleader Abaaoud, trained in ISIS's Syria-Iraq caliphate territory. (Gartenstein-Ross Decl.¶ 182) (Dkt. 75). (2) The Amniyat al-Kharji oversaw and played a significant role in the Paris attacks. (3) The Syria-Iraq safe haven enabled Abaaoud to flee to safety following a thwarted attack in 2015. (Gartenstein-Ross Decl. ¶ 182) (Dkt. 75). ISIS's control of that territory allowed these operatives to gain expertise through constant experimentation that would not have been possible in a different geographic space where they would have to worry about detection by law enforcement.

---

[99] *See* U.S. Department of State, press release, "State Department Terrorist Designations of Abdullah Ahmed al-Meshedani, Basil Hassan, and Abdelilah Himich," November 22, 2016, https://2009-2017.state.gov/r/pa/prs/ps/2016/11/264498.htm (last accessed May 25, 2023); Jean-Charles Brisard & Kévin Jackson, "The Islamic State's External Operations and the French-Belgian Nexus," *CTC Sentinel* 9:11 (November/December 2016).

[100] *See* https://www.reuters.com/world/europe/belgium-starts-trial-into-brussels-bombings-2022-12-05/ (last accessed May 25, 2023); https://www.reuters.com/world/europe/factbox-how-french-court-ruled-paris-islamist-attacks-trial-2022-06-29/ (last accessed May 25, 2023); https://www.reuters.com/world/europe/factbox-how-french-court-ruled-paris-islamist-attacks-trial-2022-06-29/ (last accessed May 25, 2023).

(Gartenstein-Ross Decl. ¶ 182) (Dkt. 75). Finally, per Dr. Gartenstein-Ross[101], it also provided an ease of communication that would not have existed were they in a place where they had to worry about law enforcement pursuing them. (Gartenstein-Ross Decl. ¶ 182) (Dkt. 75).

## E. ISIS's Responsibility for the Brussels Suicide Bombings

On March 22, 2016, Ibrahim el-Bakraoui, Najim Aachari, and Mohamed Abrini exited a taxi and entered the main terminal of the Brussels airport, using luggage trolleys to push large bomb-laden suitcases. (Gartenstein-Ross Decl. ¶ 183) (Dkt. 75). At 7:58 a.m., Bakraoui detonated his bomb at row 11 of the departure hall. (Gartenstein-Ross Decl. ¶ 183) (Dkt. 75). Nine seconds later, Laachraoui detonated his bomb at row 2. (Gartenstein-Ross Decl. ¶ 183) (Dkt. 75). Unable to detonate his bomb, Abrini fled, leaving his suitcase behind. (Gartenstein-Ross Decl. ¶ 183) (Dkt. 75). Over an hour later, Khalid el-Bakraoui detonated a bomb inside a train in the Maelbeek metro station.[102] (Gartenstein-Ross Decl. ¶ 183) (Dkt. 75). The three explosions claimed 32 lives and injured 340 people.[103] (Gartenstein-Ross Decl. ¶ 183) (Dkt. 75). Ten men are on trial for the 2016 Brussels attacks, including some that were convicted for the 2015 Paris attacks.[104] (Dkt. 98, Ex. 1).

---

[101] The Court finds that Dr. Gartenstein-Ross is qualified as an expert in terrorism with respect to ISIS, the history of ISIS and its precursors, the Paris terror attacks, Brussels terror attacks and Istanbul terror attack at issue in this case, as well as Syria's material support provided to ISIS. Dr. Gartenstein-Ross has qualified as an expert in other cases involving ISIS terrorism. *See Sotloff*, 525 F. Supp. 3d 121, and *Doe*, 2020 WL 9244135.

[102] *Id.*, p. 6.

[103] "Brussels Explosions: What We Know About Airport and Metro Attacks," BBC News, April 9, 2016, https://www.bbc.com/news/world-europe-35869985 (last accessed May 25, 2023).

[104] *See* https://www.reuters.com/world/europe/belgium-starts-trial-into-brussels-bombings-2022-12-05/ (last accessed May 25, 2023); https://www.reuters.com/world/europe/verdict-expected-wednesday-paris-islamist-attacks-2022-06-29/ (last accessed May 25, 2023); https://

-37-

The Brussels attack was carried out by an ISIS cell operating in France and Belgium. (Gartenstein-Ross Decl. ¶ 199) (Dkt 75). On the day of the attacks, ISIS claimed responsibility for the attacks. (Gartenstein-Ross Decl. ¶ 186) (Dkt. 75). Dr. Gartenstein-Ross in his declaration details the authenticity of the various posts by ISIS claiming responsibility for the attacks. (Gartenstein-Ross Decl. ¶¶ 188-199) (Dkt. 75). There are additional indicators of ISIS's culpability for the attacks, including repeated publications celebrating, promoting, and laying claim to the attacks. (Gartenstein-Ross Decl. ¶¶ 184, 200, 201, 204, 219) (Dkt. 75).

### The Amniyat al-Kharji's Role in the Brussels Attacks

Many of the Paris-Brussels cell members and attackers maintained direct connections to ISIS leaders in Syria. (Gartenstein-Ross Decl. ¶ 208) (Dkt. 75). After receiving training in ISIS territory, some individuals in the Amniyat al-Kharji travel back to their areas of responsibility, as was the case with Abdelhamid Abaaoud who French authorities concluded was key to orchestrating the 2015 Paris attacks. (Gartenstein-Ross Decl. ¶ 210) (Dkt. 75). Abaaoud and Salah Abdeslam, his childhood friend, connected the network of terrorists that would carry out the Brussels attacks in March 2016.[105] (Gartenstein-Ross Decl. ¶ 210) (Dkt. 75). Other Amniyat al-Kharji commanders would carry out their roles remotely. (Gartenstein-Ross Decl. ¶ 210) (Dkt. 75). This gave rise to a phenomenon known as *virtual plotters*—operatives who, through encrypted communications, could serve many of the same functions of physical terrorist networks. (Gartenstein-Ross Decl. ¶ 210) (Dkt. 75). Most of ISIS's virtual planners appear to be based in

---

www.reuters.com/world/europe/factbox-how-french-court-ruled-paris-islamist-attacks-trial-2022-06-29/ (last accessed May 25, 2023).

[105] Peter Bergen & David Sterman, "Jihadist Terrorism 17 Years After 9/11: A Threat Assessment," The New America Foundation, September 10, 2018, p. 52, https://d1y8sb8igg2f8e.cloudfront.net/documents/ISP_17_Years_DIGITAL_Final.pdf.  (last accessed May 25, 2023).

Syria and Iraq, in large part due to proximity and access to ISIS's top leadership. (Gartenstein-Ross Decl. ¶ 210) (Dkt. 75). Virtual planners can offer operatives the same services once provided by physical networks. (Gartenstein-Ross Decl. ¶ 210) (Dkt. 75).

Abaaoud served as the tactical theater commander for this cell, receiving orders from Syria-based Amniyat al-Kharji members. (Gartenstein-Ross Decl. ¶ 212) (Dkt. 75). German federal prosecutors drew this connection, naming Osama Atar as a key Syria-based contact. (Gartenstein-Ross Decl. ¶ 212) (Dkt. 75). Atar is also known by his *kunya*[106] Abu Ahmad. (Gartenstein-Ross Decl. ¶ 212) (Dkt. 75). The German newspaper *Deutsche Welle* reported that "a laptop found near the safehouse used for the airport attack shows that the jihadists had been in close contact with Atar."[107] (Gartenstein-Ross Decl. ¶ 212) (Dkt. 75). Abaaoud's French-Belgian network conducted several operations, including the 2015 Paris attacks. (Gartenstein-Ross Decl. ¶ 212) (Dkt. 75). Although Abaaoud and some other members of the network were killed during and after the Paris attacks, other members carried out the Brussels attacks. (Gartenstein-Ross Decl. ¶ 212) (Dkt. 75).

Members of the French-Belgian network that Abaaoud led include Najim Laachraoui—one of the Brussels Airport attackers and bomb maker for the Paris and Brussels attacks—and Salah Abdeslam. (Gartenstein-Ross Decl. ¶ 213) (Dkt. 75). Laachraoui and Abdeslam traveled to Syria around the same time as Abaaoud to join MSC, which was led by Amr al-Absi—who was one of the militants Assad freed from Sednaya prison in 2011. (Gartenstein-Ross Decl. ¶ 213) (Dkt. 75).

---

[106] The Arabic word *kunya* in this context refers to a *nom de guerre*, often favored by Arab guerillas and clandestine operators. *See* https://en.wikipedia.org/wiki/Kunya_(Arabic) (last accessed May 25, 2023).

[107] Aasim Saleem, "Key Figures in Brussels Attacks," *Deutsche Welle* (Germany), March 20, 2017, https://www.dw.com/en/key-figures-in-brussels-attacks/g-38013006 (last accessed May 25, 2023).

Another member of the French-Belgian network was a childhood associate of Abaaoud, Mohamad Abrini, who traveled to Syria to join ISIS in mid-2015. (Gartenstein-Ross Decl.¶ 228) (Dkt. 75). According to Abrini's statement to Belgian authorities, Abaaoud met with Abrini in Syria and gave him instructions before sending him back to Europe, where Abrini participated in the Paris and Brussels attacks.[108] (Gartenstein-Ross Decl. ¶ 213) (Dkt. 75).

Some of the French-Belgian network's members were involved operationally or logistically in the Paris and Brussels attacks. (Gartenstein-Ross Decl. ¶ 219) (Dkt. 75). Abrini rented an apartment used by several of the Paris attackers, and was seen by French authorities on security camera footage with Abdeslam two days before the attack, driving a car that was later used to drop off the Stade de France attackers.[109] (Gartenstein-Ross Decl. ¶ 219) (Dkt. 75). In the Brussels attack, Abrini was an airport suicide bomber, but he failed to detonate his bomb.[110] (Gartenstein-Ross Decl. ¶ 219) (Dkt. 75). Laachraoui, according to Belgian authorities, served as the bombmaker for at least two of the suicide bombs used in the Stade de France and Bataclan attacks before wearing his own vest as one of the suicide bombers at the Brussels Airport.[111] (Gartenstein-Ross Decl. ¶ 219) (Dkt. 75).

---

[108] Duncan Gardham, "The 'Man in the Hat' Spills Terror Gang's Secrets," *NBC News*, December 7, 2016, https://www.nbcnews.com/storyline/brussels-attacks/man-hat-spills-terror-gang-s-secrets-n693046 (last accessed May 25, 2023).

[109] Robert-Jan Bartunek & Alastair Macdonald, "Belgians Seize Key Suspects in Paris, Brussels Attacks," Reuters, April 8, 2016; "Unraveling the Connections Among the Paris Attackers," *New York Times*, March 18, 2016, https://www.nytimes.com/interactive/2015/11/15/world/europe/manhunt-for-paris-attackers.html. (last accessed May 25, 2023).

[110] Aasim Saleem, "Key Figures in Brussels Attacks," *Deutsche Welle* (Germany), March 20, 2017, https://www.dw.com/en/key-figures-in-brussels-attacks/g-38013006 (last accessed May 25, 2023).

[111] Lilia Blaise & Aurelien Breeden, "Najim Laachraoui, 24, Bomb Maker for Paris and Brussels Attacks," *New York Times*, March 25, 2016, https://www.nytimes.com/2016/03/26/

***Direct Connections to ISIS: Najim Laachraoui Case Study***

Numerous individuals in the Brussels cell maintained direct ties to ISIS. (Gartenstein-Ross Decl. ¶ 215) (Dkt. 75). This further indicates ISIS's responsibility for the Brussels attacks, as well as the importance of the safe haven that the group had obtained in Syria and Iraq. (Gartenstein-Ross Decl. ¶ 215) (Dkt. 75). Dr. Gartenstein-Ross illustrated this connection in his declaration through the examination of one attacker's connections, those of Najim Laachraoui. (Dkt. 75 ¶ 215). He worked at the Brussels Airport for five years until 2012.[112] (Gartenstein-Ross Decl. ¶ 216) (Dkt. 75). During this period, Laachraoui was radicalized by jihadist recruiter Khalid Zerkani.[113] (Gartenstein-Ross Decl. ¶ 216) (Dkt. 75).

Laachraoui left to join the jihad in Syria in 2013.[114] (Gartenstein-Ross Decl. ¶ 217) (Dkt. 75). He joined Majlis Shura al-Mujahedin, led by Amr al-Absi. (Gartenstein-Ross Decl. ¶ 217) (Dkt. 75). Thereafter, he pledged *bayah*[115] to al-Baghdadi and joined ISIS.[116] (Gartenstein-Ross Decl. ¶ 217) (Dkt. 75). Through *Dabiq*, ISIS claimed that during Laachraoui's time with ISIS in Syria, he served as a foreign fighter, then trained to carry out an attack in Europe and prepared the explosives for the Paris and Brussels attacks.[117] (Gartenstein-Ross Decl. ¶ 217) (Dkt. 75).

---

world/europe/najim-laachraoui-24-bomb-maker-for-paris-and-brussels-attacks.html?searchResultPosition=1.  (last accessed May 25, 2023).

[112] Rory Mulholland, "Brussels Bomber Najim Laachraoui 'Worked at Airport for Five Years,' " *Telegraph* (United Kingdom), April 21, 2016. Laachraoui may also have held summer cleaning jobs at the European Parliament Headquarters in Brussels during the summers of 2009 and 2010. *Id.*

[113] Rubin, "Radicalization of a Promising Student Turned Bomb Maker."

[114] *Dabiq*, Issue 14, April 13, 2016, p. 8.

[115] In this context, *bayah* is an Islamic oath of allegiance to a leader. *See* https://en.wikipedia.org/wiki/Bay%27ah (*last* accessed May 25, 2023).

[116] *Id.*, p. 7.

[117] *Dabiq*, Issue 14, April 13, 2016, p. 7.

Laachraoui also served as an ISIS guard,[118] as well as an interrogator. (Gartenstein-Ross Decl. ¶ 218) (Dkt. 75).[119]

Authorities found Laachraoui's DNA on the explosives in a rental house in Auvelais, which was used as a safehouse prior to the Paris attacks, and also in another safehouse used prior to the Brussels attacks.[120] (Gartenstein-Ross Decl. ¶ 219) (Dkt. 75). On September 9, 2015, Laachraoui, carrying forged Belgian identification documents that employed a fake name, was stopped at a checkpoint between Hungary and Austria while travelling in a rental car with Mohamed Belkaid and Salah Abdeslam.[121] (Gartenstein-Ross Decl. ¶ 220) (Dkt. 75). Thereafter, Laachraoui built the TATP explosives for the Paris and Brussels attacks. (Gartenstein-Ross Decl. ¶ 221) (Dkt. 75). From Europe, he was in contact with Abu Ahmad (the aforementioned Osama Atar), "a French-speaking 'emir' of foreign fighters in Syria," through encrypted messaging platforms, including Telegram.[122] (Gartenstein-Ross Decl. ¶ 221) (Dkt. 75). Laachraoui reportedly requested that

---

[118] *Id.*

[119] Raphael Satter, "Lawyer: Brussels Bomber Was a Jailor for Islamic State Group," Associated Press, April 22, 2016, https://apnews.com/4db6ea994f024f7b82dfa3020bf54d02 (last accessed May 25, 2023).

[120] Lilia Blaise, "Belgian Police Name Man Suspected of Being Salah Abdeslam's Accomplice," *New York Times*, March 21, 2016, https://www.nytimes.com/2016/03/22/world/europe/paris-attacks-accomplice-najim-laachraoui.html (last accessed May 25, 2023); Alissa J. Rubin, "Radicalization of a Promising Student Turned Bomb Maker in Brussels," *New York Times*, April 8, 2016, https://www.nytimes.com/2016/04/09/world/europe/najim-laachraoui-paris-brussels-attacks.html#:~:text=Laachraoui%20wheeled%20his%20handiwork%20into,on%20a%20subway%2C%20killing%2017 (last accessed May 25, 2023).

[121] *Id;* Lilia Blaise, "Belgian Police Name Man Suspected of Being Salah Abdeslam's Accomplice," *The New York Times*, March 21, 2016; Lilia Blaise & Aurelien Breeden, "Najim Laachraoui, 24, Bomb Maker for Paris and Brussels Attacks," *The New York Times*, March 25, 2016, https://www.nytimes.com/2016/03/26/world/europe/najim-laachraoui-24-bomb-maker-for-paris-and-brussels-attacks.html?module=inline (last accessed May 25, 2023).

[122] Sebastian Rotella, "ISIS Via WhatsApp: 'Blow Yourself Up, O Lion,'" *ProPublica*, July 11, 2016.

Ahmad reach out to Syria-based explosives experts to provide him with technical assistance. (Gartenstein-Ross Decl. ¶ 221) (Dkt. 75). According to a Belgian counterterrorism official, Laachraoui had the Syria-based experts "check different mixtures," which allowed him to adjust "his work based on what they tell him."[123] (Gartenstein-Ross Decl. ¶ 221) (Dkt. 75). Ahmad oversaw the plot from Syria and provided guidance on the targets, as well as provided technical guidance on bomb making and received the attackers' last wills. (Gartenstein-Ross Decl. ¶ 222) (Dkt. 75).

### *Conclusions About ISIS and the Brussels Suicide Bombings*

The importance of Syrian support, and also ISIS's Syria-Iraq safe haven, for the success of the Brussels plot is established by a number of factors: (1) Assad's prisoner releases are directly connected to how the Brussels plotters joined ISIS. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). Assad released the militant leader Amr al-Absi from Sednaya prison in 2011. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). Thereafter, Laachraoui, Abdeslam and Abaaoud joined his militant group Majlis Shura al-Mujahedin in Syria, and then followed al-Absi's lead in joining ISIS. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). (2) Training in a physical safe haven increases the chances of a plot's success. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). Cell members, including bombmaker Laachraoui, trained in ISIS's Syria-Iraq caliphate territory. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). (3) The Amniyat al-Kharji oversaw and played a significant role in the Brussels attacks. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). Absent the physical safe haven that ISIS enjoyed spanning from Syria into Iraq, the Amniyat al-Kharji could not have been erected with the sophisticated bureaucracy that it boasted. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). (4) The

---

[123] *Id.*

Brussels cell was overseen by an operative based in ISIS's Syria-Iraq territory, Abu Ahmad. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). His presence in the group's caliphate territory allowed him to plan relatively calmly, in the absence of being hunted by law enforcement. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). (5) The Syria-Iraq safe haven enabled Laachraoui to reach out to ISIS explosives experts for technical assistance. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). ISIS's control of that territory allowed these operatives to gain expertise through constant experimentation that would not have been possible in a different space where they would have to worry about detection by law enforcement. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75). It also provided an ease of communication that would not have existed were they in a geographic space where they had to worry about law enforcement pursuing them. (Gartenstein-Ross Decl. ¶ 225) (Dkt. 75).

## F.      ISIS's Responsibility for the Istanbul Suicide Bombing

Closed-circuit television footage released by authorities after the attack shows that on March 19, 2016, Mehmet Öztürk followed a group of Israeli tourists from their hotel to a nearby restaurant before detonating his bomb next to them on a street in Istanbul.[124] (Gartenstein-Ross Decl. ¶ 220) (Dkt. 75). The blast killed Öztürk and 4 others and injured at least 39 more. (Gartenstein-Ross Decl. ¶ 220) (Dkt. 75).

---

[124] Hannah Lucinda Smith, "Israelis Were Targeted by Istanbul Bomber," *Times* (United Kingdom), March 21, 2016, https://www.thetimes.co.uk/article/istanbul-bomber-targeted-israeli-tourists-f6dpbwcsn (last accessed May 25, 2023); "Istanbul Suicide Bomber Öztürk Fought in DAESH Ranks for 2 Years," *Daily Sabah* (Turkey), March 22, 2016, https://www.dailysabah.com/war-on-terror/2016/03/22/istanbul-suicide-bomber-ozturk-fought-in-daesh-ranks-for-2-years (last accessed May 25, 2023).

No group claimed responsibility for the attack, but various external indicia point to ISIS's culpability. (Gartenstein-Ross Decl. ¶ 227) (Dkt. 75). A number of attacks in Turkey attributed to ISIS during this period went unclaimed. (Gartenstein-Ross Decl. ¶ 227) (Dkt. 75). The likely reason that claims of responsibility were not made in these cases is that ISIS relied on Turkey as a major transit point for foreign fighters bound for its Syria-based caliphate, and claiming responsibility for attacks in Turkey risked a major crackdown by Turkish authorities.[125] (Gartenstein-Ross Decl. ¶ 227) (Dkt. 75).

### *Identification of the Istanbul Attacker as a Member of ISIS*

Turkish authorities confirmed the attacker as Öztürk based on DNA.[126] (Gartenstein-Ross Decl. ¶ 229) (Dkt. 75). Turkey's Interior Minister revealed that Öztürk was an ISIS member.[127] (Gartenstein-Ross Decl. ¶ 229) (Dkt. 75). After the attack, Turkish authorities disclosed that Öztürk had traveled to Syria in 2013. (Gartenstein-Ross Decl. ¶ 230) (Dkt. 75). Öztürk disappeared in 2013 from his family home in Gaziantep, prompting his family to file a missing person's report. (Gartenstein-Ross Decl. ¶ 230) (Dkt. 75). A subsequent police investigation found that he had

---

[125] *See* also Elais Groll & Dan De Luce, "Why Isn't ISIS Claiming the Istanbul Airport Bombing?," *Foreign Policy*, June 29, 2016.

[126] Ece Toksabay & Ayla Jean Yackley, "Turkey Says Istanbul Suicide Bomber Was Member of Islamic State," Reuters, March 20, 2016, https://www.reuters.com/article/us-turkey-blast/turkey-says-istanbul-suicide-bomber-was-member-of-islamic-state-idUSKCN0WM0I1 (last accessed May 25, 2023); "İstiklal Caddesi'ni Kana Bulayan Canlı Bombanın Kimliği Belli Oldu," *Hurriyet* (Turkey), March 3, 2016, https://www.hurriyet.com.tr/gundem/istiklal-caddesini-kana-bulayan-canli-bombanin-kimligi-belli-oldu-40072382 (last accessed May 25, 2023).

[127] Ece Toksabay & Ayla Jean Yackley, "Turkey Says Istanbul Suicide Bomber Was Member of Islamic State," Reuters, March 20, 2016, https://www.reuters.com/article/us-turkey-blast/turkey-says-istanbul-suicide-bomber-was-member-of-islamic-state-idUSKCN0WM0I1 (last accessed May 25, 2023); "İstiklal Caddesi'ni Kana Bulayan Canlı Bombanın Kimliği Belli Oldu," *Hurriyet* (Turkey), March 3, 2016, https://www.hurriyet.com.tr/gundem/istiklal-caddesini-kana-bulayan-canli-bombanin-kimligi-belli-oldu-40072382 (last accessed May 25, 2023).

joined ISIS.[128] (Gartenstein-Ross Decl. ¶ 230) (Dkt. 75). After leaving for Syria, Öztürk made frequent trips between Turkey and Syria, which were noted at the time by Turkey's national intelligence agency, which placed Öztürk on Turkey's list of supporters of a terrorist group.[129] (Gartenstein-Ross Decl. ¶ 230) (Dkt. 75). The U.S. State Department's Bureau of Counterterrorism attributed the attack to ISIS in its 2016 *Country Reports on Terrorism*. (Gartenstein-Ross Decl. ¶ 232) (Dkt. 75).[130] Finally, the conclusions of Turkish authorities are reinforced by testimony given to Kurdish forces by an ISIS member connected to Öztürk. (Gartenstein-Ross Decl. ¶ 231) (Dkt. 75). Captured ISIS fighter Savas Yildiz described how he and his accomplices would cross back and forth into Syria from Turkey.[131] (Gartenstein-Ross Decl. ¶ 231). Yildiz was sought by Turkish police along with Öztürk and two other ISIS operatives from the Dokumacılar group (an ISIS cell) after they were believed by authorities to have re-entered Turkey to carry out attacks.[132] (Gartenstein-Ross Decl. ¶ 231) (Dkt. 75).

---

[128] Ece Toksabay & Ayla Jean Yackley, "Turkey Says Istanbul Suicide Bomber Was Member of Islamic State," Reuters, March 20, 2016, https://www.reuters.com/article/us-turkey-blast/turkey-says-istanbul-suicide-bomber-was-member-of-islamic-state-idUSKCN0WM0I1 (last accessed May 25, 2023); "İstiklal Caddesi'ni Kana Bulayan Canlı Bombanın Kimliği Belli Oldu," *Hürriyet* (Turkey), March 3, 2016, https://www.hurriyet.com.tr/gundem/istiklal-caddesini-kana-bulayan-canli-bombanin-kimligi-belli-oldu-40072382 (last accessed May 25, 2023); "Police Identifies Istanbul Bomber as ISIL Member," *Hurriyet Daily News* (Turkey), March 20, 2016, https://www.hurriyetdailynews.com/police-identifies-istanbul-bomber-as-isil-member-96674 (last accessed May 25, 2023).

[129] Deniz Zeyrek, "Istanbul Suicide Bomber 'Known but Not Tracked'," *Hurriyet Daily News* (Turkey), March 22, 2016, https://www.hurriyetdailynews.com/istanbul-suicide-bomber-known-but-not-tracked-96794 (last accessed May 25, 2023).

[130] U.S. Department of State, *Country Reports on Terrorism 2016* (2017), p. 162, https://www.state.gov/wp-content/uploads/2019/04/crt_2016.pdf (last accessed May 25, 2023).

[131] *Id.*

[132] Nafeez Ahmed, "Turkey's Secret Pact with Islamic State Exposed by Operative Behind Wave of ISIS Attacks," Insurge Intelligence, July 22, 2016, https://medium.com/insurge-

***The Attack Was Consistent with ISIS's TTPs***

The Istanbul attack was consistent with ISIS's choice of civilian targets, particularly tourists and foreign nationals, in Turkey in 2016. (Gartenstein-Ross Decl. ¶ 233). For example, on January 12, 2016, a suicide bomber killed 13 people in Istanbul's Sultanahmet district, which has two tourist attractions, the Blue Mosque and Hagia Sophia. (Gartenstein-Ross Decl. ¶ 233) (Dkt. 75). Most of the victims were German tourists.[133] (Gartenstein-Ross Decl. ¶ 233) (Dkt. 75). ISIS did not claim responsibility for this attack, but Turkish authorities attributed it to ISIS.[134] (Gartenstein-Ross Decl. ¶ 233) (Dkt. 75). The U.S. Department of State's *2016 Country Reports on Terrorism* highlighted ISIS's 2016 Istanbul attacks as evidence of a pattern in ISIS's efforts to reach beyond its territorial holdings. (Gartenstein-Ross Decl. ¶ 235) (Dkt. 75).

---

intelligence/turkeys-secret-pact-with-islamic-state-exposed-by-operative-behind-wave-of-isis-attacks-6b35d1d29e18 (last accessed May 25, 2023).

[133] Jennifer Amur & Julie Vitkovskaya, "In Turkey, Suicide Bombers are Targeting Tourists," *Washington Post*, June 29, 2016, https://www.washingtonpost.com/news/worldviews/wp/2016/06/28/in-turkey-suicide-bombers-are-targeting-tourists/?itid=sr_1 (last accessed May 25, 2023).

[134] "Deadly Istanbul Blast 'Caused by Isis Suicide Bomber,'" *The Guardian*, January 12, 2021, https://www.theguardian.com/world/2016/jan/12/explosion-istanbul-square-sultanahmet-turkey (last accessed May 25, 2023); "Turkey: 'IS Suicide Bomber' Kills 10 in Istanbul Sultanahmet District,'" BBC, January 12, 2016, https://www.bbc.com/news/world-europe-35290760 (last accessed May 25, 2023); Ceylan Yeginsu & Tim Arango, "Istanbul Explosion Kills 10 Tourists, and ISIS Is Blamed," *The New York Times*, January 12, 2016, https://www.nytimes.com/2016/01/13/world/europe/explosion-in-istanbul-tourist-district-kills-at-least-10.html (last accessed May 25, 2023).

*Conviction of ISIS Members for Supporting the March 19, 2016 Istanbul Bombing*

After the attack, Turkish authorities tied Öztürk to other suspects: Ercan Çapkın, Hüseyin Kaya, İbrahim Gürler, and Mehmet Mustafa Çevik.[135] (Gartenstein-Ross Decl. ¶ 236) (Dkt. 75). Çapkın and Kaya were both charged with murder and attempting to abolish the constitutional order. (Gartenstein-Ross Decl. ¶ 237) (Dkt. 75). Çevik and Gürler were charged with terrorism-related charges stemming from their ISIS membership. (Gartenstein-Ross Decl. ¶ 237) (Dkt. 75). Turkish courts convicted all four individuals in connection with the March 19, 2016, suicide bombing in Istanbul, finding each to have been a member of, or acting on the orders of, ISIS. (Gartenstein-Ross Decl. ¶ 237) (Dkt. 75). During the trial, prosecutors offered proof that Çapkın and Kaya assisted Öztürk with the plot, and that ISIS executed the bombing. (Gartenstein-Ross Decl. ¶ 237) (Dkt. 75). The prosecution also offered proof that Gürler and Çevik were members of ISIS and had trained and prepared for future suicide bombings.[136] (Gartenstein-Ross Decl. ¶ 237) (Dkt. 75).

The Turkish government had previously placed Çevik on a list of wanted ISIS terrorists with a reward for information.[137] (Gartenstein-Ross Decl. ¶ 238) (Dkt. 75). Çapkin was referred to

---

[135] TC Gaziantep Governorship, press release, "BASIN AÇIKLAMASI (2017-23)," February 28, 2017, http://gaziantep.gov.tr/basin-aciklamasi-2017-23 (last accessed May 25, 2023).

[136] Özden Atik, "Canlı Bomba Saldırısında 3 Sanığa 6 Kez Ağırlaştırılmış Müebbet Hapis İstendi," *Hurriyet* (Turkey), July 3, 2018, https://www.hurriyet.com.tr/canli-bomba-saldirisinda-3-saniga-6-kez-agirlas-40885209 (last access May 25, 2023).

[137] "Canlı Bomba Olduğu Değerlendirilen 3 IŞİD'li Ya/k/alandı," *Al Jazeera Turk* (Turkey), March 1, 2017, https://www.aljazeera.com.tr/haber/canli-bomba-oldugu-degerlendirilen-3-isidli-yakalandi (last accessed May 25, 2023); Son Güncelleme, "'Nikah' Sifresi Cözüldü, IŞİD'in Beyin Takımı Cökertildi," *Hurriyet* (Turkey), June 2, 2016, https://www.hurriyet.com.tr/nikah-sifresi-cozuldu-isidin-beyin-takimi-cokertildi-37289697 (last accessed May 25, 2023).

as the head of an ISIS cell in Gaziantep by Turkish media outlets.[138] (Gartenstein-Ross Decl. ¶ 238) (Dkt. 75). Following a police raid on Çapkın's residence, investigators discovered the names of several other individuals, which led them to the city of Adıyaman and an ISIS cell, along with suicide vests, weapons, and ammunition.[139] (Gartenstein-Ross Decl. ¶ 238) (Dkt. 75). They were being trained by ISIS to be suicide bombers.[140] (Gartenstein-Ross Decl. ¶ 243) (Dkt. 75).

### Mehmet Öztürk's Connections to a Larger Turkish ISIS Cell

The Federal Bureau of Investigation ("FBI") aided Turkish authorities in an investigation that led to ISIS. (Gartenstein-Ross Decl. ¶ 242) (Dkt. 75). The FBI assessed that ISIS's Dokumacılar cell, which was based in Adıyaman, was connected to the Istanbul attack.[141] (Gartenstein-Ross Decl. ¶ 242) (Dkt. 75). Citing a U.S. Department of Justice letter sent to Turkish authorities, the Turkish newspaper *Hurriyet* reported that the Dokumacılar cell was believed to

---

[138] İdris Emen, "Turkey Offers $14 Million Bounty for 23 Wanted ISIL Militants," *Hurriyet Daily News* (Turkey), April 5, 2016, https://www.hurriyetdailynews.com/turkey-offers-14-million-bounty-for-23-wanted-isil-militants-97324 (last accessed May 25, 2023); Son Güncelleme, "'Nikah' Sifresi Cözüldü, IŞİD'in Beyin Takımı Cökertildi," *Hurriyet* (Turkey), June 2, 2016, https://www.hurriyet.com.tr/yerel-haberler/gaziantep/nikah-sifresi-cozuldu-isidin-beyin-takimi-cokertildi-37289697 (last accessed May 25, 2023).

[139] TC Gaziantep Governorship, press release, "BASIN AÇIKLAMASI (2017-23)," February 28, 2017, http://gaziantep.gov.tr/basin-aciklamasi-2017-23 (last accessed May 25, 2023); Son Güncelleme, "Gaziantep'te, DEAŞ'ın 3 Canlı Bombası Tutuklandı," *Hurriyet* (Turkey), February 28, 2017, https://www.hurriyet.com.tr/gaziantepte-deasin-3-canli-bombasi-tutukland-40380608 (last accessed May 25, 2023).

[140] TC Gaziantep Governorship, press release, "BASIN AÇIKLAMASI (2017-23)," February 28, 2017, http://gaziantep.gov.tr/basin-aciklamasi-2017-23 (last accessed May 25, 2023).

[141] İsmail Saymaz, "FBI Investigating ISIL Cell in Turkey's Adıyaman, Case File Reveals," *Hurriyet Daily News* (Turkey), March 14, 2017, https://www.hurriyetdailynews.com/fbi-investigating-isil-cell-in-turkeys-adiyaman-case-file-reveals-110785 (last accessed May 25, 2023); "FBI 'Dokumacılar'ın Peşinde," *Hurriyet* (Turkey), March 14, 2017, https://www.hurriyet.com.tr/gundem/fbi-dokumacilarin-pesinde-40394082 (last accessed May 25, 2023).

have crossed into Syria to train with ISIS and that the cell was involved in the March 19 attack and other attacks in Turkey.[142] (Gartenstein-Ross Decl. ¶ 242) (Dkt. 75).

Öztürk made visits to Gaziantep and Adıyaman in between trips to Syria.[143] (Gartenstein-Ross Decl. ¶ 243) (Dkt. 75). A teahouse in Adıyaman, which featured the ISIS flag inside, played host to meetings of the Dokumacılar cell.[144] (Gartenstein-Ross Decl. ¶ 243) (Dkt. 75). Surveillance footage showed Öztürk purchasing a bus ticket from Adıyaman to Istanbul on March 18, the day before the attack.[145] (Gartenstein-Ross Decl. ¶ 243) (Dkt. 75). Police believed that Öztürk received assistance from someone in Adıyaman in plotting the attack.[146] (Gartenstein-Ross Decl. ¶ 243) (Dkt. 75).

---

[142] "FBI 'Dokumacılar'ın Peşinde," *Hürriyet* (Turkey), March 14, 2017, https://www.hurriyet.com.tr/gundem/fbi-dokumacilarin-pesinde-40394082 (last accessed May 25, 2023).

[143] "Istanbul Suicide Bomber Öztürk Fought in DAESH Ranks for 2 Years," *Daily Sabah* (Turkey), March 22, 2016, https://www.dailysabah.com/war-on-terror/2016/03/22/istanbul-suicide-bomber-ozturk-fought-in-daesh-ranks-for-2-years (last accessed May 25, 2023).

[144] In his analysis of how terrorist groups recruit, scholar Ahmet S. Yayla notes the importance of such meetings in allowing new or prospective recruits the opportunity to interact with current cell members to become socialized into the group's culture and ideology. In fact, Yayla uses the Islam Tea House (*İslam Çay Ocağı* in Turkish) as an example of such a recruitment strategy. Ahmet S. Yayla, "Prevention of Recruitment to Terrorism," in ed. Alex P. Schmid, *Handbook of Terrorism Prevention and Preparedness* (The Hague: ICCT Press, 2020), pp. 413-463. *See* also Cagil Kasapoglu, "IŞİD Neden Adıyaman'da Orgütlendi?," BBC Turkey, October 22, 2015, https://www.bbc.com/turkce/haberler/2015/10/151022_isid_adiyaman (last accessed May 25, 2023); İdris Emen, "Turkey Offers $14 Million Bounty for 23 Wanted ISIL Militants*," Hürriyet Daily News* (Turkey), April 5, 2016, https://www.hurriyetdailynews.com/turkey-offers-14-million-bounty-for-23-wanted-isil-militants-97324 (last accessed May 25, 2023).

[145] "Istanbul Suicide Bomber Öztürk Fought in DAESH Ranks for 2 years," *Daily Sabah* (Turkey), March 22, 2016, https://www.dailysabah.com/war-on-terror/2016/03/22/istanbul-suicide-bomber-ozturk-fought-in-daesh-ranks-for-2-years (last accessed May 25, 2023).

[146] "Police Identifies Istanbul Bomber As ISIL Member," *Hürriyet Daily News* (Turkey), March 20, 2016, https://www.hurriyetdailynews.com/police-identifies-istanbul-bomber-as-isil-member-96674 (last accessed May 25, 2023).

Öztürk reportedly attended the Muslim Youth Association ("MYA"), a religious organization founded in 2012 by Yunus Durmaz, a Turkish citizen who later became a leader of ISIS cells in Turkey. (Gartenstein-Ross Decl. ¶ 240) (Dkt. 75). According to a profile of Durmaz published in *Hurriyet*, the MYA was a hub and training center for ISIS supporters in southern Turkey.[147] (Gartenstein-Ross Decl. ¶ 240) (Dkt. 75). Durmaz and other attendees would later travel to Syria to join ISIS, where Durmaz participated in ISIS executions.[148] (Gartenstein-Ross Decl. ¶ 240) (Dkt. 75).

Durmaz was ISIS's "emir of Gaziantep" as he prepared the members of his cell, which totaled 19 recruits, including Öztürk, for attacks. (Gartenstein-Ross Decl. ¶ 241) (Dkt. 75). This preparation involved religious indoctrination, pledging allegiance to ISIS, and combat training. (Gartenstein-Ross Decl. ¶ 241) (Dkt. 75). Durmaz then leveraged ISIS's smuggling networks in Syria to acquire materials for suicide vests, which were in turn assembled in Gaziantep warehouses.[149] (Gartenstein-Ross Decl. ¶ 241) (Dkt. 75). This demonstrates the training and material support that Öztürk likely received when preparing for his attack, and also shows the key

---

[147] Ismail Saymaz, "IŞİD'in Ölüm Hattı: Gaziantep'ten Sonra?" *Hürriyet* (Turkey), August 28, 2016, https://www.hurriyet.com.tr/gundem/isidin-olum-hatti-gaziantepten-sonra-40210151 (last accessed May 25, 2023).

[148] Aaron Stein, "Turkey Did Nothing About the Jihadists in Its Midst — Until It Was Too Late," *Foreign Policy*, July 1, 2016, https://foreignpolicy.com/2016/07/01/turkey-did-nothing-about-the-jihadists-in-its-midst-until-it-was-too-late/ (last accessed May 25, 2023); Ismail Saymaz, "IŞİD'in Ölüm Hattı: Gaziantep'ten Sonra?" *Hürriyet* (Turkey), August 28, 2016, https://www.hurriyet.com.tr/gundem/isidin-olum-hatti-gaziantepten-sonra-40210151 (last accessed May 25, 2023).

[149] Aaron Stein, "Turkey Did Nothing About the Jihadists in Its Midst — Until It Was Too Late," *Foreign Policy*, July 1, 2016, https://foreignpolicy.com/2016/07/01/turkey-did-nothing-about-the-jihadists-in-its-midst-until-it-was-too-late/ (last accessed May 25, 2023).

role that Syria-connected smuggling routes played in such preparation. (Gartenstein-Ross Decl. ¶ 241) (Dkt. 75).

### *Conclusions About ISIS and the Istanbul Suicide Bombing*

Syrian support for ISIS, and its role in helping ISIS to attain a Syria-Iraq safe haven, was causally related to the Istanbul attack: (1) Beginning with how Öztürk was drawn to ISIS, the group's territorial safe haven helped it to erect a sophisticated media apparatus for a jihadist group. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). This media apparatus raised ISIS's international profile, helped to radicalize people to ISIS's cause, and prodded many to join ISIS networks or carry out attacks in its name. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). Further, the group's military victories in the Syria-Iraq theater produced more pro-ISIS furor, thus additionally aiding its recruitment efforts. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). (2) ISIS's control of territory was causally linked to the attacker's recruitment in another way. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). Öztürk traveled to Syria to join ISIS. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). He was one of several members of the MYA who received training from ISIS in Syria. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). ISIS's Syria safe haven allowed Öztürk to deepen his relationship with the group through the time he spent with it physically; evidence suggests that militants build bonds most effectively in person. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). ISIS's safe haven and battlefield successes also allowed it to make Gaziantep a hub that would not have been possible absent its successes in Syria. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). (3) Training in a physical safe haven increases the chances of a plot's success. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). (4) ISIS's Syria safe haven allowed it to erect robust smuggling networks. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). Durmaz maintained a robust network of connections with ISIS in Syria that enabled him to smuggle in the explosives that were assembled into suicide vests in a Gaziantep warehouse. (Gartenstein-Ross

Decl. ¶ 245) (Dkt. 75). (5) The size of ISIS's cell in Turkey further evidences a causal relationship to ISIS's Syria safe haven. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). There existed a web of connections that tied Öztürk to a 60- to 70-member ISIS cell. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75). A cell of this size, per Dr. Gartenstein-Ross, is highly unlikely to have formed as quickly as it did absent the group's Syria safe haven, which enabled its reach back into Turkey. (Gartenstein-Ross Decl. ¶ 245) (Dkt. 75).

### G.     Vehicular Terror Attack at the Armon Hanatziv Promenade in Jerusalem

#### ISIS, Gaza and the West Bank

Abu Bakr al-Baghdadi's self-appointment as Caliph and the establishment of the IS have inspired and driven tens of thousands of Muslim volunteers from all over the world to join the ranks of IS and perpetrate acts of terror in its name, including Israel's Arab citizens. (Spitzen Decl. ¶ 46) (Dkt. ¶ 78). Terror organizations that have operated in the Gaza Strip since the end of the first decade of the 21st century, were drawn to the concept of the IS. (Spitzen Decl. ¶ 47) (Dkt. 78). The strengthening of the IS since the summer of 2014 has instilled renewed momentum among Salafi Jihadist activists in Gaza, and has led to a cluster of organizations from this camp declaring their support for the radical stream.[150] (Spitzen Decl. ¶ 47) (Dkt. 78). A prominent figure involved in the connection between the Gaza Strip and the IS was Husayn Juaythini, who was designated

---

[150] *Id.* p. 157. IS was ready to welcome Palestinians as individual operatives, but it refused to accept "pledges of allegiance" from Palestinian organizations because, according to the concept of the IS, the Caliphate is supposed to take control of the territories that were conquered or liberated by its supporters. The Gaza Strip is controlled by Hamas. IS does not want to not clash with Hamas over its absolute rule in the Gaza Strip. Such was not the case regarding the Sinai Peninsula, that, in the view of the IS, was under unstable Egyptian control and thus was decidedly a legitimate and achievable target, from its perspective, for the establishment of an area (Wilaya) under IS Caliphate control.

by the US Treasury in April 2016 for aiding foreign terrorists' communication and movement, and for participating in the financing of ISIS. (Spitzen Decl. ¶ 48) (Dkt. 78). In September 2014, Juaythini traveled to Syria to pledge allegiance to ISIS and was tasked by ISIS leadership to return to Gaza to establish an ISIS foothold. (Spitzen Decl. ¶ 48) (Dkt. 78). Juaythini was the link between Abu Bakr al-Baghdadi and armed groups in Gaza, and he financed their activities.[151] (Spitzen Decl. ¶ 48) (Dkt. 78).

In July 2015, a report was published concerning an ISIS-affiliated network in the Gaza Strip calling itself the Sheikh Omar Hadid - Bayt al-Maqdis Brigade, which launched rockets at Ashqelon.[152] (Spitzen Decl. ¶ 49) (Dkt. 78). In November 2014, the Ansar Bayt al-Maqdis, the Egyptian organization leading the terror campaign against the Egyptian regime, issued a formal statement via its Twitter account, in which it announced it had sworn allegiance to ISIS.[153] (Spitzen Decl. ¶ 50). (Dkt. 78).

### *The Work Methods Used by the Islamic State in its Terror Operations*

Since its founding, the IS has operated primarily on two fronts:

**The war front in Iraq and Syria**: In an effort to preserve its conquests and expand the borders of the Islamic caliphate, the IS engaged in fighting that included consolidation of the territories over which the organization had taken control, efforts to enlist operatives in the service of the organization (including from Western countries) and action against anyone who sought to

---

[151] https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/individual/husayn-juaythini (last accessed May 25, 2023).

[152] www.terrorism-info.org.il//Data/articles/Art_20845/E_116_15_1894672650.pdf  p.14 (last accessed May 25, 2023).

[153] www.terrorism-info.org.il//Data/articles/Art_20845/E_116_15_1894672650.pdf  p.19 (last accessed May 25, 2023).

eradicate IS control. (Spitzen Decl. ¶ 52) (Dkt. 78). The war began in 2014 and ended (at least, for now) in March 2019. (Spitzen Decl. ¶ 52) (Dkt. 78).

**Terror operations in Western countries**: The IS called for its operatives and supporters to plan and engage in terror activity. (Spitzen Decl. ¶ 52) (Dkt. 78). Activity, in whose inspiration and as a result of which, acts of terror causing multiple casualties and much destruction were perpetrated in the U.S. and other Western countries, as well as against "enemies of the Islamic State" in various countries of the world.[154] (Spitzen Decl. ¶ 52) (Dkt. 78). For execution of terror activity around the world, ISIS developed work methods based on conventional communications, media, Internet, and social media skills, that it used for recruitment and employment of ISIS supporters to carry out acts of terror, destruction and killing, marked by a range of characteristics. (Spitzen Decl. ¶ 53) (Dkt. 78).

### *The Islamic State: Use of Internet and Media for Operations and Mobilization of Activists*

Use of the media, websites, and social networks for recruitment and mobilization of operatives for terror is ISIS's primary tool for execution of terror acts. (Spitzen Decl. ¶ 56) (Dkt. 78). In his statement before the Senate Homeland Security and Governmental Affairs Committee in October 2018,[155] the Director of the FBI addressed ISIS's use of the media for its terror operations and touched on the following points:

---

[154] *See*, for example: July 2015, shooting in Tennessee, U.S., at the army enlistment office. Four fatalities. October 2015, Sharm a-Sheikh, Egypt, downing of Russian airline, Flight 9268. 224 fatalities. July 2016, vehicular attack with truck in Nice, France. 84 fatalities. December 2016, vehicular attack in Berlin, Germany. 12 fatalities.

[155] hhttps://www.fbi.gov/news/testimony/threats-to-the-homeland-101018 (last accessed May 25, 2023).

a. ISIS uses high-quality, traditional media platforms, as well as widespread social media campaigns to propagate its extremist ideology.

b. With the broad distribution of social media, terrorists can spot, assess, recruit, and radicalize vulnerable persons of all ages in the U.S. either to travel or to conduct an attack on the homeland.

(Spitzen Decl. ¶ 55) (Dkt. 78).

The fact that ISIS command centers were located in Syria and Iraq, far from the targets of terror and perpetrators of terror, without the ability to directly communicate with their operatives throughout the world, led ISIS to develop work methods for recruitment and guidance of operatives throughout the world via the media and the Internet. (Spitzen Decl. ¶ 57) (Dkt. 78). ISIS, its supporters, and operatives took advantage of the Twitter and Telegram networks for conveying messages and directing terror activity.[156] (Spitzen Decl. ¶ 57) (Dkt. 78). Encrypted message channels, such as Telegram, gave ISIS a very powerful, operative tool to encourage, plan, coordinate and broadcast attacks.[157] (Spitzen Decl. ¶ 57) (Dkt. 78). An additional means that ISIS uses is on-line magazines, such as "Dabiq", that was published between June 2014 and August 2016 and disseminated ISIS propaganda, with an emphasis on the recruitment of foreign fighters through the use of advanced technology both for graphics and text.[158] (Spitzen Decl. ¶ 58) (Dkt.

---

[156] *See* research by Elizabeth Bodine-Baron, Todd C. Helmus, Madeline Magnuson, Zev Winkelman, "Examining ISIS Support and Opposition Networks on Twitter", pp.5-11 https://www.rand.org/content/dam/rand/pubs/research_reports/RR1300/RR1328/RAND_RR132 8.pdf (last accessed May 25, 2023).

[157]*See* article by Jason Burke, "The Age of Selfie Jihad: How Evolving Media Technology is Changing Terrorism." https://ctc.westpoint.edu/wp-content/uploads/2016/11/CTC-Sentinel_ Vol9Iss1115.pdf (last visited May 23, 2023).

[158] The Carter Center's article about the propaganda of Dabiq, p. 2: https://www. cartercenter.org/resources/pdfs/peace/conflict_resolution/countering-isis/dabiq-report-12-17-15.pdf (last accessed May 25, 2023).

78). ISIS used the Internet as a strategic platform to intimidate its enemies and to sow fear throughout the world. (Spitzen Decl. ¶ 59) (Dkt. 78). Without the use of advanced Internet technology, ISIS would not have been able to deliver its terror worldwide.[159] (Spitzen Decl. ¶ 59). (Dkt. 78).

The fact that the terror cells of ISIS were spread out over wide territories and that some of them were located in active fighting zones presented a challenge to their ability to conduct a centralized campaign of mobilization of forces and terror activity. (Spitzen Decl. ¶ 61) (Dkt. 78). Research from 2015[160] shows that ISIS chose a strategy of decentralization for its mode of operation in the field of mobilizing force. (Spitzen Decl. ¶ 61) (Dkt. 78). ISIS's propaganda was conducted primarily via local media outlets of the various districts in the Islamic State's caliphate.[161] (Spitzen Decl. ¶ 61) (Dkt. 78). This decentralization is part of a strategy to disseminate content over and maintain presence on the Internet.[162] (Spitzen Decl. ¶ 61) (Dkt. 78). ISIS operates dozens of platforms for production and distribution.[163] (Spitzen Decl. ¶ 61) (Dkt. 78). Central control is exercised through the Central Media Office, subject to its leadership. (Spitzen Decl. ¶ 61) (Dkt. 78). The various districts in Syria, Iraq, and throughout the world operate local

---

[159] https://www.weforum.org/agenda/2018/09/what-we-can-learn-from-isis-about-using-the-internet-to-counter-terrorism/ (last accessed May 25, 2023).

And, see as well: https://journals.sagepub.com/doi/abs/10.1177/1354066117714416 (last accessed May 25, 2023).

[160] *See* the research of Adam Hoffman, https://tinyurl.com/2x434kax (last accessed May 25, 2023).

[161] Adam Hoffman, p. 100.

[162] *Id.*, p. 101.

[163] *See* the review of the Meir Amit Intelligence and Terrorism Information Center: "ISIS's media network: Developments in 2018 and Future Courses of Action" pp. 12-13. https://www.terrorism-info.org.il/app/uploads/2019/02/E_285_18.pdf (last accessed May 25, 2023).

propaganda offices, subject to the Central Propaganda Office, and enable maintenance of the hierarchal structure and a uniform propaganda strategy.[164] (Spitzen Decl. ¶ 61) (Dkt. 78).

The terror attacks of ISIS can be divided into a few categories according to the extent of the connection of the campaigns to the organization's headquarters. (Spitzen Decl. ¶ 62) (Dkt. 78). Only a small portion of the terror activities are completely controlled, from the perspective of classic control that includes recruiting, funding, planning, training, and sending instructions for execution. (Spitzen Decl. ¶ 62) (Dkt. 78). Another portion is carried out by individuals, who receive their inspiration from ISIS propaganda and its calls on the Internet to carry out attacks. (Spitzen Decl. ¶ 62) (Dkt. 78). Between these two extremes there are many gradations of connection of one kind or another to the central terror cells.[165] (Spitzen Decl. ¶ 62) (Dkt. 78).

### The Islamic State's Threat of Terror against Targets Throughout the World

ISIS relies on the recruitment and direction of operatives via the media and social networks. (Spitzen Decl. ¶ 65) (Dkt. 78). Instruction of operatives to perform terror acts is given in an exact manner (including recommendations as to the means of action). (Spitzen Decl. ¶ 65) (Dkt. 78). Supporters and operatives of ISIS throughout the world influence each other by dissemination of ideas, suggestions and examples that integrate with the organization's ideology via the Internet and also directly, in their places of residence, under the method of, "A friend brings a friend." (Spitzen Decl. ¶ 65) (Dkt. 78). The geographic distance between the command centers from the operatives and the terror targets does not allow for direct contact with those who carry out the

---

[164] *Id.* pp. 8-9

[165] *See* an article by Kyle Orton: "Foreign Terrorist Attacks by The Islamic State, 2002-2016" https://radical.hypotheses.org/files/2018/01/HSJ_ISIS_Attacks.pdf (last accessed May 23, 2023).

attacks, and, therefore, in most cases, the method of operation is decentralized and is performed by transferring content regarding what is appropriate and what must be done via the various means available on the Internet. (Spitzen Decl. ¶ 66) (Dkt. 78).

### *Vehicular Terror Attack at the Armon Hanatziv Promenade in Jerusalem[166]*

On January 8, 2017, a terrorist, Fadi Ahmad Hamdan al-Qanbar, who was a supporter of ISIS, ran over a group of soldiers and those with them that had just stepped off a bus at the Armon Hanatziv Promenade.[167] (Spitzen Decl. ¶ 68) (Dkt. 78). Fadi drove his truck from his village in the direction of Jerusalem, spotted the group of soldiers, veered from his route, accelerated, and ran over the soldiers. (Spitzen Decl. ¶ 68) (Dkt. 78). After he ran over the soldiers, Fadi reversed and drove his truck backwards, right back over the soldiers again. (Spitzen Decl. ¶ 68) (Dkt. 78).

The terrorist was determined to strike as many people as possible, to kill and injure them, and it only ended after he was shot and killed. (Spitzen Decl. ¶ 69) (Dkt. 78). A number of soldiers and civilians opened fire on the terrorist as soon as they realized a terror attack was underway. (Spitzen Decl. ¶ 69) (Dkt 78). This did not stop the terrorist, who was determined to carry out his scheme and even die as a Shahid (Martyr) during the attack. (Spitzen Decl. ¶ 69) (Dkt. 78). The police ballistics lab report noted that there were dozens of bullet holes in the truck. (Spitzen Decl. ¶ 69) (Dkt. 78). As a result of the attack, four soldiers were killed, including Erez, and at least 13 others were injured, including Eytan. (Spitzen Decl. ¶ 69) (Dkt. 78).

---

[166] The description of the attack is based on the Israel Police attack file (Police File No. 12119), that Spitzen received from the plaintiffs' attorney. *See* also a report by The Meir Amit Intelligence and Terrorism Information Center: https://www.terrorism-info.org.il/app/uploads/2018/02/Efv_015_18.pdf (last accessed May 30, 2023).

[167] The Promenade is a Jerusalem tourist attraction.

*Profile of the Terrorist*

Fadi worked in delivery of building materials as the driver of a crane truck, the same truck he used in the attack. (Spitzen Decl. ¶ 70) (Dkt. 78). He purchased the truck from a building material business owner a year before the attack.[168] (Spitzen Decl. ¶ 70) (Dkt. 78). According to media reports, the terrorist was previously convicted of the criminal charge of purchase of a stolen vehicle and was sentenced to community service.[169] (Spitzen Decl. ¶ 71) (Dkt. 78). The terrorist's family and people with whom he was in regular contact with at work described him as a radically devout, religious Muslim. (Spitzen Decl. ¶ 72) (Dkt. 78). The terrorist repented and became devoutly observant of the religion's precepts a few years before the attack.[170] (Spitzen Decl. ¶ 73) (Dkt. 78). In their statements to the police, his family and other acquaintances described the terrorist's radicalization of religious behavior and his penchant for preaching to those around

---

[168] This information was taken from the Israel Police attack file (Police File No. 12119). The terrorist had not completed payment for the vehicle. Therefore, at the time of the attack, ownership of the truck had not yet been transferred to his name.

[169] *See* an Israeli news website: https://www.yediot.co.il/articles/0,7340,L-4834204,00.html (last accessed May 30, 2023). Also see, for example, an Arabic news website: https://tinyurl.com/38ezjmha (last accessed May 25, 2023).

[170] According to most of those who gave statements to the police, Al-Qanbar started to behave this way more than three years before the attack. According to his relatives and acquaintances, prior to his religious repentance, the terrorist had cast aside all religious obligations. He drank alcoholic beverages and consorted with women in contravention of Muslim tenets. According to two of his relatives (his sister, Shadia Awisat, in a statement to the police on January 8, 2017, and Hamza al-Qanbar, in a statement to the police on January 16, 2017), his religious repentance came after he recovered from serious injuries sustained in a fall from a building three years before the attack. Shadia explained it this way: "Because he saw that he was going to die from his injury, he decided to become religious." Read more at: https://tinyurl.com/4xjj62fs (last accessed May 25, 2023).

him.[171] (Spitzen Decl. ¶ 75) (Dkt. 78). The terrorist's religious radicalization was also manifested in his outward appearance; he started to grow a beard and dress in the traditional garb, which characterizes activists of ISIS. (Spitzen Decl. ¶ 75) (Dkt. 78).

### Intent to Perpetrate a Terror Attack

It is not possible to learn from the statements to the police of those closest to the terrorist that any one of them knew that an attack was supposed to be executed and that they did not inform the police in order to prevent it because such an admission would mean complicity with the crime and self-incrimination as well as an increased risk that their homes would be demolished. (Spitzen Decl. ¶ 76) (Dkt. 78). However, a review of the decision of the High Court of Justice, in the terrorist's family's appeal against the decision to demolish their home, shows that secret information, which was filed with the Israel Supreme Court, sitting as the High Court of Justice, indicated that the terrorist's family apparently did know of his intention to perpetrate an attack.[172] (Spitzen Decl. ¶ 77) (Dkt. 78).

An examination of the terrorist's Facebook pages shows that Fadi hinted all too clearly how Jews should be handled, and that he intended to die as a shahid. (Spitzen Decl. ¶ 78) (Dkt 78). The posting of the choice of death ("the life of the afterworld") as the preferred option, one week before the attack shows that the terrorist had already made plans and was intending to die as a shahid during the attack that he planned to execute. (Spitzen Decl. ¶ 81) (Dkt. 78).

---

[171] In her statement to the police, Shadia said that her brother would make comments to her regarding her behavior, which was not religious enough for him, and because of this, their relationship was strained.

[172] Decision of the Israeli High Court of Justice, 799/17, on February 13, 2017. *See* also a publication of a news agency in Arabic: https://tinyurl.com/5n99u5wn (last accessed May 25, 2023).

### The Terrorist's Identification with and Support of the Islamic State

Statements taken by the Israel Police from relatives and acquaintances of the terrorist portray the terrorist as being a public supporter of ISIS.[173] (Spitzen Decl. ¶¶ 84-87) (Dkt. 78). Two years before the attack, the terrorist sought to leave for Turkey and from there to reach ISIS territories to join its fighters. (Spitzen Decl. ¶ 87) (Dkt. 87). The terrorist's intentions seemed so serious to his family that his mother hid his Jordanian passport that she had renewed and did not tell him the passport was still valid. (Spitzen Decl. ¶ 87) (Dkt. 87). In his statement to the police, Mussa Sharaf, who sold the truck to the terrorist and employed him as a driver, stated that the terrorist would at work preach the importance of supporting ISIS, distribute propaganda for it and try to convince others of ISIS's merits. (Spitzen Decl. ¶ 85) (Dkt. 75).

### The Terrorist's Connection to the Islamic State—Social Network

Spitzen was apprised of the terrorist's Facebook content as well as his list of friends.[174] (Spitzen Decl. ¶ 89) (Dkt. 78). The terrorist's Facebook pages begin on November 16, 2016 and reveal he identifies with IS. (Spitzen Decl. ¶ 90) (Dkt. 78). The reason for the late start date of the Facebook profile can be found in the statement to the police of the terrorist's cousin, Muhammad al-Qanbar: "I would see his posts on ISIS, Mosul, and Aleppo and such. He made a lot of Facebooks, and they would be shut down." [175] (Spitzen Decl. ¶ 90) (Dkt. 78). Thus, it appears the

---

[173] Statement to the Police of Munzir al-Qanbar, brother of the terrorist, on January 22, 2017.

[174] *See* the Israel Police Activity Report, dated January 9, 2017, that lists the material that the cyber unit of the police downloaded from al-Qanbar's Facebook profile. The Police downloaded Facebook profile contents, as well as a friends list and six videos that the terrorist had uploaded to his Facebook profile.

[175] Statement to the police of Muhammad al-Qanbar, on January 8, 2017.

terrorist opened prior Facebook pages, but these were closed likely because he posted inciteful and violent content that supported the IS. (Spitzen Decl. ¶ 90) (Dkt. 78).

Many of the terrorist's Facebook page friends based on their accompanying photos were violent, ISIS supporters who did not want to expose their faces. (Spitzen Decl. ¶ 91) (Dkt. 78). The photos depict violence, weapons, involvement of children in fighting, affiliation with ISIS (a caption in praise of the Caliphate, images of ISIS fighters), adoption of ISIS's flag (for example, the organization's flag on the top of the Eiffel Tower), use of ISIS symbols, such as 'lions' or 'lion' as a nickname for the fighters, and, 'a horseman on a horse' holding a sword and to its side, is the caption: "The Caliphate is coming." (Spitzen Decl. ¶ 91) (Dkt. 78).

The cover picture of Fadi's Facebook page (which he updated on November 11, 2016) depicted a tank with fighters on it. (Spitzen Decl. ¶ 93) (Dkt. 78). The caption for the picture was: "The Lions of Sunna (Usud a-Suna) are coming from a place you don't know (coming by surprise)."[176] (Spitzen Decl. ¶ 93) (Dkt. 78). There was wide use of the 'lions' designation (including dubbing the terrorist himself 'lion') as well as a picture of a horseman on a horse on the terrorist's Facebook pages and in the announcements that were published in his memory. (Spitzen Decl. ¶ 93) (Dkt. 78). These are conspicuous motifs and symbols of ISIS.[177] (Spitzen Decl. ¶ 93)

---

[176] The terrorist's Facebook pages reveals that he followed the events in the territories in which ISIS was fighting. According to the statement to the police of Hamza al-Qanbar, on January 22, 2017, a relative of the terrorist by the name of Khalid Ibrahim al-Qanbar, who resided in the U.S. and who visited Jabl al-Mukabbir in 2015 (staying there for over one and a half months) joined the forces in Syria that supported ISIS.

[177] On the issue of the Islamic State's use of these symbols, see the Memri Research Institute reference: "The songs… of the Islamic State (hereinafter 'ISIS') are an important tool for conveying the narrative and the messages of the organization [1]. These songs include praise for ISIS fighters, who are dubbed "lions" or "horsemen," as well as expressions of pride and joy over the establishment of the Islamic caliphate that stands up against all its enemies with pride and power." http://www.memri.org.il/cgi-webaxy/item?4076 (last accessed May 25, 2023).

(Dkt. 78). On January 1, 2016, the terrorist uploaded a post that emphasized ISIS's concern for its citizens in areas of civilian life as part of positive propaganda for the work of ISIS. (Spitzen Decl. ¶ 95) (Dkt. 78). The terrorist dedicated a good deal of space on his Facebook pages to an attack on the enemies of ISIS and the disparagement of those who fight against it. (Spitzen Decl. ¶ 97) (Dkt. 78).

### *Islamic State Responsibility for the Terror Attack*

The day after the attack, an Arabic article published that: "a source close to the 'State' organization is celebrating the Al-Quds Operation and is claiming that the Shahid Fadi belongs to the organization." [178] (Spitzen Decl. ¶ 103) (Dkt. 78). The article emphasized that the day of the attack, January 8, was the anniversary of the killing of another terrorist who had executed a terror attack in January 2016 in Tel Aviv. (Spitzen Decl. ¶ 103) (Dkt. 78). This terrorist and the attack he executed were identified with ISIS.[179] (Spitzen Decl. ¶ 103) (Dkt. 78). Shortly after that attack, the Prime Minister of Israel, Benjamin Netanyahu, indicated that the terrorist belonged to ISIS.[180] (Spitzen Decl. ¶ 104) (Dkt. 78).

The nature of the attack, a multiple-victim, vehicular attack, by means of a truck, that resembled attacks that were perpetrated in Europe (in Nice on July 14, 2016, and in Berlin, on

---

[178]*See* Ex. F attached to Spitzen's Declaration. (Dkt. 78).

[179] The terrorist, Nahs'at Milham, was killed on January 8, 2016, one year before the attack at the Armon Hanatziv Promenade. Selection of anniversary dates, that commemorate terrorists who executed terror acts, or organization leaders who were killed or eliminated, and anniversary dates that mark symbolically significant events or the founding of organizations, is a common practice among terrorists affiliated with established terror organizations.

[180] https://tinyurl.com/3ynd2sh7 (last accessed May 25, 2023); https://www.cnn.com/2017/01/08/middleeast/jerusalem-vehicle-attack/index.html (last accessed May 25, 2023).

This statement of the Israeli Prime Minister was later softened, and he was quoted as saying that the terrorist was an ISIS supporter.

December 19, 2016) by terrorists of ISIS, also strengthens the assertion that this was an attack by ISIS. (Spitzen Decl. ¶ 105) (Dkt. 78). The Commissioner of the Israel Police at the time made statements to the same effect.[181] (Spitzen Decl. ¶ 105) (Dkt. 78). Depicted as one of the methods used to "punish the Jews," the vehicular attack was published in a diagram that appeared on the Facebook page of A'maq, the ISIS news agency, in October 2015.[182] (Spitzen Decl. ¶ 105) (Dkt. 78). ISIS-supporting propaganda websites in Gaza publicized statements on social media, praising and extolling the terrorist and toting him as an operative of ISIS, dubbing him, the "Lion of the Caliphate," an appellation reserved for ISIS fighters. (Spitzen Decl. ¶ 106) (Dkt. 78).

### *Summary and Conclusions*

The terror attack on January 8, 2017, by the terrorist Fadi al-Qanbar was a premeditated terror attack of the IS. (Spitzen[183] Decl. ¶ 108) (Dkt. 78). The attack was executed by a terrorist, who identified with ISIS and its ideas. (Spitzen Decl. ¶ 108) (Dkt. 78). The attack was executed under the inspiration of ISIS ideology. (Spitzen Decl. ¶ 108) (Dkt. 78).

---

[181] https://web.archive.org/web/20171203140613/http://www.onlinejihadexposed.com/2017/ (last accessed May 30, 2023).

[182] *See* above: http://www.memri.org.il/cgi-webaxy/item?3989 (last accessed May 25, 2023).

[183] The Court finds that Spitzen is a qualified expert in terrorism, including with respect to ISIS and its precursors and the terror attack in Jerusalem at issue in this case. Spitzen has qualified as an expert in other terrorism cases. *See Force*, 464 F. Supp. 3d 323, and *Fraenkel*, 248 F. Supp. 3d 21.

# III.
# CONCLUSIONS OF LAW

## A.     Burden of Proof

Even when a plaintiff seeks a default judgment, the plaintiff must establish a right to the relief. 28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").[184] Section 1608(e) provides protection to foreign states from unfounded default judgments rendered solely upon a procedural default. *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 950-51 (11th Cir. 1996). Although a court receives evidence from only the plaintiff when a foreign sovereign defendant has defaulted, § 1608(e) does not require a court to demand more or different evidence than it would ordinarily receive in order to render a decision. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). In evaluating the plaintiff's proofs, a court may "accept as true the plaintiff's uncontroverted evidence," *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007), and a plaintiff may establish proof by affidavit. *See Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). By its failure to appear and defend itself, Syria put itself at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to the Court to prove their allegations. In fact, the Court finds that Plaintiffs have presented satisfactory evidence to prove liability and damages against the Defendant.

## B.     Service

Service under the FSIA is governed by 28 U.S.C. § 1608. Subsection (a) provides for service on a foreign state and subsection (b) provides for service on an agency or instrumentality

---

[184] *See also Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (holding an FSIA default winner must prove damages like any other default winner).

of a foreign state. In this case, service upon the Defendant was perfected under § 1608(a), which governs service on foreign states. Obviously, Syria is a foreign state. Specifically, service upon Syria was attempted via 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated into Arabic) to its agent via international courier service, but DHL was not providing service to Syria at the time. (Dkt. 41). Subsequently, service via 28 U.S.C. § 1608(a)(4) through diplomatic channels on Syria was accomplished on May 9, 2021 and May 13, 2021. (Dkt. 45, 51). The diplomatic notes provide proof of service as to Syria. (Dkt. 51).

## C.      Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Accordingly, this Court lacks jurisdiction over Syria unless one of the FSIA's enumerated exceptions applies. Here, the state-sponsored terrorism exception to sovereign immunity applies. 28 U.S.C. § 1605A(a). Additionally, the FSIA was amended in 2008 to provide a private cause of action by which a foreign state that sponsors terrorism can be held liable for certain enumerated damages arising from terrorist activities: economic damages, solatium, pain and suffering, and punitive damages. *Id.* § 1605A(c). A foreign state that is or was a state sponsor of terrorism shall be liable to—

(1)     a national of the United States,

(2)     a member of the armed forces,

(3)     an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4)     the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) [i.e., the provision of material support or resources for hostage taking, torture, or extrajudicial killing].... In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a

foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

See U.S.C. § 1605(A)(c).

For persons covered by the private right of action in § 1605A(c) state law claims are not available. By providing for a private right of action and precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in cases decided under state law. Compare *Jackovich v. Gen. Adjustment Bureau, Inc.*, 326 N.W.2d 458, 464 (Mich. Ct. App. 1982) (under Michigan law, exemplary damages are available but punitive damages are not) *with Todd v. Byrd*, 640 S.E.2d 652, 661 (Ga. Ct. App. 2006) (noting that punitive damages are available under Georgia law).

A U.S. court will hear a claim under FSIA if: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act occurred, or was so designated as a result of such act"; (2) "the claimant or the victim was, at the time the act…occurred" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment"; and (3) if the act occurred in the foreign state against which the claim has been brought, the foreign state has been afforded "a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." *Id.* § 1605A(a)(2)(A).

Because the victims or claimants of the terror attacks were U.S. nationals,[185] § 1605A(a)(2)(A)(ii)(I) provides that the sovereign immunity of Syria is waived, and the victims,

---

[185] Under the FSIA, a U.S. national is defined as "a citizen of the United States." *See* 28 U.S.C. § 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

Case 5:20-cv-00230-BO   Document 127   Filed 06/28/23   Page 68 of 202

the estates of the victims and their families' claims can be heard. Plaintiffs are the victims, as well as the mothers, fathers, siblings, spouses, and children of U. S. citizens and, therefore, liability and damages are assessed under § 1605A(c), providing a private right of action for U.S. nationals. (Dkt. 70, Ex. 1-30, U.S. Passport of Anne[186] Cameron Baarbé, U.S. Passport of James Cain, U.S. Passport of Helen Cain, U.S. Passport of Nohemi Gonzalez, U.S. Passport of Beatriz Gonzalez, U.S. Passport of Paul Gonzalez, Proof of U.S. residency for Reynaldo Gonzalez, U.S. Passport of Erez Orbach, U.S. Passport of Eitan Orbach, U.S. Passport of Alon Orbach, U.S. Passport of Caryn Orbach, U.S. Passport of A.O., U.S. Passport of E.O., Certificate of U.S. Citizenship for O.O., U.S. Passport of Eytan Rund, U.S. Passport of Tamar Rund, U.S. Passport of S.A.R., U.S. Passport of H.H.R., U.S. Passport of Y.M.R., U.S. Passport of Ron Greenfield, U.S. Passport of Liron Greenfield, U.S. Passport of Shere Greenfield, U.S. Passport of Gili Greenfield, U.S. Passport of Shye Greenfield, U.S. Passport of Nitzhia Goldman, U.S. Passport of Abvraham Goldman, U.S. Passport of Gila Nissenbaum, U.S. Passport of Nathan Goldman, U.S. Passport of Maya Goldman Cohen and U.S. Passport of Sharon Goldman).

Additionally, the right to arbitrate is not an issue here because the acts of terrorism did not occur in Syria. Moreover, as discussed below, Syria was designated a sponsor of terrorism at the time of each of these terror attacks. Therefore, this Court can hear this FSIA claim.

## D.     Liability to U.S. Citizen Plaintiffs

As detailed, there are five elements necessary to establish liability under FSIA's state-sponsored terrorism exception. *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 101

---

[186] The caption in this case inadvertently omits Anne Cameron Cain Baarbé's first name. Plaintiffs respectfully request that the caption be corrected, and that any judgment be entered herein include Anne Cameron Cain.

(D.D.C. 2012) (quoting 28 U.S.C. § 1605A(a)(1), (c). Here, Plaintiffs are seeking money damages so the fifth element has been met. (Dkt. 44).

The third and fourth elements are satisfied when a plaintiff proves a theory of liability and justifies the damages s/he seeks, generally "through the lens of civil tort liability." *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 399-401 (D.D.C. 2015). Plaintiffs need not show Syria specifically "knew of or intended its support to cause the particular attacks in question or even that Syria's material support was a 'but for' cause of their injuries." *See Force*, 464 F. Supp. 3d at 368; *Owens*, 864 F.3d 751, 798; *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2014). Instead, FSIA only requires a "showing of 'proximate cause' which is satisfied where a plaintiff can show 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). FISA has a low bar for establishing proximate cause. *See Roth*, 78 F. Supp. 3d at 394. "Defendant's actions must be a substantial factor in the sequence of events that led to the plaintiff's injury" (quoting *Rothstein v. UBS*, 708 F.3d 82 91 (2d Cir. 2013)) and plaintiff's injury "must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Force*, 464 F. Supp. 3d 323, 368. Here, just as in *Force* and *Owens*, the death and injury to innocent people and the suffering of their families were reasonably foreseeable by Syria with its material support of ISIS, a known violent terrorist organization. *See Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 37-38 (D.C. Cir. 2017); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012).

This Court may rely on the evidence produced in *Doe*, 2020 WL 5422844, *Winternitz*, 2022 WL 971328, and *Fields*, 2021 WL 9244135, without requiring the Plaintiffs here to re-submit and

re-establish that same evidence, to reach its own findings as to those elements that *Doe*, *Winernitz* and *Fields* found to be demonstrated with clear and convincing evidence. *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115-16 (D.D.C. 2012). The Court in *Doe*, 2020 WL 5422844, at * 1, 8-14, found the following as to the March 22, 2016, Brussels terror attack: (1) Syria has been designated a state sponsor of terrorism since 1979 and had been at the time of the terror attack; (2) Syria provided material support and resources to ISIS that caused the plaintiffs' personal injuries; (3) such personal injuries were the result of an extrajudicial killing; (4) the material support and resources Syria provided to ISIS were "a legally sufficient cause of the terrorist attack"; (5) plaintiffs presented sufficient evidence that ISIS was responsible for the Brussels terror attack; (6) having materially supported ISIS and its predecessor, AQI, it was reasonably foreseeable that ISIS would commit violent terror attacks as it was common knowledge ISIS and AQI were violent organizations that committed terror attacks against civilians; (7) the evidence of the terror attack was sufficient to establish the claims of assault, battery, and intentional infliction of emotional distress; and (8) Syria's aid to ISIS "was essential to strengthening the group's operating capacity and this was the legally sufficient cause of the terror attack." *See also Winternitz*, 2022 WL 971328, at * 4-9. In *Fields*, 2021 WL 9244135, at * 4-5, 7-9, the Court found the following as to the Paris terror attack: (1) ISIS operatives killed Nohemi Gonzalez; (2) ISIS took responsibility for the attack; (3) the French government's investigation concluded that ISIS was responsible for the attack; (4) Syria for decades provided safe haven to terror groups within its borders; (5) Syria has a long standing relationship with ISIS, including its precursor terror groups; (6) Nohemi was a U.S. citizen; (7) Syria has been a state sponsor of terrorism since December 29, 1979; (8) the deaths in the attack were extrajudicial killings; (9) Syria provided material support to ISIS, including a safe haven for recruiting and training militants, allowing safe passage of jihadists from Syria into Iraq and purchasing stolen oil from ISIS; (10) Syria's material support of ISIS caused

extrajudicial killings; (11) Syria's material support was a substantial factor in the sequence of events that led to the death of the victims; and (12) the extrajudicial killings were a reasonably foreseeable consequence of Syria's material support of ISIS. (Dkt. 98, Ex. 14). In light of *Doe*, *Fields* and *Winternitz*, the Court should review and take judicial notice of the evidence admitted and relied upon in these cases with respect to Syria's material support to ISIS and ISIS's responsibility for the Brussels and Paris terror attacks without Plaintiffs having to present such evidence again. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (holding courts in FSIA terrorism cases may review and take judicial notice of the evidence admitted and relied upon in other cases without requiring such evidence to be reintroduced).

The term "extrajudicial killing," both when *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) was decided in 2003 and now, means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note; 28 U.S.C. § 1605A(h)(7); 28 U.S.C. § 1605(e)(1) (2002). Here, the first and fourth elements are met because Alexander, Abvraham, Nohemi and Erez all died at the hands of terrorists in terror attacks. These were not authorized killings but were murders of innocent persons. The terror attacks here at issue constitute "extrajudicial killing." *Id.* at 270.

This is a claim against Syria, which is a foreign state. Syria is and was, at all pertinent times, designated a state sponsor of terrorism as that term is defined by § 1605A(h)(6). *See* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/j/ct/list/c14151.htm (last visited May 24, 2023); *Campuzano*, 281 F. Supp. 2d at 270.

Section 1605A(h)(3) defines "material support or resources" to have "the meaning given that term in section 2339A of title 18." Section 2339A provides:

"material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel..., and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). To determine whether a defendant sovereign has provided material support to terrorism, courts consider whether a particular terrorist group committed the terrorist act and whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act. *See e.g., Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008). The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, *see, e.g.*, *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 90 (D.D.C. 2008); *Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 WL 2007582, at *5-6 (D.D.C. July 5, 2007); allowing terrorist groups to use its banking institutions to launder money, *see, e.g., Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-50 (E.D. Va. 2007); and allowing terrorist groups to use its territory as a meeting place and safe haven,[187] *see, e.g., id.* Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, *see, e.g., Ben-Rafael*, 540 F. Supp. 2d at 47; that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, *see, e.g., Sisso*, 2007 WL 2007582, at *6; or when the support facilitated the terrorist group's development of the expertise,

---

[187] *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) (finding that insofar as the Sudan "affirmatively allowed and/or encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within its borders," it provided a safe haven).

networks, military training, munitions, and/or financial resources necessary to plan and carry out the attack, *see, e.g., Rux*, 495 F. Supp. 2d at 553 (expert testimony that the "attack might have been possible, but it would not have been as easy" without defendant's support).[188] In *Soltoff*, 525 F. Supp. 3d 121, 139-140 (D.D.C. 2021) and *Doe*, 2020 WL 5422844, at *11, the plaintiffs relied upon government reports, expert reports and expert testimony to establish that Syria provided material support to ISIS in the form of financial assistance, safe haven, releasing key ISIS members from Syrian prisons, military training and allowing jihadists to use its borders to cross into Iraq and that such material support was key to ISIS strengthening its operating capacity. (Dkt. 98, Ex. 2, 5-8, 9, 9A-9S). *See also Winternitz*, 2020 WL 971328, (Dkt. 17 in *Winternitz*). (Dkt. 98, Ex. 10).

Here, the evidence demonstrates that during the time leading up to the terror attacks in this case, Syria supported ISIS by:

(1)     Providing a safe haven for ISIS and locations for its headquarters in Damascus, where they could engage in open meetings and fundraising;

(2)     Training members of ISIS in the use of terrorist tactics;

(3)     Providing a location where ISIS could openly recruit members;

(4)     Providing a public political platform and legitimacy due to ISIS's presence in Damascus;

(5)     Providing financial support directly through funds transmitted to the ISIS' headquarters in Damascus; and

---

[188] In cases regarding the state-sponsored terrorism exception to the FSIA such as this one, courts rely extensively on expert testimony. *See, e.g.*, *Wachsman*, 537 F. Supp. 2d at 90; *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007).

(6)      Assisting in funneling weapons shipments by allowing them to be transported through Syria.

(Dkt. 75). *See also Sotloff*, 525 F. Supp. 3d at 128-130, 138-139; *Doe*, 2020 WL 5422844, at *1, 8, 10-11; *Winternitz*, 2022 WL 971328; and *Fields*, 2021 WL 9244135, for the reports of Dr. Gartenstein-Ross and Dr. Levitt, as well as their testimony. (Dkt. 98, Ex. 2, 5-8, 10-11). In *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193-95 (D.D.C. 2017), the Court found that Syria supported various incarnations of ISIS precursor groups. In *Thuneibat*, 167 F. Supp. 3d 22, 36, the Court found that Syria provided material support to Zarqawi's terror organization. *See also Gates*, 580 F. Supp. 2d 53, 59-63, 119, 127 (finding Syria provided a critical entry point for Zarqawi's fighters into Iraq and served as a base for Zarqawi). Recently, in *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 147 (D.D.C. 2019), the Court relying upon Dr. Levitt noted that the Assad regime in response to the Arab Spring uprising in Syria allowed ISIS to grow within Syria so the U.S. and its allies would have a choice between ISIS and the Assad regime. *See also Winternitz*, 2022 WL 971328; *Doe* 2020 WL 5422844; and *Fields*, 2021 WL 9244135, as well Dr. Gartenstein-Ross' declaration. (Dkt. 75, pp. 11-47).

Plaintiffs' evidence establishes that ISIS carried out the terror attacks in this case that caused extrajudicial killings. Plaintiffs evidence demonstrates that Syria provided material support to ISIS and that such material support bears a causal connection to the success of the Paris, Brussels, Istanbul, and Jerusalem terror attacks. Plaintiffs further provided satisfactory evidence that Syria is legally responsible for each terror attack due to the longstanding material support Syria provided to ISIS that allowed this group to grow and flourish into a terrorist organization. The evidence demonstrates that each of the victims in these attacks was injured or murdered as part of an intentional ISIS plan to injure or murder citizens in order to intimidate a civilian population and/or affect government policies. Moreover, the evidence establishes the extrajudicial

killings were a reasonably foreseeable consequence of Syria's material support of ISIS, especially since Syria was well aware that ISIS is a violent terrorist organization. In sum, jurisdiction over Syria is consistent with § 1605A(a), the state-sponsored terrorism exception to sovereign immunity, and the U.S. citizen Plaintiffs have provided evidence satisfactory to the Court in support of their private cause of action for damages under § 1605A(c).

## E.    Damages for U.S. Citizen Plaintiffs

Damages for a private action for proven acts of terrorism by foreign states under FSIA § 1605A(c) may include pain and suffering, economic damages, solatium, and punitive damages. 28 U.S.C. § 1605A(c).

### 1.    Pain and Suffering

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). Courts have awarded varying amounts of pain and suffering damages, depending upon the length of the suffering. *See, e.g., Braun v. Islamic Republic of Iran*, 2017 WL 79937, at *12 (D.D.C. Jan. 9, 2017) (awarding $1,000,000 for pain and suffering lasting two hours); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) and *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017) (finding the baseline award for individuals who suffered severe injuries in terror attacks are entitled to $5 million in compensatory damages); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hours). Substantial injuries include "compound fractures severe flesh wounds, and wounds and scars from shrapnel, as well as lasting and severe psychological pain." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010). Victims who suffer "severe emotional injury"

accompanied by minor physical injuries receive $1,500,000-$3,000,000. *See Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 180 (D.D.C. 2019).

### a.     *Eytan Yair Rund*

Plaintiffs present Dr. Friedman's expert report regarding the physical injuries sustained by Eytan in the attack, along with Eytan's declaration. (Dkt. 79, Ex. B, 95). On June 16, 2022, Dr. Friedman evaluated Eytan in person. (Dkt. 79, Ex. B). On January 8, 2017, Eytan was working as a tour guide for a group of soldiers on a tour. (Dkt. 95). They were standing around discussing the day's agenda when an old friend saw him and called his name. (Dkt. 95). Eytan turned around to look at her and was sent flying in the air. (Dkt. 95). Eytan was either struck by the truck or by one of the soldiers that had been hit by the truck. (Dkt. 95). Eytan landed on his right side. (Dkt. 95). He struck his head but did not lose consciousness. (Dkt. 79, Ex. B). Eytan was bleeding from his nose. (Dkt. 79, Ex. B). He was transferred by EMS to Hadassah Hospital and discharged that same day. (Dkt. 79, Ex. B). Eytan had severe bruising on his right side from his thigh to his shoulder. (Dkt. 79, Ex. B). The bruising remained for one month and made it difficult to walk and sleep during that time. (Dkt. 79, Ex. B, 95). After examining Eytan and reviewing his Emergency Room records, Dr. Friedman's diagnoses as to the attack is post terror attack, right leg, flank, and arm bruising—resolved after one month and superficial head trauma. (Dkt. 79, Ex. B).

The Court finds Dr. Friedman's methods to be reliable, that he is a qualified expert in his field, that his expert testimony and report are relevant to the issue in this case. Plaintiffs have presented evidence to the Court's satisfaction that Eytan sustained minor physical injuries as a result of the terror attack. The Court will award $1,500,000 in compensatory damages to Eytan Rund. *See Barry*, 410 F. Supp. 3d 161, 180.

### b.       Erez Orbach

One of the soldiers Eytan witnessed get run over by the terrorist was Erez. (Dkt. 95). When

Eytan saw Erez, he ran over to Erez, along with another tour guide who was also a medic. (Dkt.

95). Erez was unconscious and strewn on the ground and without his eyeglasses on. (Dkt. 95).

There was dirt and grass in Erez's mouth. Eytan removed the dirt and grass from Erez's mouth so

the medic could perform CPR, but it was no use. (Dkt. 95). Eytan thought Erez's head must have

been run over because he could not imagine how else dirt and grass got into Erez's mouth. (Dkt.

95).

Plaintiffs have presented evidence to the Court's satisfaction that Erez experienced and

suffered severe physical trauma before passing away as a result of the terror attack, along with

immense fright when the truck accelerated toward him. *See Hamen v. Islamic Republic of Iran*,

407 F. Supp. 3d 1, 7 (D.D.C. 2019); *Force v. Islamic Republic of Iran*, *et al.*, 617 F. Supp. 3d 20,

35-36 (D.D.C. 2022). The Court therefore grants Erez Orbach's estate $1,000,000 as being run

over would have caused a great amount of pain and suffering. *See Stern*, 271 F. Supp. 2d 286, 300

(D.D.C. 2003).

### c.       Nitzhia Goldman

Plaintiffs presented Dr. Friedman's report regarding Nitzhia's physical injuries sustained

in the attack, along with Nitzhia's declaration. (Dkt. 79, Ex. E, 116). On July 22, 2022, Dr.

Friedman examined Nitzhia by video. (Dkt. 79, Ex. E). Nitzhia and her husband were in Istanbul

walking through the streets with their tour when she heard "a loud boom" and fell down. (Dkt.

116). She could not see as she had shrapnel in her eyes. (Dkt. 116). Nitzhia cleared her eyes out

and saw her husband lying on the ground. (Dkt. 116). Somebody from a nearby store came out,

saw she was bleeding from her right leg and placed a tourniquet on Nitzhia's leg. (Dkt. 116). EMS

arrived and transported her to a public hospital where they sutured the bleeding vessel without using anesthesia. (Dkt. 116). Nitzhia was transferred to a private hospital where they performed a right talus fixation for a comminuted fracture of the medial talus. (Dkt. 79, Ex. E).

The next morning, Nitzhia was transferred by an Israeli military plane to Israel. (Dkt. 116). Nitzhia was taken to Sheba Hospital Tel Ha'Shomer. (Dkt. 79, Ex. E). She was there for the next month and during that time had three surgeries. (Dkt. 79, Ex. E). The last surgery was a skin and nerve graft (the skin was taken from the left thigh and grafted to the right ankle). (Dkt. 79, Ex. E). After the surgeries, Nitzhia received physical rehabilitation at home. (Dkt. 116). Due to her injuries in the attack, Nitzhia was awarded Israeli disability benefits. (Dkt. 116).

Nitzhia's medical records reveal an injury to the tibialis posterior nerve which was lacerated in the explosion and sutured in the hospital in Turkey. (Dkt. 79, Ex. E). Currently, Nitzhia has constant pain in her right leg. (Dkt. 79, Ex. E). She uses a cane to walk and now needs a second cane because she has developed elbow and neck pain from the use of a cane. (Dkt. 79, Ex. E). Nitzhia has been told that she has "no cartilage" in her right knee but because of the prior ankle surgery she is not a surgical candidate for a knee replacement. (Dkt. 79, Ex. E). She is using a cannabis cream and Optalgin for pain relief. (Dkt. 79, Ex. E). Nitzhia also has pain in the lower back, especially when she walks. (Dkt. 79, Ex. E). According to Dr. Friedman, these all appear to be a result of her biomechanical changes. (Dkt. 79, Ex. E). Because of her altered gait, Nitzhia's left leg has begun to hurt. (Dkt. 79, Ex. E). Nitzhia has decreased sensation and numbness in the right leg and the right ankle. (Dkt. 79, Ex. E).

Dr. Friedman's examination revealed discoloration over the entire medial portion of the right medial ankle. (Dkt. 79, Ex. E). There was also disfiguration of the lateral malleolus. (Dkt. 79, Ex. E). Nitzhia's gait was normal with the use of the cane but without the use of the cane the right ankle pronates causing Nitzhia to lose balance. (Dkt. 79, Ex. E). Nitzhia is unable to stand

one legged on the right, but she is able to do so on the left. (Dkt. 79, Ex. E). She is unable to walk

on her toes or her heels because of pain. (Dkt. 79, Ex. E). Nitzhia has a well healed scar on the left

thigh, which is the skin graft donor site. (Dkt. 79, Ex. E). There is a 9 cm linear scar on the medial

left thigh where they took muscle for a procedure (the gracilis flap most likely), there is a 3.5 cm

scar on the posterior right leg and a 2 cm scar on the posterior right ankle. (Dkt. 79, Ex. E).

Nitzhia reported to Dr. Friedman visual issues, which are documented in her medical

records. (Dkt. 79, Ex. E). For example, the discharge summary from the plastic surgery department

from Sheba Hospital dated April 7, 2016 noted that an ophthalmologist examined Nitzhia during

her stay at the hospital and found a foreign body in the cornea. (Dkt. 79, Ex. E). On April 29, 2016,

Dr. Yoav Berger removed a foreign body from Nitzhia's right eye. (Dkt. 79, Ex. E). On May 24,

2016, Dr. Berger instructed Nitzhia to continue her medications for the eye. (Dkt. 79, Ex. E). Dr.

Alon Saka'at in an undated note indicated Nitzhia had dry eyes and a pterygium. (Dkt. 79, Ex. E).

He recommended artificial tears and referral to a corneal specialist for definitive treatment. (Dkt.

79, Ex. E). On January 29, 2017, Nitzhia complained to Dr. Iris Ben-Bast about double vision and

right eye esotropia (turning inward). (Dkt. 79, Ex. E). On July 21 2017, Dr. Ben-Bast again noted

right eye esotropia. (Dkt. 79, Ex. E).

On May 20, 2016, Dr. Edo Tradler wrote a report concerning Nitzhia's injuries and noted

that she injured her right foot and ankle and suffered right eardrum perforation with subsequent

hearing loss. (Dkt. 79, Ex. E). During her hospitalization, Nithzia had a hearing test, which

revealed decreased hearing. (Dkt. 79, Ex. E). Dr. Tradler noted that Nitzhia's right ear had a

decreased light reflex. (Dkt. 79, Ex. E). He listed the following diagnoses regarding the terror

attack injuries: fracture ankle closed—unstable; blast injury to ear; adjustment difficulty to

terrorism and Post-Traumatic Stress Disorder ("PTSD"). (Dkt. 79, Ex. E).

Based on his examination of Nitzhia and his review of her medical records, Dr. Friedman rendered the following diagnoses: post right femur fixation secondary to blast injury, shrapnel wounds to the eyes with residual vision limitations, post skin, blood vessel, and nerve grafting to the right ankle, disfigurement and decreased range of motion in the right ankle following the above surgeries, gait abnormality and pain in the right knee pain, neck, lower back, and elbows. (Dkt. 79, Ex. E). Nitzhia's gait was significant for not planting the right heel on the ground. (Dkt. 79, Ex. E). This is important in providing stability and proper gait mechanics, per Dr. Friedman. (Dkt. 79, Ex. E). This is contributing to her altered gait biomechanics leading to the knee, back, spine, and neck pains. (Dkt. 79, Ex. E). It is Dr. Friedman's opinion that Nitzhia's symptoms are causally related to the terror attack. (Dkt. 79, Ex. E). Given the time since the injury and her age, per Dr. Friedman, no improvement can be expected. (Dkt. 79, Ex. E). Rather, a progressive exacerbation of Nitzhia's symptoms is expected, per Dr. Friedman. (Dkt. 79, Ex. E). Because of the condition of her legs Nitzhia is not a candidate for a knee replacement. (Dkt. 79, Ex. E). Therefore, the expected outcome is continued pain, and slow deterioration of her function coupled with an increase in her degenerative joint disease. (Dkt. 79, Ex. E).

Plaintiffs have presented evidence to the Court's satisfaction that Nitzhia experienced and suffered severe permanent physical injuries as a result of the terror attack. The Court will depart upward from the baseline amount of $5,000,000 and grant Nitzhia Goldman $10,000,000 in compensatory damages in light of her substantial physical injuries (e.g., multiple surgeries, vision limitation, and hearing loss). *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37-39 (D.D.C. 2012).

#### d. *Abvraham Goldman*

Plaintiffs presented Nitzhia's declaration regarding the terror attack. (Dkt. 116). Nitzhia felt and heard a blast. (Dkt. 116). After orientating herself after the blast, Nitzhia saw her husband lying on the ground. (Dkt. 116). Nitzhia called out to her husband, but he did not respond. (Dkt. 116). Someone else checked for a pulse but Abvraham had no pulse. (Dkt. 79, Ex. E). Plaintiffs have presented evidence to the Court's satisfaction that Abvraham experienced and suffered severe physical trauma before dying as a result of the attack. Significantly, Nitzhia observed no external wounds to her husband's body, which means Abvraham's body was intact, despite the suicide bombing blast. (Dkt. 79, Ex. E, 116). Since Abvraham's body was intact after the suicide bombing, it is reasonable to infer that Abvraham died due to internal injuries due to the sheer force of the blast from the bomb being denotated so close to him. Internal bleeding does not cause a person's death instantaneously. As such, Abvraham felt pain for a period of time before his death, brief though that period of time may have been. Accordingly, the Court grants Abvraham Goldman's estate $1,000,000 in light of the manner of Mr. Goldman's death. *See Stern*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003).

#### e. *Ron Greenfield*

Plaintiffs present Dr. Friedman's report regarding the physical injuries Ron sustained in the terror attack, as well as Ron's declaration. (Dk. 79, Ex. C, 108). On July 11, 2022, Dr. Friedman examined Ron in person. (Dkt. 79, Ex. C). Ron and his wife were in Istanbul walking through the streets with their guided tour when he heard "a terrible boom." (Dkt. 79, C, 108). Ron fell down, turned around and saw that everybody was on the ground. (Dkt. 108). Ron's wife and her sister, who was also on the tour, called to him and he limped to where they were standing in a side alley. (Dkt. 108).

Ron's right foot was bleeding because shrapnel had pierced the medial right ankle and exited at the lateral malleolus. (Dkt. 108). Ron was taken by ambulance to a hospital where the wound was cleaned, a CT scan was performed, and surgery may have been recommended but he refused. (Dkt. 79, Ex. C). He was transferred to Israel and taken to Sheba Medical Center at Tel HaShomer, near Tel Aviv. (Dkt. 79, Ex. C). Ron was hospitalized for a week. (Dkt. 108). Ron was placed in a walking boot he wore for 6 months. (Dkt. 79, Ex. C). Ron had physical therapy at least twice a week for 3 to 4 months. (Dkt. Ex. 79, Ex. C).

Ron continues to suffer constant right foot pain and he limps when he walks. (Dkt. 79, Ex. C). The pain is exacerbated with weight bearing or when he walks without shoes. (Dkt. 79, Ex. C). Ron has numbness in the lateral right thigh and the right foot. (Dkt. 79, Ex. C). Ron had significant hyper-sensitivity in the anterior ankle but this has slowly resolved. (Dkt. 79, Ex. C). This correlates with Dr. Tannebaum's note of sensitivity over the superficial peroneal nerve distribution. (Dkt. 79, Ex. C). Ron was receiving acupuncture and alternative medicine every two weeks but receives such treatment less frequently now. (Dkt. 79, Ex. C). Ron is now able to go up and down stairs but this only started recently. (Dkt. 79, Ex. C).

Ron has right knee pain. (Dkt. 79, Ex. C). Ron thinks the pain is related to his gait pattern that has been altered as a result of the foot pain and injury. (Dkt. 79, Ex. C). Ron has "buzzing" in both ears 24 hours a day every day. (Dkt. 79, Ex. C). He is very sensitive to background noise. (Dkt. 79, Ex. C). A hearing aid has never been prescribed, but Ron did have special headphones to use when watching TV (but these have since broken). (Dkt. 79, Ex. C). These did help to partially filter out some background noise. (Dkt. 79, Ex. C). Ron has lower back pain. (Dkt. 79, Ex. C). He did have a history of back pain prior to the terror attack but it is now significantly worse. (Dkt. 79, Ex. C). Ron thinks that it is worse because of his limping and abnormal gait. (Dkt. 79, Ex. C).

Ron has a 5 cm scar on the medial right malleolus and a 4 cm scar on the antero-lateral portion. (Dkt. 79, Ex. C). Ron has decreased range of motion of the right ankle. (Dkt. 79, Ex. C). He was able to walk on his toes but had difficulty on his heels. (Dkt. 79, Ex. C). Ron was able to squat but with difficulty. (Dkt. 79, Ex. C). His balance was very limited when trying to stand one legged on the right. (Dkt. 79, Ex. C). There was mild hypersensitivity over the right ankle scar on the right lateral malleolus. (Dkt. 79, Ex. C). The right ankle plantarflexion range of motion was 10/50 degrees and dorsiflexion was 5/20 degrees. (Dkt. 79, Ex. C).

Before the terror attack, Ron enjoyed running, going to the gym, sporting activities and a social life, but all this ended after the attack. (Dkt. 108). At the time of the terror attack, Ron was working as a bookkeeper at a gas company, but he was unable to return to work after the attack because of his physical limitations and emotional struggles. (Dkt. 79, Ex. C). Ron was deemed 49% disabled by the Israeli disability insurance program. (Dkt. 79, Ex. C).

After evaluating Ron and reviewing his medical records, Dr. Friedman's diagnoses include shrapnel injury to the right ankle, right talus and medial malleolus fractures, right sinus tarsi injury, fracture of the right great toe, residual gait abnormality secondary to referenced diagnoses, right foot pain—chronic, lower back pain—chronic and range of motion limitations—lumbar spine and right ankle. (Dkt.79, Ex. C). It is Dr. Friedman's opinion that Ron's symptoms are causally related to the terror attack. (Dkt. 79, Ex. C). Ron continues to suffer from pain and gait abnormalities, despite years of physical rehabilitation. (Dkt. 79, Ex. C). The other pains are related to the altered gait biomechanics, per Dr. Friedman. (Dkt. 79, Ex. C). Due to the time since the injury and Ron's age, no significant improvement can be expected in the future. (Dkt. 79, Ex. C).

Plaintiffs have presented evidence to the Court's satisfaction that Ron experienced and suffered severe permanent physical injuries as a result of the attack. The Court will grant Ron

Greenfield an upward adjustment from the basic baseline amount of $5,000,000 to $7,000,000 in compensatory damages. *See Wultz*, 864 F. Supp. 2d 24, 37-39.

### f.      *Nohemi Gonzalez*

Plaintiffs presented the final death certificate for Nohemi, as well as the Medical Examiner's report. (Dkt. 19, 98, Ex. 13). According to the autopsy report, per Dr. Friedman, Nohemi suffered two gunshot wounds—one to the chest and the other to the left lower limb. (Dkt. 79, Ex. F). There were fractures of left ribs, the T6 vertebra left transverse process, spinous processes of vertebrae T5, T6, and T7. (Dkt. 79, Ex. F). There was a subarachnoid hemorrhage of the spinal cord and a thoracic spinal-cord contusion at the level of the T7 vertebra. (Dkt. 79, Ex. 79). There was no damage to the major blood vessels or to the heart, which would have caused almost instantaneous death. (Dkt. 79, Ex. F). The left lung lacerations are likely secondary injuries due to the rib fractures. (Dkt. 79, Ex. F). Based upon the review of these records, it is Dr. Friedman's opinion that Nohemi survived the initial gunshot wounds for a period of at least two minutes. (Dkt. 79, Ex. F). During this time, in Dr. Friedman's opinion Nohemi likely suffered extreme pain from her injuries. (Dkt. 79, Ex. F). The spinal cord injuries may well have paralyzed her, and it is possible that she was aware of this, per Dr. Friedman. (Dkt. 79, Ex. F). Plaintiffs have presented evidence to the Court's satisfaction that Nohemi experienced and suffered severe physical trauma before passing away as a result of the terror attack. The Court will grant Nohemi Gonzalez's estate $2,000,000. *See Stern*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003).

### 2.      *Economic Damages*

Ron Greenfield, James and Helen Cain and the Estates of Nohemi Gonzalez and Erez Orbach seek economic damages for financial losses, pursuant to 28 U.S.C. § 1605A.

### a.      The Estate of Nohemi Gonzalez

Plaintiffs have presented the expert report of forensic accountant Michael Soudry, M.B.A.,

calculating the recoverable economic loss to the estate as a result of the murder of Nohemi with

future losses adjusted to present value in 2023. (Dkt. 76, Ex. C). Mr. Soudry calculated the present

value of the cumulative economic loss to the estate to be $1,493,216. (Dkt. 76, Ex. C). The Court

accepts and adopts Mr. Soudry's findings and the report in full and finds that the estate of Nohemi

Gonzalez is entitled to an award of $1,493,216 for economic loss against the Defendant.

### b.      The Estate of Erez Orbach

Plaintiffs have presented the expert report of Mr. Soudry calculating the recoverable

economic loss to the estate as a result of the murder of Erez with future losses adjusted to present

value in 2023. (Dkt. 76, Ex. D). Mr. Soudry calculated the present value of the cumulative

economic loss to the estate to be between $1,091,238 and $1,679,788. (Dkt. 76, Ex. D). The Court

accepts and adopts Mr. Soudry's findings and the report in full and finds that the estate of Erez

Orbach is entitled to an award of $1,679,788 for economic loss against the Defendant.

### c.      Ron Greenfield

Plaintiffs have presented the expert report of Mr. Soudry calculating the recoverable

economic loss to Ron as a result of the injuries he sustained in the terror attack that left him unable

to work again with future losses adjusted to present value in 2023. (Dkt. 76, Ex. B). Mr. Soudry

calculated the present value of the cumulative economic loss Ron to be $237,875. (Dkt. 76, Ex.

B). The Court accepts and adopts Mr. Soudry's[189] findings and the report in full and finds that Ron Greenfield is entitled to an award of $237,875 for economic loss against the Defendant.

### d. James and Helen Cain

In supporting Cameron after the terror attack, Helen and James incurred financial expenses as Cameron was unable to return to her work at The Asia Society. (Dkt. 92). Attached to James' declaration as Ex. C is an itemization of those expenses. (Dkt. 92). Attached to James' declaration as Ex. D-M are copies of the bills and receipts for payment for those expenses. (Dkt. 92). Based on James' declaration, as well as the bills and receipts, the Court will award James and Helen Cain $42,806.49 in economic damages.

### 3. Solatium

The Plaintiffs herein, all U.S. nationals are the parents, spouses, siblings, in-laws, stepparents and children of the decedents or survivors of the terror attacks. (Dkt. 70, Ex. 1-30). The Plaintiffs bring this action to recover their damages for loss of solatium, as authorized by 28 U.S.C. § 1605A(c). The evidence presented establishes that the violent circumstances surrounding the terror attacks, and the trauma of their loved one's horrific death or attempted murder caused and continues to cause the families severe grief and pain.

### a. Alexander Pinczowski's Family

The family members claiming solatium are Anne Cameron Cain Baarbé, James Cain and Helen Cain. All are U.S. citizens. (Dkt. 70, Ex. 1-3).

---

[189] The Court finds Mr. Soudry is qualified to be an expert in forensic accounting. Mr. Soudry has served as an expert in forensic accounting in similar cases. *See Ben-Yishai v. The Syrian Arab Republic*, 18-cv-3150 (D.D.C. Nov. 25, 2022).

**Anne Cameron Cain-Baarbé**: Plaintiffs presented Dr. Strous' report regarding the psychological trauma suffered by Cameron when her husband was murdered, as well as Cameron's declaration. (Dkt. 82, Ex. B, 93). On March 22, 2016, Cameron woke up to a BBC alert on her cell phone that there had been a terror attack at the Brussels airport with several deaths. (Dkt. 93). Alexander's mother called Cameron and told her that she was not able to reach him on his phone. (Dkt. 93). Alexander was at the Brussels airport to board a plane to New York to accompany Cameron to a wedding in North Carolina. (Dkt. 93). Cameron thought Alexander was not available because he was helping other people, but as the hours passed that day Cameron was overwhelmed with fear and dread. (Dkt. 93). Cameron was frantic to locate Alexander and his sister, Sascha, who was traveling to New York City with Alexander that day to visit friends. (Dkt. 93). Cameron made calls to anyone she could in Brussels to try and locate them and she sent messages via social media to others to help find them. (Dkt. 93).

On March 23, 2016, Cameron flew with her parents to Brussels to try and find Alexander and Sascha. (Dkt. 93). Cameron, along with her parents, searched the local hospitals and Cameron went on television to try and help find them. (Dkt. 93). After searching and wondering for a day and a half, on March 25, 2016, the hospital released a survivors list and indicated that anyone not on the list should be presumed dead. (Dkt. 93). It was highly traumatic and emotional for Cameron to search for Alexander and Sacha. (Dkt. 93). Cameron went through a very public anguish and torment as the news covered the attack and her search for Alexander and Sacha. (Dkt. 93).

On March 25, 2006, the Brussels authorities allowed Cameron to visit her husband's body in a morgue. (Dkt. 93). Alexander had sustained a head gash and his legs were badly injured in the bombing blast. (Dkt. 93). Cameron had nightmares for months about Alexander's injuries. (Dkt. 93). That image still haunts Cameron to this day. (Dkt. 93).

Once Alexander and Sascha's funeral was held, Cameron had no will to live. (Dkt. 93). Cameron was numb for weeks after Alexander's death. (Dkt. 93). Cameron returned to North Carolina with her parents. (Dkt. 93). She began psychological treatment on April 25, 2016 with Dr. Jessica Tischner and continued therapy with Dr. Tischner until May 25, 2017. (Dkt. 93). During the initial visit, Dr. Tischner indicated that Cameron was not psychologically stable enough to return to work and recommended Cameron take a medical leave from work. (Dkt. 93). Dr. Tischner diagnosed Cameron with PTSD. (Dkt. 93). While Dr. Tischner recommended Cameron take prescription medication, Cameron declined to do so. (Dkt. 93). Instead, Cameron joined a grief support group in Florida led by a registered nurse from July 11, 2016-August 11, 2016. (Dkt. 93). Cameron also tried to cope with the loss by writing and reading, as well as doing daily exercise and outdoor activities. (Dkt. 93). On September 5, 2016, Cameron returned to Florida to rejoin the same grief support group and was in the group until November 2, 2016. (Dkt.93). Cameron restarted therapy with Dr. Tischner in 2018 on an intermittent basis and now sees a psychologist in Canada, Jo Hodgson. (Dkt. 93).

At the time of the attack, Cameron was an Executive Associate for The Asia Society, a non-profit in New York City. (Dkt. 93). Cameron was unable to return to work at The Asia Society because of her extreme grief as she had difficulty concentrating and focusing. (Dkt. 93). Cameron filed for and was granted disability benefits through The Asia Society's disability insurer starting June 21, 2016 but those benefits were terminated on May 20, 2017. (Dkt. 93). Cameron's employment at The Asia Society officially ended on July 1, 2016. (Dkt. 93).

Cameron's parents helped her with the many administrative things she had to deal with due to Alexander's death, including filling out her disability claim form, scheduling therapy sessions, dealing with the disability insurer, packing up and storing Alexander's possessions from their

apartment in New York. (Dkt. 93). Cameron appointed her father to deal with all legal matters due to Alexander's death. (Dkt. 93).

In May 2016, Cameron returned to Brussels with her father for meetings with the medical examiner, the coroner, first responders, U.S. Ambassador, attorneys and to lay flowers at Zaventum Airport in Brussels. (Dkt. 93). On May 19, 2016, Cameron went to Frankfurt, Germany to attend a Memorial Service at Frankfurt International School, which Alexander and Sascha had attended, and dedication of monuments for them. (Dkt. 93). For the one-year anniversary of the attack, Cameron returned to Belgium for a memorial for Alexander and Sascha's passing. (Dkt. 93).

Cameron met Alexander through a mutual friend in July 2010. (Dkt. 93). Alexander fell in love with Cameron at first sight. (Dkt. 93). Three days after they met, Alexander told Cameron he loved her. (Dkt. 93). They moved in together in New York after six months of dating. (Dkt. 93). Alexander and Cameron had lots of things to look forward to that they had discussed, including travel, children and opening a small business together. (Dkt. 93).

Alexander was Cameron's rock. (Dkt. 93). He was supportive and encouraging of her life goals. (Dkt. 93). Their families got along and loved each other. (Dkt. 93). Alexander had a part-time job at an art gallery in Maastricht so he could go back and forth from their apartment in Manhattan and the Netherlands as he was unable to obtain a work visa. (Dkt. 93). Alexander was a highly intelligent person who wanted to make a positive difference in the world. (Dkt. 93). He dreamed of being a writer, scientist, and blacksmith. (Dkt. 93).

Before Alexander's death, Cameron was a social person but after his murder she would only speak with her friends by telephone for almost a year. (Dkt. 82, Ex. B). Cameron experiences daily anxiety and fear of losing another loved one. (Dkt. 82, Ex. B). Cameron was not an anxious person before Alexander's murder. (Dkt. 82, Ex. B). Cameron reported to Dr. Strous post-

traumatic symptoms, including an inability to sleep with constant thoughts of the blast that killed Alexander and Sascha, nightmares, which continue to this day, flashbacks to the initial week after the attack, chest tightening when she speaks about the attack, anxiety over large crowds and guilt that Alexander was at the airport to be her guest at her friend's wedding. (Dkt. 82, Ex. B). Cameron told Dr. Strous that although she remarried in 2019, the death of Alexander remains very much a factor in her life. (Dkt. 82, Ex. B). Cameron remains very close with Alexander's parents and will never stop loving Alexander. (Dkt. 82, Ex. B).

It is Dr. Strous' opinion that Cameron suffers from persistent complex bereavement disorder with traumatic bereavement, PTSD, and other specified anxiety disorder. (Dkt. 82, Ex. B). Despite treatment, Dr. Strous expects Cameron's anxiety, mood, and grief issues that affect many areas of her functioning to continue for a long period of time. (Dkt. 82, Ex. B).

**James Cain**: Plaintiffs presented James' declaration regarding the murder of his son-in-law. (Dkt. 92). On Tuesday March 22, 2016, James was at the Raleigh-Durham International Airport preparing to board a scheduled flight to New York when his daughter, Cameron, who was living in New York, texted and called him. (Dkt. 92). James did not answer his cell phone or look at Cameron's text because he was engaged in a conversation with a friend he had just run into in the airport. (Dkt. 92). When James was able to read Cameron's text, he learned that Alexander and his sister Sascha had a scheduled flight out of the Brussels airport to New York. (Dkt. 92). There had been a terrorist attack perpetrated by ISIS at the Brussels airport. (Dkt. 92). Cameron was quite concerned as she knew Alexander's travel schedule and could not reach him on the phone. (Dkt. 92).

James flew to New York on his scheduled flight to join Cameron in her search for Alexander, and Helen joined them in New York later that day. (Dkt. 92). Working from Cameron and Alexander's apartment in Manhattan, they reached out to every authority and source they could

think of as they tried to learn anything about Alexander and Sascha's whereabouts. (Dkt. 92). The Belgian authorities were not helpful and they had no one on the ground to assist them. (Dkt. 92). As the long hours passed without any confirmation or reliable information, Cameron made the decision that she had to travel to Belgium to try and locate Alexander. (Dkt. 92). The next day, Wednesday March 23, Cameron, Helen, and James flew to Brussels to help search for Alexander and Sascha. (Dkt. 92). Arriving in Brussels early morning on Thursday March 24 and quickly joining Alexander and Sascha's parents Ed and Marjan Pinczowski who were residing in Belgium, James, Helen and Cameron spent the next twelve hours searching local hospitals of Brussels for Alexander and Sascha or any news of them. (Dkt. 92). Hearing rumors that unidentified victims, some still alive, were in the Astrid Military Hospital, Helen and James held a press conference in front of the facility imploring the Belgian authorities to let the dozen-plus families gathered there have access to the unidentified victims; declaring that regardless of the condition of the bodies, any mother or father would recognize their son or daughter. (Dkt. 92). Belgian authorities refused to heed their pleas. (Dkt. 92). James worked the phones to appeal to the US Embassy, international media, and other US authorities for help, and Helen and Cameron went through the corridors of the Belgian military hospital handing out pictures of Alexander and Sascha, begging for any news of either sibling. (Dkt. 92).

Eventually, around 9:30 p.m. on Thursday evening, in the basement of Astrid Hospital, with dozens of similarly distraught families looking for their lost loved ones, the hospital released a list of surviving victims and told the families to presume that anyone not on that list was dead. (Dkt. 92). Neither Alexander nor Sascha's name was on that list. (Dkt. 92).

Plaintiffs subsequently learned that Alexander and Sascha were killed in the first of the two bomb blasts that occurred in the Zaventum Airport, the bomb being detonated directly behind Alexander while he and Sascha were standing in line at a Delta Airlines ticket counter. (Dkt. 92).

-92-

They also learned that Belgium's first responders were aware of Alexander and Sascha's identities within an hour or two of the blast. (Dkt. 92). Therefore, even before they left New York for Brussels the first responders knew that Alexander and Sascha had been murdered but the Belgian bureaucracy did not allow them to inform their family for over two and a half days. (Dkt. 92).

Those anguishing days in March of 2016 during which Cameron frantically searched the hospitals of Brussels for her husband Alexander and Sascha were highly traumatic and scarring for Cameron. (Dkt. 92). She felt as if her world had collapsed, and no one was able to assist her in her panic, desperation, and anguish. (Dkt. 92). On Easter Monday, March 28, while in Maastricht, The Netherlands, where Alexander and Sascha were to be buried, James confirmed to the world during a live morning broadcast of the "NBC Today Show" the loss of Alexander and Sascha Pinczowski. (Dkt. 92).

On Friday, April 1, 2016, James attended the funeral of Alexander and Sascha in Maastricht, along with Cameron and Helen. (Dkt. 92). The sadness and despair of the double ceremony is almost too difficult to put into words. (Dkt. 92). James was asked to speak at the funeral and he gave a heartfelt eulogy for Alexander. (Dkt. 92). In the days and weeks after the murder of Alexander, as Cameron's father, James' focus, along with Cameron's mother's, was to provide Cameron with love and support. (Dkt. 92). For James, witnessing Cameron's pain and mental anguish led to moments of extreme anxiety and a sense of hopelessness. (Dkt. 92).

The murder of Alexander and Sascha had a devasting and profound effect on Cameron. (Dkt. 92). In the wake of the tragedy, Cameron was unable to deal with the administrative and procedural matters related to Alexander's murder. (Dkt. 92). Helen and James had to step in and fulfill these tasks. (Dkt. 92). James has tried to support Cameron in any way he can, including receiving from her a power of attorney to deal with any litigation and criminal matters arising from the murder of Alexander. (Dkt. 92). On May 7, 2016, he went to Brussels with Cameron to attend

meetings with the medical examiner, coroner, first responders, U.S. Ambassador, and attorneys and to lay flowers at the memorial at the Belgium airport. (Dkt. 92). The first week of December, 2022, James attended the first few days of the criminal trial of the nine terrorists who are standing trial for the March 22 attacks, including the lone survivor of the attack in the airport who dropped his bomb and fled the scene. (Dkt. 92). James and Helen dealt with the disability insurer, Cameron and Alexander's apartment in New York City and the storage of Alexander's belongings from their apartment. (Dkt. 92). Helen and James also provided financial support to Cameron after the murder of Alexander as she was unable to return to work at The Asia Society due to the emotional toll his murder took on her. (Dkt. 92).

Watching Cameron in her darkest times was brutal. (Dkt. 92). It caused James at times to feel utter hopelessness. (Dkt. 92). Even to this day, it is difficult for Cameron to answer questions from lawyers for litigation involving the terror attack and James does what he can to minimize Cameron's involvement in such litigation because it stirs up Cameron's emotions regarding the loss of her husband and Sascha. (Dkt. 92).

James and Helen considered Alexander a son. (Dkt. 92). James had a very close relationship with Alexander, and they had deep conversations, including about the freeing of Europe from Nazis during the Second World War and the sacrifices that were required for that to happen. (Dkt. 92). James and Helen enjoyed family trips with Alexander to various places, including Vermont, Pennsylvania, and Scotland. (Dkt. 92). James and Helen loved having Alexander join them for family holidays, including birthdays, Christmas, and Thanksgiving. (Dkt. 92). Alexander enjoyed making family meals during the holidays for them. (Dkt. 92). The meals were of Alexander's own creation and would take a long time to make but he really did enjoy cooking. (Dkt. 92).

Alexander was very curious about the world and a clever student of international studies. (Dkt. 92). One of James' most fond memories, and an example of Alexander's worldly knowledge and insight, occurred in New York one summer evening, when Alexander and Cameron, Helen and James went to see the play "War Horse" at the Lincoln Center in New York. (Dkt. 92). At intermission James spotted the president of the European Union, Jose Barroso. (Dkt. 92). James had never met President Barosso before, but James knew he had been friends with us former boss President George W. Bush. (Dkt. 92). James introduced himself to him and they engaged in a brief, polite conversation about President Bush. (Dkt. 92). Then James waved Alexander over, introduced him to President Barroso as a "proud citizen of the EU," and then James stood back and witnessed Alexander engage the President of the EU in a ten minute, highly technical, conversation about EU policy. (Dkt. 92). James was exceedingly proud of Alexander, and, not for the first time, awed by his intellect and insight. (Dkt. 92). Alexander was an ideal son-in-law and was taken much too soon and much too tragically. (Dkt. 92). Cameron and Alexander had a bright future together that was abruptly and cruelly cut short. (Dkt. 92). Alexander was hopeful and optimistic for the future. (Dkt. 92).

**Helen Cain**: Plaintiffs presented Helen's declaration regarding the murder of her son-in-law. (Dkt. 91). On March 22, 2016, Helen was home in Raleigh, North Carolina when she received a telephone call from Cameron. (Dkt. 91). Cameron told Helen Alexander had been scheduled to fly out of the Brussels airport to meet her in New York City and there had been, according to media reports, a devastating terror attack at the Brussels airport. (Dkt. 91). Cameron was panicked because she was unable to reach Alexander by phone and the news reports were stating that there had been many causalities and injured passengers. (Dkt. 91). Alexander's sister Sascha had been traveling with him, as well. (Dkt. 91). Cameron was gravely afraid for Alexander's safety and the hours were passing by without any communication from him. (Dkt. 91). They began to fear that

something terrible had occurred. (Dkt. 91). There was no one to contact on the ground in Brussels as the massacre had plunged the city into chaos. (Dkt. 91).

Unable to stand idly by Helen flew from Raleigh to New York where she joined Cameron and her husband James to continue from afar the search for Alexander and Sascha, and to provide emotional support for Cameron. (Dkt. 91). The next day, March 23, Helen flew with Cameron and James to Amsterdam, landing in the early morning on March 24. (Dkt. 91). The city was still in utter confusion and no one was available to assist them. (Dkt. 91). Cameron, Helen and James spent the day searching local hospitals for the siblings. (Dkt. 91). Helen and Cameron made flyers with Alexander and Sascha's photographs which they handed out through the corridors of Astrid Military Hospital, where news reports indicated most of the victims had been taken. (Dkt. 91). Eventually, late that night, one of the hospitals released a list of surviving victims and told the families to presume that anyone not on that list was dead. (Dkt. 91). Helen was the first one into the curtained-off room where the list was posted on a table; a dozen individuals representing other families in a similar situation were lined up behind her. (Dkt. 91). Filled with emotion Helen checked the list over twice, and then turned to her husband to shake her head, indicating that neither Alexander nor Sascha's name was on the list. (Dkt. 91). Helen, James and Cameron were devastated by the news that Alexander and Sascha were among the murdered victims of the attack. (Dkt. 91). Alexander had been twenty-nine years old at the time of his murder and Sascha was just twenty-six years old. (Dkt. 91).

It took many days to straighten out the situation, receive official notice of what had happened to Alexander and his sister and deal with the bureaucracy. (Dkt. 91). On April 1, 2016, Helen attended the funeral of Alexander and Sascha in Maastricht, The Netherlands. (Dkt. 91). Helen was accompanied at the funeral by Cameron, James, and her and James' other daughter Laura. (Dkt. 91). The ceremony was extremely tragic and emotional as everyone was grieving the

senseless loss of these two young people. (Dkt. 91). James provided a eulogy for Alexander because Cameron was unable to do so due to her emotional state. (Dkt. 91).

In the days and weeks following the murders of Alexander and Sascha, Helen supported Cameron as she mourned the sudden and violent death of Alexander and his sister. (Dkt. 91). Cameron was so deep in her grief that Helen worried she would leave them and begged her to stay with them. (Dkt. 91).

Cameron wanted to stay in the Netherlands to be close to Alexander's parents and his remains, but Helen insisted she return to Raleigh with her so she and James could give her the love and support she needed to cope with her horrific loss. (Dkt. 91). On April 9, 2016, Cameron and Helen left Maastricht. (Dkt. 91). When they returned to North Carolina Helen scheduled weekly psychologist sessions for Cameron. (Dkt. 91).

On August 14, 2016, James and Helen travelled to New York to pack up Cameron and Alexander's apartment and store their belongings. (Dkt. 91). James and Helen had to attend to the apartment because it was too painful for Cameron to be in the home they had shared. (Dkt. 91).

Alexander was Cameron's support system for nearly six years. (Dkt. 91). He loved her, encouraged her, challenged her, and supported her dreams. (Dkt. 91). Cameron and Alexander had a bright future together that was abruptly and cruelly cut short. (Dkt. 91).

The murder of Alexander and Sascha had a devastating effect on Cameron. (Dkt. 91). She was unable to deal with the administrative and procedural matters related to Alexander's murder. (Dkt. 91). Helen has tried to be there since the tragedy to support Cameron in any way she can. (Dkt. 91). For example, Helen, along with James, dealt with the disability insurance to assist Cameron. (Dkt. 91). In addition, Helen, along with James, assisted Cameron in many different aspects of her trying to get resettled, plan a new future and restart her life after this overwhelming upheaval and loss. (Dkt. 91). Besides the above emotional support and assistance, James and Helen

provided financial support to Cameron after the murder of Alexander as she was unable to return to work at The Asia Society, where she had been employed, due to the emotional toll his murder took on her. (Dkt. 91).

Alexander's transition into the Cain family was effortless. (Dkt. 91). He was a welcomed, appreciated and loved addition to the family. (Dkt. 91). The family enjoyed family trips with him to various places, including Vermont, Pennsylvania, Scotland, and Alexander's favorite, the mountains of North Carolina. (Dkt. 91). The Cain family also loved having Alexander join them for family holidays, including birthdays, Christmas, and Thanksgiving. (Dkt. 91). Alexander enjoyed making family meals during the holidays for us and it was a real treat to enjoy the meals that Alexander prepared for the family. (Dkt. 91). He was well-educated, knowledgeable, confident and well-traveled. (Dkt. 91). Most importantly, he made Cameron happy and was a stable, supportive, and loving pillar in her life. (Dkt. 91).

All agree Alexander was a wonderful person with a bright future with Cameron and seeing Cameron in such pain after his death was very difficult. (Dkt. 91). It continues to impact Cameron, Helen and James until this day. (Dkt. 91). Much as they all try to put the tragedy behind them, it still continues to remain beneath the surface of their relationships. (Dkt. 91). It is still so hard for the family to accept that Alexander was taken from Cameron, his own family and Helen and James in this horrific manner. (Dkt. 91).

The severe emotional and psychological effects on each of these members of Alexander's family is in their declarations and Cameron's medical diagnosis is detailed in Dr. Strous' report, which this Court accepts and adopts in full. The Court finds Dr. Strous' methods to be reliable, that he is a qualified expert in his field and that his expert testimony and report are relevant to the issue in this case.

Based upon the foregoing, the Court orders that the Defendant shall pay $13,000,000 in

solatium damages to Anne Cameron Cain Baarbé, $2,500,000 in solatium damages to James Cain and $2,500,000 in solatium damages to Helen Cain.

### b. Rund Family

Eytan and his family members Tamar Rund, S.A.R., Y.M.R. and H.H.R. claim solatium damages. All are U.S. citizens. (Dkt. 70, Ex. 13-17).

**Eytan Rund:** Plaintiffs presented Eytan's declaration regarding the psychological trauma he suffered due to the attack, along with Dr. Strous' report. (Dkt. 82, N, 95). Eytan told Dr. Strous that as soon as he turned to his left, he saw a truck coming and smashing straight into his acquaintance. (Dkt. 82, Ex. N). Eytan initially thought it was an accident. (Dkt. 82, Ex. N, 95). Eytan was thrown to the side, and he rolled six or seven meters. (Dkt. 82, Ex. N, 95). Eytan was frightened because he thought he was going to be paralyzed. (Dkt. 82, Ex. N, 95). After regaining his senses, Eytan tried to get up and felt relieved that he could feel his feet. (Dkt. 82, Ex. N, 95). Eytan then saw the truck reverse and continue to plow into people. (Dkt. 82, Ex. N, 95). That is when Eytan realized it was a terror attack. (Dkt. 82, Ex. N, 95). The driver of the truck was driving in circles running over the injured. (Dkt. 82, Ex. N, 95). Eytan pulled out his gun and ran towards the cabin of the truck. (Dkt. 82, Ex. N, 95). He shot at the truck's wheels. (Dkt. 82, Ex. N, 95). He then ran behind the truck and shot at the driver with the remaining bullets. (Dkt. 82, Ex. N, 95). He felt frustrated that the driver was still running over people and that he had run out of bullets. (Dkt. 82, Ex. N, 95). A solider then appeared on the scene and shot the terrorist. (Dkt. 82, Ex. N, 95).

Eytan ran to the wounded on the ground. (Dkt. 82, Ex. N, 95). There were people under the truck's wheels. (Dkt. 82, Ex. N, 95). One girl's face was disfigured from being run over by the truck. (Dkt. 82, Ex. N, 95). His acquaintance had a badly dislocated shoulder and she was

mumbling to herself. (Dkt. 82, Ex. N, 95). Eytan saw a solider unconscious strewn on the ground and ran toward him with another tour guide who was also a medic to try and help him. (Dkt. 82, Ex. N, 95). As medics arrived, Eytan was needed less, so he tended to less injured soldiers and helped pick up the guns that had been dropped in the melee. (Dkt. 82, Ex. N, 95).

Long-term, Eytan experiences sadness and frustration, especially when he has flashbacks to the attack. (Dkt. 82, Ex. N, 95). After the attack, Eytan became closed off as he felt that he could not share the experience with his family and friends as they could not understand the trauma. (Dkt. 82, Ex. N, 95). Eytan was also disappointed by some of the soldiers who did not run at the truck and shoot the terrorist because three of the four killed by the terrorist were killed so while the truck was in reverse. (Dkt. 82, Ex. N, 95). Eytan suffered from PTSD symptoms after the attack, including hypervigilance in public places, avoidance of public places as much as possible, easily startled, difficulty relaxing, stressful feelings when there is a slow-moving truck near him, difficulty falling asleep with sleepiness during the day, and when he has to speak about the attack or is reminded of it he tenses up, sweats and his heart rate increases. (Dkt. 82, Ex. N, 95). Two weeks after the attack, Eytan consulted a therapist. (Dkt. 82, Ex. N, 95).

Dr. Strous opines that Eytan suffers from PTSD and persistence depressive disorder; mild severity, late onset, with pure dysthymic syndrome. (Dkt. 82, Ex. N). Eytan's PTSD symptoms have continued to last years after the attack. (Dkt. 82, Ex. N). Despite the psychological treatment Eytan received and the years that have passed since the attack, Dr. Strous expects Eytan's mood and anxiety issues affecting many areas of his functioning to continue to affect him for a long time. (Dkt. 82, Ex. N).

**Tamar Rund:** Plaintiffs present Dr. Strous' report, along with Tamar's declaration regarding the psychological trauma she experienced due to the terror attack. (Dkt. 82, Ex. O, 94). When Eytan spoke by phone to Tamar to let her know he was in a terror attack, Tamar was in

shock. (Dkt. 82, Ex. O, 94). Eytan told Tamar he was about to be interviewed by police and then he would be sent to the hospital to be checked out. (Dkt. 82, Ex. O, 94). Tamar had family watch the children and she went to the hospital. (Dkt. 82, Ex. O, 94). When Tamar saw Eytan at the hospital he was irritable, confused, and very tired. (Dkt. 82, Ex. O, 94). Tamar tried to convince Eytan to drink something since she felt he was dehydrated as he was fasting. (Dkt. 82, Ex. O, 94). Eytan's face was bashed up and full of blood. (Dkt. 82, Ex. O, 94). Tamar and her children were very scared about what happened as they almost lost Eytan. (Dkt. 82, Ex. O, 94).

Tamar had to deal with and manage Eytan's medical checkups, along with his lowered mood, fears, and his intimacy problems due to stress after the attack. (Dkt. 82, Ex. O, 94). Eytan never had these issues before the attack. (Dkt. 82, Ex. O, 94). Whenever Eytan speaks about the attack and how it has affected him, this affects Tamar's mood negatively as well. (Dkt. 82, Ex. O, 94). Tamar is constantly thinking about how she can ease Eytan's pain and help him. (Dkt. 82, Ex. O, 94). This stresses her out. (Dkt. 82, Ex. O, 94). In order to deal with the trauma, Tamar feels she has developed a level of disconnect from Eytan so that if she loses him in the future she will be prepared emotionally. (Dkt. 82, Ex. O, 94). Since the attack, Tamar has not slept as well as she feels constantly on edge. (Dkt. 82, Ex. O, 94). Tamar is constantly concerned for the safety of her family. (Dkt. 82, Ex. O, 94). Tamar is not as motivated at her job and her migraines have increased from once per month to twice a week. (Dkt. 82, Ex. O, 94).

According to Dr. Strous, Tamar suffers from unspecified anxiety disorder as a direct result of Eytan's near death in a terror attack. (Dkt. 82, Ex. O). Tamar's empathy for Eytan has affected her anxiety levels and this in turn affects her occupational function and family and her enjoyment of experiences. (Dkt. 82, Ex. O). It is Dr. Strous' opinion that Tamar will continue to suffer from anxiety. (Dkt. 82, Ex. O).

**S.A.R.:** S.A.R. is Eytan and Tamar's minor child.[190] Plaintiffs presented Dr. Strous' report, as well as the declarations of Tamar and Eytan regarding the psychological trauma S.A.R. suffered as a result of the attack that injured Eytan. (Dkt. 82, Ex. P). Eytan reported that S.A.R., Y.M.R. and H.H.R. were each very much affected following the attack. (Dkt. 82, Ex. P). Eytan also indicated that their mother had to spend time assisting in his care and rehab. (Dkt. 82, Ex. P). Thus, due to these factors Dr. Strous did not have the opportunity to examine the children and perform a formal psychiatric evaluation on them. (Dkt. 82, Ex. P). Dr. Strous agrees with Eytan and Tamar that speaking with their children could cause harm. (Dkt. 82, Ex. P).

Eytan indicated that S.A.R. was affected by the attack even though at the time she did not appear to have reacted abnormally. (Dkt. 82, Ex. P). Over time S.A.R. developed major anxiety to various stimuli. (Dkt. 82, Ex. P). S.A.R.'s anxiety surrounds various fears including an extreme anxiety response/reaction to strangers and dogs. (Dkt. 82, Ex. P). According to Eytan, S.A.R. was a "normal child" before the attack and her anxiety is due to his near death in the attack. (Dkt. 82, Ex. P).

Due to S.A.R.'s problems related to anxiety; she was referred for psychological treatment. (Dkt. 82, Ex. P). This included cognitive behavioral treatment for six months which helped S.A.R. but the effects were not long-lasting. (Dkt. 82, Ex. P). S.A.R. was also helped by the Center for Resilience—an organization which assists victims of terror attacks. (Dkt. 82, Ex. P). Eytan

---

[190] Courts have awarded solatium damages to younger children who experience long term effects of the loss of a family member. *See Bathiand v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 72513, at * 17-18 (D.D.C. 2020) (awarding solatium damages to a minor child who was eleven months old at the time of her father's death because the minor child grew up in a family experiencing extreme grief); *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 51 (D.D.C. 2014) (awarding a two-year-old of an injured victim the same amount of solatium damages as her two older siblings).

believes that with treatment S.A.R. is 20% improved. (Dkt. 82, Ex. P). S.A.R. is still unable to leave the house alone. (Dkt. 82, Ex. P). S.A.R. is also unable to touch, pick-up or play with various small animals. (Dkt. 82, Ex. P). All of these functions are normally carried out by children of S.A.R.'s age but she remains unable to perform these functions due to her anxieties. (Dkt. 82, Ex. P). S.A.R. insists on travelling always in a bullet proof bus to school and out of the town from where she lives. (Dkt. 82, Ex. P). If terrorist rioters throw stones at the bus, S.A.R. becomes more distressed than is expected for her age. (Dkt. 82, Ex. P).

Tamar indicated that S.A.R. was almost nine at the time of the attack. (Dkt. 82, Ex. P). According to Tamar, after the attack, S.A.R. suffered from significant anxiety out of character compared to how she behaved prior to the attack. (Dkt. 82, Ex. P). Tamar stated that S.A.R. kept up an outward appearance of no problems, but whenever she would be confronted with any anxiety provoking situation, such as strangers, new environment etc., she would react in an extreme anxious manner. (Dkt. 82, Ex. P). Tamar describes S.A.R.'s responses as being "extreme reactions to normal everyday situations—both social and academic." (Dkt. 82, Ex. P).

**Y.M.R.:** Y.M.R. is Eytan and Tamar's minor child. Plaintiffs presented Dr. Strous' report, as well as the declarations of Eytan and Tamar regarding the psychological trauma Y.M.R. suffered as a result of the attack. (Dkt. 82, Ex. P, 94, 95). Eytan reported that Y.M.R. had "major trouble in coping with her knowledge of her father's near death." (Dkt. 82, Ex. P). Y.M.R.'s symptoms were expressed in poor sleep and "bad nightmares." (Dkt. 82, Ex. P). Y.M.R. "became scared of everything." (Dkt. 82, Ex. P). Y.M.R. for weeks after the attack was not functioning. (Dkt. 82, Ex. P). Eytan and Tamar attended therapy in order to learn how to manage Y.M.R.'s difficulties after the attack. (Dkt. 82, Ex. P). Eytan and Tamar were told by the therapist to discuss with Y.M.R. her anxieties and to encourage her to speak about what had transpired. (Dkt. 82, Ex. P). Following this advice, Eytan discussed the attack with Y.M.R. (Dkt. 82, Ex. P). Eytan believes as a result of the

parental therapy for his children that he and Tamar received, Y.M.R. improved over time. (Dkt. 82, Ex. P).

Tamar told Dr. Strous that Y.M.R. was five years old at the time of the attack. (Dkt. 82, Ex. P). Even though Y.M.R. was very young at the time, she is intelligent, and she realized that something happened around her and that her family had become insecure. (Dkt. 82, Ex. P). Y.M.R. became very afraid. (Dkt. 82, Ex. P). Y.M.R.'s behavior changed and she started "throwing tantrums with extreme meltdowns." (Dkt. 82, Ex. P). Y.M.R. would not let her father out of her sight. (Dkt. 82, Ex. P). Due to Y.M.R.'s extreme reaction and change in behavior, Tamar turned to the local authorities and requested psychotherapy treatment for Y.M.R. (Dkt. 82, Ex. P). They were provided with a psychologist who in turn gave Eytan and Tamar guidelines over how to deal with their daughter in her best interests. (Dkt. 82, Ex. P). Y.M.R. received treatment from the therapist and her treatment surrounded stress and frustration management, and how to deal with low mood and fears surrounding the attack. (Dkt. 82, Ex. P). Tamar describes that initially Y.M.R.'s treatment consisted of parental guidance and reassurance. (Dkt. 82, Ex. P). However, a few years after the attack, when Y.M.R.'s anxieties reignited to a major extent around her fear of bee stings, she was referred again for psychotherapy and dealt with issues including re-traumatization after not completely resolving her previous anxiety issues. (Dkt. 82, Ex. P).

**H.H.R.:** H.H.R. is Eytan and Tamar's minor child. Plaintiffs presented Dr. Strous' report and the declarations of Eytan and Tamar regarding the psychological trauma H.H.R. suffered as a result of the attack. (Dkt. 82, Ex. P, 94, 95). According to Eytan, H.H.R. at the time of the attack dealt with it in a robust emotional manner and this attitude helped her cope and overcome any subsequent anxieties and insecurities. (Dkt. 82, Ex. P). Tamar reported to Dr. Strous that H.H.R. was seven years old at the time of the attack. (Dkt. 82, Ex. P). Tamar recalls that H.H.R. was the most emotional and responsive of all her children after the attack. (Dkt. 82, Ex. P). H.H.R.

expressed how worried she was for her father. (Dkt. 82, Ex. P). H.H.R. cried at the time and was very expressive of her concerns. (Dkt. 82, Ex. P). H.H.R. calmed down after a few months and has appeared to be the most resilient of Tamar's older children to the anxieties surrounding the attack. (Dkt. 82, Ex. P).

Dr. Strous opines that S.A.R., Y.M.R. and H.H.R. all appear to have been affected by the injury of their father and his near death in an attack. (Dkt. 82, Ex. P). Although they are very young and their development is not complete, the trauma their father's injuries and near death in the attack wreaked on the family unit including the disruption and upheaval in various extremes to their lives, can clearly be noted in their anxious behavior, both in the initial period after the attack and after— a notable change from before the attack. (Dkt. 82, Ex. P). While H.H.R. appears to be in remission following her initial intense anxiety response, S.A.R. and Y.M.R. appear to exhibit an expression of ongoing Unspecified Anxiety Disorder, per Dr. Strous. (Dkt. 82, Ex. P). Dr. Strous expects that many aspects of their father's sudden involvement in an attack, along with him almost being killed, and associated injury and its repercussions on their lives and growing up in such a family, will continue to affect these children for a long time. (Dkt. 82, Ex. P).

While Eytan's physical injuries sustained in the terror attack have healed, the psychological injuries to Eytan and his family remain. The severe emotional and psychological effects on Eytan and each of his family members and their individual medical diagnoses are detailed in the reports of Dr. Strous, which this Court accepts and adopts in full. Plaintiffs have presented evidence to the Court's satisfaction that Eytan and his family have experienced severe psychological trauma as a result of the terror attack. The Court will award $1,500,000 to Eytan Rund in solatium damages, $4,000,000 in solatium damages to Tamar Rund, $2,500,000 in solatium damages to S.A.R., $2,500,000 in solatium damages to Y.M.R. and $2,500,000 in solatium damages to H.H.R.

### c. Orbach Family

The family members claiming solatium are Caryn Orbach, Eitan Orbach, Alon Orbach, A.O., E.O. and O.O. All are U.S. citizens. (Dkt. 70, Ex. 18-24).

**Caryn Orbach:** Plaintiffs presented Dr. Strous' report, as well as Caryn's declaration regarding the psychological trauma she suffered due to Erez's murder. (Dkt. 82, Ex. G, 90). The mourning of Erez was difficult as Caryn felt vulnerable and like she had no defenses. (Dkt. 90). Everything that was important before Erez's death was no longer important after his death. (Dkt. 82, Ex. G, 90). To this day, Caryn has a hard time with the fact that Erez was murdered at only twenty years old, especially since he was so good and innocent, and he was not allowed to realize his dreams. (Dkt. 90). Caryn is unable to this day to speak about Erez at home because she will cry. (Dkt. 90). Since Erez's death, everything is no longer simple but "turmoiled." (Dkt. 82, Ex. G, 90). Caryn remembers the last time she saw Erez before he was murdered. (Dkt. 82, Ex. G, 90). Erez was leaving the house and he turned left and said I love you to Caryn and she said I love you back to him. (Dkt. 82, Ex. G, 90).

Some of Caryn's post-traumatic symptoms include nightmares of Erez traveling near her in a car and waving goodbye to her, flashbacks of the soldiers giving her the news, the *shiva*,[191] including with all the visitors such as the President of Israel and head of the army, and avoidance of news of violence and the attack site. (Dkt. 82, Ex. G). If Caryn has to go near the attack location, she experiences strong anxiety to the point she almost has a panic attack. (Dkt. 82, Ex. G). Caryn began psychotherapy, but she refused medication. (Dkt. 82, Ex. G, 90). Instead, Caryn tried alternative treatments. (Dkt. 82, Ex. G, 90). Caryn went to therapy because she had to return to

---

[191] *Shiva* is the traditional Jewish mourning period when friends and relatives comfort the bereaved.

some level of function for her other children. (Dkt. 82, Ex. G, 90). Caryn was unable to work for a year after Erez's death. (Dkt. 90). While Caryn sat at her sewing machine she just stared off into space as she was not present mentally due to the loss of her son. (Dkt. 90). Caryn feels she no longer has the potential for happiness and enjoyment in her life due to the loss of Erez. (Dkt. 90).

Caryn had a special relationship with Erez. (Dkt. 90). Erez required extra care as he had congenital dyserythropoietic anemia, a rare blood disorder. (Dkt. 90). Erez was not obligated to do mandatory army service due to his condition, but he insisted on volunteering and even participated in an officer's course. (Dkt. 90). Erez planned a career as a military officer. (Dkt. 90). Erez was sweet natured and fought for what he achieved in life. (Dkt. 90). Caryn feels Erez is still very much part of her life and time has not brought her any relief from her grief. (Dkt. 90). Because of Erez's violent death, Caryn is more anxious about the wellbeing of her other children and tries not to control their lives but the stress of worrying about them is something she did not experience before the attack. (Dkt. 82, Ex. G, 90).

Caryn withdrew from her friends after Erez's death. (Dkt. 82, Ex. G, 90). Some of her friends looked at her with pity and she could not handle being around people who felt sorry for her. (Dkt. 82, Ex. G, 90). Other friends of Caryn's distanced themselves from her because they did not understand what she was going through after Erez's death. (Dkt. 82, Ex. G, 90). Caryn's physical health has deteriorated since Erez's death in that she has general body weakness and pain in her legs and back. (Dkt. 82, Ex. G, 90). Caryn had to have pelvic surgery as she had a long-term pelvis problem that became exacerbated after Erez's death. (Dkt. 82, Ex. G, 90).

Dr. Strous is of the opinion that Caryn has persistent complex bereavement disorder with traumatic bereavement, PTSD, and persistent depressive disorder; moderate severity, late onset, with pure dysthymic syndrome. (Dkt. 82, Ex. G). Despite the treatment Caryn received and the years that have passed, Dr. Strous expects that her low mood, and complicated grief issues

affecting many areas of her functioning to continue to do so for a long period of time. (Dkt. 82, Ex. G).

**Eitan Orbach:** Plaintiffs presented Dr. Strous' report, as well as Eitan's declaration regarding his psychological trauma due to Erez's murder. (Dkt. 82, Ex. I, 101). Upon hearing the news, Eitan called his mother to find out if Erez was in the attack, but she did not have news. (Dkt. 101). When Eitan returned home later that day from work, the military support team was at the house and had just informed his parents that Erez was killed in the attack. (Dkt. 101). When his father told him the news, Eitan was shocked. (Dkt. 82, Ex. I, 101).

Erez's funeral was extremely traumatic for the family as they lost him so suddenly and violently. (Dkt. 82, Ex. I, 101). The funeral and *shiva* were also difficult because Eitan's parents had divorced months before Erez's death, so Eitan had to deal with the tension between his parents and going between two houses for *shiva*. (Dkt. 82, Ex. I, 101). Erez and Eitan were very close and had a tight friendship. (Dkt. 82, Ex. I, 101). Eitan sought advice in life about adversities and deep personal matters from Erez. (Dkt. 82, Ex. I, 101). Eitan feels lost at times without Erez, as he was a good listener and did not judge Eitan. (Dkt. 82, Ex. I, 101). Eitan's social life was affected negatively by Erez's death because Eitan does not spend time with friends when he returns home because he does not like people to feel sorry for him. (Dkt. 82, Ex. I, 101). Eitan also is forced to grieve for Erez when he makes new friends because new friends ask how many siblings he has and that makes Eitan think of Erez. (Dkt. 82, Ex. I, 101). After Erez's death, Eitan told his parents and siblings that he refused to take on the eldest child's functions because no one can replace Erez. (Dkt. 101). Eitan treated with a psychologist for four months after Erez's death but stopped because it was not helping him much. (Dkt. 82, Ex. I, 101).

Dr. Strous opines that Eitan has persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder; mild severity, late onset, with pure dysthymic

syndrome. (Dkt. 82, Ex. I). Eitan has been closed off since Erez's murder as a defense mechanism in order to manage his grief. (Dkt. 82, Ex. I). Despite the treatment Eitan received and the years that have passed since Erez's death, Dr. Strous expects that Eitan's sad mood and complicated grief issues that affect many areas of his functioning to continue to affect him for a long time. (Dkt. 82, Ex. I).

**Alon Orbach:** Plaintiffs presented Dr. Strous' report and Alon's declaration regarding the emotional trauma he suffered due to Erez's murder. (Dkt. 82, Ex. J, 100). Alon reported that within five minutes of returning home from volunteering in Jerusalem that day soldiers came to his mother's home. (Dkt. 82, Ex. J, 100). Alon's father came to the house and told him that Erez had died in the attack. (Dkt. 82, Ex. J, 100). The news was shocking to Alon. (Dkt. 82, Ex. J, 100). Alon wanted to be alone and went to write an obituary for Erez to read at the funeral. (Dkt. 82, Ex. J, 100). The *shiva* period was very difficult because he had to tell stories about Erez to his friends and hear stories about Erez. (Dkt. 82, Ex. J, 100). Alon was in his final year of high school when Erez was killed, and he missed several weeks of school. (Dkt. 82, Ex. J, 100). When Alon returned to school his mind was not present because he missed Erez, and his house was full of sorrow. (Dkt. 82, Ex. J, 100).

Erez and Alon were very close as they were only two years apart and they shared a room. (Dkt. 82, Ex. J, 100). To this day, Alon feels the loss of his best friend, Erez, very much, especially when he returns home and goes into his room where Erez's things remain as he left them. (Dkt. 82, Ex. J, 100). Alon's parents' homes are sad places. (Dkt. 82, Ex. J, 100). At times, Alon's father bursts into tears while eating a meal with Alon and his siblings at his father's home. (Dkt. 82, Ex. J, 100). Alon finds that his friends after Erez's death are more sensitive to him. (Dkt. 82, Ex. J, 100). Since Erez' death Alon prefers to be alone rather than with a group of friends. (Dkt. 82, Ex. J, 100). Since Erez's death, Alon does not enjoy festivals and other happy occasions as he used to

before Erez's death. (Dkt. 82, Ex. J, 100). After Erez's death, Alon did attempt psychotherapy, but he did not find such sessions helpful. (Dkt. 82, Ex. J, 100). To this day, Alon experiences flashbacks whenever he sees a minibus because Erez used a minibus to get to work the day he was killed, and he also experiences flashbacks when he is reminded of Erez's death, or any attack details. (Dkt. 82, Ex. J, 100).

Dr. Strous opines that Alon suffers from persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder; moderate severity, early onset, with pure dysthymic syndrome. (Dkt. 82, Ex. J). Despite the treatment Alon received and the years that have passed since Erez's murder, Dr. Strous expects Alon's sadness, depressed mood and complicated grief issues that affect many areas of his functioning to continue to affect him for a long time. (Dkt. 82, Ex. J).

**A.O.:** Plaintiffs presented Dr. Strous' report and A.O.'s declaration regarding the psychological trauma she suffered due to Erez's murder. (Dkt. 82, Ex. K, 99). A.O. was thirteen years old when her brother was killed in an attack. (Dkt. 82, Ex. K, 99). Upon learning of her brother's murder, A.O. was in shock and started to cry. (Dkt. 82, Ex. K, 99). After a short time of intense emotion, A.O. "cut off." (Dkt. 82, Ex. K, 99). Later, A.O. cried on and off. (Dkt. 82, Ex. K, 99). A.O. returned to school soon after Erez's murder but feels that she should have taken more time off from school. (Dkt. 82, Ex. K, 99). While on the outside it looked like that A.O. was managing her grief, on the inside she was falling apart. (Dkt. 82, Ex. K, 99).

It took A.O. about two years to come to terms with the loss. (Dkt. 82, Ex. K, 99). A.O. had anxiety and panic attacks after Erez's death as she was unable to deal with the loss. (Dkt. 82, Ex. K, 99). The anxiety attacks lasted for some time but are not so prominent anymore. (Dkt. 82, Ex. K, 99). Since Erez's death, A.O. feels lonely, and she feels distant even from her other brothers since it is more difficult to speak to them since Erez's loss. (Dkt. 82, Ex. K, 99). A.O. experiences

flashbacks to the terror attack day when she speaks about it. (Dkt. 82, Ex. K, 99). Since A.O. struggled with anxiety after Erez's murder, A.O. was referred to a psychotherapist to help her cope with her grief and she continues to treat with the psychotherapist. (Dkt. 82, Ex. K, 99). Erez's death has caused A.O. to struggle with her religion. (Dkt. 82, Ex. K, 99). Before Erez's death, A.O. was religiously observant but now she does not know if she believes in God anymore. (Dkt. 82, Ex. K, 99).

A.O. was very close to Erez, and he always gave her time and was there to answer questions and support her. (Dkt. 82, Ex. K, 99). Erez used to write a lot so after Erez's death A.O. began to write a lot as a form of escape. (Dkt. 82, Ex. K, 99). A.O. was inspired to try her best to move forward with her life despite Erez's death by a social media post by Erez she found after his death in which Erez said he was a good person who strives to improve all the time. (Dkt. 82, Ex. K, 99).

Dr. Strous opines that A.O. has persistent complex bereavement disorder; with traumatic bereavement and unspecified anxiety disorder. (Dkt. 82, Ex. K). Despite the psychotherapy A.O. has received and the time that has passed, Dr. Strous expects A.O.'s anxiety and grief issues affecting several areas of her life to continue to affect her long term. (Dkt. 82, Ex. K).

**E.O.:** Plaintiffs presented Dr. Strous' report and E.O.'s declaration regarding the psychological trauma he suffered due to Erez's murder. (Dkt. 82, Ex. L, 102). E.O. was eleven years old when Erez was murdered. (Dkt. 82, Ex. L). E.O. was on his way home from watching a movie with friends when a friend said he just heard that there had been an attack in Jerusalem. (Dkt. 82, Ex. L, 102). E.O. did not think the attack involved anyone in his family but when he arrived at his street, the area near E.O.'s home was blocked off and there were military cars, an ambulance, and police vehicles on the road. (Dkt. 82, Ex. L, 102). Police did not allow E.O. down the road to go home but once he told the police he lived there he was allowed to return home with his friend. (Dkt. 82, Ex. L, 102). When E.O. got inside his home, he saw his mother sitting with

two army officers and crying. (Dkt. 82, Ex. L, 102). E.O. went to the kitchen to get water but overheard a military officer telling his mother that Erez had been killed in the attack. (Dkt. 82, Ex. L, 102).

After hearing the news, E.O. was confused. (Dkt. 82, Ex. L, 102). E.O. knew that his life had just changed, but he did not realize the extent to which it would influence him and his family. (Dkt. 82, Ex. L, 102). It was only at the traditional 30-day post death memorial ceremony, that E.O. accepted that Erez had been murdered in a "violent and unjust manner." (Dkt. 82, Ex. L, 102). E.O. realized then that he now "had only five siblings." (Dkt. 82, Ex. L, 102).

After the initial shock and massive outpouring of support that E.O. and his family received from friends, family, and the community, E.O. recalls that reality began to set in. (Dkt. 82, Ex. L, 102). E.O. became very sad. (Dkt. 82, Ex. L, 102). Losing an elder brother with whom E.O. was so close, was a sudden reality that E.O. did not know or understand. (Dkt. 82, Ex. L, 102). E.O. suffered very much from the loss and he "had to mature and grow up in one sweep" whereas his "friends were allowed to gradually grow up." (Dkt. 82, Ex. L, 102). This was not easy for E.O. and caused him a "great deal of hardship." (Dkt. 82, Ex. L, 102).

Since his parents demanded that routine continue as much as possible after *shiva* was completed, E.O. returned to school. (Dkt. 82, Ex. L, 102). At school, everyone had pity on E.O. and were sensitive around him. (Dkt. 82, Ex. L, 102). The attention was uncomfortable for E.O. (Dkt. 82, Ex. L, 102). E.O. recalls that his scores dropped, and he was not able to concentrate in class anymore. (Dkt. 82, Ex. L, 102). While E.O. sat in class, his mind was still on the loss of Erez. (Dkt. 82, Ex. L, 102).

E.O. suffered from insomnia for weeks after Erez's death. (Dkt. 82, Ex. L, 102). E.O.'s appetite was also negatively affected for a few years. (Dkt. 82, Ex. L, 102). After the attack, some of E.O.'s friends became distant from him and this is painful for E.O. (Dkt. 82, Ex. L, 102). Since

Erez's death, E.O. has had dreams of being at the attack and speaking to Erez during the attack. (Dkt. 82, Ex. L, 102). E.O. tries to avoid the site of the attack but he did return to it twice since the attack and he felt anxious and tense there both times. (Dkt. 82, Ex. L, 102). E.O. avoids movies that may remind him of the trauma of losing a brother and he avoids any film clips of the attack and its aftermath. (Dkt. 82, Ex. L, 102). When E.O. speaks about the attack and losing Erez, he feels shaky and "full of goosebumps." (Dkt. 82, Ex. L, 102). E.O. still experiences flashbacks around the trauma and of his time with Erez. (Dkt. 82, Ex. L, 102).

Because E.O. was suffering after the loss of Erez, he began psychotherapy four months after Erez's death and continued psychotherapy for about two years until he left to attend high school in a dormitory. (Dkt. 82, Ex. L, 102). E.O. still misses Erez very much and he does not enjoy life as much as his friends. (Dkt. 82, Ex. L, 102). Erez was a special big brother as he would take E.O. along with his friends even though there was an age gap. (Dkt. 82, Ex. L, 102). E.O. sought any way to remember Erez. (Dkt. 82, Ex. L, 102). E.O. recently started learning guitar and is using Erez's guitar. (Dkt. 82, Ex. L, 102). In ways like this E.O. tries to keep the connection with Erez and his memory. (Dkt. 82, Ex. L, 102).

Dr. Strous opines that E.O. has persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder, mild severity, early onset, with pure dysthymic syndrome. (Dkt. 82, Ex. L). Despite the treatment E.O. has received and the years that have past, Dr. Strous expects E.O.'s sad mood and complicated grief issues affecting many areas of his functioning to continue to affect him for a long time. (Dkt. 82, Ex. L).

**O.O.:** Plaintiffs presented Dr. Strous' report and the declarations of Caryn and Uri Orbach regarding O.O.'s emotional trauma due to Erez's death. (Dkt. 82, Ex. M, 89, 90). Dr. Strous interviewed Caryn and Uri and reviewed corroborating information from O.O.'s mental health care provider. (Dkt. 82, Ex. M). Dr. Strous was unable to conduct a formal psychiatric evaluation of

O.O. because Caryn thought it was best not to expose O.O. to the potential trauma of discussing Erez's death. (Dkt. 82, Ex. M, 90). Dr. Strous agreed that speaking with O.O. may cause some harm. (Dkt. 82, Ex. M).

Caryn reported that O.O. is the youngest of her six children and he was eight years old at the time of the attack. (Dkt. 82, Ex. M). O.O. was very much affected following Erez's death, and the disruption to their family life. (Dkt. 82, Ex. M). Caryn was not as available for O.O. because she was grieving after Erez's death. (Dkt. 82, Ex. M). Caryn indicated that O.O. remembers the soldier and his father talking to him, but he does not remember much after. (Dkt. 82, Ex. M). O.O. was in shock and did not know how to make sense of what was going on around him. (Dkt. 82, Ex. M). The morning of the funeral O.O. refused to go to the cemetery, and he stayed at home with a teacher. (Dkt. 82, Ex. M). A short time after the funeral, O.O. developed severe separation anxiety. (Dkt. 82, Ex. M). O.O. fears that others in the family may die and leave him alone to fend for himself. (Dkt. 82, Ex. M). Caryn and O.O.'s siblings were unable to leave the house without O.O. asking several times where they were going and when they would be back. (Dkt. 82, Ex. M). O.O. refused to stay alone at home, and it took him a very long time to be able to leave the house by himself and feel safe wherever he went. (Dkt. 82, Ex. M). For a long time when going places in the car, O.O. used to ask Caryn to stop and wait until whoever was getting out of the car would walk away or arrive at the nearest sidewalk before he let Caryn drive away. (Dkt. 82, Ex. M). Caryn attributes this change in behavior to Erez being murdered by a terrorist driving a vehicle. (Dkt. 82, Ex. M).

O.O. always wants to make sure everyone in the family is safe and healthy. (Dkt. 82, Ex. M). For about a year or so, O.O. used to come to Caryn crying while asking her what he will do if she dies. (Dkt. 82, Ex. M). During this period, O.O. spoke of death a great deal. (Dkt. 82, Ex. M). O.O. often speaks about Erez, at times asking what Caryn what he was like or what would have

been different had Erez still been alive. (Dkt. 82, Ex. M). Caryn thinks that they would have been close and that O.O. would have been able to learn from Erez and would have spent much time with him. (Dkt. 82, Ex. M). Due to O.O.'s anxieties and insecurities after Erez's death, O.O. was referred for psychotherapy. (Dkt. 82, Ex. M).

Uri indicated Erez's death was traumatic for O.O. (Dkt. 82, Ex. M). Uri has tried to give O.O. the message that life has to continue. (Dkt. 82, Ex. M). It is for that reason that Uri feels that O.O. did not share too much of his struggles and difficulties coping with Erez's death. (Dkt. 82, Ex. M). Uri said that O.O. expressed grief for Erez, but over time O.O. became closed off and did not share much with him. (Dkt. 82, Ex. M). It was for that purpose that O.O. was sent for psychotherapy in order to cope with the loss of Erez as well as the stress of the divorce. (Dkt. 82, Ex. M). Uri said that occasionally O.O. "throws" a question at him regarding death and asks about Erez. (Dkt. 82, Ex. M). Uri feels that the loss and grief for Erez remains in the background at all times. (Dkt. 82, Ex. M).

Dr. Strous reviewed a report from Yiska Landau, a cognitive behavioral therapist and clinical social worker, and her report confirms that O.O. was in treatment with her for a year and was referred for treatment by his parents. (Dkt. 82, Ex. M). Initially, O.O. would only enter into therapy sessions with his mother. (Dkt. 82, Ex. M). After several sessions, O.O. was able to attend alone. (Dkt. 82, Ex. M). Issues which were dealt with included how to deal with friends, the divorce of his parents and the loss of Erez. (Dkt. 82, Ex. M). O.O. exhibited considerable anxiety regarding the wellbeing and health of his mother to the extent that his anxiety affected his ability to fall asleep at night. (Dkt. 82, Ex. M). At times, O.O. would even stay awake in the living room of their home in order to prevent a situation of waking up at night from anxiety—which falling asleep in his own bed often led him to experience. (Dkt. 82, Ex. M). The therapist noted that O.O. decided not to attend memorial services on Memorial Day. (Dkt. 82, Ex. M). Ms. Landau indicated that it

is clear that O.O.'s anxiety is related to his insecurity and fear of death and associated with Erez's death in a violent attack. (Dkt. 82, Ex. M).

According to Dr. Strous, the sudden trauma of losing Erez caused O.O. significant anxiety and grief. (Dkt. 82, Ex. M). It also led to considerable disruption and upheaval within his family. (Dkt. 82, Ex. M). This can be noted in O.O.'s anxious behavior after the attack. (Dkt. 82, Ex. M). O.O.'s anxiety was expressed particularly in his fear of falling asleep and waking up with anxiety as well as in social situations and fear for his mother's wellbeing. (Dkt. 82, Ex. M). All these are not expected for a young boy of his age and indicate significant anxiety. (Dkt. 82, Ex. M). Dr. Strous indicated that it appears that O.O. exhibits an expression of ongoing Unspecified Anxiety Disorder. (Dkt. 82, Ex. M). Dr. Strous expects that many aspects of Erez's violent death in an attack and its repercussions on his personal and family life and growing up in such a family, will continue to affect O.O. in the long term. (Dkt. 82, Ex. M).

The severe emotional and psychological effects on each of these members of Erez's family and their individual medical diagnoses are detailed in the reports of Dr. Strous, which this Court accepts and adopts in full.

Based upon the foregoing, the Court will depart upward from the *Estate of Heiser v. Islamic Republic of Iran*, 446 F. Supp. 2d 229, 269 (D.D.C. 2006) baseline amounts due to the nature of Erez's death, his young age and the severe negative impact his death still has on his family and orders that the Defendant shall pay $8,000,000 in solatium damages to Caryn Orbach, $4,000,000 in solatium damages to Eitan Orbach, $4,000,000 in solatium damages to Alon Orbach, $4,000,000 in solatium damages to A.O., $4,000,000 in solatium damages to E.O. and $4,000,000 in solatium damages to O.O.

### d.    Goldman Family

The family members claiming solatium are Abvraham Goldman's widow Nitzhia Goldman, his daughters Maya Cohen and Sharon Goldman, his sister Gila Nissenbaum and his brother Nathan Goldman. All are U.S. citizens. (Dkt. 70, Ex. 25-30). His son Yoseff Goldman, not a U.S. citizen is discussed below in the section regarding non-U.S. citizen Plaintiffs.

**Nitzhia Goldman:** Plaintiffs have presented Dr. Strous' report and Nitzhia's declaration regarding the psychological trauma she endured due to the attack. (Dkt. 82, Ex. W, 116). On the morning of the attack, the tour group was told to eat breakfast at a "special restaurant" outside of the hotel. (Dkt. 116). After regaining her senses after the attack, Nitzhia noticed a head and leg near her that she was told later belonged to the terrorist. (Dkt. 82, Ex. W, 116). While at the scene a friend called her and Nitzhia told her friend there had been an attack and that Abvraham was dead. (Dkt. 116). Nitzhia's daughter called and asked what was going on, so Nitzhia told her that she had an injury and Abvraham had been taken to the hospital to protect their daughter. (Dkt. 116). Nitzhia was taken to the hospital, and she had intense pain and was emotional. (Dkt. 116).

While in the hospital, Nitzhia called her daughter Maya who came with a friend from Israel to the hospital to try to comfort and assist her. (Dkt. 116). While in the hospital in Turkey two psychologists from the Jewish community visited Nitzhia. (Dkt. 116). The rabbi from the local Jewish community came to the hospital to inform Nitzhia that her husband had been killed. (Dkt. 116). Nitzhia felt sad, shocked, and devastated to lose Abvraham, her husband of over fifty years. (Dkt. 116). An airplane provided by the Israeli government transported her back to Israel and Nitzhia recalls seeing the three coffins on the tarmac. (Dkt. 116). Nitzhia's daughter saluted the coffins. (Dkt. 116). Nitzhia was taken to the cemetery by ambulance when Abvraham was buried. (Dkt. 116).

For months and years Nitzhia had difficulty sleeping and to this day she does not sleep through the night. (Dkt. 82, Ex. W). Nitzhia received psychological treatment from Dr. Shai Greenstein after the attack. (Dkt. 82, Ex. W). Dr. Greenstein prescribed medication to help Nitzhia sleep, and she also prescribed an anti-depressant and anti-anxiety medication that Nitzhia took. (Dkt. 82, Ex. W). Since the attack, milestones and holidays have been particularly difficult for Nitzhia, especially since Abvraham used to take charge of such events. (Dkt. 116). For the first year after Abvraham's death Nitzhia wrote him a letter every day. (Dkt. 82, Ex. W). Nitzhia misses her husband's hugs, travelling with him, Friday night family Sabbath dinners and going to plays with him. (Dkt. 116).

Because of her immense grief and pain, Nitzhia believes she developed cognitive impairment, as well as anxiety. (Dkt. 82, Ex. W, 116). Nitzhia has become disconnected from many of her friends since the attack and she does not feel comfortable being with other couples as doing so compounds her memories of being with Abvraham (Dkt. 82, Ex. W, 116). Nitzhia has experienced post-traumatic symptoms following the attack, including nightmares, frequent flashbacks, physiological reaction when she has to recount the attack, avoidance of news or movies with violence, guilt that despite having had a premonition about the Turkey trip she did not cancel it, hypervigilance with struggling to go to crowded places, hypersensitivity to loud noises, and feeling constantly on edge, which takes away from the enjoyment of activities. (Dkt. 82, Ex. W).

Dr. Strous opines that Nitzhia has persistent complex bereavement disorder with traumatic bereavement, PTSD, and persistent depressive disorder; moderate, late onset, with pure dysthymic syndrome. (Dkt. 82, Ex. W). According to Dr. Strous, despite treatments over the years, Nitzhia's anxiety, mood and complicated grief issues that affect many areas of her functioning will continue to affect her long term. (Dkt. 82, Ex. W).

**Maya Goldman Cohen:** Plaintiffs have presented Dr. Strous' report and Maya's declaration regarding the psychological trauma she suffered as a result of the murder of her father and the injuries her mother sustained in the attack. (Dkt. 82, Ex. X, 110). Maya received a news alert on her phone about an attack in Turkey. (Dkt. 110). Maya called her father, but he did not answer. (Dkt. 110). Maya then called her mother three times and on the third try her mother answered and confirmed that they were involved in the attack. (Dkt. 110). Maya's mother told her that she did not know about her father, but Maya found out later that her mother suspected that her father had been killed in the attack. (Dkt. 110). Maya went home and started making calls to find out about her father. (Dkt. 110). A few hours later, the Rabbi of Istanbul called to let her know that her father had been killed in the attack. (Dkt. 110). Maya was devastated and flew to Turkey to support her mother. (Dkt. 110).

When she arrived in Istanbul, Maya went to the hospital. (Dkt. 110). Maya's mother required emergency surgery on her leg. (Dkt. 110). Maya traveled back to Israel with her mother, along with her father's coffin. (Dkt. 110). Maya recalls covering her father's coffin before it was placed on the plane. (Dkt. 110). The flight to Israel was very difficult as her mother was in a great deal of physical pain and Maya and her mother cried during the flight. (Dkt. 110). When they arrived in Israel, Maya helped arrange for her mother to go to the hospital directly for treatment of her injuries. (Dkt. 110). Maya organized her father's funeral, which was very distressing. (Dkt. 82, Ex. X, 110). Maya had to identify her father's body at the cemetery prior to his burial. (Dkt. 82, Ex. X, 110). At that moment Maya felt she was going to collapse. (Dkt. 82, Ex. X, 110). Due to her distress, Maya took medication to calm her down. (Dkt. 82, Ex. X, 110). Maya had to arrange for her mother to be brought to the funeral by ambulance from the hospital. (Dkt. 82, Ex. X, 110). Maya's mother's leg was fractured and had metal rods in it. (Dkt. 82, Ex. X, 110). The week of *shiva* had its challenges because Maya had to travel between her mother in the hospital and the

rest of the family who were at their home to receive visits from friends and family to offer condolences. (Dkt. 82, Ex. X, 110).

Maya had to deal with her mother's care and home, as well as the needs of her own nuclear family. (Dkt. 82, Ex. X, 110). Maya missed two months of work as a Pilates instructor and lost $5,000 in earnings. (Dkt. 110). Maya felt guilty that she was barely available to her husband and children during this time. (Dkt. 82, Ex. X). While caring for her mother, Maya also had to deal with the loss of her father. (Dkt. 82, Ex. X). Maya was very close to her father, and they spoke by phone at least once a day. (Dkt. 110). Her father was a wonderful grandfather. (Dkt. 110). Maya's father would babysit her children, say prayers on Friday nights for the family and tell stories to her kids. (Dkt. 110). Maya's father was always available to her to listen, give advice and provide security in her life. (Dkt. 110).

Due to the trauma of losing her father and almost losing her mother in the attack, Maya started to experience anxiety, flashbacks to her father's coffin and the hospital in Turkey, and difficulty sleeping. (Dkt. 82, Ex. X, 110). Due to the attack, Maya avoids speaking about the loss and she will not visit Turkey. (Dkt. 82, Ex. X, 110). Maya no longer likes to leave her home and when she is reminded of the attack she has a physical reaction that includes palpitations, difficulty breathing, crying and a sensation of suffocating with a feeling of a mass in her throat. (Dkt. 82, Ex. X, 110). Six months after the attack, Maya attended several grief therapy sessions with a psychologist but three to four years after the attack she went for further psychotherapy sessions to help her more. (Dkt. 82, Ex. X, 110). Ever since the attack Maya has lost all trust in people, and she has become overly protective of her children and husband. (Dkt. 82, Ex. X, 110). Since the attack Maya has developed a fear of flying and requires a sedative to fly. (Dkt. 82, Ex. X, 110). Maya is anxious that something is going to happen, and she no longer participates in sports, and she does not allow her husband to participate in extreme sports, which has placed a barrier in their

relationship. (Dkt. 82, Ex. X, 110). Maya feels she has lost safety and happiness in her life. (Dkt. 82, Ex. X, 110).

Dr. Strous opines that Maya has persistent complex bereavement disorder with traumatic bereavement, PTSD, and other specified anxiety disorder. (Dkt. 82, Ex. X). Dr. Strous expects Maya's anxiety issues affecting many areas of her functioning to continue to affect her long term. (Dkt. 82, Ex. X).

**Sharon Goldman Najman:** Plaintiffs presented Dr. Strous' report and Sharon's declaration regarding her psychological trauma due to the murder of her father and the injuries her mother sustained in the attack. (Dkt. 82, Ex. Y, 111). Sharon had conversed with her father via the video app Facetime the night before the attack and he told her that the tour group had thrown her parents a party. (Dkt. 111). Sharon recalls her parents looked so happy during the Facetime chat. (Dkt. 111). After waking up the next day, Sharon's sister called and told her something happened to their parents. (Dkt. 111). Sharon received a call from her mother informing her that she did not know where her father was but that they both had been injured in the attack. (Dkt. 111). An hour or two later a rabbi of the Istanbul Jewish community informed her that their father had been killed in the attack. (Dkt. 111). The rabbi also asked for permission for the doctors at the hospital to perform emergency surgery on her mother's leg. (Dkt. 111).

Upon hearing the news, Sharon was devastated. (Dkt. 82, Ex. Y, 111). Sharon recalls crying and yelling from the grief. (Dkt. 82, Ex. Y, 111). Sharon flew to Israel but had to take sedative in order to fly. (Dkt. 82, Ex. Y, 111). The flight was very difficult as she cried the entire flight. (Dkt. 82, Ex. Y, 111). Sharon helped her mother in the hospital and helped plan her father's funeral. (Dkt. 111). Sharon also had to deal with her father's siblings, who required extra attention because they were very emotional. (Dkt. 111). Within 24 hours of landing in Israel, Sharon was attending her father's funeral, which was traumatic. (Dkt. 111). *Shiva* was distressing and tiring as Sharon

had to travel between the hospital and the family home to receive visitors to offer their condolences. (Dkt. 82, Ex. Y).

Sharon spent most of her time by her mother's side at the hospital. (Dkt. 111). Sharon's immediate family returned to the U.S. a week after her father's funeral. (Dkt. 111). Sharon's mother's treatment and rehab was lengthy, painful, and required a lot of support from Sharon. (Dkt. 82, Ex. Y). In the weeks after her father's death, Sharon slept and ate little. (Dkt. 82, Ex. Y, 111). Sharon felt like she was on the verge of an emotional collapse. (Dkt. 82, Ex. Y, 111). It took Sharon weeks to be able to enter her father's office in her parents' home. (Dkt. 82, Ex. Y, 111). Sharon spent her days looking at photo albums and crying. (Dkt. 82, Ex. Y, 111). Sharon focused on her mother's health and sat outside the surgery room for all of her mother's surgeries. (Dkt. 82, Ex. Y, 111).

Almost six weeks after the attack, Sharon returned to the U.S., but she still struggled to get a good night's sleep and get up in the morning. (Dkt. 82, Ex. Y, 111). Sharon did the bare minimum she had to do to take care of her family and she spent her days speaking on the phone with her mother and sister. (Dkt. 82, Ex. Y, 111). After a year of barely functioning, Sharon realized that her family needed her to return to her function level she had been at before her father's death. (Dkt. 82, Ex. Y, 111).

Sharon's father's death at the hands of a terrorist caused her to become disillusioned with life and she lost faith in people. (Dkt. 82, Ex. Y, 111). After the attack Sharon experienced PTSD symptoms, including nightmares about the call she received about her parents being injured and her father's death, flashbacks to the airplane ride to Israel to bury her father and take care of her mother, avoidance of challenging situations such as situations that remind her of the challenges after the attack and when asked about her loss Sharon experiences palpitations and breathlessness. (Dkt. 82, Ex. Y, 111). After the attack, Sharon became much more worried about her children and

separation from them remains difficult for her. (Dkt. 82, Ex. Y, 111). Due to her grief, Sharon met with a psychologist from One Family Foundation, and she participated in all the ceremonies related to the terror victims. (Dkt. 82, Ex. Y, 111). Sharon speaks about her father at home daily. (Dkt. 82, Ex. Y, 111).

Dr. Strous opines that Sharon suffers from persistent complex bereavement disorder; with traumatic bereavement, PTSD, and persistent depressive disorder; mild severity, late onset, with pure dysthymic syndrome. (Dkt. 82, Ex. Y). Dr. Strous expects Sharon's depressive issues affecting many areas of her functioning to continue to affect her in the long term. (Dkt. 82, Ex. Y).

**Gila Nissenbaum:** Plaintiffs presented Dr. Strous' report and Gila's declaration regarding her psychological trauma due to the terror attack. (Dkt. 82, Ex. AA, 112). Upon learning of her brother's murder, Gila experienced an emotional breakdown from which she has still not recovered. (Dkt. 82, Ex. AA, 112). Gila returned to Israel for Abvraham's funeral. (Dkt. 82, Ex. AA, 112). Gila became depressed after Abvraham's death, and she experienced intense anxiety. (Dkt. 82, Ex. AA, 112). Gila at one point had no desire to live and considered suicide. (Dkt. 82, Ex. AA, 112). Gila's children were so worried about her that they would not leave her alone for months after Abvraham's death. (Dkt. 82, Ex. AA, 112). Gila had no history of mental illness before Abvraham's murder. (Dkt. 82, Ex. AA, 112). Abvraham's death was very difficult for Gila because he was like a father to her. (Dkt. 112). Abvraham helped Gila with her problems in life and he was her guiding light. (Dkt. 112).

For years after Abvraham's death, Gila was unable to go out to do simple tasks like grocery shopping because she was afraid of an attack. (Dkt. 82, Ex. AA, 112). Gila would start to sweat and become too anxious. (Dkt. 82, Ex. AA). It was only a year ago that Gila started to go back to the grocery store. (Dkt. 82, Ex. AA). For months after Abvraham's death, Gila experienced nightmares that would wake her up. (Dkt. 82, Ex. AA). When she woke up from a nightmare Gila

had sweated so much that she had to change her bed sheets. (Dkt. 82, Ex. AA). Gila experiences flashbacks to a photograph of Abvraham's lifeless body after the attack on the street. (Dkt. 82, Ex. AA). Gila will never visit Turkey and she avoids violent movies. (Dkt. 82, Ex. AA). Gila also avoids leisure trips for fear of an attack. (Dkt. 82, Ex. AA). Gila feels guilt for not convincing Abvraham not to travel to Turkey. (Dkt. 82, Ex. AA). Before the attack, Gila was very social but after the attack she withdrew from her friends. (Dkt. 82, Ex. AA).

Gila received psychiatric treatment for years after Abvraham's death. (Dkt. 82, Ex. AA). Dr. Strous reviewed records from Gila's treating psychiatrist, Dr. Amy Aloysi, who indicated that Gila has been a patient under her care since January 17, 2019, and that Gila suffers from major depressive disorder and PTSD. (Dkt. 82, Ex. AA). Dr. Aloysi indicated that when Gila presented to her that Gila was in a severe refractory depressive episode. (Dkt. 82, Ex. AA). Gila's symptoms, per Dr. Aloysi, included severe anxiety with physical manifestations, depressed mood, low energy, poor concentration, catastrophic thinking, suicidal ideation, and significant impairment of her daily functioning. (Dkt. 82, Ex. AA). One of the triggers to Gila's illness, according to Dr. Aloysi, was the sudden death of Gila's brother in an attack and this was compounded by Gila's father's experiences in the Holocaust. (Dkt. 82, Ex. AA). Gila took prescription medications for depression that did not work. (Dkt. 82, Ex. AA). Gila also tried electro-convulsive shock therapy and medical marijuana. (Dkt. 82, Ex. AA). After six years of treatment, Gila underwent pharmacogenetic testing and a combination of medications was prescribed that Gila takes that help partially. (Dkt. 82, Ex. AA). Gila still misses Abvraham very much and dreams about him every night. (Dkt. 82, Ex. AA, 112).

Gila's son, Lee, told Dr. Strous that for years after the attack Gila would wake up in the morning with a panic attack. (Dkt. 82, Ex. AA). The death of Abvraham took Lee's mother to a state of depression that his mother has treated for since the attack. (Dkt. 82, Ex. AA). For years

Gila was in a state of panic and Lee feared his mother would jump out her window each morning. (Dkt. 82, Ex. AA). While his mother's current medications have helped somewhat, Lee's mother is not back to where she was before Abvraham's death, and she is still hypersensitive and gets emotional and overwhelmed easily. (Dkt. 82, Ex. AA). According to Lee, his mother's focus is still not there, and she is unable to handle the normal stressors of life like she used to before the attack. (Dkt. 82, Ex. AA).

Dr. Strous opines that Gila has persistent complex bereavement disorder with traumatic bereavement, major depressive disorder, and PTSD, partial. (Dkt. 82, Ex. AA). Dr. Strous expects Gila's anxiety, mood, and complicated grief issues affecting many areas of her functioning to continue to affect her indefinitely. (Dkt. 82, Ex. AA).

**Nathan Goldman:** Plaintiffs presented Dr. Strous' report and Nathan's declaration regarding his psychological trauma due to Abvraham's murder. (Dkt. 82, Ex. BB, 115). Nathan learned that his oldest brother, Abvraham, had been killed in an attack in Istanbul when he received a call that day from his sister-in-law. (Dkt. 115). Nathan was in shock and began shaking. (Dkt. 115. Nathan traveled to Israel to attend Abvraham's funeral. (Dkt. 115). The funeral was traumatic and overwhelming for Nathan, especially since he had to identify Abvraham's body. (Dkt. 82, Ex. BB, 115). Nathan will never forget seeing his brother's lifeless body lying on the slab of stone. (Dkt. 82, Ex. BB, 115). Nathan frequently has flashbacks to his brother's lifeless body. (Dkt. 82, Ex. BB, 115).

For a few years after Abvraham's death, Nathan was depressed. (Dkt. 82, Ex. BB, 115). There are still days Nathan's mood is low, but he pushes through for the sake of his children and grandchildren. (Dkt. 82, Ex. BB, 115). Abvraham and Nathan were very close. (Dkt. 115). From 1994 to 2014, Abvraham and Nathan worked together in Nathan's business. (Dkt. 115). While

grief therapy was recommended, Nathan declined it and decided to throw himself into his business. (Dkt. 82, Ex. BB, 115).

When Nathan hears about a terror attack or news about Turkey, he experiences anxiety and emotional panic. (Dkt. 82, Ex. BB, 115). Due to the death of Abvraham in an attack in Turkey Nathan will never visit Turkey. (Dkt. 82, Ex. BB, 115). Since the attack, Nathan has lost trust in people, and he lives in constant fear. (Dkt. 82, Ex. BB, 115). For four years after the attack Nathan experienced nightmares. (Dkt. 82, Ex. BB, 115). Nathan would dream about the explosion and wake up in a state of panic. (Dkt. 82, Ex. BB, 115). This affected Nathan's sleep for years and he was tired for years after the attack. (Dkt. 82, Ex. BB, 115).

Since Abvraham's death, Nathan no longer feels safe in public places and he looks for potential danger in public places. (Dkt. 82, Ex. BB, 115). Nathan avoids groups of tourists and people who appear to potentially be terrorists due to Abvraham's death in a terror attack. (Dkt. 82, Ex. BB, 115). Whenever Nathan talks about the attack, he sweats and experiences palpitations. (Dkt. 82, Ex. BB, 115). Nathan's nightmares about the attack occur at night but his flashbacks to identifying Abvraham's body occur at any moment. (Dkt. 82, Ex. BB, 115). Nathan also feels guilt for not having discouraged his brother more forcefully from going to Turkey. (Dkt. 82, Ex. BB, 115). Nathan struggles with enjoying life because Abvraham was murdered. (Dkt. 82, Ex. BB, 115). Nathan is angry with God but his family is the reason he chooses life. (Dkt. 82, Ex. BB, 115).

Dr. Strous opines that Nathan has persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder with pure dysthymic syndrome. (Dkt. 82, Ex. BB). Dr. Strous expects Nathan's mood, and complicated grief issues affecting many areas of his functioning to continue to affect him indefinitely. (Dkt. 82, Ex. BB).

The severe emotional and psychological effects on Nitzhia and each of member of her and Abvraham's family and their individual medical diagnoses are detailed in the reports of Dr. Strous, which this Court accepts and adopts in full.

Based upon the foregoing, the Court will depart upward from the *Heiser* baseline amounts due to the long lasting psychological impact on the family members of Abvraham and Nitzhia due to the terror attack and orders that the Defendant shall pay $14,000,000 in solatium damages to Nitzhia Goldman, especially since she witnessed her husband die and continues to suffer severe psychological trauma, $6,000,000 in solatium damages to Maya Goldman Cohen, $6,000,000 in solatium damages to Sharon Goldman, $4,500,000 in solatium damages to Gila Nissenbaum, and $4,500,000 in solatium damages to Nathan Goldman.

### e.      Greenfield Family

The family members claiming solatium are Ron Greenfield, who was injured in the attack along with his wife Pnina Greenfield who is addressed in the section below regarding non-citizen Plaintiffs, their son Liron Greenfield, and their daughters Shere Greenfield, Sheye Greenfield, and Gili Greenfield. All are U.S. citizens. (Dkt. 70, Ex. 8-12).

**Ron Greenfield:** Plaintiffs presented Ron's declaration and Dr. Strous' report regarding Ron's psychological trauma due to the terror attack. (Dkt. 82, Ex. Q, 108). Shortly after the attack, Ron experienced post-traumatic symptoms, including nightmares, difficulty sleeping, avoidance of leaving the house for months after the attack for non-essential activities, hypervigilance when he goes out into public places, hypersensitivity to noises and loud sounds and physiological reactions whenever he is reminded of the attack, including sweating and hyperventilation. (Dkt. 82, Ex. Q, 108). Ron to this day struggles to enjoy activities outside his home in communal places.

(Dkt. 82, Ex. Q, 108). Since Ron lives in a city, the noises and loud sounds that occur there are difficult for him and affect his function at times. (Dkt. 82, Ex. Q).

As Ron became a homebound person, he was with his wife all day and tensions rose with them. (Dkt. 82, Ex. Q). Ron treated with a psychologist for six months and he also met with a psychiatrist after the attack who prescribed sleep medication and medication for Ron's low mood and post-traumatic anxiety. (Dkt. 82, Ex. Q, 108). The attack and its' aftermath have affected Ron's entire life. (Dkt. 82, Ex. Q).

Dr. Strous opines that Ron suffers from PTSD and persistent depressive disorder; moderate severity, late onset, with pure dysthymic syndrome. (Dkt. 82, Ex. Q). Despite Ron's treatment and the years that have passed, Dr. Strous expects that Ron's mood and anxiety issues affecting many areas of his functioning to continue to affect him long term. (Dkt. 82, Ex. Q).

**Shye Greenfield:** Plaintiffs presented Dr. Strous' report and Shye's declaration regarding the psychological trauma she suffered as a result of the terror attack. (Dkt. 82, Ex. V, 105). Shye received a WhatsApp message from her father informing her that he was injured in an attack. (Dkt. 105). Upon reading the message, Shye had an anxiety attack. (Dkt. 82, Ex. V). After calming down, Shye spoke with her mother, but she could not stop crying. (Dkt. 105). Shye's anxiety and fear were increased because she did not know how badly her parents were injured. (Dkt. 82, Ex. V). Shye was relieved to see her parents a day after the attack after being flown back to Israel. (Dkt. 105).

Shye could not cope with seeing her father cry when he heard who had died in the attack. (Dkt. 82, Ex. V, 105). The attack very much affected Shye's sense of safety and stability. (Dkt. 82, Ex. V, 105). Because of the attack Shye is now tense and has a difficult time relaxing. (Dkt. 105). Because of the attack, Shye, a dancer, missed a major career-changing dance performance and never felt she could get back to where she was in her dance career, so it ended. (Dkt. 105). The

weeks, months and years since the attack were very frustrating to Shye, especially since she lived in her parents' apartment and helped with all of their medical issues, including her father's urinary problems and showered her father as well. (Dkt. 82, Ex. V, 105). Shye had to cook the meals for the household, manage her parents' anxiety and reassure them, as well as try to manage her own anxiety, and she had to take her parents to medical appointments and rehabilitation, which was difficult because they were both wheelchair bound for a period of time. (Dkt. 82, Ex. V, 105). It has been difficult for Shye to see how her parents are now as they have aged substantially since the attack, and they never returned to the level of energy they had before the attack. (Dkt. 82, Ex. V, 105).

Shye's post-traumatic symptoms include nightmares of attacks, riots, avoidance of areas where there could be terror attacks, hypervigilance in public places and feeling disconnected from her surroundings with a physical response of her throat closing. (Dkt. 82, Ex. V). Shye began psychotherapy treatment in September 2017 and ended such treatment recently.(Dkt. 82, Ex. V, 105).

Dr. Strous opines that Shye suffers from PTSD and other specified anxiety disorder. (Dkt. 82, Ex. V). Dr. Strous expects Shye's anxiety issues that affect various areas of her functioning to continue to affect her for a long time. (Dkt. 82, Ex. V).

**Shere Greenfield:** Plaintiffs presented Dr. Strous' report and Shere's declaration regarding the psychological trauma she suffered as a result of the terror attack. (Dkt 82, Ex. T, 104). Shere's father sent her a text that there had been an attack, but it did not occur to her that her parents were the target of the attack. (Dkt. 104). Shere had been walking her sister's dog and when she went back inside her sister's house her brother-in-law told her that her parents had been in an attack. (Dkt. 104). Shere was devastated. (Dkt. 82, Ex. T). Shere called her father and he told them that he and her mother had been injured. (Dkt. 104). Shere's brother travelled to Turkey to support

her parents. (Dkt. 104). Shere's parents returned the next day and were transferred to a hospital in Israel. (Dkt. 104).

It was only when she saw her parents that Shere realized how bad physically and emotionally they were. (Dkt. 82, Ex. T, 104). Shere was overwhelmed to think two elderly innocent people could go on a trip that was a gift for her mother and that trip became a nightmare. (Dkt. 82, Ex. T, 104). The first few months after the attack, Shere felt the need to be with her parents all the time, especially since they were in wheelchairs. (Dkt. 82, Ex. T, 104). As a result, Shere cancelled a ski trip and lost 2,000 Euros. (Dkt. 82, Ex. T, 104). Shere missed worked for a few months after the attack to help take care of her parents but when she returned to work she could only return part-time because she had to continue to help with her parents' physical and emotional needs. (Dkt. 82, Ex. T, 104).

Shere became less social with friends after the attack as her friends cannot understand what she and her family had gone through. (Dkt. 82, Ex. 104). Since the attack, Shere spends her energy and time on parents in a way she did not anticipate before the attack. (Dkt. 82, Ex. T, 104). For example, after the attack it was Shere and not her mother that was with her sister when she delivered her baby because her mother was still in a wheelchair. (Dkt. 82, Ex. T, 104). Shere feels it is not safe to leave her child alone with her parents. (Dkt. 82, Ex. T, 104). Her father is not happy, and he has lost his passion for life. (Dkt. 82, Ex. T, 104). Shere's mother has become less capable and gets hysterical in the face of stress. (Dkt. 82, Ex. T, 104). Since Shere's parents do not work anymore, her parents being always at home together creates a negative stress dynamic that is not healthy for them or the family. (Dkt. 82, Ex. T, 104). Some of Shere's post-traumatic symptoms after the attack include hypervigilance in public places, avoidance of public places like concerts, guilt that she needs to be around and take care of the family, always on edge, memories of the attack cause a physical response with her heart pounding, and she tenses up whenever she has to

talk about it. (Dkt. 82, Ex. T). About a year after the attack, Shere began psychotherapy treatment that lasted for three years. (Dkt. 82, Ex. T, 104).

Dr. Strous opines that Shere suffers from PTSD and other specified anxiety disorder. (Dkt. 82, Ex. T). Dr. Strous expects Shere's anxiety issues that affect various areas of her functioning to continue to affect her for a long time. (Dkt. 82, Ex. T).

**Gili Greenfield:** Plaintiffs presented Dr. Strous' report and Gili's declaration regarding the psychological trauma she suffered due to the terror attack. (Dkt. 82, Ex. U, 106). On the day of the attack Gili received a WhatsApp message from her father informing her that there had been an attack during their visit and that he had been injured. (Dkt. 106). Gili had an anxiety attack. (Dkt. 82, Ex. U). When Gili was able to speak to her parents, she felt somewhat calmer. (Dkt. 106). Gili's parents were injured from bomb fragments that hit their legs. (Dkt. 106). Gili's brother flew to Turkey to organize their parents' return to Israel. (Dkt. 106). Gili went to the hospital to meet her parents on their arrival in Israel. (Dkt. 106). Gili was worried for their wellbeing. (Dkt. 82, Ex. U, 106). Gili was also concerned for her unborn baby and what the excessive sudden extreme worrying, and shock of the moment may have done to affect the wellbeing of her baby. (Dkt. 82, Ex. U, 106).

Gili's first year of motherhood was filled with the stress of managing her parents' medical problems. (Dkt. 82, Ex. U, 106). Gili moved in with her parents to become the 24-hour medical care giver for her parents. (Dkt. 106). Gili was designated with this task in her family since she was about to go on maternity leave. (Dkt. 106). Gili had to look after all her parents' needs including bathing them, cleaning them, dressing them, changing their bandages, feeding them, and escorting them to medical appointments. (Dkt. 106). Gili also needed to take them to visit with other family members. (Dkt. 106). Much of this caring work was very physical and Gili recalls how difficult and painful it was for her body pushing them both around in a wheelchair. (Dkt. 106).

Gili ended up living with her parents for over six months. (Dkt. 106). After she gave birth, Gili stayed with her parents several more months along with her baby until her parents were able to walk and move without her assistance and without wheelchairs. (Dkt. 106).

Gili felt torn between her duties to her parents and her duties to her baby and husband. (Dkt. 82, Ex. U, 106). Gili did not work for a year while dedicating herself to her parents. (Dkt. 104). Before the attack, Gili had considered taking off three months for maternity leave and then returning to work. (Dkt. 106). Gili feels that she missed out on the positive bonding experience every mother deserves with their baby. (Dkt. 82, Ex. U, 106). Gili's husband tried to be supportive from a distance as he did not move in with her parents. (Dkt. 82, Ex. U, 106). Gili's post-partum months were also characterized by having to care for her baby alone without the help, assistance, and guidance of her mother which she had previously thought she could rely upon. (Dkt. 82, Ex. U, 106). This was due to the fact that her mother was preoccupied with her own physical and mental challenges after the attack. (Dkt. 82, Ex. U, 106).

Due to the terror attack, Gili is not able to simply get up and travel and enjoy life as she used to. (Dkt. 82, Ex. U, 106). Gili knows that this is associated with the intense pain and suffering she observed her parents experience after the attack. (Dkt. 82, Ex. U, 106). They acted somewhat on a whim by travelling in the manner they did. (Dkt. 82, Ex. U, 106). Gili knows how frustrating and disastrous the outcome was in their situation. (Dkt. 82, Ex. U, 106). Gili is thus scared for herself and her family. (Dkt. 82, Ex. U, 106). Gili recalls how much her father changed after the attack. (Dkt. 106). He changed in function from someone always in control to someone dependent on others and unable to work. (Dkt. 106).

Since the attack, Gili experiences significant anxiety and panic attacks with news of a terror attack. (Dkt. 82, Ex. U, 106). Whenever Gili is asked to speak about what she experienced after the attack and how she reacted, she experiences anxiety symptoms with her "body tightening up,

tension, palpations and general unease." (Dkt. 82, Ex. U). Gili is unable to attend large social or family events or stay long in public areas where there are many people. (Dkt. 82, Ex. U). This is as a result of Gili developing hypervigilance after the attack. (Dkt. 82, Ex. U). Gili jumps to any loud noise and is unable to relax. (Dkt. 82, Ex. U). All this is a major change from Gili's behavior prior to the attack. (Dkt. 82, Ex. U).

While Gili did not attend any psychotherapy at the time, she had been taking a selective serotonin reuptake inhibitor (SSRI) since age 23 prescribed by her doctor for stress management. (Dkt. 82, Ex. U, 106). More recently, due to Gili's residual anxiety from her parent's traumatic experience and the increase in her anxiety from the worsening state of attacks in Israel, Gili's doctor increased the dose of the medication to its maximin dose. (Dkt. 82, Ex. U, 106).

Dr. Strous opines that Gili suffers from PTSD (partial) and other specified anxiety disorder. (Dkt. 82, Ex. U). Dr. Strous expects that her anxiety issues affecting many areas of her functioning to continue to affect her for a long time. (Dkt. 82, Ex. U).

**Liron Greenfield:** Plaintiffs presented Dr. Strous' report and Liron's declaration regarding the psychological trauma he suffered as a result of the terror attack. (Dkt. 82, Ex. S, 103). On the third day of his parents' trip to Istanbul, Liron received on the family's WhatsApp group a message from his father that his parents had been injured in an attack. (Dkt. 82, Ex. S, 103). Liron thought his father was joking that they had exploded from eating on their food tour. (Dkt. 82, Ex. S, 103). However, Liron's aunt called shortly after the WhatsApp message, and she shouted his name and was crying. (Dkt. 82, Ex. S, 103). The phone call was then disconnected. (Dkt. 82, Ex. S, 103). A few minutes later various news outlets reported on an attack in Istanbul. (Dkt. 82, Ex. S, 103). Liron tried calling his parents and after a few attempts he was able to speak to them. (Dkt. 82, Ex. S, 103). Liron flew to Turkey and went to the hospital to see his parents. (Dkt. 82, Ex. S, 103). It

was devastating for Liron to see his parents in the hospital. (Dkt. 82, Ex. S, 103). Liron had to arrange with his parents' insurer a special flight back to Israel for his parents. (Dkt. 82, Ex. S, 103).

Liron had to leave work for six months to care for his parents. (Dkt. 82, Ex. S, 103). Liron had to help his parents with showers, going to the toilet, dressing, and attending medical appointments. (Dkt. 82, Ex. S, 103). Liron became depressed that his parents were in an attack, and he had to care for them as they were no longer the same after the attack. (Dkt. 82, Ex. S, 103). It was very difficult and emotional to see his parents disabled for months after the attack, especially since Liron's mother is his best friend. (Dkt. 82, Ex. S, 103). Because Liron was unable to work for six months while caring for his parents this was a stress on Liron, especially since he had extra expenses associated with caring for his parents, including travel, rent, and parking fees. (Dkt. 82, Ex. S, 103).

Socially, Liron had no time for his friends and his girlfriend because his parents needed him. (Dkt. 82, Ex. S, 103). Liron became anxious after the attack. (Dkt. 82, Ex. S, 103). Liron had symptoms of PTSD, including nightmares about explosions, flashbacks to the phone call telling him about the attack, guilt about failing to impress upon his parents the danger of terror despite the travel alert for Turkey before they left on the tour. When he speaks about the attack, he shivers. (Dkt. 82, Ex. S, 103). Liron used to be a calm person but now he is much more suspicious of his surroundings. (Dkt. 82, Ex. S, 103). While psychological was recommended to Liron, he declined it and instead had a tattoo put on his forearm with a replica of the passport stamp he received when he entered Turkey. (Dkt. 82, Ex. S, 103).

According to Dr. Strous, Liron suffers from PTSD, partial and unspecific anxiety disorder. (Dkt. 82, Ex. S, 103). Dr. Strous is of the opinion that Liron's mood and anxiety issues affecting his outlook on life and function in various situations will continue to affect him long term. (Dkt. 82, Ex. S, 103).

Plaintiffs have presented evidence to the Court's satisfaction that Ron experienced and suffered severe permanent psychological trauma as a result of the terror attack. The Court will award Ron Greenfield $4,000,000 in solatium damages.

The severe emotional and psychological effects on each of these members of Ron's family and their individual medical diagnoses are detailed in the reports of Dr. Strous, which this Court accepts and adopts in full. Based upon the foregoing, the Court orders that the Defendant shall pay $2,500,000 in solatium damages to Liron Greenfield, $2,500,000 in solatium damages to Shere Greenfield and $2,500,000 in solatium damages to Shye Greenfield. The Court will award enhanced solatium damages in the amount of $3,500,000 to Gili Greenfield as she missed a year of work to care for her parents, while also caring for her newborn baby, and was forced to be separated from her husband for several months while caring for her parents and her newborn baby.

### f. Gonzalez Family

The family members claiming solatium damages are decedent Nohemi Gonzalez's mother Beatriz Gonzalez, and her brothers Reynaldo Gonzalez and Paul Gonzalez. All are U.S. citizens or U.S. legal residents. (Dkt. 70, Ex. 4-7). Nohemi's father, who was a non-custodial parent and former spouse of Beatriz, sued separately as a plaintiff in *Fields*, 2021 WL 9244135 (Dkt. 98-34).

**Beatriz Gonzalez:** Plaintiffs presented Dr. Strous' report and Beatriz's declaration regarding her psychological trauma due to Nohemi's murder. (Dkt. 82, Ex. C, Dkt. 85). Beatriz learned that her daughter, whom everyone called "Mimi," had been murdered in the Paris terror attack while working at her hair salon from Nohemi's boyfriend, Tim. (Dkt. 85). Beatriz was shocked and could not comprehend the meaning of what he was telling us. (Dkt. 85). Beatriz could not accept what Tim was saying had actually occurred. (Dkt. 85). Upon learning of Nohemi's murder, Beatriz fell to the ground crying. (Dkt. 85). Beatriz and her husband, José Hernandez,

tried to obtain accurate information but the police in Paris were in total chaos in the aftermath of the attack which took so many French lives. (Dkt. 85). The next day the police and agents of the FBI visited to officially inform Beatriz that Nohemi had been killed in the Paris terror attack. (Dkt. 85). Beatriz and José wanted to travel to Paris to be with Nohemi but they were told to remain in the U.S. and await her return. (Dkt. 85). While Beatriz remained in the U.S., this period was emotionally unbearable. (Dkt. 85). Beatriz could not even bury her daughter. (Dkt. 85). It took the authorities 17 days to return Nohemi's body home and only then could Beatriz plan her daughter's funeral. (Dkt. 85).

For many months Beatriz had a tough time accepting that someone so special and young could be taken away from her, especially in such a senseless, violent, and cruel manner. (Dkt. 85). Beatriz sacrificed a lot to give Nohemi an education and complete her career studies. (Dkt. 85). Nohemi was the one in the family that had made it, that was such a shining success. (Dkt. 85). Nohemi was the first person in the family to attend college. (Dkt. 85). Nohemi was in her last year of college studying industrial design at California State University. (Dkt. 85). Nohemi had been so excited to have been chosen to study abroad for six months in order to strengthen and broaden her academic experience. (Dkt. 85). For her, going to Paris to study at the State College of Design in Sevres and pursuing her dreams and career goals was the highlight of her life. (Dkt. 85). It was validation that all the years of studying, working hard, and disciplining herself had paid off. (Dkt. 85). She felt certain this was going to be an important steppingstone of what she was determined would be a life of great meaning and accomplishment. (Dkt. 85).

Before her death, Nohemi had been a teacher's aide in industrial design for three years. (Dkt. 85). Nohemi moved out of Beatriz's house at age 17 and attended Rio Hondo Community College while still in high school before transferring to California State University in Long Beach after graduating high school. (Dkt. 85). During college, Nohemi worked during the week as a

teacher's aide and on the weekends at an Armani store. (Dkt. 85). Despite their busy lives, Nohemi and Beatriz were very close. (Dkt. 85). Beatriz and Nohemi enjoyed hiking, camping, talking over coffee and doing their nails together. (Dkt. 85).

Everything Nohemi set out to achieve in the fields of sports, academics, and social involvement she had earned through her energy and grit. (Dkt. 85). Nohemi planned to obtain a master's degree in industrial design to advance her career. (Dkt. 85). If Nohemi had not been murdered, she would have no doubt become a teacher of industrial design as she frequently stated she intended to be. (Dkt. 85). Nohemi was a very driven person with a good work ethic. (Dkt. 85). As her mother, Beatriz was robbed of seeing Nohemi achieve all her goals in life because she was killed so young. (Dkt. 85).

California State University raised money after Nohemi's death to renovate the room she in which she taught as a teacher's aide, and they named the room on the campus to be called "The Nohemi Gonzalez Room" in her memory. (Dkt. 85).

In her personal life, Nohemi planned on moving in with Tim and eventually marrying him. (Dkt. 85). Nohemi and Tim discussed having children when they were settled in their careers. (Dkt. 85). Nohemi wanted to have one biological child and one adopted child because Beatriz had been a foster mom when Nohemi was a teenager. (Dkt. 85). She loved the idea of sharing her home and her love with an unfortunate child and helping them build their life. (Dkt. 85).

Growing up, Nohemi enjoyed sports, including swimming and running. (Dkt. 85). She was a natural athlete and took part in many competitions over the years. (Dkt. 85). Nohemi was passionate about animals and travel as well. (Dkt. 85). Instead of an elaborate quinceañera (a big celebration for turning fifteen years old, which is customary in their culture), Nohemi went on a trip through Rio Hondo College to Greenland. (Dkt. 85).

For her college graduation, Nohemi wanted a Jeep and Beatriz planned to help her purchase the car as a college graduation gift. (Dkt. 85). Sadly, instead of accompanying Mimi to her graduation ceremony and celebrating this gigantic accomplishment, Beatriz attended a posthumous ceremony to receive Nohemi's diploma for her college graduation and a ceremony for the awards she had been given. (Dkt. 85).

For weeks and months after Nohemi's death, Beatriz functioned poorly, and she had frequent nightmares about Nohemi's death. (Dkt. 82, Ex. C). Despite Beatriz's grief, she had to keep running her hair salon because she had to support her family. (Dkt. 82, Ex. C, 85). Beatriz felt very disconnected from the world and would not take calls from anyone after Nohemi's death. (Dkt. 82, Ex. C, 85). Beatriz cut herself off from her friends as she preferred to be alone because no one could understand her pain. (Dkt. 82, Ex. C 85). While alone Beatriz was flooded with the emptiness of losing Nohemi and with memories of her daughter. (Dkt. 82, Ex. C, 85).

While time has passed since Nohemi's death, Beatriz still feels at times that Nohemi is coming back to her. (Dkt. 85). Any talk about the terror attack makes Beatriz feel anxious and she cries frequently. (Dkt. 82, Ex. C). Before the terror attack, Beatriz was not an anxious person. (Dkt. 82, Ex. C). Beatriz tries very hard to keep her pain and anxiety to herself because people come to a hair salon, like the one she operates, to be pampered and cared for and not to hear about her problems. (Dkt. 85). While Beatriz rarely speaks about the terrorist attack or Nohemi's death it hovers over her every hour of every day. (Dkt. 85).

Over the past seven years since the attack, Beatriz has been depressed and her life has centered around an overwhelming feeling of the loss of Nohemi, despite trying to focus on her living children and grandchild. (Dkt. 82, Ex. C). Beatriz attended many therapy sessions with a psychologist in order to try and cope with her grief and pain. (Dkt. 85). Beatriz feels a hole in her

heart, and it feels like she lost half her life when Nohemi was murdered. (Dkt. 82, Ex. C). Beatriz is just waiting for the day when she will be with Mimi again. (Dkt. 82, Ex. C).

José has supported Beatriz throughout her struggle to come to grips with Nohemi's death. (Dkt. 85). In the early days, José dealt with the various media inquiries and to this day he tries to deal with anything involving Nohemi's estate, including this litigation because discussing Nohemi is too painful for Beatriz. (Dkt. 85). Outside of her sons, José is the only family Beatriz has in the U.S., and he has been Beatriz's main support since Nohemi's death. (Dkt. 85). Without José Beatriz could not have survived this tragedy. (Dkt. 85).

José had a good relationship with Nohemi. (Dkt. 85). He was truly like a father to her. (Dkt. 85). That is how Nohemi saw him. (Dkt. 85). José would help Beatriz with Nohemi and drive her places and run errands with her while Beatriz busy at her hair salon. (Dkt. 85). Nohemi was happy Beatriz had found a partner that made her happy because she was busy with her education and work. (Dkt. 85).

Beatriz started a non-profit organization in Nohemi's name to honor her and focus on her life's goals and achievements, and less on the way she died. (Dkt. 85). After Nohemi's death, the city of Norwalk, CA was very supportive and many in the community brought flowers and food for Beatriz and her family. (Dkt. 85). A local church donated Nohemi's coffin, flowers, and coffee, as well as organized her funeral service. (Dkt. 85). Nohemi Mimi Gonzalez's non-profit is a way to give back to the children of Norwalk. (Dkt. 85). Beatriz provides about 120 haircuts annually as a donation for the non-profit and the non-profit also partners with other charity groups to give children backpacks with school supplies. (Dkt. 85). The non-profit aims to help inspire children in the Hispanic community to work hard in school just as Nohemi did, so they can fulfill their dreams as Nohemi was inspired to do. (Dkt. 85). José helps Beatriz with the non-profit by donating his time to help make calls and organize events, like the one held in Norwalk in 2020. (Dkt. 85).

Dr. Strous opines that Beatriz has persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder with pure dysthymic syndrome. (Dkt. 82, Ex. C). Dr. Strous expects that Beatriz's mood and complicated grief issues affecting many areas of her functioning to continue to affect her indefinitely. (Dkt. 82, Ex. C).

**Reynaldo Hernandez:** Plaintiffs have presented Dr. Strous' report and Reynaldo's declaration regarding the psychological trauma he suffered due to Nohemi's death. (Dkt. 82, Ex. E, 88). Reynaldo learned about Nohemi's murder when his brother Paul called him. (Dkt. 88). Reynaldo was shocked, and he froze for several days. (Dkt. 88). After trying to pull himself together for a few days, Reynaldo left Mexico where he was working and returned to Los Angeles to attend Nohemi's funeral. (Dkt. 88). Reynaldo felt a strong sense of regret because Nohemi had a bright future as she had been successful so far in life. (Dkt. 88). Reynaldo also experienced regret over the time he no longer would have with Nohemi. (Dkt. 88). It was very traumatic for Reynaldo to lose Nohemi so suddenly and in such a violent way. (Dkt. 82, Ex. E). Reynaldo was very close to his sister, and she was, according to Reynaldo, "the best of the family." (Dkt. 82, Ex. E, 88). Reynaldo told Dr. Strous that the trauma of losing Nohemi has left emotional scars that will never go away, especially since he never got to say goodbye to her. (Dkt. 82, Ex. E).

Since Nohemi's death, Reynaldo's life has been negatively impacted in various ways, including being angry with everyone and with life in general, frequent irritability, acting out the first few years after Nohemi's death, guilt over not being able to hold the family together as the eldest child, ceased personal relationships outside the family and turning to alcohol as a way to escape the emotional pain. (Dkt. 82, Ex. E). For years after Nohemi's death, Reynaldo experienced nightmares and flashbacks to the day he learned of her death and to her funeral. (Dkt. 82, Ex. E). Due to his pain, Reynaldo avoided his family and did not discuss his pain with his family. (Dkt. 82, Ex. E). It was only recently that the family has felt more unified. (Dkt. 88). Following

Nohemi's death, Reynaldo experienced anxiety and avoided crowded places out of fear. (Dkt. 82, Ex. E). He even experienced panic attacks with cold sweats and palpitations in crowded places. (Dkt. 82, Ex. E). To this day, it is very painful for Reynaldo to speak about Nohemi's death. (Dkt. 82, Ex. E).

Dr. Strous opines that Reynaldo suffers from persistent complex bereavement disorder with traumatic bereavement, PTSD, and other specified anxiety disorder. (Dkt. 82, Ex. E). According to Dr. Strous, Reynaldo's anxiety and traumatic issues affecting his functioning will continue to affect him long term. (Dkt. 82, Ex. E).

**Paul Gonzalez:** Plaintiffs presented Dr. Strous' report and Paul's declaration regarding the psychological trauma he suffered as a result of Nohemi's death. (Dkt. 82, Ex. F, 83). Upon learning of his sister's murder from his mother, Paul was broken up. (Dkt. 83). Paul fell down onto his couch and stayed there the entire night but did not sleep at all. (Dkt. 82, Ex. F). Paul remained in shock without functioning for a day. (Dkt. 83). Nohemi and Paul were very close as they were only two and a half years apart. (Dkt. 82, Ex. F). The next day the FBI arrived at Paul's door and officially informed him that Nohemi had been killed in the Paris attack. (Dkt. 83). Paul was unable to function for weeks to months after Nohemi's murder. (Dkt. 82, Ex. F). Paul went to Mexico for a short period of time to try and recover from Nohemi's death but alone at night he continued to cry. (Dkt. 82, Ex. F, 83).

Paul's ability to focus was impaired following Nohemi's death and this affected his ability to hold a job. (Dkt. 82, Ex. F). Paul turned to alcohol in an attempt to try to dull his pain. (Dkt. 82, Ex. F). The fact that Paul would never see Nohemi again and he was unable to say goodbye to her is incredibly painful for him. (Dkt. 82, Ex. F). Paul wished it was him and not Nohemi that had died in the attack as he deemed her more worthy of life. (Dkt. 82, Ex. F, 83). A year after Nohemi's murder, Paul traveled to Paris for a commemorative ceremony, and this provided some closure for

him. (Dkt. 82, Ex. F, 83). While in Paris for the ceremony Paul visited the place where Nohemi was murdered and he broke down and felt he could not leave the spot. (Dkt. 82, Ex. F, 83). Nohemi was a strong and dominant personality and the jewel of the family. (Dkt. 82, Ex. F, 83). Although Nohemi was younger than Paul she assisted and guided him in life. (Dkt. 82, Ex. F, 83). Following Nohemi's death, Paul did not have any desire to maintain social relationships. (Dkt. 82, Ex. F). Everyone in the family dealt with their pain on an individual level and did not grieve together as a family. (Dkt. 82, Ex. F). Therefore, the family after Nohemi's death fell apart and only recently has the family slowly started getting together again as a unit. (Dkt. 82, Ex. F, 83). It took Paul about two years after Nohemi's death to reengage socially. (Dkt. 82, Ex. F).

Dr. Strous opines that Paul has persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder. (Dkt. 82, Ex. F). Dr. Strous expects Paul's mood and grief issues that affect his functioning to continue to affect Paul long term. (Dkt. 82, Ex. F).

The severe emotional and psychological effects on each of these members of Nohemi's family and their individual medical diagnoses are detailed in the reports of Dr. Strous, which this Court accepts and adopts in full.

Based upon the foregoing, the Court will depart upward from the *Heiser* baseline amounts due to the severe permanent psychological impact Nohemi's death has had on her family members and orders that the Defendant shall pay $7,000,000 in solatium damages to Beatriz Gonzalez, $3,500,000 in solatium damages to Reynaldo Gonzalez and $3,500,000 in solatium damages to Paul Gonzalez.

### 4.    *Punitive Damages*

The FSIA allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. 28 U.S.C. § 1605A(c). The purpose of punitive damages is

two-fold: to punish those who engage in outrageous conduct and to deter others from similar conduct in the future. *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000). "This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 33 (D.D.C. 1998). Considering these factors, the Court finds an award of punitive damages is warranted. First, Syria's support for ISIS' terrorist activities is horrific and condemnable. Second, the Defendant clearly intended to cause significant harm in multiple ways when it provided material support to ISIS, a known terrorist organization that routinely carries out brutal attacks on innocent civilians. Third, prior damages have been awarded to deter Syria from related actions against civilians. *See Gates*, 580 F. Supp. 2d at 75 (awarding $150 million each to the estates of two victims); *Colvin*, 363 F. Supp. 3d at 163 (awarding $300 million in punitive damages); *Doe*, 2020 WL 5422844, at *17-18 (awarding $31,500,000 in punitive damages because the plaintiff survived). Fourth, prior awards of punitive damages against Syria have noted that Syria is a nation of significant wealth. *See Fields*, 2021 WL 9244135 (Dkt. 20 in *Fields*) (Dkt. 98, Ex. 14); *Colvin*, 363 F. Supp. 3d at 163.

### a. *Goldman and Greenfield Families*

On March 19, 2016, Nitzhia and Abvraham and Ron and Pnina were with their tour group walking in a tourist area when a terrorist detonated a bomb near them. Nitzhia, Abvraham, Ron and Pnina were all injured in the attack. Nitzhia witnessed her husband die. Nitzhia, Ron and Pnina have never been the same since the terror attack and the lives of their families are still negatively impacted to this day. The Court will award $150,000,000 to each family in punitive damages against Syria.

**b.** *Alexander Pinczowski's Family*

Alexander was on his way home to Cameron when a terror attack occurred at the Brussels airport. Alexander and Cameron were robbed unexpectedly of fulfilling their dreams and sharing their lives together. Alexander's loss was also a deep loss for Cameron's parents who supported Cameron in the aftermath of Alexander's murder. While the Court awarded $31,500,000 in punitive damages in *Doe*, 2020 WL 5422844, at *17-18, here, unlike in *Doe*, Alexander did not survive. It is clear the terrorists targeted a crowded international airport to maximize the harm inflicted on as many individuals and their families as possible. *See Doe*, 2020 WL 5422844, at *17-18. As such, the need to deter terrorism is high and Syria is a wealthy sovereign. *Id.*; *Colvin*, 363 F. Supp. 3d at 163. The Court will award Plaintiffs $150,000,000 in punitive damages against Syria.

**c.** *Orbach and Rund Families*

On January 8, 2017, a terrorist deliberately rammed a truck into a group of Israeli soldiers in a tour group in Jerusalem. He then reversed the truck to run over the soldiers again. The attack only stopped because the terrorist was shot. Erez Orbach was one of the Israeli soldiers that was murdered in the terror attack. Erez was only twenty years old and had his whole life in front of him. Erez had a medical condition that excused him from compulsory military service but he chose to join the military despite his medical condition. His loss is still devastating for his family. Eytan Rund was a tour guide who sustained injuries in the terror attack and witnessed Erez's death at the hands of the terrorist that day. Eytan to this day suffers from psychological injuries due to the terror attack. Eytan's life and the life of his family has never been the same since the attack. The Court will award Plaintiffs $150,000,000 per family in punitive damages against Syria.

### d. Gonzalez Family

Nohemi was studying abroad in Paris when she was murdered in a terror attack. Nohemi was shot in the chest and leg. She felt conscious pain and suffering before her death. Nohemi was a kind and hardworking person with the goal of becoming a teacher in industrial design. Nohemi and her boyfriend were discussing getting married and having children later on after they were settled in their careers. Nohemi's family has struggled ever since her death but her mother started a non-profit to help other young Hispanic children so they can, like Nohemi, become successful in life. (Dkt. 85). The Court will award Plaintiffs $150,000,000 in punitive damages against Syria.

## F.    Liability to Non-U.S. Citizen Plaintiffs

The FSIA does not contain an express choice-of-law provision for plaintiffs not covered by § 1605A(c). FSIA § 1606 does provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if an FSIA exception abrogates immunity, plaintiffs not covered by § 1605A(c) may bring state or foreign law claims that they could have brought if the defendant were a private individual.

Here, the Court must apply North Carolina's choice of law rules to determine which jurisdiction's substantive law governs. North Carolina applies the *lex loci delicti* rule—the law of the place of the injury governs tort claims. *See Worley Claims Services, LLC v. Jefferies*, 429 F. Supp. 3d 146, 158 (W.D.N.C. 2019); *Martinez v. National Fire Ins. Co.*, 911 F. Supp. 2d 331, 336 (W.D.N.C. 2012); *Blankenship v. Sprint Corp.*, N. 3:03-cv-221, 2007 WL 1387971, at *3 (W.D.N.C. 2007); *Gbye v. Gbye*, 130 N.C. App. 585 (1998). The tort for personal injury is deemed to have occurred where the last event took place that is necessary to render an actor liable. *Worley*,

429 F. Supp. 3d at 158; *Martinez*, 911 F. Supp. 2d at 336. *See also Giblin v. National Multiple Sclerosis Soc., Inc.*, 2008 WL 4372787 (W.D.N.C. 2008).

Uri Orbach is an Israeli citizen whose son, Erez, was murdered by a terrorist in Israel. There is no legal relationship between Uri and the Defendant or ISIS. Accordingly, as to Uri's claims, the Court finds that Israeli law will apply.

Pnina Greenfield was injured in the terror attack in Istanbul. Pnina is a citizen of Israel. There is no legal relationship between Pnina and the Defendant or ISIS. Accordingly, applying the *lex loci deliciti* rule, the Court finds that Turkish law will apply to Pnina's claims.

Concerning the claims of Israel Gorenzky, Nitzhia's brother, the terror attack that injured Nitzhia and murdered her husband occurred in Turkey. Likewise, Tamar Choresh, the sister of Nitzhia, was an Israeli citizen whose sister was injured and who lost her brother-in-law Abvraham in the attack in Turkey. Further, Yoseff Goldman is an Israeli citizen who lost his father in the attack in Turkey. There is no legal relationship between Israel, Tamar and Yoseff and the Defendant or ISIS. Accordingly, the Court finds that Turkish law will apply to the claims of Israel, Yoseff, and Tamar Choresh's estate.

Regarding the claims of the estate of Alexander Pinczowski, Alexander was a citizen of Netherlands and his murder occurred in the terror attack at the Brussels airport in Belgium. There is no legal relationship between Alexander and the Defendant or ISIS. The Court finds that Belgian law will apply to the claims of Alexander Pinczowski's estate.

Lastly, José Hernandez, stepfather of Nohemi Gonzalez, is a citizen of Mexico but resides in the U.S. Nohemi was a U.S. citizen studying abroad in Paris when ISIS terrorists murdered her. There is no legal relationship between José and the Defendant or ISIS. Accordingly, the Court finds that French law will apply to José's claims.

### Foreign Laws

In determining the scope of applicable foreign law, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Thuneibat*, 167 F. Supp. 2d 22, 44.

### Israeli Law

Plaintiffs rely upon the expert declarations of Dr. Boaz Shnoor ("Shnoor Decl."), an attorney and law professor in Israel relied upon by the court in *Force,* Dkt. 34, 464 F. Supp. 3d at 374-376 and in *Borochov*, Dkt. 60-1, 2022 WL 656168, *12-15, as well as the expert declaration of Dr. Israel Gilead ("Gilead Decl.") relied upon by the court in *Henkin*, 2021 WL 291403, *8-13 (Dkt. 98, Ex. 15-17).

### Negligence

Plaintiffs asserted a claim of negligence under Israeli law. (Dkt. 44 ¶¶ 303-318). The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO) at § 35, 2 LSI (New Version) 14-15 (1972); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 57-58 (D.D.C. 2010). As discussed in *Henkin*, 2021 WL 291403, at *8, there are two types of negligence under Articles 35-36 of the CWO. The first type of negligence is "a type of harm that is careless or negligent conduct, which consists of failure to act as a reasonable, prudent person would under the circumstances." Gilead Decl. at pages 6-8 in *Henkin*, Dkt. 56-2, 2021 WL 291403, at *8. (Dkt. 98, Ex. 17). The second type of negligence includes "harms caused knowingly, intentionally, and maliciously." *See* Gilead Decl. at pages 6-8 in *Henkin*, Dkt. 56-2, 2021 WL 291403, at *7. (Dkt. 98, Ex. 17). Therefore, Israeli law places negligence under what the common law of the U.S. would consider an intentional tort. *See* Gilead Decl. at pages 6-8 in *Henkin*, Dkt. 56-2, 2021 WL 291403, at *7. (Dkt. 98, Ex. 17).

As Dr. Shnoor discussed in his declaration in *Force*, Dkt. 34 ¶¶ 50-60, 464 F. Supp. 3d at 374-376, the elements required under either type of negligence under Israeli law include (1) duty, (2) breach, (3) cause (4) harm. (Dkt. 98, Ex. 15). *See also Weinstock v. Islamic Republic of Iran*, 2019 WL 1507255 (S.D. Fla. April 4, 2019); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 241 (D.D.C. 2012).

Under Israeli law, the first element of negligence "recognizes that a duty of care exists not to harm others." *Estate of Botvin*, 873 F. Supp. 2d at 241 (relying on Dr. Shnoor and CA 243/83 *City of Jerusalem v. Gordon, P.D.* 39(1) 113 128 (1985)); *Wultz*, 755 F. Supp. 2d 1, 58-59. Duty under Israeli law is divided into "duty in fact and notional duty." *Id.*, 755 F. Supp. 2d at 58. "[E]very person owes a duty to all persons whom…a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." CWO § 36, 2 LSI (New Version) 15 (1972). A court asks if a reasonable person could have foreseen the likelihood of damage when determining duty-in-fact. *See Wultz*, 755 F. Supp. 2d at 58. Furthermore, if a duty-in-fact exists but the risk of harm as it occurred was already "taken into account by normal society when engaged in a particular action," a defendant will not be liable under the tort of negligence. *Id.* at 58-59. Normative duty considers "whether a reasonable person ought, as a matter of policy, to have foreseen the occurrence of the particular damage." *CA 145/80 Vaknin v. Beit Shemesh Local Council 37(1) PD 113, 125-26 (1982) (Isr.); see also Wultz*, 755 F. Supp. 2d at 59.

Here, a reasonable person could foresee that ramming a truck into people and running them over would cause damage to them. The Court finds that Uri Orbach has demonstrated the terrorist was under a duty to the victims as it was foreseeable that his intentional act of ramming a truck into people and running over those people would cause injuries and/or death to the victims. The Court also finds that the Defendant was under a duty to the victims because, as discussed above,

the injuries and death of the victims were foreseeable consequences of providing material support to ISIS and supporting ISIS's efforts to further extremist propaganda against countries against terrorism. For the same reasons that the Court finds sufficient evidence to tie Syria to ISIS terrorist actions, it finds that a duty existed between Syria and the Plaintiffs and their families because their injuries were foreseeable consequences of the aid and support.

A breach of the duty of care occurs when a party with a duty fails to take "reasonable precautionary measures." *Vaknin*, 37(1) PD at 131. Reasonable precautions are determined by balancing the interests of the plaintiff with that of the tortfeasor and considering the public interest in the continuation or cessation of the alleged tortious actions. *See Wultz*, 755 F. Supp. 2d at 62. Here, a reasonable person could foresee that a person intentionally ramming a truck into people would cause great harm to those at or around them. *See Estate of Botvin*, 873 F. Supp. 2d at 241 (citing CA 796/80 *Ohana v. Abraham P.D.* 37(4) 337 (1983) (concluding that intentional killings breached the duty of care)). The Court finds the terrorist breached his duty of care to the Plaintiffs by intentionally ramming his truck into people and then running them over for the purpose of killing or causing serious bodily injury to them. The Court finds Syria breached its duty of care to the Plaintiffs by engaging in the continuous support and financing of ISIS, despite knowledge of ISIS's terrorist actions.

Israeli law uses the "but for" test for causation. *See* Shnoor Decl. in *Force*, Dkt. 34 ¶ 21, 464 F. Supp. 3d at 374-376, relying on CA 145/80 *Va'aknin v. The City of Beit Shemesh,* P.D. 37(1) 113, 144). (Dkt. 98, Ex. 15). "If a reasonable person could have foreseen that a harm of the kind that happened might happen, the legal causation requirement is met." *See* Shnoor's Decl. in *Force*, Dkt. 34 ¶ 22, 464 F. Supp. 3d at 374-376. (Dkt. 98, Ex. 15). Here, just like in *Force*, it is clear that the ISIS terrorist foresaw that ramming his truck into a crowd of people and running those people over would cause serious bodily injury and/or death to those individuals. The ISIS

terrorist sped up his truck before ramming into the people and even circled back to run over his victims again. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78). Defendant provided material support to ISIS in the years leading up to the January 8, 2017 terror attack, including financial and military support. (Gartenstein-Ross Decl. at pages 22-39) (Dkt. 75). *See* the testimony and reports of Dr. Gartenstein-Ross and Dr. Levitt from *Sotloff*, Dkt. 34-1, 34-2, 41, 42, 525 F. Supp. 3d 121, as well as Dr. Gartenstein-Ross' report from *Doe*, 2020 WL 9244135 (Dkt. 31-6 in *Doe*) (Dkt. 98, Ex. 2, 5-8). Plaintiff Uri Orbach has demonstrated that but for the material support provided by Syria, ISIS would not have been able to develop into the organized and deadly organization it was at the time of the attack.

Harm under Israeli law includes "loss of life, or loss of, or detriment to, any property, comfort, bodily welfare, reputation or other similar loss of detriment." *See* CWO (New Version), 5728-1968, 2 LSI 5, § 2 (1972) (Isr.). Here, Erez died as a result of his injuries from the attack and Eytan sustained physical and emotional injuries due to the attack. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78) (Dkt. 82, Ex. H, 95).

Uri Orbach has established the negligence by ISIS and Syria under Israeli law. Israeli law would hold the ISIS terrorist liable for the harm to victims caused by his attack, as well as Syria because it breached its duty, provided material support to ISIS and it was reasonably foreseeable that innocent persons would become victims of ISIS's terrorism. *See* Shnoor's Decl. in *Force*, Dkt. 34 ¶¶ 23-24, ¶¶ 53-60, 464 F. Supp. 3d at 374-376. (Dkt. 98, Ex. 15).

Under Israeli law there is also the tort of "[N]egligent Support of Terrorism" that is a judicially created theory of liability set forth in CivA 2144/13 *Mantin v. Estate of PLO* (6/12/2017) that can be used against Syria. In *Mantin*, the Israeli Supreme Court "recognized that establishing an infrastructure for assisting and encouraging terrorist acts is in itself a negligent act." *Henkin*, 2021 WL 291403, at *16-17. To establish such a claim a plaintiff must show that "(1) support for

terrorism constitutes knowingly, intentionally, and maliciously doing something that causes an unreasonable risk of harm, (2) defendants had a duty of care not to support terrorism or create an unreasonable risk of harm from terrorism, and they breached this duty by supporting terrorism, and (3) defendants' support was both the but-for cause and proximate cause" of the attack. *Henkin*, 2021 WL 291403, at *8. While in *Henkin*, 2021 WL 291403, at *8, the plaintiffs did not establish the but-for and proximate cause element of this theory of liability, the plaintiffs relied upon *Mantin v. PLO*, which shifted the burden to defendants to show they were not the cause because the plaintiffs had shown the defendants supported terrorism and had asserted but-for and proximate causation. Since the defendants defaulted in *Heinken*, defendants did not meet their burden and the Court found the defendants primarily liable for negligent support of terrorism. *See* Gilead Decl. at pages 17-18 in *Henkin*, Dkt. 56-2, 2021 WL 291403, at *8. Here, Plaintiffs have detailed the material support the Defendant provided to ISIS in the years leading up to the attack that injured Eytan and killed Erez. (Gartenstein-Ross Decl. at pages 22-39) (Dkt. 75). *See also* the testimony and reports of Dr. Gartenstein-Ross and Dr. Levitt from *Sotloff*, 525 F. Supp. 3d 121 (Dkts. 34-1, 34-2, 41, 42 in *Sotloff*) (Dkt. 98, Ex. 5-8) as well as Dr. Gartenstein-Ross' report from *Doe*, 2020 WL 9244135 (Dkt. 31-6 in *Doe*) (Dkt. 98, Ex. 2, 5-8). These experts have established that Syria provided a safe haven for ISIS that allowed ISIS to train, recruit, fundraise, plan attacks, and communicate throughout the world with respect to terrorism and that Syria funded ISIS with its purchase of oil from ISIS. Here, the Defendant defaulted so the Defendant has failed to show it was not the cause because Plaintiffs have demonstrated Defendant's negligent support of terrorism.

### *Intentional Infliction of Emotional Distress*

Intentional infliction of emotional harm under Israeli law is part of negligence because intentional torts are blended with the tort of negligence under Israeli law. *See* Gilead Decl. ¶ 25 in

*Henkin*, Dkt. 56-2, 2021 WL 291403, at *8. (Dkt. 98, Ex. 17). As Prof. Gilead noted in his Decl. ¶ 25 in *Henkin*, Dkt. 56-2, 2021 WL 291403, at *8, negligence overlaps with intentional torts because "reasonable persons do not cause unreasonable harm knowingly, intentionally, and maliciously, and when they do, courts recognize a "duty" not to do so." (Dkt. 98, Ex. 17). In *Leibovitch v. The Syrian Arab Republic*, 25 F. Supp. 3d 1071 (N.D. Ill. 2014), the Court discussed the elements for intentional infliction of emotional distress under Israeli law relying on the Israeli case LCA 444/87 *Munhar Alsoucha v. Dehan*, at 56 [1990] (Isr.). Under Israeli law, the four elements are as follows:

1.      Whether plaintiffs enjoy a close relationship to the primary victim;

2.      Whether plaintiffs directly perceived the tortious act;

3.      Plaintiff's degree of spatial and temporal proximity to the injurious event; and

4.      The severity of mental injury.

*Alsucha* at 62-73.

Here, it is submitted that the terrorist's act of ramming a truck into a group of people on an educational tour would have a foreseeable consequence of mental injury. In *Alsucha*, the Israeli Court stated that parents, spouses, children, and other first-degree relatives automatically meet the closeness requirement. *Id.* at 63 cited in *Leibovitch*, 25 F. Supp. 3d at 1802-1803. Uri Orbach was Erez's father so Uri has met the first element of this claim.

Concerning the second element of this cause of action, the Israeli Court in *Alsoucha* "held that witnessing a tortious act is not determinative, but the foreseeability of mental injury increases when one witnesses the act." *Leibovitch*, 25 F. Supp. 3d at 1083. Here, while Uri was not present at the scene at the time of the attack, his mental injuries, which are discussed in detail in his declaration and in Dr. Strous' report were foreseeable. (Dkt. 82, Ex. H, 89). A review of Uri's declaration and Dr. Strous' report for Uri reveal he suffered mental injuries as Erez's father. (Dkt.

82; Ex. H, 89). Uri has demonstrated the negative impact the attack has had on his life and the toll the attack has taken on his family.

The third element of this claim is implicated when the mental injury is 'the product of a continuous process of exposure to the consequences of the injurious event' as opposed to mental injury resulting from a one-time experience." *Leibovitch*, 25 F. Supp. 3d at 1083 citing LCA 444/87 *Munhar Alsoucha*, at 46. In *Alsoucha*, the Israeli Court decided that the "distinction should be based upon the extent of the damage, or 'clear proof of real and definite mental injury'" because the 'distinction between mental injury caused on the spot…and damage caused at a later stage' is arbitrary." *Leibovitch*, 25 F. Supp. 3d at 1803 citing *Alsoucha* at 69. Under Israeli law, the plaintiff must experience the "tragic event, or in an exceptional case, learns about the event in such circumstances that the emotional damage is expectable." *See Leibovitch*, 25 F. Supp. 3d at 1083-1804; *Estate of Botvin*, 873 F. Supp. 2d at 245 (quoting *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009)). Here, Uri has been diagnosed by Dr. Strous with a psychological injury and Uri has received grief counseling. (Dkt. 82, Ex. H, 89). The Court finds that the decline of Uri's mental health is proof of injury that meets the third element of this claim.

The fourth element concerns the severity of the mental injury, and a plaintiff needs to establish a mental illness with physiological effects or severe mental injury. *See Leibovitch*, 25 F. Supp. 3d at 1083 relying on LCA 444/87 *Munhar Alsoucha*, at 69. Uri has established his mental injuries diagnosed by Dr. Strous with physiological effects (e.g., lack of sleep,) due to Erez's death. (Dkt. 82, Ex. H, 89). Per Dr. Strous, Uri will continue to endure his mental trauma for the foreseeable future. (Dkt. 82, Ex. H). The Court finds Uri has established severe mental injury. Therefore, Uri has established the intentional infliction of emotional distress claims under Israeli law. *See Henkin*, 2021 WL 291403, at *12.

### Battery and Assault

The civil torts of battery and assault are governed by Article 23 of the CWO under Israeli law. The elements of a battery are as follows:

1. The defendant knowingly;

2. Used force- directly or indirectly;

3. Against the body of another person;

4. Without the consent of that person.

The elements of assault under Israeli law are as follows:

a. A defendant knowingly;

b. Attempted or threatened by any act or gesture to use force against another person;

c. Making the other believe upon reasonable grounds that he has the present intention and ability to affect his purpose.

*See* Shnoor Decl. at pages 8-9 in *Force*, Dkt. 34, 464 F. Supp. 3d at 374-376. (Dkt. 98, Ex. 15). Here, the terrorist deliberately used a truck as a weapon with the intent to kill and/or seriously injure as many individuals as possible as evidenced by the terrorist speeding up and running over individuals and then reversing the truck to run over those individuals again. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78). The terrorist ran over Erez, and he died from his injuries. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78). Eytan was injured in the attack. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78). Eytan and Erez did not consent to being physically injured. (Dkt. 78). The only reason the attack stopped was because the terrorist was shot dead. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78). Therefore, pursuant to Article 23 of the CWO of Israeli law, the Court finds Plaintiffs have established a battery and assault took place.

### *Israeli Damages*

Israeli law provides that an immediate family member of a tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim. *See* Shnoor Decl. at ¶ 59, Dkt. 34, in *Force*, 464 F. Supp. 3d at 374-376. (Dkt. 98, Ex. 15). The harm suffered by a secondary victim is compensable if (1) the family member witnessed the event or its consequences, (2) there is a time and space proximity between the two harms, and (3) the secondary victim suffers severe harm that disrupts daily function. *Id.* Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily function. Shnoor Decl. ¶ 59, Dkt. 34, in *Force*, 464 F. Supp. 3d at 374-376 (Dkt. 98, Ex. 15); *see also Estate of Botvin*, 873 F. Supp. 2d at 245.

The Court in *Henkin*, 2021 WL 2914030, at *9, relying on Prof. Gilead's declaration, found that the wife and children all of which were Israeli citizens suffered severe emotional injury as a result of the terror attack. (Dkt. 98, Ex. 17). The Court in *Henkin*, 2021 WL 2914030, at *10, further indicated that bereavement is a theory of recovery that is equivalent to solatium damages in the U.S. law. (Dkt. 98, Ex. 17). Therefore, in *Henkin*, the Court noted that even if the widow and children had not suffered severe mental harm, they could still recover damages under the theory of bereavement. 2021 WL 2914030, at *10. Under Israeli law, Uri Orbach has the same range of damages available to him as U.S. plaintiffs proceeding under the FSIA have under the category of solatium damages. *See* Gilead Decl. ¶¶ 60-64 in *Henkin*, Dkt. 56-2, 2021 WL 291403, at *8-13. (Dkt. 98, Ex. 17).

### *Compensatory Damages*

As Plaintiffs have established claims for battery, intentional infliction of emotional distress and negligence under Israeli law, Erez's estate, via its administrator Uri, is entitled to recover for

the physical injuries Erez suffered in the attack. In *Henkin*, 2021 WL 291403, at *12, the widow, an Israeli citizen, and her children, also Israeli citizens, recovered under Israeli law for the negligently inflicted wrongful death of her husband who was the children's father. *Id.* (Dkt. 98, Ex. 17). The Court in *Henkin* further held that if Eitam had survived he could have asserted causes of action for assault and negligence under Israeli law. *Id.* at * 12, 15. (Dkt. 98, Ex. 17). Here, Erez was run over by a truck. (Spitzen Decl. ¶¶ 68-69) (Dkt. 78). Accordingly, pursuant to Israeli law, Uri Orbach is entitled to recover on behalf of Erez's estate compensatory damages for the physical injuries Erez sustained in the attack, as well as for the wrongful death of Erez. The Court will enter judgments of liability for Uri Orbach against the Defendant consistent with the above findings of fact and conclusions of law.

### Solatium Damages

Plaintiffs presented Dr. Strous' report and Uri's declaration regarding the psychological trauma he suffered as a result of Erez's murder. (Dkt. 82, Ex. H, 89). The day before Erez's death, Erez spent the Sabbath with his mother and returned in the morning of his death to say goodbye to Uri before returning to his army service. (Dkt. 89). Erez was supposed to be working in Hebron the day he was murdered. (Dkt. 89). Caryn called Uri and told her about the attack and told Uri that she could not reach Erez. (Dkt. 89). Uri told Caryn not to worry because Erez was in Hebron and not Jerusalem. (Dkt. 89). Uri called a few people to investigate what happened. (Dkt. 89). Uri's son, Alon, called him to tell him that soldiers were at the house and to come over to Caryn's place right away. (Dkt. 89). Uri went over to Caryn's home and was informed by the military officers that Erez had been killed in the attack. (Dkt. 89). Uri's body tensed up and he was almost "convulsing." (Dkt. 89). Uri tried to keep control of himself because he had to go and tell his mother about Erez's death. (Dkt. 89).

It was very difficult and painful for Uri to bury his son. (Dkt. 89). Uri declined an offer to identify Erez's body as he wanted to remember him as he was alive and not as a murdered disfigured son. (Dkt. 89). During *shiva* he was told many stories about Erez he was not aware of that only reinforced how special Erez was as a person. (Dkt. 89). Uri was unable to work for four months after Erez's death because he was in a dreamlike state. (Dkt. 89). It took Uri months before he felt that he could "return to the world." (Dkt. 82, H, 89). Time has not helped lessen Uri's grief. (Dkt. 89). While grief counseling allows Uri to function for his children, he does not enjoy life as he did before Erez's death. (Dkt. 82, Ex. H, 89).

Uri and Erez were very close. (Dkt. 89). Uri reaches out to a grief therapist when he needs support to help him cope with the loss of his son. (Dkt. 82, Ex. H, 89). The loss of Erez affected Uri's social life and he became identified as a bereaved father. (Dkt. 82, Ex. H, 89). Uri feels his friends cannot understand the trauma of losing a child, especially so suddenly and violently. (Dkt. 82, Ex. H, 89). Some of Uri's post-traumatic symptoms include difficulty sleeping for three to four months after Erez's murder and frequent flashbacks to his time with Erez. (Dkt. 82, Ex. H).

Dr. Strous opines that Uri suffers from persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder; mild severity, late onset, with pure dysthymic syndrome. (Dkt. 82, Ex. H). Dr. Strous expects that Uri's mood and complicated grief issues affecting many areas of his functioning to continue to affect him indefinitely. (Dkt. 82, Ex. H).

### Amount of Awards to Israeli Plaintiffs

Israeli Courts have not rendered awards for victims of terrorism in cases such as this because Israel does not have diplomatic relations with Syria and Iran, but Israeli procedural law requires that service of process on a foreign state be by diplomatic channels. *See* Shnoor Decl. at

¶ 10 in *Borochov*, 2022 WL 656168, at *12-15. (Dkt. 60-1 in *Borochov*) (Dkt. 98, Ex. 16). Without

the ability to serve process on such countries, including Syria, such lawsuits cannot proceed in

Israeli Courts. *See LCA 1104/09 AG v. Steen* (12/8/2011). In *Leibovitch*, 25 F. Supp. 3d at 1086,

the plaintiffs and their Israeli law expert did not set forth what the amount of damages would be

awarded under Israeli law for the Israeli plaintiffs. The Court in *Leibovich* used the law of the

forum in "assessing the proper damages award" because to conduct "further research would unduly

burden both Plaintiffs and the Court." *Id*. The Court indicated that using the law of the forum

would be "in the interests of justice" for a damages assessment. *See Estate of Botvin v. Islamic

Republic of Iran*, 772 F. Supp. 2d 220, 228 (D.D.C. 2011); *Oveissi*, 768 F. Supp. 2d 16 (D.D.C.

2011) (applying French law to the tort claims and federal law to the damages assessment). In

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 358 (D.C. Cir. 2018), the Court noted that

when there is a lack of information about the proper calculation of damages under a foreign law,

the Court defaults to the application of federal law. *See also Force*, 617 F. Supp. 3d at 37, (D.D.C.

2022) *Jakubowicz v. Islamic Republic of Iran*, *et al.*, 2022 WL 3354719, at *10 (D.D.C. Aug. 9,

2022). In *Fraenkel*, the Court applied the Section 1605A framework to damages where liability

was established under Jordanian law. *Id. See also Oveissi v. Islamic Republic of Iran,* 768 F. Supp.

2d 16, 25-26 (D.D.C. 2011) (applying the federal standard for solatium damages where liability

was established under French law); *Thuneibat*, 167 F. Supp. 2d 22, 47 (collecting cases where

courts assessed liability under foreign or state law but applied federal standard to damages

calculation). In *Weinstock*, 2019 WL 1507255, the Court used Israeli law to impute negligence to

the defendants but used the *Heiser* framework under federal case law to assess damages for an

Israeli father whose U.S. son died in a terror attack when it awarded the Israeli father $5,000,000

in solatium damages. In *Cohen v. Islamic Republic of Iran et al.*, 238 F. Supp. 3d 71, 86 (D.D.C.

2017), the Court used D.C. law for an intentional infliction of emotional distress claim for Shalom

Cohen, an Israeli citizen, and awarded him the same amount of solatium damages as his wife, a U.S. citizen. *See also Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 212-13 (D.D.C. 2008) (applying federal law to damages award); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59-60 (D.D.C. 2006) (applying federal law to damages award).

Although the "*Heiser* framework is non-binding, it provides baseline figures and a basic methodology by which to ascertain the 'appropriate measure of damages' both for directly-injured victims and for 'the family members of victims who died' or were injured in a terrorist attack." *Lelchook v. Syrian Arab Republic*, 2019 WL 4673849, at *4-5 (D.D.C. Jan. 31, 2019) quoting *Peterson*, 515 F. Supp. 2d 25, 51 (internal citations omitted)); *see also, e.g, Valore*, 700 F. Supp. 2d 52, 85-86 (noting "strong precedential support" for framework); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57-58 (D.D.C. 2009); *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Oveissi*, 768 F. Supp. 2d 16, 26. As the Court held in *Fraenkel*, "[w]hile past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'" *Fraenkel*, 892 F.3d at 362 (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017)). Moreover, utilizing *Heiser* as a guideline for the amount of damages furthers the policy interest of avoiding "the problem of 'disparity among the various state laws regarding the recovery of emotional distress by immediate family members.'" *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 49 (D.D.C. 2020).

Since Uri has established that he would be entitled to recover solatium damages under Israeli law, the Court will calculate damages under the *Heiser* damages framework but depart

upward and award $8,000,000 in solatium damages to Uri Orbach for his severe and continuing psychological trauma over losing his first-born child.

### Punitive Damages

In *Henkin*, 2021 WL 2914036, at *10, the Court determined relying on Prof. Gilead's declaration (Dkt. 56-2 at page 22) that Israeli law does provide for punitive damages. (Dkt. 98, Ex. 17). Professor Gilead cited Civil File 4332-02 (Jerusalem) *Shemesh v. PLO* (2.11.2020) in which an Israeli Court stated "in cases of terrorists attack, punitive damages should be triple the amount of compensatory damages. *Henkin*, 2021 WL 2914036, at *10. (Dkt. 98, Ex. 17). Here, because an ISIS terrorist intentionally used a truck as a weapon against Israeli soldiers to seriously injury and/or kill them, Plaintiffs respectfully submit that the attack was indeed an "immoral and outrageous act" warranting punitive damages to punish such vile violent attacks against innocent people. As indicated, the Orbach family members request $150,000,000 in punitive damages.

### Belgian Law

Plaintiffs retained Dr. Rafaël Jafferali,[192] a Professor in Belgium of contract law and tort law, to prepare a declaration ("Jafferali Decl.") regarding what claims Alexander Pinczowski's estate could bring under Belgian law. (Dkt. 81) Article 1382 of the Belgian Old Civil Code provides the principle of civil extra-contractual liability pursuant to which any tortious act or omission causing a damage to another person entails the obligation for the tortfeasor to repair the damage caused. (Jafferali Decl. ¶ 11) (Dkt. 81). Such liability requires three elements: (i) a tortious

---

[192] The Court finds Dr. Jafferali is a qualified expert in his field and that his expert testimony is relevant to the issue in this case.

act or omission, (ii) damages, and (iii) a factual causational relationship between the tortious act or omission and the damage.[193] (Jafferali Decl. ¶ 11) (Dkt. 81).

The burden of the proof of the tortious act or omission, the damage and the causation lies on the plaintiff, who must evidence each of these elements with reasonable certainty (new Belgian Civil Code ("B.C.C."), art. 8.4 and 8.5). (Jafferali Decl. ¶ 12) (Dkt. 81). If the nature of the elements to be proven makes it unreasonable to demand reasonable certainty, the elements may be proven with likelihood (B.C.C., art. 8.6, § 2). (Jafferali Decl. ¶ 12) (Dkt. 81). Finally, in exceptional circumstances, the judge may decide by a specific reasoning that the normal burden of proof would be unreasonable and must shift on the defendant (B.C.C., art. 8.4, § 5). (Jafferali Decl. ¶ 12) (Dkt. 81). This shift may occur only if the judge does not have sufficient evidence despite the evidencing measures taken and the parties' offering of evidence. (Jafferali Decl. ¶ 12) (Dkt. 81).

A tortious act or omission can consist either of a breach of a rule that mandates or prevents a specific behavior or of a breach of the general duty of care.[194] (Jafferali Decl. ¶ 13) (Dkt. 81). The breach of the general duty of care requires an analysis *in abstracto* to assess whether the defendant acted as a reasonably prudent person put in the same circumstances: if the behavior of

---

[193] *See* for example: P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II, Les obligations, Bruxelles, Bruylant, 2013, p. 1167, n 800; Cass., 6 December 2013, *Pas.*, 2013, n 661, p. 2457; Cass., 5 June 2008, *Pas.*, 2008, n 350, p. 1425; Cass., 14 December 2006, *Pas.*, 2006, n 650, p. 2667; Cass., 12 October 2005, *Pas.*, 2005, n 507, p.1913; Cass., 1er avril 2004, *Pas.*, 2004, n 174, p. 527.

[194] P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II, Les obligations, Bruxelles, Bruylant, 2013, pp. 1219 sqq., n 830; on the breach of a rule that mandates or prevents a behavior, see for instance: Cass., 9 February 2017, *Pas.*, 2017, n 97, p. 337; Cass., 16 May 2011, *Pas.*, 2011, n 320, p. 1139; on the general duty of care, see for instance: Cass., 5 June 2003, *Pas.*, 2003, n 337, p. 1125; Cass., 21 March 1986, *Pas.*, I, 1986, n 458, p. 911.

the defendant deviates from this standard, the breach is established.[195] (Jafferali Decl. ¶ 13) (Dkt. 81). A person must take the reasonable measures required in the circumstances given to avoid damages to others.[196] (Jafferali Decl. ¶ 13) (Dkt. 81).

Under Belgian law the Belgian State can commit a tort through its executive power and bears liability accordingly.[197] (Jafferali Decl. ¶ 14) (Dkt. 81). The liability does not require the identification of the precise organ of the State involved in the tortious act.[198] (Jafferali Decl. ¶ 14) (Dkt. 81).

The commission of a criminal offense is always a tortious act for civil extra-contractual liability purposes because it is a breach of a rule that prevents a certain criminal behavior.[199]

---

[195] *See* for example: E. MONTERO et B. GOFFAUX, «La référence au paradigme du "bon père de famille" en responsabilité extracontractuelle», *For. Ass.*, 2014, pp. 2 sqq.

[196] J.-L. FAGNART, «Principe de précaution et responsabilité civile», *Bull. Ass.*, 2011, p. 124, n 17; R. O. DALCQ, *Traité de la responsabilité civile*, t. I: *Les causes de responsabilité*, *Novelles*, Droit civil, t. V, vol. I, Bruxelles, Bruylant, 1959, p. 167, n 312, pp. 172 sqq., nos 335 sqq; Cass., 15 January 1953, *Pas.*, 1953, I, p. 331.

[197] P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II: *Les obligations*, Bruxelles, Bruylant, 2013, pp. 1253 sqq., nos 854 sqq; *see* for instance: Cass., 9 February 2017, *Pas.*, 2017, n 98, p. 349; Cass., 19 March 2010, *Pas*., 2010, n 200, p. 892; Cass., 21 December 2007, n 661, p. 2491; Cass., 27 March 2003, *Pas.*, 2003, n 211, p. 673; Cass., 8 November 2002, *Pas.*, 2002, n 591, p. 2136; Cass., 21 December 2001, *Pas.*, 2001, n 719, p. 2204. Based on Dr. Gartenstein-Ross' report the behavior of Syria is attributable to its executive power only.

[198] P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II: Les obligations, Bruxelles, Bruylant, 2013, p. 1319, no 883; briefs of the General Prosecutor. Velu before Cass. 19 December 1991, *Pas*., I, 1992, p. 355.

[199] P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II, Les obligations, Bruxelles, Bruylant, 2013, p. 1183, n 809; B. DUBUISSON, V. CALLEWAERT, B. DE CONINCK et G. GATHEM, *La responsabilité civile*, *Chronique de jurisprudence 1996-2007,* vol. 1: *Le fait générateur et le lien causal*, Bruxelles, Larcier, 2009, p. 21, n 1; R. O. DACLQ, «Faute civile—Faute pénale», *Ann. Dr. Louvain*, 1983, p. 82; see for medical liability: G. GENICOT, *Droit médical et biomédical*, 2ᵉ édition, Bruxelles, Larcier, 2016, p. 374; see on the fact that criminal liability necessarily implies a breach of a legal our regulatory provision of criminal nature: F. KUTY, *Principes généraux de*

(Jafferali Decl. ¶ 15) (Dkt. 81). The Supreme Court also held that the person who, by negligence, commits a criminal offence that requires intent, may be criminally acquitted but yet commits a civil tortious act.[200] (Jafferali Decl. ¶ 15) (Dkt. 81).

The Belgian Penal Code ("B.P.C.") sanctions several crimes related to terrorism (B.P.C., art. 137-141 *ter*), including terrorist murder and terrorist destruction of public transport premises (B.P.C., art. 137) or participating in the activity of a terrorist organization, e.g., by financing it[201] (B.P.C., art. 140). (Jafferali Decl. ¶ 116) (Dkt. 81). The B.P.C. also contains a section related to co-conspirators and accomplices (B.P.C., art. 66-69). (Jafferali Decl. ¶ 16) (Dkt. 81). An accomplice is among others the person who knowingly provides an aid to the primary actor to facilitate, prepare or commit the crime (B.P.C., art. 67). (Jafferali Decl. ¶ 16) (Dkt. 81). In principle, the accomplice must have a precise knowledge of the crime that will be committed, i.e., the nature and the goal of the crime and the factual circumstances that characterize the act as a crime.[202] (Jafferali Decl. ¶ 16) (Dkt. 81). Finally, criminal liability applies to legal persons (B.P.C., art. 5) for all crimes.[203] (Jafferali Decl. ¶ 16) (Dkt. 81).

---

*droit pénal belge*, t. III: *L'auteur de l'infraction pénale*, 2ᵉ édition, Bruxelles, Larcier, 2020, p. 41, n 1618.

[200] Cass., 21 avril 1921, *Pas.*, 1921, I, p. 302.

[201] The activities that qualify as a participation are broad and include: advising on how to reach a war zone, creating, and managing a jihadist website, collecting money in mosques for financing terrorist activities, etc; see I. DE LA SERNA, «Des infraction terrorists», *Les infractions*, vol. 5, H. Bosly, et Ch. De Valkeneer (dir.), Bruxelles, Larcier, 2012, pp. 191 sqq.

[202] F. KUTY, *Principes généraux de droit pénal belge*, t. III: *L'auteur de l'infraction pénale*, 2ᵉ édition, Bruxelles, Larcier, 2020, pp. 311 sqq., nᵒˢ 2048 sqq; Cass., 18 May 2022, R.G. n P.22.0113.F; Cass., 17 October 2018, *Pas.*, 2018, n 562, p. 1940; Cass., 7 September 2005, *Pas.*, 2005, n 414, p. 157; Cass., 16 December 2003, *Pas.*, 2003, n 647, p. 2021.

[203] Cass., 1ᵉʳ October 2014, *Pas.*, 2014, n 566, p. 2025; Cass., 14 November 2007, *Pas.*, 2007, n 553, p. 2030.

Damages are defined as harm to a legitimate and stable interest of the victim.[204] (Jafferali Decl. ¶ 17) (Dkt. 81). Damages are usually classified between harms to property interests, non-lethal personal injury, and death. (Jafferali Decl. ¶ 17) (Dkt. 81). Within these classifications, a distinction is made between material harm and moral harm and between damage suffered by the victim itself and damage suffered consequently by relatives. (Jafferali Decl. ¶ 17) (Dkt. 81).

The causation between the tortious act and the damage relates to the cause in fact and is assessed in Belgium under the theory of the "equivalence of conditions."[205] (Jafferali Decl. ¶ 118) (Dkt. 81). It holds that causation exists if, but for the tortious act, the damage would not have occurred or not in the same manner.[206] (Jafferali Decl. ¶ 18) (Dkt. 81). The foregoing has the remarkable consequence that no additional distinction is made between the causes of the damage, e.g., between direct or indirect tortious acts causing the damage,[207] or between tortious acts for which the damage was or was not a foreseeable consequence.[208] (Jafferali Decl. ¶ 18) (Dkt. 81). By contrast, if evidence shows that the damage would have occurred as it occurred if the tortious

---

[204] *See* e.g.: P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II: Les obligations, Bruxelles, Bruylant, 2013, pp. 1542-1543, no 1063; Cass., 5 June 2020, n C.19.0396.F; Cass., 17 October 2016, *Pas.*, 2016, n 577, p. 1978; Cass., 3 October 1997, *Pas.*, 1997, I, n 387, p. 965.

[205] P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II: Les obligations, Bruxelles, Bruylant, 2013, p. 1608, n 1092 and p. 1612, n 1095; Cass., 30 May 2001, *Pas.*, 2001, n 319, p. 994.

[206] *See* for instance: Cass., 28 June 2018, *Pas.*, 2018, n 423, p. 1472; Cass., 23 September 2011, *Pas.*, 2011, n 496, p. 2034.

[207] Cass., 10 November 2020, n P.20.0659.N; Cass., 9 December 2015, *Pas.*, 2015, n 734, p. 2810; Cass., 28 May 1991, *Pas.*, 1991, I, n 497, p. 843.

[208] Cass., 15 November 2006, *Pas.*, 2006, n 561, p. 2336; Cass., 17 avril 1975, *Pas.*, 1975, I, p. 820.

act was not committed, there is no causation.[209] (Jafferali Decl. ¶ 18) (Dkt. 81). Causation must be certain, but the certainty must be reasonable, not absolute.[210] (Jafferali Decl. ¶ 18) (Dkt. 81).

Here, in Dr. Jafferali's opinion Alexander's estate has a claim for the harm suffered by Alexander before his death and caused by the explosion. (Jafferali Decl. ¶ 23) (Dkt. 81). The acts ascribed to Syria in Dr. Gartenstein-Ross' declaration would qualify as tortious under Belgian law. (Jafferali Decl. ¶ 23) (Dkt. 81). A Belgian judge facing the situation would probably analyze Syria's actions in view of the standard of a reasonably prudent State in the same circumstances. (Jafferali Decl. ¶ 23) (Dkt. 81). From that point of view, the acts noted in Dr. Gartenstein-Ross' declaration constitute support to ISIS, a terrorist organization. (Jafferali Decl. ¶ 23) (Dkt. 81). By giving support to ISIS, Syria took part in the terrorist activities of this group and knew its support would contribute to the commission of crimes or felonies of ISIS. (Jafferali Decl. ¶ 24) (Dkt. 81). This may qualify as a criminal offence under article 140 of the B.P.C. and thereby automatically qualify as tortious. (Jafferali Decl. ¶ 24) (Dkt. 81). However, because Syria did not seem to specifically know in advance of the attacks of March 22, 2016, Syria probably cannot be considered as an accomplice of the attacks in the meaning of article 67 of the B.P.C. (Jafferali Decl. ¶ 24) (Dkt. 81). It is Dr. Jafferali's opinion that a reasonable State in the same circumstances would have avoided acts that were likely to lead to terror attacks by the support of a terrorist

---

[209] Cass., 11 June 2009, *Pas.*, 2009, n 397, p. 1501; Cass., 28 June 2018, *Pas.*, 2018, n 423, p. 1472.

[210] B. DUBUISSON, V. CALLEWAERT, B. DE CONINCK et G. GATHEM, *La responsabilité civile*, *Chronique de jurisprudence 1996-2007,* vol. 1: *Le fait générateur et le lien causal*, Bruxelles, Larcier, 2009, p. 365, n 433; P. VAN OMMESLAGHE, *Traité de droit civil belge*, t. II: Les obligations, Bruxelles, Bruylant, 2013, p. 1613, n 1095; briefs of the General Attorney T. Werquin in Cass. (ch. réunies), 1er avril 2004, *Pas.*, 2004, n 174, specifically p. 534; Art. 8.5 of the Belgian Civil Code provides that except when the law provides otherwise, evidence must be brought with a reasonable degree of certainty.

organization. (Jafferali Decl. ¶ 24) (Dkt. 81). Therefore, Dr. Jafferali believes that a judge would consider that Syria, by deviating from this standard, did not act as a reasonable State by supporting ISIS and therefore committed tortious acts. (Jafferali Decl. ¶ 25) (Dkt. 81).

The question of whether these torts bear a causal relationship with the terror attack at the Brussels airport on March 22, 2016 requires a factual assessment by the court hearing the claim. (Jafferali Decl. ¶ 26) (Dkt. 81). The court will assess whether, without the support of Syria, the terrorist suicide bombings that struck the Brussels airport would have occurred or would have occurred in the same manner. (Jafferali Decl. ¶ 26) (Dkt. 81). Dr. Gartenstein-Ross in his declaration concludes that Syria's support of ISIS bears a causal connection to the attacks. (Jafferali Decl. ¶ 26) (Dkt. 81).

The Court will enter judgments of liability for Alexander Pinczowski's estate against the Defendant consistent with the above findings of fact and conclusions of law.

### Belgian Damages

Once liability is established, the liable person must remedy the damage. (Jafferali Decl. ¶ 22) (Dkt. 81). The indicative table 2020 lists and values several damages, including the damage arising from death.[211] (Jafferali Decl. ¶ 22) (Dkt. 81). It includes: (i) funeral expenses, which are a claim of the person paying for them, (ii) *ex haerede* damages, i.e., damages suffered by the decedent itself from the tortious act until death, e.g., because of the suffering endured by the injuries or the anguish suffered because of the prospect of death, and (iii) damages to relatives. Only *ex haerede* damages can give rise to a claim of the estate of the decedent. (Jafferali Decl. ¶ 22) (Dkt. 81).

---

[211] Tableau indicatif 2020, *J.J. Pol.*, 2021, pp. 82 sqq.

Assuming proof of liability, Alexander's estate would be able to recover monetary damages covering the moral harm suffered by the decedent between the time of the terrorist attack and his death. Such harm may include fear, distress, and pain. (Jafferali Decl. ¶ 27) (Dkt. 81). The general rule that damages must compensate the harm would be applicable. (Jafferali Decl. ¶ 27) (Dkt. 81). No specific factor would apply to the determination of the amount awarded to the estate: the valuation would be made *ex aequo et bono* by the judge, according to what the judge believes is adequate to compensate the harm. (Jafferali Decl. ¶ 27) (Dkt. 81).

The evidence shows that Alexander did not die instantaneously. (Dkt. Ex. 79, Ex. G, 98, Ex. 18, 20). The authorities in Brussels advised Cameron that Alexander had sustained bad injuries to his legs and he had a gash on his head. (Dkt. 93). The Brussels authorities allowed Cameron to visit her husband's body in a morgue. (Dkt. 93). Cameron recalls seeing a gash on Alexander's head. (Dkt. 93). Dr. Friedman reviewed the autopsy report for Alexander and opined that Alexander did not die immediately. (Dkt. 79, Ex. G, 98, Ex. 18). Alexander, per Dr. Friedman, sustained a skull fracture in the blast and injuries to his legs. (Dkt. 79 Ex. G). It is possible that Alexander experienced pain and suffering before dying. (Dkt. 79, Ex. G). With this showing, a Belgian court would most probably admit damages for the mental and physical harm suffered until death. (Jafferali Decl. ¶ 27) (Dkt. 81). The valuation of damage to compensate for this harm would be *ex aequo et bono*. (Jafferali Decl. ¶ 27) (Dkt. 81).

To maintain consistency in monetary awards, per *Heiser*, and in light of the evidence, Plaintiffs request $1,000,000 in compensatory damages be awarded to Alexander Pinczowski's estate as it has been established that he did not die immediately and that he sustained a skull fracture and serious injuries to his legs in the bombing.

### French Law

Plaintiffs retained Dr. Jean-Sébastien Borghetti,[212] a French law Professor, to prepare a declaration ("Borghetti Decl.") regarding what civil liability Syria could have for Nohemi's murder under French law. Whether Syria can be held liable in tort under French law raises two initial issues. (Borghetti Decl. ¶ 10) (Dkt. 77). The first one is whether French rules on jurisdictional immunity of foreign States should apply. (Borghetti Decl. ¶ 11) (Dkt. 77). According to the *Cour de cassation*, France's highest court, a foreign State enjoys limited jurisdictional immunity. (Borghetti Decl. ¶ 11) (Dkt. 77). French rules on jurisdictional immunity only apply before French courts. (Borghetti Decl. ¶ 11) (Dkt. 77). Syria cannot therefore raise the French rules on the jurisdictional immunity of States as a defense before a U.S. court. (Borghetti Decl. ¶ 11) (Dkt. 77). The second initial issue is which *substantive* law applies to a liability claim against a foreign State. (Borghetti Decl. ¶ 12) (Dkt. 77). When a claim governed by French law is directed against a foreign State, it is the rules of civil law apply. (Borghetti Decl. ¶ 12-13) (Dkt. 77).

### Available Causes of Action

Here, a claim against Syria for harm caused in France is governed by the rules of French civil law on tort liability. (Borghetti Decl. ¶ 12) (Dkt. 77). The basic provision of French law on civil liability is article 1240 of the *code civil*. (Borghetti Decl. ¶ 15) (Dkt. 77). It states: "Any human action whatsoever which causes harm to another creates an obligation in the person by whose fault it occurred to make reparation for it." (Borghetti Decl. ¶ 15) (Dkt. 77). Thus, a person is liable for harm caused by his fault. (Borghetti Decl. ¶ 16) (Dkt. 77). Liability based on article 1240 is extremely broad, which explains why there are no intentional torts in French law.

---

[212] The Court finds Professor Borghetti is a qualified expert in his field and that his expert testimony is relevant to the issue in this case.

(Borghetti Decl. ¶ 17) (Dkt. 77). Wherever the defendant is alleged to have committed a fault, and whatever the type of harm that has been caused, a claim will be brought under article 1240 of the *code civil*, regardless of whether the defendant was negligent or inflicted harm intentionally. (Borghetti Decl. ¶ 17) (Dkt. 77).

Article 1240 of the *code civil* can be combined with article 1242(5) of the same code, which renders principals liable for damage caused by their agent's fault. (Borghetti Decl. ¶ 18) (Dkt. 77). It provides: "Masters and employers [are liable] for harm caused by their servants and employees within the functions for which they employed them." (Borghetti Decl. ¶ 18) (Dkt. 77). This provision can only apply where there exists a relationship of subordination between the principal and the agent. (Borghetti Decl. ¶ 19) (Dkt. 77). Such a relation requires that the principal can give orders to the agent and instruct the latter on how to perform the task that was entrusted to him. (Borghetti Decl. ¶ 19) (Dkt. 77). Here, based on Dr. Gartenstein Ross' declaration, Syria did not directly instruct the terrorists to commit an attack in Paris. (Borghetti Decl. ¶ 19) (Dkt. 77). However, any fault committed by Syrian civil servants when performing their functions, or more generally by any person acting under the orders of Syrian officials, can be attributed to Syria in application of article 1245(2) of the *code civil*. (Borghetti Decl. ¶ 20) (Dkt. 77). Here, the question is whether Syria, either directly or through its agents, committed faults giving rise to liability under article 1240 of the *code civil*. (Borghetti Decl. ¶ 21) (Dkt. 77).

### *Conditions of Liability Under Article 1240 of the Civil Code*

It is undisputed that there are three conditions for the application of article 1240 of the *code civil*: the existence a harm, a fault, and a causal relationship between these two elements. (Borghetti Decl. ¶ 22) (Dkt. 77).

### a.   Harm

Article 1240 of the *code civil* does not define harm and there are no other provisions in the *code civil* or elsewhere giving any indication as to what types of harm can be compensated, and how damages should be calculated. (Borghetti Decl. ¶ 23) (Dkt. 77). Death and personal injury are types of harm which must be compensated when they have been wrongfully inflicted. (Borghetti Decl. ¶ 23) (Dkt. 77). There is no doubt that Nohemi's murder constitutes a harm. (Borghetti Decl. ¶ 23) (Dkt. 77).

### b.   Fault

There is no official definition of fault in French law. (Borghetti Decl. ¶ 25) (Dkt. 77). However, a reform bill of civil liability law was published by the French Ministry of Justice, which gives a definition of fault.[213] (Borghetti Decl. ¶ 25) (Dkt. 77). This definition is intended and recognized by authors generally as reflecting the notion of fault as it is currently understood in French law, especially by the courts. (Borghetti Decl. ¶ 25) (Dkt. 77). Article 1242 of the bill reads: A violation of a legislative requirement or a failure in the general duty of care or diligence constitutes a fault. (Borghetti Decl. ¶ 25) (Dkt. 77). Fault, in the sense of article 1240 of the code civil, can therefore consist in two different types of violations: either a violation of a legislative requirement or a violation of the general duty of care or diligence. (Borghetti Decl. ¶ 26) (Dkt. 77).

---

[213] French Ministry of Justice, Projet de réforme de la responsabilité civile, March 2017, available at http://www.justice.gouv.fr/publication/Projet_de_reforme_de_la_responsabilite_civile_13032017.pdf (last accessed May 25, 2023). The official translation of the bill by S. Whittaker, commissioned by the French Ministry of Justice is available at http://www.textes.justice.gouv.fr/art_pix/reform_bill_on_civil_liability_march_2017.pdf (last accessed May 25, 2023).

### 1. *Violation of a Statutory Duty*

In French law, violation of a statutory duty is included within the broad cause of action of article 1240 of the *code civil*. (Borghetti Decl. ¶ 27) (Dkt. 77). The breach of *any* statutory duty is regarded as a fault, regardless of whether it is a civil or criminal duty and regardless of the legislator's or the State's intent when establishing this duty. (Borghetti Decl. ¶ 27) (Dkt. 77). Thus, any violation of a criminal statute automatically constitutes a fault under article 1240 of the *code civil*, but this is also true of any violation of a civil statute. (Borghetti Decl. ¶ 27) (Dkt. 77).

It is not necessary that the statute which has been violated should indicate that its violation will give rise to civil liability, nor that this violation be the result of negligence. (Borghetti Decl. ¶ 28) (Dkt. 77). It is also not necessary that the statute that was violated should have been specifically intended to protect persons in the claimant's situation or to avoid the very type of harm which the claimant suffered. (Borghetti Decl. ¶ 28) (Dkt. 77). The mere fact of violating a statute constitutes a fault, which may be relied on by any person who suffered harm because of this violation. (Borghetti Decl. ¶ 28) (Dkt. 77).

Case-law offers examples of violations of French statutory duty, but the violation of foreign statutory duties or international rules can also constitute a fault under French law. (Borghetti Decl. ¶ 29) (Dkt. 77). For example, in one case, the Paris appellate court ruled that the violation of the US embargo against Iran constituted a fault.[214] (Borghetti Decl. ¶ 29) (Dkt. 77). Here, any violation of an international law rule, including a United Nations' rule or resolution, committed by Syria or a Syrian agent would thus constitute a fault under French law. (Borghetti Decl. ¶ 30) (Dkt. 77).

---

[214] CA Paris, 19 December 2013, n. 12/00948.

## 2. *Violation of the General Duty of Care and Diligence*

Under French law there exists a general duty of care whereby everybody must act carefully, so as to avoid causing any type of foreseeable harm to others. (Borghetti Decl. ¶ 31) (Dkt. 77). It is therefore not necessary to establish the existence of a specific duty of care to characterize a fault. (Borghetti Decl. ¶ 31) (Dkt. 77). Rather, any unreasonable conduct is a fault. (Borghetti Decl. ¶ 31) (Dkt. 77). Basically, it is a fault not to behave as a reasonable person, under any circumstances.[215] (Borghetti Decl. ¶ 31) (Dkt. 77).

Professor Borghetti opines that there can be no doubt that dealing with a terror organization like ISIS and knowingly supporting such an organization constitutes an unreasonable behavior, and therefore a fault, under French law. (Borghetti Decl. ¶ 32) (Dkt. 77). Also, it is a fault for someone in charge of controlling an activity not to operate this control correctly.[216] (Borghetti Decl. ¶ 33) (Dkt. 77). In particular, French courts have accepted that mere negligence in border control constitutes a fault that can give rise to the State's liability.[217] (Borghetti Decl. ¶ 33) (Dkt. 77). Under French law, the fact that Syria or Syrian agents have willingly let ISIS members go through the border, per Dr. Gartenstein-Ross' declaration,[218] constitutes a fault. (Borghetti Decl. ¶ 33) (Dkt. 77).

---

[215] *See, e.g.*, Ph. Le Tourneau (ed.), Droit de la responsabilité et des contrats, Régimes d'indemnisation, 12th ed., 2021, ¶ 2212-11.

[216] *See, e.g.*, Ph. Le Tourneau (ed.), Droit de la responsabilité et des contrats, Régimes d'indemnisation, 12th ed., 2021, ¶ 2212-151.

[217] *See, e.g.*, Conseil d'Etat, 26 April 2017, n. 394651.

[218] *See, e.g.*, Declaration by Dr. Gartenstein-Ross, ¶ 76 (Dkt. 75).

### c. *Causation*

French law does not define causation and does not set a clear test for assessing it. (Borghetti Decl. ¶ 34) (Dkt. 77). It also does not make a difference between what some legal systems call factual and legal causation. (Borghetti Decl. ¶ 34) (Dkt. 77). The *Cour de cassation* sometimes suggests that the causation between fault and harm should be direct, but this requirement is not applied consistently. (Borghetti Decl. ¶ 34) (Dkt. 77). In effect, French courts enjoy great discretion in assessing causation and policy considerations play a great role in this assessment.[219] (Borghetti Decl. ¶ 34) (Dkt. 77).

While there are some cases in which causation was denied on the ground that the relationship between fault and harm was indirect, there are also many cases where French courts, including the *Cour de cassation*, have accepted the existence of a causal relationship between an event and the harm, even though the harm was quite remote from the fault. (Borghetti Decl. ¶ 35) (Dkt. 77). For example, it is now a well-established rule in caselaw that where the victim of a traffic accident must receive a blood transfusion and is given contaminated blood, the person liable for the traffic accident is also liable for the harm resulting from the transfusion of contaminated blood.[220] (Borghetti Decl. ¶ 36) (Dkt. 77). Likewise, the *Cour de cassation* has ruled that there was a causal link between the fault of the owner of a dangerous building, who had not taken sufficient measures to forbid access to that building, and the harm suffered by a teenager while playing in that building.[221] (Borghetti Decl. ¶ 36) (Dkt. 77).

---

[219] *See, e.g.*, M. Bacache-Gibeili, Les Obligations. La responsabilité civile extracontractuelle, 3rd ed., 2016, ¶ 501; J. Knetsch, Tort Law in France, 2021, ¶ 233.

[220] *See, e.g.*, Cour de cassation, Première chambre civile, 4 December 2001, n. 99-19.197, Bull. civ. I, n. 310.

[221] Cour de cassation, Deuxième chambre civile, 5 October 2006, n. 05-14.825. 7

The *Cour de cassation* has also accepted that the intervention of a decision by a third party between the fault and the occurrence of harm does not necessarily severe the causal relationship between these two elements. (Borghetti Decl. ¶ 37) (Dkt. 77). In one case, where a man had committed suicide three weeks after having lost his wife in an accident, out of despair, the Court held that the fault of the defendant that had caused the wife's death was also the cause of the husband's suicide.[222] (Borghetti Decl. ¶ 37) (Dkt. 77).

As a rule, the court's opinion on the defendant's moral wrongdoing is likely to have an impact on the assessment of causation: the greater the moral wrongdoing, the more willing a French court will be to accept the existence of causation between that wrongdoing and damage. (Borghetti Decl. ¶ 38) (Dkt. 77). Here, the relationship between the fault of Syria or Syrian agents and the terror attacks in Paris is not an immediate one. (Borghetti Decl. ¶ 39) (Dkt. 77). However, given the discretion French judges have when assessing causation, and given their greater willingness to accept the existence of a causal link when the defendant is guilty of clear moral wrongdoing, given the clear moral wrongdoings of Syria and Syria's agents, per Professor Borghetti, a French judge would likely accept the existence of a causal link between their faults and the death of Nohemi. (Borghetti Decl. ¶ 39) (Dkt. 77).

Under French law, all tortfeasors are jointly and severally liable to the victim, per article 1265(1) of the civil liability reform bill. (Borghetti Decl. ¶ 40) (Dkt. 77). The fact that the harm caused to Nohemi was not caused exclusively by Syria or Syria's agents would not prevent Syria from being fully liable for Nohemi' death, should causation between these faults and her death be accepted. (Borghetti Decl. ¶ 41) (Dkt. 77).

---

[222] Cour de cassation, Chambre criminelle, 24 November 1965, D. 1966. 104.

### *José Hernandez's Claim*

#### a. *Standing to Sue*

Under French law, stepparents have standing to sue when they suffer losses resulting from their stepchild's death or personal injury. (Borghetti Decl. ¶ 45) (Dkt. 77). There is no doubt that, under French law, José Hernandez has standing to sue and claim compensation for the losses he suffered due to Nohemi's death. (Borghetti Decl. ¶ 46) (Dkt. 77).

The Court will enter judgments of liability for José Hernandez against the Defendant consistent with the above findings of fact and conclusions of law.

### *French Damages*

In cases of death or personal injury, a distinction should be made between harm, and the losses that flow from it. (Borghetti Decl. ¶ 47) (Dkt. 77). It is normally not the harm itself that gets compensated, but the losses resulting from it, which can be pecuniary or non-pecuniary. (Borghetti Decl. ¶ 47) (Dkt. 77). Under French law that compensable losses can be suffered by the primary victim or by persons sufficiently close to him so as to suffer losses which are direct consequences of the primary victim's harm. (Borghetti Decl. ¶ 47) (Dkt. 77). Persons claiming damages for losses flowing from the harm suffered by someone else are called indirect victims. (Borghetti Decl. ¶ 47) (Dkt. 77).

In 2005, a working group established by the French Ministry of Justice published a classification of the heads of losses that can arise in case of death or bodily injury, known as *nomenclature Dintilhac*.[223] (Borghetti Decl. ¶ 47) (Dkt. 77). The *nomenclature Dintilhac*

---

[223] J.-P. Dintilhac (ed.), *Rapport du groupe de travail chargé d'élaborer une nomenclature des préjudices corporels* (*nomenclature Dintilhac*), available at https://www.vie-publique.fr/ rapport/28092-rapport-du-groupe-de-travail-charge-delaborer-une-nomenclature-des-prej     (last accessed 12/21/21).

enumerates the heads of pecuniary and non-pecuniary losses that may be suffered by the primary victim, as well as those that may be suffered by indirect victims. (Borghetti Decl. ¶ 47) (Dkt. 77). While the *nomenclature* has no official value, it has been widely adopted by French courts, and the *Cour de cassation* even requires lower courts to use it in certain circumstances.[224] (Borghetti Decl. ¶ 47) (Dkt. 77). Courts are free to identify new heads of loss not mentioned by the *nomenclature*. (Borghetti Decl. ¶ 47) (Dkt. 77).

Relatives of the dead primary victim can seek pecuniary losses, including funeral expenses, loss of income and various other costs (such as transportation and housing costs that the indirect victims may have incurred following the primary victim's death). (Borghetti Decl. ¶ 48) (Dkt. 77). Non-pecuniary losses include emotional harm. (Borghetti Decl. ¶¶ 48-49) (Dkt. 77). Emotional harm is intended to capture the moral pain and suffering that the claimant experiences due to the primary victim's death. (Borghetti Decl. ¶ 49) (Dkt. 77). When that death causes more than grief and directly results in an alteration of the claimant's medical condition, for example when the claimant suffers a depression, that alteration constitutes itself a new personal injury, the consequences of which, both pecuniary and non-pecuniary, must be compensated by the defendant liable for the primary harm. (Borghetti Decl. ¶ 49) (Dkt. 77).

Here, Plaintiffs presented Dr. Strous' declaration and José's declaration regarding the psychological trauma he suffered due Nohemi's death. (Dkt. 82, Ex. DD, 84). José learned Nohemi was murdered by terrorists when her boyfriend, Tim, came into Beatriz's hair salon and asked to speak to José at the back of the hair salon. (Dkt. 84). Tim told José that Nohemi was dead. (Dkt. 84). José was in shock, as Nohemi was like a daughter to him. (Dkt. 84). José took Beatriz from

---

[224] Cour de cassation, deuxième chambre civile, 28 February 2013, no. 11-21015, Bull. civ. II, no. 48.

the front of her hair salon and brought her to the back of the salon and told Beatriz that Nohemi had an accident and she needed to prepare for the worst. (Dkt. 84). Tim told Beatriz that Nohemi was dead. (Dkt. 84). Beatriz became hysterical and started hitting José in his chest to relieve her pain. (Dkt. 84). Beatriz threw herself on the ground crying uncontrollably. (Dkt. 84). In the days, weeks, months and years after Nohemi's death, José has supported his wife and suppressed his own emotional anguish from Nohemi's death. (Dkt. 84). When the FBI and other government officials reached out to Beatriz, José managed those matters on her behalf, as well as the media contacts. (Dkt. 84). Beatriz was too distraught to deal with the large number of journalists and José declined media requests. (Dkt. 84). Beatriz simply was unable to manage these tasks relating to Nohemi's death, they are far too painful. (Dkt. 84). To this day, José tries to address any questions, including regarding legal matters, on behalf of Beatriz because she becomes emotional when she has to talk about the loss of Nohemi. (Dkt. 84).

José had a very close relationship with Nohemi as Nohemi was happy that her mother met someone that made her happy. (Dkt. 84). Nohemi would often thank José for caring for her mother. (Dkt. 84). Nohemi often invited José to join her and Beatriz on outings. (Dkt. 84). Just having Nohemi around made Beatriz happy. (Dkt. 84). Nohemi treated José like a father, and this is why it was so painful to lose such a special young lady. (Dkt. 84). Beatriz became a "zombie" for years after Nohemi's murder and has not returned to herself. (Dkt. 84). After Nohemi's death, José had difficulty sleeping for weeks and ate more to calm himself. (Dkt. 82, Ex. D, 84). Therefore, José gained a great deal of weight since the terror attack. (Dkt. 82, Ex. D, 84). Due to his grief, José saw a psychologist for several weeks after Nohemi's death. (Dkt. 82, Ex. D, 84).

Dr. Strous opines that José has persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder. (Dkt. 82, Ex. D). Dr. Strous expects José's mood

and grief issues that affect his functioning to continue to affect him in the long term. (Dkt. 82, Ex. D).

To calculate damages, French law uses the full compensation rule, whereby damages awarded to the claimant must compensate the harm he suffered, without his getting any poorer or richer from it.[225] (Borghetti Decl. ¶ 50) (Dkt.77). Damages must compensate for the damage in full, and nothing but the damage. (Borghetti Decl. ¶ 50) (Dkt. 77). Therefore, the assessment of damages is an issue of fact, which must be decided by lower courts. (Borghetti Decl. ¶ 52) (Dkt. 77). It cannot be reviewed by the *Cour de cassation*, which only reviews issues of law. (Borghetti Decl. ¶ 52) (Dkt. 77). This means that lower courts have full discretion in assessing the actual losses suffered by the claimant and in setting the amount of damages. (Borghetti Decl. ¶ 52) (Dkt. 77). Only if lower judges openly violate the full compensation rule, for example by awarding explicitly a lump sum instead of measuring the actual loss suffered by the claimant, can their decision be subject to review. (Borghetti Decl. ¶ 52) (Dkt. 77).

French lower courts usually do not disclose the elements they take consider when assessing non-pecuniary losses. (Borghetti Decl. ¶ 53) (Dkt. 77). However, Dr. Borghetti observes that if one looks at the amounts awarded in different cases, the following elements seem to be relevant to the courts when setting damages for emotional suffering:

1. The actual closeness between the deceased and the claimant—This appears to be the main factor taken into account by the courts. It is not cohabitation as such that is decisive, nor the degree of kinship, but the actual impact of the primary victim's death on the life of the claimant. Some authors express this by saying that damages

---

[225] *See, e.g.*, Cour de cassation, deuxième chambre civile, 8 July 2004, no. 02-14854, Bull civ II, no. 393: "Les dommages-intérêts alloués à une victime doivent réparer le préjudice subi sans qu'il résulte pour elle ni perte ni profit".

should be proportional to the disruption that the primary victim's death has caused in the claimant's life.[226] It is therefore not just about grief, but about the extent to which the claimant saw his life changed, or even turned upside down, by that death.

2.    The circumstances of the primary victim's death—The more tragic and violent the death, the greater the emotional suffering of the relatives is likely to be. The Primary victim's age, though probably not a decisive circumstance as such, may also play a role in this respect since, as a rule, the younger the victim and the more shocking her death, the greater the damages.

(Borghetti Decl. ¶ 53) (Dkt. 77).

Here, José has clearly suffered emotionally, per Dr. Strous. (Dkt. 82, Ex. D). He had a good relationship with Nohemi and considered her to be like a daughter. (Dkt. 88). Nohemi was a young woman studying abroad in an effort to better herself and her life was abruptly and violently cut short by a terrorist. (Dkt. 85). In *Fields*, 2021 WL 9244135, at * 10-12, 14-15, the Court noted that the governing law in France allows for the assessment of damages using the *Heiser* range. The Court in *Fields* relied upon the legal expert declaration of Henri Daudet who noted that moral damages can be adjusted based on the circumstances of the case. *See* Dkt. 16-4 in *Fields*. (Dkt. 98, Ex. 12). In *Oveissi*, 768 F. Supp. 2d 16, 24-27, the Court applied the *Heiser* range to a French solatium claim. In light of the violent circumstances of Nohemi's death and her relationship with José, the Court will grant José Hernandez $2,500,000 in solatium damages.

---

[226] Y. Lambert-Faivre & S. Porchy-Simon, *Droit du dommage corporel. Systèmes d'indemnisation*, 6th ed., 2009, ¶ 201.

*Turkish Law*

Plaintiffs retained Dr. N. Can Isiktac[227] as an expert in Turkish tort law to prepare a declaration ("Isiktac Decl.") regarding the potential claims against Syria by Pnina Greenfield, Yoseff Goldman, Tamar Choresh's estate and Israel Gorenzky. (Dkt. 80).

A.     *Liability*

Turkey is a civil law country that adopted the Swiss Civil Code. (Isiktac Decl. 10) (Dkt. 80). Under Turkish law, the monetary claims related to wrongful death, personal injury and related torts are all codified under Turkish Code of Obligations. (Dkt. 80). Articles related to torts can be found between Articles 49 to 76 and death and personal injury are under Articles 53 and 54. (Isiktac Decl. ¶ 11) (Dkt. 80). Codification related to torts are also supported with Turkish high courts' precedents. (Isiktac Decl. ¶ 11) (Dkt. 80).

The torts are defined under Article 49 of the Turkish Obligations Code ("TOC") as: "person[228], who cause damage and loss to another person by culpable and unlawful action, is obliged to compensate his damage or loss. Even if there is not a legal rule to prohibit the detrimental action, person who deliberately cause damage or loss to another person by an immoral act, is also obliged to compensate this damage or loss." (Isiktac Decl. ¶ 12) (Dkt. 80). The claims to be raised according to Turkish law can be divided into two categories. (i) The claims to be raised by people that are directly affected from the tort and (ii) the claims of people that were deprived of the support of the victim that lost his life due to the tort. (Isiktac Decl. ¶ 13) (Dkt. 80). For tort claims to be legally acceptable, the rule is "the party who has been damaged is obliged to prove

---

[227] The Court finds Dr. Isiktac is a qualified expert in his field and that his expert testimony is relevant to the issue in this case.

[228] Meaning of the term "*person*" include legal entities as well as real persons.

the damage and the fault of the other party who has caused the damage" according to Article 50/1 of the TOC. (Isiktac Decl. ¶ 14) (Dkt. 80).

The judge may reduce the compensation due to (i) the other party's fault or partake in the arising or increase of the damage and/or (ii) if compensation of a damage would put the responsible party in poverty. (Isiktac Decl. ¶ 15) (Dkt. 80). Regarding the latter, since the defendant is a sovereign country poverty reduction is not possible. (Isiktac Decl. ¶ 15) (Dkt. 80). Regarding the fault reduction, in this case, Dr. Isiktac is certain that no elaboration is needed to prove the 100% fault of the person who committed the attack. (Isiktac Decl. ¶ 15) (Dkt. 80). Also, it is obvious that the victims did not partake in the tort. (Isiktac Decl. ¶ 15) (Dkt. 80). Thus, Dr. Isiktac does not see a reason a reduction would be made from the compensation to be calculated under Turkish law. (Isiktac Decl. ¶ 15) (Dkt. 80).

Defendant not being directly the committing party but instead being an alleged sponsor of such hideous action, on the other hand, needs to be analyzed from a torts theory perspective and will be done below. (Isiktac Decl. ¶ 16) (Dkt. 80). Syria's obligation being indirect does not change the fault ratio being 100%. (Isiktac Decl. ¶ 16) (Dkt. 80).

### 1. *Standing*

There is no doubt that persons directly affected by the tortious act and (if they are deceased) their successors can sue in Turkey since the tort took place in Turkey.[229] (Isiktac Decl. ¶ 26) (Dkt. 80).

---

[229] Article 16 of Civil Procedure Code (Code no.6100) with the reference of Article 40 of International Private and Civil Procedure Law (Code no. 5718).

## 2.    *Chances of Prevailing in a Turkish Court*

The Constitutional Court of Turkey accepts individual applications regarding the right to fair trial, respect for family life, personal liberty, and security etc. (Isiktac Decl. ¶ 32) (Dkt. 80). The Constitutional Court's decisions have a strong tendency to seek effective examination and compensation for cases where there is a breach of right to live.[230] (Isiktac Decl. ¶ 33) (Dkt. 80). In a directly relevant case, a terror attack victim, Cemal Uçar, was severely injured and the vehicle he was driving was damaged beyond repair by a C-4 explosive planted by a terrorist group called PKK. (Isiktac Decl. ¶ 33) (Dkt. 80). After claiming his damages from first instance courts and latter at appeal he found the court's decision unsatisfying and in breach of his basic rights and liberties and applied to the Constitutional Court as an individual applicant[231] for retrial. (Isiktac Decl. ¶ 33) (Dkt. 80). The Constitutional Court's decision established that (i) a victim can make claims in line with the general principles of torts, (ii) can make solatium claims;[232] and (iii) ruled a retrial. (Isiktac Decl. ¶ 33) (Dkt. 80).

Dr. Isiktac opines that the Constitutional Court's precedent demonstrates that claims of injured people and people who are deprived from support of the dead have a strong chance to prevail. (Isiktac Decl. ¶ 34) (Dkt. 80). Regarding the case of claimants who were not directly affected with the attack and have a rather distant relationship with the victim, must prove their

---

[230] Sample cases: Constitutional Court: Application no: 2017/19418, Applicant: Sibel Çapraz; Application no: 2017/15128, Ümmühan Seçil Sucu; Application no: 2018/6183, Applicant: Tochukwu Gamaliah Ogu; Application no: 2018/35775, Applicant: Mehmet Köktaş, Application no: 2018/22085, Applicant: Hasan Kılıç etc.

[231] Constitutional Court: Application no: 2015/9608, Applicants: Cemal Uçar and İbrahim Uçar.

[232] First instance courts overruled applicants claims for solatium, but the Constitutional Court found that in breach of the right to access to a justice and against the constitution.

deprivation of support and/or emotional damages so that their claims could be accepted. (Isiktac Decl. ¶ 34) (Dkt. 80).

From a Turkish law perspective, the person who committed the attack, Mehmet Öztürk, is responsible. (Isiktac Decl. ¶ 35) (Dkt. 80). As for Syria, the liability of a state is a matter that related to national and international law. (Isiktac Decl. ¶ 35) (Dkt. 80). Under international law, if a sovereign state acts unlawfully against another it shall be held liable.[233] (Isiktac Decl. ¶ 36) (Dkt. 80). The grounds for such liability could arise from an international agreement or a tort. (Isiktac Decl. ¶ 36) (Dkt. 80). If certain conditions are satisfied, the state where the unlawful act took place or a state whose act transcended its borders and harmed a citizen of another state may be held internationally liable. (Isiktac Decl. ¶ 36) (Dkt. 80). Such liability shall be to compensate for the damages, or in other words civil liability. (Isiktac Decl. ¶ 36) (Dkt. 80).

**Responsibility of states from the terrorist activities**: A state is responsible for the actions of its organs and persons or authorities that are legally bound to it.[234] (Isiktac Decl. ¶ 37) (Dkt. 80). Article 4 of the draft articles on *Responsibility of States for Internationally Wrongful Acts,*[235] adopted by the International Law Commission in 2001 states:

> 1.    **The conduct of any State organ shall be considered an act of that State under international law**, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.

---

[233] Shaw, Malcom N., International Law, Cambridge University Press, 2021, p. 677 ff.

[234] Barnidge, Robert P, *Due Diligence Principle Under International Law*, International Community Law Review, Vol. 8, 2006, p. 86.

[235] International Law Commission, Draft Articles on Responsibility of States for Internationally Wrongful Acts, November 2001, Supplement No. 10 (A/56/10), chp.IV.E.1, available at: https://www.refworld.org/docid/3ddb8f804.html (last accessed May 25, 2023).

2.      An organ includes any person or entity which has that status in accordance with the internal law of the State.

*Id.* Therefore, if a terrorist act is committed by a person who has *de jure* relation with a state, the state will be responsible for that terror act.[236] (Isiktac Decl. ¶ 37) (Dkt. 80). In the Istanbul attack the person that committed the act does not have a *de jure* connection. (Isiktac Decl. ¶ 38) (Dkt. 80). But instead, by accepting the actions and/or through controlling or managing the private persons that committed the act, Syria established a *de facto* connection with the act. (Isiktac Decl. ¶ 38) (Dkt. 80). In this case, the person who committed the act is considered to be acting on behalf of the state, or in other words a *de facto* agent of Syria. (Isiktac Decl. ¶ 38) (Dkt. 80). This concept is explained under Articles 8 and 11 of the *Responsibility of States for Internationally Wrongful Acts* text.

Article 8 is as follows:

The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons **is in fact acting on the instructions of, or under the direction or control of, that State** in carrying out the conduct.

*Id.* And Article 11 is as follows:

Conduct which is not attributable to a State under the preceding articles shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.

*Id.* The articles indicate that, if its involvement is proven, Syria should be held responsible for the acts that are committed by private parties that are *de facto* controlled/managed/supported by the state and/or acts that the state acknowledges and adopts the conduct in question as its own. (Isiktac

---

[236] Conderelli, Luigi, *The Imputability to States of Acts of International Terrorism*, Israel Yearbook on Human Rights, Vol. 19, Tel Aviv University, Martinus Nijhoff Publications; Dupuy, Pierre—Marie, "State Sponsors of Terrorism: Issues of International Responsibility, Enforcing International Law Norms Against Terrorism, Andrea, Bianchi (Edit.), Hart Pub., Oxford, 2004.

Decl. ¶ 39) (Dkt. 80). A subtle acknowledgement would fulfill this condition. (Isiktac Decl. ¶ 39) (Dkt. 80).

Under international law, there are two liabilities for the sovereign states. (Isiktac Decl. ¶ 40) (Dkt. 80). First is to prevent similar terrible acts to be committed and the second is to compensate for the damages (that shall be a monetary compensation) related to those acts. (Isiktac Decl. ¶ 40) (Dkt. 80). Only the latter is relevant to this case. (Isiktac Decl. ¶ 40) (Dkt. 80). Accepting Dr. Gartenstein-Ross' declaration as fact, then by supporting the terrorist organization that committed the Istanbul attack, Syria can be held liable according to international law and Turkish law's understanding of it. (Isiktac Decl. ¶ 41) (Dkt. 80).

**Immunity from Jurisdiction**: Since this case is filed in a U.S. court, Turkish law or the authority of Turkish courts does not need to be analyzed here regarding the immunity of a sovereign state from jurisdiction. (Isiktac Decl. ¶ 42) (Dkt. 80).

The Court will enter judgments of liability for Tamar Choresh's estate, Israel Gorenzky, Yoseff Goldman and Pnina Greenfield against the Defendant consistent with the above findings of fact and conclusions of law.

### 3.    *Damages*

Under Turkish law the only claimable damages are real damages and generally enrichment via compensation is not accepted under Turkish law. (Isiktac Decl. ¶ 17) (Dkt. 80). Solatium damages may be considered as an exception to that principle, but solatium damages in Turkey are not high, compared to other jurisdictions, especially the U.S. (Isiktac Decl. ¶ 17) (Dkt. 80). The reason for that is Article 50/2 of the TOC, which states "[i]f the measure of the damage cannot be exactly proved, the judge determines the measure of the damage according to equity by considering the normal course of events and precautions taken by the injured party." (Isiktac Decl. ¶ 17) (Dkt.

80). Due to the wording of the article, (i) the compensation of the real measure of the damage must be decided, (ii) if such determination is not possible, then the judge shall order a compensation by the assessment of the damage considering the equity and precautions taken by the injured party. (Isiktac Decl. ¶ 17) (Dkt. 80). The judge will order compensation that is based on the expected *real damages*. (Isiktac Decl. ¶ 17) (Dkt. 80). Punitive damages are not available under Turkish law. (Isiktac Decl. ¶ 17) (Dkt. 80).

Claims related to death can be made by successors of the deceased and persons deprived from his support. (Isiktac Decl. ¶ 20) (Dkt. 80). According to article 53 of TOC the damages related to death are: (i) "funeral expenses," (ii) "medical treatment expenses and losses resulting from decline or loss of the work ability," (if death did not occur immediately) and (iii) "losses of individuals who are deprived of support of dead because of that." (Isiktac Decl. ¶ 19) (Dkt. 80). Medical expenses and funeral expenses are simpler to calculate, and they are the exact amount, plus interest, of such expense. (Isiktac Decl. ¶ 20) (Dkt. 80). In case of death, the successors cannot make an emotional damages claim on behalf of deceased person's estate. (Isiktac Decl. ¶ 21) (Dkt. 80). However, if the situation fulfils the conditions required by the law, inheritors or persons that deprived of a deceased person's financial and/or emotional support can make their own emotional damages claims.[237] (Isiktac Decl. ¶ 21) (Dkt. 80).

Claims arising from damages related to personal injury are: (i) medical treatment expenses, (ii) losses of future income, (iii) losses occurred from decline or loss of work ability, and (iv) losses occurred from collapsing of economic future. (Isiktac Decl. ¶ 22) (Dkt. 80). Moreover, the injured may raise emotional damage claims for the pain and suffering that they had to go through. (Isiktac Decl. ¶ 22) (Dkt. 80). Medical treatment expenses are real damages occurred due to medical

---

[237] *See* ¶¶ 65-70.

treatment, which would include anything that is related to medical treatment of the damage from the tortious act. (Isiktac Decl. ¶ 23) (Dkt. 80). The judge may order damages for future medical treatment expenses if the treatment needs to continue. (Isiktac Decl. ¶ 23) (Dkt. 80). All these damages must be provable damages. (Isiktac Decl. ¶ 23) (Dkt. 80).

It is hard to calculate emotional damages. (Isiktac Decl. ¶ 25) (Dkt. 80). The wording of the Article 56 of TOC is "[i]n case of damages to body integrity, the judge may decide an amount of money as an emotional damage, to be paid to injured party by considering circumstances of the situation." (Isiktac Decl. ¶ 25) (Dkt. 80). The wording seems to give room for the judge's consideration when determining a monetary amount for emotional damages. (Isiktac Decl. ¶ 25) (Dkt. 80). However, the judge must determine a monetary amount for emotional damage claims that would not enrich the claimant but somehow fairly compensates his emotional losses. (Isiktac Decl. ¶ 25) (Dkt. 80).

### 4. *Factors/Laws Used to Determine the Amount of Damages*

**Damages That Already Took Place Before an Official Claim is Made**: In case of death, funeral, and related expenses; in case of injury, medical expenses are claimable. (Isiktac Decl. ¶ 44) (Dkt. 80). The claims related to these should be proven by the claimant with a bill, proof of payment or similar document. *See* Articles 53, 54 and 55 of TOC. (Isiktac Decl. ¶ 44) (Dkt. 80).

**Future Damages of individuals deprived of support of a decedent:** Spouses and infant children are accepted as persons who are deprived of the support of a decedent. (Isiktac Decl. ¶ 53) (Dkt. 80). Other claimants need to prove their deprivation of the support of the decedent. (Isiktac Decl. ¶ 53) (Dkt. 80). For instance, if the decedent was sending a certain amount of money yearly to his nephew for his college studies the nephew may claim the total money he was expecting to get until his graduation. (Isiktac Decl. ¶ 54) (Dkt. 80).

**Intangible Claims (Emotional Damages/Solatium Damages):** Damages related to psychological injury, emotional harm, etc. fall under this category. (Isiktac Decl. ¶ 61) (Dkt. 80). The reference article of the TOC is Article 56.

> **Article 56. –** "In case of damages to body integrity, the judge may decide an amount of money as an emotional damage, to be paid to injured party by considering circumstances of the situation.
>
> In case of major personal injury or death, the judge may rule that a reasonable monetary compensation to be paid as an emotional damage to the acquaintances of the harmed.

*Id.* In Dr. Isiktac's opinion, the article allows for the injured and the acquaintances of the injured or the dead to assert emotional damages claims according to Turkish law. (Isiktac Decl. ¶ 62) (Dkt. 80).

The Constitutional Court has found determining a monetary compensation amount for emotional damages claims is a difficult task.[238] (Isiktac Decl. ¶ 63) (Dkt. 80). The mere reason for compensations being monetary is that there is no other reasonable and humane tool other than money that can be used for relief.[239] (Isiktac Decl. ¶ 63) (Dkt. 80). Monetary compensation aims to provide a sort of relief to the harmed person.[240] (Isiktac Decl. ¶ 63) (Dkt. 80). Therefore, the judge should consider each claimant's situation and decide how they should be compensated so that their pain could be relieved, at least to a reasonable point. (Isiktac Decl. ¶ 64) (Dkt. 80). This gives large room for judicial discretion. (Isiktac Decl. ¶ 64) (Dkt. 80).

There are some widely accepted standards for determining emotional damages. (Isiktac Decl. ¶ 65) (Dkt. 80). Comparative fault of the claimant is seen as a reason for reduction.[241] (Isiktac

---

[238] Constitutional Court case no: 1968/33 E, date: 11.02.1969.

[239] Supra footnote.

[240] Supra footnote.

[241] Eroğlu Durkal, Ibid, p. 189.

Decl. ¶ 65) (Dkt. 80). The significance of the event[242] as well as the status and special condition of each of the claimants[243] must be taken into consideration. (Isiktac Decl. ¶ 65) (Dkt. 80). Here, the victims and claimants do not have any fault regarding the tortious action. (Isiktac Decl. ¶ 65) (Dkt. 80). There is no doubt that a terror attack that caused such damage is a significant event. (Isiktac Decl. ¶ 65) (Dkt. 80). Thus, there is no reason to deduct or dismiss the emotional damages claims of the claimants. (Isiktac Decl. ¶ 65) (Dkt. 80). Status and special condition of the claimants should be analyzed by the court and emotional damages must be determined accordingly. (Isiktac Decl. ¶ 66) (Dkt. 80).

### 5.    *Award Amount*

As for the amount of a potential award, Dr. Isiktac discussed in his declaration several Turkish cases filed against the Turkish government for its failure to protect its citizens lives from terror attacks where the Turkish government had no involvement whatsoever. (Isiktac Decl. ¶¶ 67-70) (Dkt. 80). In those cases, Turkey was held responsible due to its negligence. (Isiktac Decl. ¶¶ 67-70) (Dkt. 80). Here, considering the fault of Syria and how the attack took place are accepted criteria for determining an amount of compensation for emotional damages, Dr. Isiktac would expect a much higher compensation to be granted to victims if there was an involvement of Syria in the terror acts. (Isiktac Decl. ¶ 71) (Dkt. 80). Furthermore, there is a widely used precedent where the courts quote that the nature of emotional damages requires the consideration of the permanent injuries and health problems when determining the monetary compensation[244]. (Isiktac

---

[242] Eroğlu Durkal, Ibid, p.191,192.

[243] Eroğlu Durkal, Ibid, p.192, 193.

[244] Court of Cassation Assembly of Civil Chamber, case no: 1966/9-1267 E., date: 27.09.1967, Council of State 10th Chamber, case no: 1997/324 E., date: 12.10.1999, Eroğlu Durkal, Ibid, p.203.

Decl. ¶ 72) (Dkt. 80). If the Court decides the Syrian government was not only negligent but was involved in the Istanbul terror attack, the compensation would and should be much higher. (Isiktac Decl. ¶ 73) (Dkt. 80).

### *Application of Turkish Law to Plaintiffs' Claims*

**Pnina Greenfield:** Pnina is Ron's wife, and she was injured in the Istanbul attack. Pnina's solatium and emotional distress, mental anguish and physical pain and suffering claims do fall under emotional damages claims under Turkish law. (Isiktac Decl. ¶ 76) (Dkt. 80). Pnina, if applicable, also has claims for loss of income and medical expenses for her injuries but she must prove such damages. (Isiktac Decl. ¶ 76) (Dkt. 80). Since, Pnina did not take part in the attack and the attack is a significant event for the injured as well as society the emotional damages should be determined by the Court at a higher rate compared to other torts. (Isiktac Decl. ¶ 76) (Dkt. 80).

Plaintiffs presented the reports of Dr. Friedman and Dr. Strous, as well as Pnina's declaration regarding the trauma she suffered as a result of the terror attack. (Dkt. 79, Ex. D, 82, Ex. R, 107). On July 11, 2022, Dr. Friedman evaluated Pnina via telemedicine. (Dkt. 79 Ex. D). Pnina was on a food tour with Ron and her sister in Istanbul walking through the streets in March 2016. (Dkt. 79, Ex. D). She was walking slightly ahead of the group, walking backwards so that she was able to take photos of the group. (Dkt. 107). There was a large explosion. (Dkt. 107). Pnina heard a whistle, felt "little stones and wind near" her foot and then heard a boom. (Dkt. 79, Ex. D, 107). She felt a hot sensation in her left foot. (Dkt. 79, Ex. D, 107). Pnina went to a nearby small mall and found Ron there. (Dkt. 79, Ex. D, 107).

Pnina had shrapnel embedded in her left foot. (Dkt. 79, Ex. D, 107). Specifically, the head of a screw was lodged in her foot—the entry was in the middle of the foot and ended near the small toe. (Dkt. 79, Ex. D, 107). Pnina was taken by ambulance to a hospital where the wound was

irrigated. (Dkt. 79, Ex. D, 107). She was transferred back to Israel by an Israeli government plane. (Dkt. 107). She went from the airport to Sheba Medical Center at Tel Ha'Shomer, near Tel Aviv. (Dkt. 79, Ex. D, 107). Pnina was hospitalized for a week during which the shrapnel was removed. (Dkt. 79, Ex. D, 107). A vacuum assisted closure was used for wound healing, and she used it for a number of months. (Dkt. 79, Ex. D, 107). She received physical therapy at least twice a week for 3 to 4 months. (Dkt. 79, Ex. D, 107).

Pnina reported to Dr. Friedman that she walks with a limp of the left foot and is unable to run due to the limp. (Dkt. 79, Ex. D). Sometimes she gets swelling in the left foot. (Dkt. 79, Ex. D). Pnina experiences intermittent numbness in both legs for a few seconds. (Dkt. 79, Ex. D). Upon examination, when trying to stand one legged on the left, Pnina was unable to do so. (Dkt. 79, Ex. D). Her balance was poor and she was unable to maintain standing on one leg. (Dkt. 79, Ex. D). Pnina has a linear scar along the lateral left foot that she said is 2-3 cm. (Dkt. 79, Ex. D). Based on his exam, Dr. Friedman's diagnoses of Pnina is post shrapnel injury to the left foot, gait abnormality, balance deficit and scar—left foot. (Dkt. 79, Ex. D). Dr. Friedman's opinion is that Pnina's symptoms are causally related to the terror attack. (Dkt. 79, Ex. D). Due to the time since the injury and in light of Pnina's age, no significant improvement can be expected in the future. (Dkt. 79, Ex. D).

Pnina told Dr. Strous that she experienced a "strong blast" close to her and that she was thrown to the ground. (Dkt. 82, Ex. R). Pnina dealt with the trauma at the scene by having an "out of body experience." (Dkt. 82, Ex. R, 107). Pnina saw dead members of her tour group and pieces of bones and body parts on the ground. (Dkt. 82, Ex. R, 107). An ambulance took her and Ron to the hospital and when they arrived at the hospital, Pnina noticed a pool of her blood on the ambulance's floor. (Dkt. 82, Ex. R, 107).

Pnina and Ron were initially in wheelchairs and they both were in pain. (Dkt. 82, Ex. R, 107). Over time, Pnina became more irritable, and she lost all patience. (Dkt. 82, Ex. R, 107). This affected her relationship with Ron, her family, and friends. (Dkt. 82, Ex. R, 107). Before the attack they both had active lives. (Dkt. 82, Ex. R, 107). After the attack, they were in their apartment together 24 hours a day and this became a difficult and traumatic time for them. (Dkt. 82, Ex. R, 107). After the attack, Pnina experienced post-traumatic symptoms, including avoidance of crowds and speaking about the trauma, hypervigilance in public places, nightmares, hypersensitivity to loud noises and physiological responses, including palpitations and stress, when reminded of the attack. (Dkt. 82, Ex. R). Pnina also withdrew socially from family and friends after the attack. (Dkt. 82, Ex. R). Pnina treated with a psychiatrist, and she was prescribed medication for her mental state. (Dkt. 82, Ex. R). Pnina also received psychotherapy for several months after the attack. (Dkt. 82, Ex. R). Pnina finds less enjoyment in life then she did before the attack. (Dkt. 82, Ex. R).

Dr. Strous opines that Pnina suffers from PTSD and major depressive disorder, single episode, in partial remission. (Dkt. 82, Ex. R). Despite the treatment Pnina has received and the years that have passed, Dr. Strous expects Pnina's mood and anxiety issues that affect various areas of her functioning to continue to affect her for a long time. (Dkt. 82, Ex. R).

In light of Pnina's permanent physical injuries and severe psychological injuries due to the terror attack and given the lack of fault on Pnina's part for the attack, and to maintain consistency of awards in such cases amongst family members, per *Heiser* and *Wultz*, the Court will award Pnina Greenfield $5,000,000 in compensatory damages and $4,000,000 in solatium damages.

**Yoseff Goldman:** Yoseff is Nitzhia and Abvraham's son. He has a claim for deprivation of support and for emotional damages suffered due to Abvraham's death in the Istanbul terror

attack. (Isiktac Decl. ¶ 77) (Dkt. 80). He must prove the financial and emotional support of Abvraham to his life since he is over eighteen years old. (Isiktac Decl. ¶ 78) (Dkt. 80).

Plaintiffs presented Dr. Strous' report and Yoseff's declaration regarding the psychological trauma he suffered as a result of the murder of his father and the injuries his mother sustained in the attack. (Dkt. 82, Ex. Z, 114). When Yoseff learned of his father's murder, he was in shock and began to cry, but he wanted to write his father's eulogy right away to honor his father and keep his mind from falling apart, especially since Yoseff was diagnosed with bipolar disorder at age 15. (Dkt. 82, Ex. Z, 114). Yoseff's father was his best friend and his emotional rock. (Dkt. 82, Ex. Z, 114). Abvraham took care of Yoseff's rent and financial issues. (Dkt. 82, Ex. Z, 114). Yoseff was overcome with the thought of having to live without his father. (Dkt. 82, Ex. Z, 114). The sudden death of his father forced Yoseff to become more independent, but he still struggles. (Dkt. 82, Ex. Z, 114). Yoseff returned to work for the last few days of *shiva* so he could distract himself from the loss with busy work. (Dkt. 82, Ex. Z, 114). Yoseff decided to throw himself into his work for a year after his father's death until exhaustion. (Dkt. 82, Ex. Z, 114). Yoseff then met with his case worker and asked for a different type of work, assisting someone else in need, in an effort to try and help him cope with his father's death. (Dkt. 82, Ex. Z, 114). Despite being an assistant for the elderly, the pain Yoseff experiences due to the loss of his father has not lessened. (Dkt. 82, Ex. Z, 114).

Over the years since his father's death, Yoseff has withdrawn from his friends. (Dkt. 82, Ex. Z, 114). Yoseff has a recurring dream of sitting with his father at a restaurant, hugging his father and his father going out to sea after telling Yoseff that he loves him. (Dkt. 82, Ex. Z, 114). When Yoseff has a life decision to make or needs advice, he often thinks about what his father would tell him. (Dkt. 82, Ex. Z, 114). Because Yoseff struggles with his grief from losing his father, Yoseff has received grief counseling with therapists. (Dkt. 82, Ex. Z, 114).

Dr. Strous opines that Yoseff suffers from persistent complex bereavement disorder with traumatic bereavement and persistent depressive disorder; moderate severity, late onset, with pure dysthymic syndrome due to his father's murder. (Dkt. 82, Ex. Z). Dr. Strous expects Yoseff's anxiety, mood, and complicated grief issues affecting many areas of Yoseff's functioning to continue to affect him for a long time. (Dkt. 82, Ex. Z).

Dr. Strous' report demonstrates Yoseff's special vulnerable condition and his connection with and need for his father. (Dkt. 82, Ex. Z). The worsening of his mental and physical condition and all the changes in his life due to losing his father's emotional support should be considered while determining Yoseff's claims for deprivation of support. (Dkt. 82, Ex. Z). Additionally, Yoseff relied upon his father financially. (Dkt. 82, Ex. Z, 114). Accordingly, in light of the fact that Yoseff's father was his emotional rock and provided financial support to Yoseff, the Court will depart upward from the *Heiser* baseline, which the Court is utilizing as a reference to maintain consistent in award amounts among family members, and award Yoseff Goldman $6,000,000 in solatium damages.

**Israel Gorenzky:** Israel is Nitzhia's brother. Since Nitzhia survived the terror attack, Israel can only make emotional damages claims. (Isiktac Decl. ¶ 80) (Dkt. 80). Israel needs to prove his special connection with Nitzhia and Abvraham. (Isiktac Decl. ¶ 80) (Dkt. 80).

Plaintiffs presented Dr. Strous' report and Israel's declaration regarding the psychological trauma he suffered due to the murder of Abvraham and the injuries Nitzhia sustained in the terror attack. (Dkt. 82, Ex. CC, 113). On March 19, 2016, Israel heard on the news that there had been an attack in Istanbul. (Dkt. 82, Ex. CC, 113). He knew that Nitzhia and Abvraham were in Istanbul so he called Nitzhia. (Dkt. 82, Ex. CC, 113). Nitzhia answered the call in a hysterical state and told Israel that she had been injured and that her husband had been killed. (Dkt. 82, Ex. CC, 113). Israel was in shock and fell to the floor. (Dkt. 82, Ex. CC, 113). Nitzhia and Abvraham had a special

relationship and everyone in the family loved Abvraham. (Dkt. 82, Ex. CC, 113). Abvraham was the strong one in the family and the tragic nature of the sudden loss was huge. (Dkt. 82, Ex. CC, 113).

Israel met Nitzhia on her arrival from Turkey at the hospital. (Dkt. 82, Ex. CC, 113). Israel tried to support Nitzhia while keeping his own anxiety in check which was "boiling up inside him." (Dkt. 82, Ex. CC, 113). The weeks and months, which became years, after the loss became a difficult time for Israel. (Dkt. 82, Ex. CC, 113). Israel was very close to Abvraham and they used to spend a lot of time together. (Dkt. 82, Ex. CC, 113). Their families were very close with each other. (Dkt. 82, Ex. CC, 113). Abvraham was like a brother. (Dkt. CC, Ex. CC, 113). They respected each other a lot and did so much together, including close business interactions. (Dkt. 82, Ex. CC, 113).

The shock of Nitzhia being injured and becoming initially helpless and so reliant on others, as well as the sudden loss of Abvraham, led Israel to experience a "long chronic period of low mood, irritability and hypersensitivity." (Dkt. 82, Ex. CC, 113). Israel became an extreme "worrier", both regarding Nitzhia and his own family. (Dkt. 82, Ex. CC, 113). Israel used to visit Nitzhia every day for months after the attack. (Dkt. 82, Ex. CC, 113). Israel used to babysit Nitzhia's grandchildren and go with her to follow-up medical appointments. (Dkt. 82, Ex. CC, 113).

After the attack, Israel developed anxiety which became chronic over time. (Dkt. 82, Ex. CC, 113). This together with a chronic low mood lasted from the attack until now. (Dkt. 82, Ex. CC, 113). In mid-2019, Israel had a sudden neurological event in which he lost consciousness and was diagnosed with a CVA (cerebrovascular event). (Dkt. 82, Ex. CC, 113). Israel believes that the CVA that he had was as a result of the terror attack since he was so stressed and anxious. (Dkt.

82, Ex. CC, 113). The CVA affected him in several ways including his memory and mobility. (Dkt. 82, Ex. CC, 113).

Due to his depression, Israel was referred to a psychiatrist and took antidepressant medication for a year. (Dkt. 82, Ex. CC, 113). The medication did not help much, so Israel stopped taking it. (Dkt. 82, Ex. CC, 113). Because Israel was depressed after the attack, he had no interest in friendships anymore so he distanced himself from his friends. (Dkt. 82, Ex. CC, 113). Israel experienced PTSD symptoms post attack, including nightmares, avoidance of Turkey, dreams about Abvraham, refusal to swim in the sea anymore as he did that with Abvraham and tension when speaking about the attack and loss, along with stress. (Dkt. 82, Ex. CC). The family has never been the same since the attack and even at family gatherings the loss of Abvraham is felt. (Dkt. 82, Ex. CC, 113).

Dr. Strous opines that Israel suffers from persistent depressive disorder, moderate severity, late onset, with pure dysthymic syndrome and persistent complex bereavement disorder with traumatic bereavement. (Dkt. 82, Ex. CC). The court will rely upon *Heiser* to maintain consistent in awards among family members but depart upward from the *Heiser* baseline due to Israel's severe and continued psychological trauma and award Israel Gorenzky $3,000,000 in solatium damages.

**Tamar Choresh:** Tamar was Nitzhia's sister and she had a claim for emotional damages. (Isiktac Decl. ¶ 80) (Dkt. 80). Since Tamar has passed away, her son, Alon Horesh, has presented a declaration detailing the negative impact the terror attack had on his mother. (Dkt. 109). Alon and Nitzhia both spoke with Dr. Strous about the negative impact of the terror attack on Tamar and based on that conversation, as well as a review of Tamar's pertinent medical records, Dr. Strous issued a report regarding the psychological trauma Tamar experienced due to Abvraham's death and the serious injuries Nitzhia sustained in the attack. (Dkt. 82, Ex. DD).

Tamar grew up very close to her younger sister Nitzhia. (Dkt. 82, Ex. DD, 109). Tamar was for an extended period of time like a mother to Nitzhia. (Dkt. 82, Ex. DD, 109). They both married men with the same name. (Dkt. 82, Ex. DD, 109). Their families were very close over the years. (Dkt. 82, Ex. DD, 109). They would spend almost every weekend together with the weekly highlight of their interaction occurring on Friday nights to which everyone would look forward. (Dkt. 82, Ex. DD, 109). Nitzhia's husband, Abvraham was dynamic and charismatic. (Dkt. 82, Ex. DD, 109). Abvraham was very close to Tamar and her husband. (Dkt. 82, Ex. DD, 109). Abvraham was the person who kept everyone together and was the go-to person\ if anyone needed any help or advice in any matter. (Dkt. 82, Ex. DD, 109). When Tamar's husband died, Nitzhia and Abvraham became even closer to Tamar and they would spend hours and hours together. (Dkt. 82, Ex. DD, 109).

Alon told Dr. Strous that while his mother experienced depression after his father died, she was able to function and find happiness in spending time with family, exercising and sewing. (Dkt. 82, Ex. DD, 109). After Tamar became a widow, Abvraham and Nitzhia became Tamar's main support system. (Dkt. 82, Ex. DD, 109). Abvraham would take care of Tamar and be the principal source of advice and direction after her husband died. (Dkt. 82, Ex. DD, 109). Alon recalls his mother was against Nitzhia and Abvraham's trip to Turkey. (Dkt. 82, Ex. DD, 109). When his mother learned about the attack, she immediately called Nitzhia and learned Nitzhia was still lying on the ground at the scene of the attack. (Dkt. 82, Ex. DD, 109). Alon recalls his mother and Nitzhia were hysterical. (Dkt. 82, Ex. DD, 109). Alon's mother was devastated upon learning of Abvraham's death. (Dkt. 82, Ex. DD, 109). Alon remembers that his mother continued to worry about Nitzhia's wellbeing while she was in Turkey. (Dkt. 82, Ex. DD, 109). Tamar tried to give Nitzhia all the support and help that Nitzhia needed, thus turning the tables on the previous help and support that she had received from Nitzhia and Abvraham. (Dkt. 82, Ex. DD, 109).

Before the attack, Tamar was highly active, happy, and healthy, despite losing her husband. (Dkt. 82, Ex. DD, 109). After the attack, Tamar became depressed. (Dkt. 82, Ex. DD, 109). Long-term, Alon's mother was deeply affected and tormented by the tragedy. (Dkt. 82, Ex. DD, 109). Tamar's depression was severe and became treatment resistant. (Dkt. 82, Ex. DD, 109). Tamar began meeting with a psychiatrist and a psychologist. (Dkt. 82, Ex. DD, 109). Alon's mother had never been in such a severely depressed state ever in her life. (Dkt. 82, Ex. DD, 109). Alon noted that after the attack, his mother lost interest in social activities, stopped exercising and she was not sleeping so she started taking sleeping medication. (Dkt. 82, Ex. DD, 109). Alon's mother's appetite was also drastically affected and she lost a great deal of weight. (Dkt. 82, Ex. DD, 109). She stopped caring about her health. (Dkt. 82, Ex. DD, 109). Alon's mother remained at home, withdrawn, sad and tense. (Dkt. 82, Ex. DD, 109). In the case of any family event or celebration, Alon's mother had to be dragged along since she became resistant to participating in any activity outside her home. (Dkt. 82, Ex. DD, 109). Alon's mother's depression became so extreme that she would even express suicidal ideation. (Dkt. 82, Ex. DD, 109). In the last year of her life, Alon's mother expressed to him that she just wanted to go to heaven to be with his father. (Dkt. 82, Ex. DD, 109). Alon's mother's depression brought her to a place where her body failed her. (Dkt. 82, Ex. DD, 109). While his mother died from heart failure, Alon knows that this was all connected in some manner to her increasing depression since the attack. (Dkt. 82, Ex. DD, 109).

Nitzhia told Dr. Strous that Tamar was very much affected by the terror attack. (Dkt. 82, Ex. DD). Tamar gradually slid into a deep depression from which she never was able to recover. (Dkt. 82, Ex. DD, 116). After Nitzhia returned from Turkey, Tamar would visit Nitzhia daily in the hospital and bring food for her. (Dkt. 82, Ex. DD, 116). This was not easy for Tamar since she had a long bus ride she had to take to get to the hospital. (Dkt. 82, Ex. DD, 116). Tamar would help Nitzhia with all her needs in the hospital and feed her. (Dkt. 82, Ex. DD, 116). Tamar would

also try and comfort Nitzhia even though Nitzhia could see how devastated Tamar was from the loss of Abvraham and from seeing how much Nitzhia was affected physically with her injuries. (Dkt. 82, Ex. DD, 116). Even after Nitzhia returned home, Tamar continued to visit her almost every day. (Dkt. 82, Ex. DD, 116).

Nitzhia witnessed how Tamar became increasingly depressed. (Dkt. 82, Ex. DD, 116). While Tamar was affected by the loss of her own husband ten years prior to the attack and was somewhat down for some time as a result, nothing came close to how she reacted after the sudden loss of Abvraham in a terror attack. (Dkt. 82, Ex. DD, 116). Tamar loved Abvraham very much and they were all very close. (Dkt. 82, Ex. DD, 116). Abvraham was like the father of the family and his sudden death was traumatic to Tamar. (Dkt. 82, Ex. DD, 116). Nitzhia stated that Tamar's low mood affected her physically as well. (Dkt. 82, Ex. DD, 116). After the attack, Tamar gave up so much in her life, including caring for herself physically, sewing, exercising and social activities. (Dkt. 82, Ex. DD, 116). Tamar weakened and declined to the deteriorated physical state she was in at the end of her life. (Dkt. 82, Ex. DD, 116). Nitzhia feels that Tamar just gave up. (Dkt. 82, Ex. DD, 116). This was all a marked change from the dynamic, caring, extroverted, outgoing and happy person Tamar used to be before the attack. (Dkt. 82, Ex. DD, 116).

Dr. Strous in his report summarizes Tamar's medical records that span several years and reveal a diagnosis of anxiety and depression and list various medications for depression with a poor response to the anti-depressants, as well as a prescription to help Tamar sleep. (Dkt. 82, Ex. DD). Those medical notes document the terror attack that injured Nitzhia and killed Abvraham and noted that a psychiatrist was treating Tamar. (Dkt. 82, Ex. DD). The medical notes document Tamar's thoughts about death, low motivation, and her withdrawal from society. (Dkt. 82, Ex. DD).

According to medical notes, Tamar had been suffering from depression prior to the attack and carried a diagnosis of "Depressive Disorder" dated 03/07/2008. (Dkt. 82, Ex. DD). This diagnosis was updated again on 23/10/2015 to "Anxiety and Depression." (Dkt. 82, Ex. DD). It thus appears, per Dr. Strous, that Tamar was suffering from depression prior to the attack that was treated with medication. (Dkt. 82, Ex. DD). However, the depression did not interfere with Tamar's function, and she continued to participate and function in all activities. (Dkt. 82, Ex. DD). However, after the attack, per Dr. Strous, Tamar was markedly affected and her depression worsened. (Dkt. 82, Ex. DD). It appears that Tamar "fell apart" and her function deteriorated significantly. (Dkt. 82, Ex. DD). Attempts to treat Tamar failed and she tried several different medications without success. (Dkt. 82, Ex. DD). Tamar died from heart failure accompanied by deep sadness and depression. (Dkt. 82, Ex. DD). Tamar was never able to find any relief from her depression and she spent her final days suffering from a deep depression. (Dkt. 82, Ex. DD).

The Court will use *Heiser* as a reference in determining the amount of damages to award Tamar Choresh's estate and will depart upward from the baseline award for several reasons. Abvraham was very close to Tamar and Tamar relied heavily on him after her own husband died. In fact, her sister Nitzhia and Abvraham before their trip to Istanbul spent a lot of time with Tamar, especially after her husband passed away. Due to their close relationship, Abvraham's death caused Tamar to spiral into a deep depression from which she never recovered at the time of her death, along with the fact that Abvraham and Nitzhia were Tamar's stability after the death of her own husband and that stability was shattered with the terror attack that killed Abvraham and severely injured her sister Nitzhia. Based on the record, the Court will award Tamar Choresh's estate $3,000,000 in solatium damages.

## **CONCLUSION**

Erez Orbach was murdered by a terrorist that used a truck as a weapon. Erez was only twenty years old when his life was cut short unexpectedly. His parents and siblings were devastated when they learned of his murder. Erez's family tries its best to move forward but they will never get over his death. Eytan Rund was also a victim of the Jerusalem attack. While Eytan recovered from his physical injuries sustained in the terror attack, he continues to struggle with his emotional injuries from the attack. Eytan, his wife and their children continue to struggle as a family to this day.

Abvraham and Nitzhia Goldman were on a vacation in Turkey when a terrorist blew himself up right next to their tour group. While Nitzhia sustained serious permanent physical injuries in the bombing, she witnessed her husband die. The death of Abvraham was a tragic event for which money can never compensate his family. Abvraham's murder forever changed the family with severe and long-lasting effects, and the resultant emotional trauma can also never be fully compensated. Ron and Pnina Greenfield survived the Istanbul suicide bombing but sustained physical and emotional injuries from which they still struggle to overcome. Their children have emotional scars from the attack and its aftermath as well.

The death of Nohemi Gonzalez in Paris while studying abroad shattered her family. Nohemi was a kind and hardworking young woman with a bright future that was tragically and abruptly cut short. Nohemi's family was immensely proud of her and they very much looked forward to seeing her fulfill her dreams.

The death of Alexander Pinczowski at the Brussels airport devastated Cameron. Cameron and Alexander had a loving marriage that was abruptly cut short. James and Helen provided the love and support Cameron needed in the days, weeks, months, and years that have followed

Alexander's murder, but seeing Cameron emotionally tortured by Alexander's death has taken its emotional toll on James and Helen.

In light of the entire record, the Court finds that Syria provided material support to the ISIS and facilitated the murder of Alexander Pinczowski, Abvraham Goldman, Erez Orbach and Nohemi Gonzalez and facilitated the infliction of bodily injuries upon Ron Greenfield, Pnina Greenfield, Eytan Rund and Nitzhia Goldman. Damages will be awarded in accordance with these findings.

When a state such as Syria chooses to use terror as a policy tool that state forfeits its sovereign immunity and deserves unadorned condemnation. Barbaric acts like those alleged in this action have no place in civilized society and represent a moral depravity that knows no bounds. In stark contrast to the terrorist thugs and their Syrian sponsors stand the courageous Plaintiffs in this action, who have resolved to fight injustice with whatever tools are at their disposal, and their patient determination in this case is a credit to both them and to the memory of their decedents. This Court hopes that the Plaintiffs may take some measure of solace in this Court's final judgment.

Dated: Raleigh, North Carolina
       May 30, 2023

_June 28, 2023_
DATED

_Terrence W. Boyle_
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE